18–1049

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ALFONSO CIOFFI, MELANIE ROZMAN, MEGAN ROZMAN, MORGAN ROZMAN,
*Plaintiffs–Appellees*

v.

GOOGLE LLC,
*Defendant–Appellant*

---

On appeal from the United States District Court for the Eastern District of Texas
in No. 2:13-cv-00103-JRG, Chief Judge J. Rodney Gilstrap

---

## NON-CONFIDENTIAL OPENING BRIEF OF APPELLANT GOOGLE LLC

---

Nathan K. Kelley
PERKINS COIE LLP
700 13th Street, N.W, Suite 800
Washington, D.C. 20005
Phone: (202) 654–3343
E-mail: NKelley@perkinscoie.com

Darin W. Snyder
David S. Almeling
Luann L. Simmons
Mark Liang
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Phone: (415) 984–9700
E-mail: dsnyder@omm.com

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, New Hampshire 03755
Phone: (602) 351–8250
E-mail: DBagatell@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 E. Main Street, Suite 201
Madison, Wisconsin 53703
Phone: (608) 663–7492
E-mail: ADufresne@perkinscoie.com

Counsel for Appellant Google LLC

May 16, 2022

## PATENT CLAIMS AT ISSUE

**RE43,500 claim 43 (dependent from claims 41 and 42):**

41. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on a portable computer and communication device capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space, the portable computer and communication device including a network interface device configured to exchange data across a network of one or more computers using a wireless connection, and an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process, configured to:

open the first web browser process within the common operating system, wherein the first web browser process is capable of accessing data of a website via the network and accessing data contained in the first memory space;

open the second web browser process within the common operating system on command from the first web browser process, wherein the second web browser process is capable of accessing data contained in the second memory space and is further capable of generating data;

pass data from the first web browser process to the second web browser process; and

process data from the second web browser process;

wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

42. The computer program product of claim 41 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.

43. The computer program product of claim 42 wherein the program code stored in the non-transitory computer readable medium is further configured to download data from the network and pass the downloaded data from the first web browser process to the second web browser process.

**RE43,528 claim 5 (dependent from claim 1):**

1. A method of operating a computer system capable of exchanging data across a network of one or more computers and having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising:

executing a first web browser process, capable of accessing data of a website via the network, in a first logical process within the common operating system using the

first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space;

executing a second web browser process in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space; and

displaying data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to a display;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

5. The method of claim 1 wherein the first and second electronic data processors are part of a multi-core electronic data processor.

**RE43,528 claim 67 (dependent from claim 64):**

64. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device configured to exchange data across a network of one or more computers and access at least one website, configured to:

store at least one system file within the first memory space;

open a first web browser process, capable of accessing data of the at least one website via the network, in a first logical process, the first logical process being configured to access data contained in the first memory space;

open a second web browser process in a second logical process, the second logical process being configured to access data contained in the second memory space; and

pass data from the first web browser process to the second web browser process, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

67. The computer program product of claim 64 wherein the first web browser process is capable of directly exchanging data with the network interface device and the second web browser process or the second web browser process is capable of directly exchanging data with the network interface device and the first web browser process.

**RE43,529 claim 49 (dependent from claim 36:**

36. A method of operating a portable computer based system employing a common operating system and configured with a first memory space and a second protected memory space and at least one electronic data processor, comprising:

storing at least one system file within the first memory space;

downloading website content potentially containing malware from a network of one or more computers using a secure web browser process, wherein the secure web browser process is configured to execute on the at least one electronic data processor, and comprises a first web browser process and at least one second protected web browser process, the first web browser process and the at least one second protected web browser process being configured to access the website content via the network of one or more computers;

executing instructions in the first web browser process, wherein the first web browser process is configured to access data contained in the first memory space and to initialize the at least one second protected web browser process;

passing data from the first web browser process to the at least one second protected web browser process;

executing instructions in the at least one second protected web browser process, wherein the at least one second protected web browser process is configured to access data contained in the second protected memory space and to execute instructions from the downloaded website content, wherein the downloaded website content is capable of accessing the second protected memory space but is denied access to the first memory space;

displaying digital content generated by the secure web browser process;

wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by website content potentially containing malware downloaded from the network and executing as part of the at least one second protected web browser process.

49. The method of claim 36 further comprising:

executing instructions from the first web browser process on a first core of a multi-core processor, and

executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.

## CERTIFICATE OF INTEREST

As counsel for appellant Google LLC, I certify that the following information is accurate and complete to the best of my knowledge.

**1. Represented Entities**

The full name of the entity I represent in this case is Google LLC.

**2. Real Parties in Interest**

There are no real parties in interest other than Google LLC.

**3. Parent Corporations and Stockholders**

The full names of all parent corporations and all publicly held companies that own 10% or more of Google LLC are XXVI Holdings Inc. and Alphabet Inc.

**4. Legal Representatives**

The law firms and lawyers who appeared for Google LLC or its predecessor, Google Inc., in the district court or who are expected to appear in this Court but have not yet appeared are:

- Brian M. Berliner, John X. Zhu*, and Mishima Alam* of O'Melveny & Myers LLP
- Stephanie Powers Skaff, Andrew P. Nguyen*, Cathleen G. Garrigan*, Daniel Chilton Callaway, Eugene Y. Mar, James L. Day, Marc Tarlock*, and Winston Liaw of Farella Braun + Martel LLP
- Michael E. Jones and Patrick Colbert Clutter, IV of Potter Minton PC
- Allen Franklin Gardner of Allen Gardner Law, PLLC
- Daryl S. Joseffer* and Joshua N. Mitchell of King & Spalding LLP

* no longer with the firm

**5. Related Cases**

No case pending in this Court or any other court or agency will directly affect or be directly affected by this Court's decision in this appeal.

**6. Organizational Victims and Bankruptcy Cases.**

There are no organizational victims or bankruptcy case debtors or trustees in this case.

Dated: May 16, 2022. /s/Dan L. Bagatell

Dan L. Bagatell

## TABLE OF CONTENTS

Patent Claims at Issue ........ inside cover

Certificate of Interest ........ i

Table of Authorities ........ vi

Table of Abbreviations and Conventions ........ ix

Statement of Related Cases ........ x

Introduction ........ 1

Jurisdiction ........ 4

Issues Presented ........ 4

Statement of the Case ........ 5

I. The Original '247 Patent ........ 5

A. The patentees described and originally claimed a hardware-isolation approach to malware protection using two separate processors and two separate memory spaces ........ 5

B. During original prosecution, the patentees surrendered single-processor structures to overcome prior art ........ 10

II. The Reissue Patents ........ 13

A. In an effort to cover Google's new Chrome web browser, the patentees sought reissue claims requiring two "web browser" processes rather than two "logical" processes ........ 13

B. The asserted product claims cover single-processor structures ........ 19

III. Google's Accused Products and Their Shared Memory Space for Browsing and Rendering Processes ........ 19

IV. This Litigation and the Judgment Against Google ........ 22

Summary of Argument ........ 23

Argument ........ 28

I. This Court reviews the § 251 issues *de novo* and the infringement issues for substantial evidence ....28

II. All four asserted claims violate the original-patent requirement because they include limitations that were not clearly and unequivocally disclosed in the original ’247 patent ....29

A. The original ’247 patent did not disclose two web browser processes ....31

1. Nothing in the original ’247 specification came close to clearly and unequivocally describing use of two web browser processes ...31

2. The district court erred as a matter of law by substituting inference and expert opinion for the clear, explicit, and unequivocal disclosure required by § 251 ....34

B. The original ’247 patent did not disclose a first web browser process passing web data to a second web browser process ....40

C. The original ’247 patent did not disclose a first web browser process initializing a second web browser process ....41

III. The two product claims violate the rule against recapture because they cover single-processor implementations that the patentees surrendered during original prosecution ....41

A. Plaintiffs conceded that the reissue claims broadened the ’247 claims by covering single-processor structures and that the patentees surrendered single-processor structures during original prosecution to overcome prior art ....43

B. The reissue claims were not materially narrowed in a way related to their broadening to cover single-processor systems ....45

C. The reissue claims do not address an “overlooked aspect” ....49

IV. Google did not infringe any claim ....54

A. The accused first and second web browser processes share memory and thus lack distinct memory spaces ....54

B. Plaintiffs failed to show that Google intended infringement, as required for indirect infringement of the method claims ....60

Conclusion ....................................................................................................64

Addendum:

Final Judgment (Appx1-5)

Opinion and Order Resolving the § 251 Issues (Appx6-71)

Opinion and Order Denying Google's Motion for JMOL of Non-Infringement (Appx72-88)

The Original '247 Patent (Appx89-111)

The RE'500 Patent (Appx112-137)

The RE'528 Patent (Appx138-164)

The RE'529 Patent (Appx165-191)

Certificate of Compliance with Type-Volume Limitation

Certificate of Compliance Regarding Confidential Material

Certificate of Authority

Certificate of Service

*Notice regarding confidentiality:*

The body of this brief is non-confidential, but confidential information regarding the basis for Plaintiffs' damages model, which is not at issue on appeal, has been redacted from addendum pages Appx81 and Appx82.

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Antares Pharma, Inc. v. Medac Pharma Inc.*,
771 F.3d 1354 (Fed. Cir. 2014) .............................. 29, 30, 31, 33, 35, 37, 38, 39

*Athletic Alts., Inc. v. Prince Mfg., Inc.*,
73 F.3d 1573 (Fed. Cir. 1996) ..........................................................................59

*Cambridge Toxicology Grp. v. Exnicios*,
495 F.3d 169 (5th Cir. 2007) ............................................................................29

*Cioffi v. Google Inc.*,
632 F. App'x 1013 (Fed. Cir. 2015) ....................................................22, 31, 33

*Clement*, *In re*,
131 F.3d 1464 (Fed. Cir. 1997) ..........................................................42, 43, 45

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015) ..........................................................................................60

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) ..........................................................................29

*Dominion Energy, Inc. v. Alstom Grid LLC*,
725 F. App'x 980 (Fed. Cir. 2018) ....................................................................61

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) (en banc in part) ..............................................60

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ..........................................................................29

*Forum US, Inc. v. Flow Valve, LLC*,
926 F.3d 1346 (Fed. Cir. 2019) ...................................................................30, 37

*Gen. Elec. Co., In re*,
789 F. App'x 857 (Fed. Cir. 2019) ............................... 43, 44, 45, 47, 48, 50, 52

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ..........................................................................................60

*Greenliant Sys., Inc. v. Xicor LLC*,
692 F.3d 1261 (Fed. Cir. 2012) .....................................................................42

*Hester Indus., Inc. v. Stein, Inc.*,
142 F.3d 1472 (Fed. Cir. 1998) .....................................................28, 50, 52, 53

*Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006) .....................................................................61

*Mentor Corp. v. Coloplast, Inc.*,
998 F.2d 992 (Fed. Cir. 1993) .......................................................................42

*Mostafazadeh*, *In re*,
643 F.3d 1353 (Fed. Cir. 2011) .................................. 43, 44, 45, 48, 49, 50, 52

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) .....................................................................43

*Pannu v. Storz Instruments, Inc.*,
258 F.3d 1366 (Fed. Cir. 2001) .....................................................................47

*Rowand*, *In re*,
526 F.2d 558 (C.C.P.A. 1975) .......................................................................37

*Swain Turbine & Mfg. Co. v. Ladd*,
102 U.S. 408 (1880) .......................................................................................29

*U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*,
315 U.S. 668 (1942) .......................................................................30, 35, 36

*Youman*, *In re*,
679 F.3d 1335 (Fed. Cir. 2012) .......................................................42, 45, 49

**Statutes and Rules**

28 U.S.C. § 1295(a)(1) ......................................................................................4

28 U.S.C. § 1338(a) ............................................................................................4

35 U.S.C. § 112 .......................................................................................1, 24, 30

35 U.S.C. § 120 ...................................................................................................1

35 U.S.C. § 251 ........................................................................................*passim*

35 U.S.C. § 271 ........................................................................................60

**Other Authority**

MPEP § 1412.01(I) (9th ed. rev. June 2020) ........................................................49

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Appx____ | appendix page____ |
| Google | defendant Google LLC (formerly Google Inc.) |
| JMOL | judgment as a matter of law |
| Plaintiffs | plaintiffs Alfonso Cioffi and Melanie, Megan, and Morgan Rozman, heirs to the estate of Allen Frank Rozman |
| (*xx*:*yy-zz*) | column *xx*, lines *yy-zz* of a patent |
| ’247 patent | U.S. Patent No. 7,484,247 (surrendered upon reissue) |
| RE’500 patent | U.S. Reissue Patent No. RE43,500 |
| RE’528 patent | U.S. Reissue Patent No. RE43,528 |
| RE’529 patent | U.S. Reissue Patent No. RE43,529 |

## STATEMENT OF RELATED CASES

This is the second appeal in this case. In *Cioffi v. Google Inc.*, No. 15-1194, 632 F. App'x 1013 (Fed. Cir. Nov. 17, 2015), this Court issued a non-precedential decision that reversed two claim-construction rulings and remanded for further proceedings. Judge O'Malley authored the opinion, joined by Judges Plager and Bryson. Google does not expect the Court's decision in this appeal to directly affect or be directly affected by the outcome in any other pending case.

## INTRODUCTION

This appeal involves three reissue patents. If a patentee is unsatisfied with patent claims initially allowed by the Patent and Trademark Office, it may pursue additional claims by filing a continuation application under 35 U.S.C. § 120 before the original patent issues. Claims in a continuation may be broader or narrower or even radically different, as long as they satisfy the written-description requirement of 35 U.S.C. § 112 and other general conditions of patentability. But if no application remains pending and the patentee wants to keep the benefit of its original filing date, its only option is to request reissue of the issued patent under 35 U.S.C. § 251. And reissue has numerous statutory restrictions, two of which are critical here.

One restriction is that the reissue patent must be, in the words of § 251(a), "for the invention disclosed in the original patent." The Supreme Court and this Court have strictly enforced this "original-patent requirement" by holding that inventions claimed in reissue patents must have been *clearly and unequivocally* disclosed in the specification of the originally issued patent. That standard is more stringent than the written-description requirement of § 112. Among other things, expert testimony about what a skilled artisan would have surmised from the original patent cannot substitute for clear and unequivocal disclosure in the original patent itself.

This Court and others have also strictly applied a "rule against recapture" that forbids patentees from reclaiming in reissue claim scope that they chose to surrender

during prosecution of the originally issued patent. The rule against recapture derives from the requirement in § 251(a) that the originally issued claims must have been inadequate "through error."

In this case, the patentees originally obtained U.S. Patent No. 7,484,247 on a variation of the well-known "sandboxing" principle of computing security in which potential malware is confined to one portion of the system. To prevent malware from spreading, the patentees taught to use two processors, each with its own separate and distinct memory space. The second processor had access to outside files and data, so its memory space could be corrupted. The originally claimed invention isolated and protected the first processor and its memory from corruption by preventing the second processor from accessing and tainting the first processor's memory.

About a year after the '247 patent issued, Google introduced its new Chrome® web browser, which incorporated its own sandboxing technology. The problem—for the patentees—was that the claims of the '247 patent did not cover the Chrome web browser. With no continuation application pending, the patentees applied for several broadening reissue patents. But the reissue claims they obtained and asserted here violate both the original-patent requirement and the rule against recapture.

All four asserted claims violate the original-patent requirement because they all require two "web browser" processes, a limitation found nowhere in the specification of the original '247 patent. The '247 patent did disclose two "logical"

processes, but disclosure of two "logical" processes did not clearly and unequivocally disclose two "*web browser*" processes. Indeed, using two web browser processes rather than one was antithetical to the originally claimed invention, which sought to isolate the first processor from outside networks and potentially compromised network files.

The two asserted product claims also violate the rule against recapture because they recapture single-processor structures. During prosecution of the original '247 patent, the applicants initially sought claims covering "at least one processor"—i.e., one or more processors—but they later amended and narrowed those claims to avoid prior art that disclosed single-processor systems. As a result, the originally issued claims required at least *two* processors and thus excluded single-processor structures. In reissue, however, the patentees obtained new, broader claims that reverted back to covering single-processor structures. The patentees did not materially narrow those reissue claims in a way related to their broadened scope covering single-processor structures. Those claims are therefore invalid under this Court's longstanding test for improper recapture.

Even if the reissue claims were valid, Plaintiffs failed to prove infringement. As explained below, the Chrome processes that Plaintiffs accused of being the recited "first" and "second" "web browser processes" share memory and thus lack the distinct memory spaces required by all four reissue claims. In addition, Plaintiffs

failed to prove infringement of the two asserted method claims because they alleged only indirect (contributory and induced) infringement, and they failed to prove that Google intended to cause infringement.

Because the asserted claims are invalid, not infringed, or both, this Court should reverse the judgment against Google.

## JURISDICTION

The district court had jurisdiction over this patent-infringement suit under 28 U.S.C. § 1338(a) and entered judgment on September 15, 2017, based on a jury verdict, Appx5624-5627. Google appealed from that judgment, Appx5628-5630, but this Court deactivated the appeal pending resolution of post-trial motions, ECF No. 2. The district court later vacated its original judgment, recognizing that Google's § 251 defenses were questions of law for the court, rather than the jury, to resolve. Appx5631-5642. But the district court ultimately rejected those defenses, Appx6-71, denied Google's motions challenging other aspects of the jury's verdict, Appx72-88, Appx6251-6263, and entered a new judgment on January 19, 2022, Appx1-5. Google timely appealed from the new judgment and the underlying rulings. Appx6266-6267. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## ISSUES PRESENTED

1. Did the district court err in ruling that the asserted reissue claims satisfy the original-patent requirement?

2. Did the district court err in ruling that the asserted reissue claims comply with the rule against recapture?

3. Did the district court err in entering judgment of infringement even though the accused products lacked distinct "first" and "second" "memory spaces" and Plaintiffs failed to establish the intent necessary for indirect infringement?

## STATEMENT OF THE CASE

### I. The Original '247 Patent

#### A. The patentees described and originally claimed a hardware-isolation approach to malware protection using two separate processors and two separate memory spaces

The original '247 patent issued in January 2009 and had the same written description and figures as the reissue patents asserted in this case. The '247 patent, titled "System and Method for Protecting a Computer System from Malicious Software," Appx89-111, contended that prior-art software techniques for combatting malicious software ("malware") were inadequate because once the malware invaded the computer's main processor, it could access memory resources and corrupt other files and programs. Appx104 (5:40-44, 5:62-65, 6:24-30). The solution, according to the patent, was to "isolate[ ] the network interface program from the main computer system such that the network interface program does not share a common memory storage with other trusted programs." Appx105 (7:1-4).

The ’247 patent accordingly disclosed a hardware-based security architecture that isolated users’ sensitive files from malware downloaded from a network. Figure 1 depicted “[c]omputer system 100” containing two processors and two memory/data storage areas: first processor (P1) 120 was connected to first memory/data storage area 110, while second processor (P2) 140 was connected to second memory/data storage area 130. Appx106 (9:30-39, 10:29-37).




Fig. 1

The specification made clear that P1 and P2 were physical hardware—e.g., Intel Pentium® 4 or IBM Power PC® processors, application-specific integrated circuits (ASICs), or field-programmable gate arrays (FPGAs). *Id.* (9:39-47, 10:31-34). Using two physical processors, each with a separate and distinct memory area, prevented malware from spreading: second processor 140 isolated first processor 120 and first memory 110 from network 195 because second processor 140 could not access first memory 110. *Id.* (10:38-46). The claimed invention aimed to confine malware to second processor 140 and second memory 130, preventing it from corrupting critical system files and other information in first memory 110. *Id.* (9:52-55, 10:58-63).

For example, when a user connected to network 195 via a web browser program, first processor 120 would instruct second processor 140 to run the browser so that the first processor could avoid running the browser program itself. Because only second processor 140 interacted with the network, potentially infected data were confined to second processor 140 and its associated memory 130, and the malware was isolated from first processor 120 and its associated memory 110. Appx106-107 (10:66-11:50).

Figure 6 and the accompanying text in column 14 applied the claimed invention to interactive online gaming. Like Figure 1, Figure 6 used two processors, P1 and P2. P2 received interactive network process status data from the network and

then informed P1 that such data were available. P1 then retrieved the data from P2, used the data to run an interactive network process and update the video display, and passed updates to P2, which then sent the updated data out over the network. Appx97, Appx108 (14:31-42).




Fig. 6

Plaintiffs agreed that P1 and P2 were the same physical processors previously discussed in connection with Figure 1. Appx4165-4166; Appx5072-5073.

Figure 9 and the corresponding text in column 16 described an alternative embodiment in which the two processors were different cores 920 and 940 within a single physical chip 960. Appx109 (16:10-19); *see also* Appx4267; Appx4861 (experts agreeing that each core was a separate processor).




Fig. 9

Finally, column 17 discussed augmenting the system of Figure 1 by encrypting sensitive outgoing data before sending them to second processor 140, which might be running a malware process. To achieve this, first processor 120 would send the data in encrypted form through second processor 140 while, in parallel, "[d]ecryption keys [would] be passed between P1 120 and network interface device 190 via a communication link 191." Appx110 (17:33-49). The purpose of doing so was to bypass second processor 140, which might be running malware, to prevent second processor 140 from knowing keys needed to decrypt sensitive data, and to allow "[d]ata [to] be decrypted by network interface device 190 prior to forwarding the data on to network 195." Appx110 (17:33-40). The patent nowhere said or suggested that first processor 120 would access network 195 itself, much less that first processor 120 would use a web browser process to obtain information over the network.

### B. During original prosecution, the patentees surrendered single-processor structures to overcome prior art

As discussed above, the specification of the '247 patent described an architecture using two processors—either two separate chips or two cores on a single chip. The written description and figures did not discuss or depict any single-processor embodiments. Nevertheless, U.S. Patent Application No. 10/913,609, which eventually became the '247 patent, initially contained claims that recited executing a "first logical process" and a "second logical process" on "*at least one* electronic

data processor" and thus encompassed single-processor systems. For example, claim 15 recited:

> 15. A computer system, comprising:
>
> *at least one electronic data processor* capable of executing instructions;
>
> …
>
> wherein the electronic data processor, first and second memory space, and video processor are configured for performing the steps of:
>
> > executing instructions in a first logical process, wherein the first logical process is capable of accessing data contained in the first memory space and the second memory space;
> >
> > executing instructions in a second logical process, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;
>
> …

Appx10065 (emphasis added).

After the examiner rejected those claims over prior art, the applicants amended the claims to require at least *two* processors. As amended, claim 1 required a computer system "*having at least a first and second electronic data processor*." Appx10146. Claim 15 similarly required a "*multi-processor*" system with "a *first and second* electronic data processor":

> 15. (Currently Amended) A multi-processor computer system using a common operating system, comprising:
>
> at least a first and second [[one]] electronic data processor capable of executing instructions using the common operating system;
>
> …
>
> wherein the first and second electronic data ~~processor~~ processors, first and second memory space, and video processor are configured for performing the steps of:
>
>> executing instructions in a first logical process with the first electronic data processor, wherein the first logical process is executing with the common [[an]] operating system and is capable of accessing data contained in the first memory space and the second memory space;
>>
>> executing instructions in a second logical process with the second electronic data processor, wherein the second logical process is executing within the common operating system and is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;
>>
>> …

Appx10149-10150.

The applicants relied on those amendments to distinguish prior-art references that disclosed only one processor. For example, the applicants argued that Corthell had taught "the use of a single electronic data processor that is necessarily executing all instructions," whereas, "[i]n stark contrast, Applicants t[aught] the use of a multi-processor computer having at least a first and second electronic data processor capable of executing instructions using a common operating system." Appx10153;

*see also* Appx10159 (similarly distinguishing the Policard and Brown references cited by the examiner).

The examiner agreed and issued a notice of allowance, relying on the multiple-processors requirement as the basis for allowance:

> [T]he Examiner agrees with the Applicant[s'] argument that the prior art does not show a single operating system that executes on *multiprocessors* such that one processor handles processes from the Internet and other potentially malicious data in order to protect the file system on the other processor.

Appx10182-10184 (emphasis added). The '247 patent issued shortly thereafter. *See* Appx89.

## II. The Reissue Patents

### A. In an effort to cover Google's new Chrome web browser, the patentees sought reissue claims requiring two "web browser" processes rather than two "logical" processes

The original '247 patent described using a web browser to obtain external files. Appx93 (Figure 3). It also described and claimed executing first and second "logical processes" on different processors. Appx111 (claim 15). But it nowhere described or claimed using two web browser processes. Instead, it described running a single web browser process on the second processor and taught to isolate the first processor and its memory from that web browser activity to protect them from malware. Appx109 (16:30-43). As discussed above, the first processor and its

memory were isolated from the network and thus would not run any web browser process that would access network data. *See*, *e.g.*, Appx106-107 (10:66-11:50).

But in October 2009, nine months after the '247 patent issued, the inventors obtained documentation describing Google's new Chrome browser, which used parallel web browser processes. Appx4137-4138, Appx4187-4190. Seeking to obtain new claims that would cover Chrome, the inventors filed a series of broadening reissue applications that ultimately produced the reissue patents that Plaintiffs asserted in this case. Appx89-191.

Among other changes, all four claims at issue on appeal require both a "first web browser process" and a "second web browser process." Three claims (all but claim 5 of the RE'528 patent) also require the first web browser to pass data to the second web browser process. One claim (claim 49 of the RE'528 patent) further requires the first web browser process to initialize the second web browser process.

RE'500 claim 43 (dependent from claim 41) recites:

> 41. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on a portable computer and communication device capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space, the portable computer and communication device including a network interface device configured to exchange data across a network of one or more computers using a wireless connection, and an intelligent cellular telephone capability with a secure web browser including *a first web browser process and a second web browser process*, configured to:

open the *first web browser process* within the common operating system, wherein the *first web browser process* is capable of accessing data of a website via the network and accessing data contained in the first memory space;

open the *second web browser process* within the common operating system on command from the *first web browser process*, wherein the *second web browser process* is capable of accessing data contained in the second memory space and is further capable of generating data;

pass data from the *first web browser process* to the *second web browser process*; and

process data from the *second web browser process*;

wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the *second web browser process*.

42. The computer program product of claim 41 wherein the *first web browser process* is capable of directly exchanging data with the network interface device and with the *second web browser process*.

43. The computer program product of claim 42 wherein the program code stored in the non-transitory computer readable medium is further configured to download data from the network and pass the downloaded data from the first *web browser process* to the second *web browser process*.

Appx136-137 (emphases added).

RE'528 claims 5 (dependent from claim 1) and 67 (dependent from claim 64) recite:

1. A method of operating a computer system capable of exchanging data across a network of one or more computers and having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising:

executing a *first web browser process*, capable of accessing data of a website via the network, in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space;

executing a *second web browser process* in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space; and

displaying data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to a display;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second *web browser process*.

5. The method of claim 1 wherein the first and second electronic data processors are part of a multi-core electronic data processor.

* * *

64. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device configured to exchange data across a network of one or more computers and access at least one website, configured to:

store at least one system file within the first memory space;

open a *first web browser process*, capable of accessing data of the at least one website via the network, in a first logical process, the first logical process being configured to access data contained in the first memory space;

open a *second web browser process* in a second logical process, the second logical process being configured to access data contained in the second memory space; and

pass data from the *first web browser process* to the *second web browser process*, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the *second web browser process*.

67. The computer program product of claim 64 wherein the *first web browser process* is capable of directly exchanging data with the network interface device and the *second web browser process* or the *second web browser process* is capable of directly exchanging data with the network interface device and the *first web browser process*.

Appx160, Appx163-164 (emphases added).

RE'529 claim 49 (dependent from claim 36) recites:

36. A method of operating a portable computer based system employing a common operating system and configured with a first memory space and a second protected memory space and at least one electronic data processor, comprising:

storing at least one system file within the first memory space;

downloading website content potentially containing malware from a network of one or more computers using a secure web browser process, wherein the secure web browser process is configured to execute on the at least one electronic data processor, and comprises a *first web browser process* and *at least one second protected web browser process*, the *first web browser process* and the *at least one second protected web browser process* being configured to access the website content via the network of one or more computers;

executing instructions in the *first web browser process*, wherein the *first web browser process* is configured to access data contained in the first memory space and to initialize the *at least one second protected web browser process*;

passing data from the *first web browser process* to the *at least one second protected web browser process*;

executing instructions in the *at least one second protected web browser process*, wherein the *at least one second protected web browser process* is configured to access data contained in the second protected memory space and to execute instructions from the downloaded website content, wherein the downloaded website content is capable of accessing the second protected memory space but is denied access to the first memory space;

displaying digital content generated by the secure web browser process;

wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by website content potentially containing malware downloaded from the network and executing as part of the *at least one second protected web browser process*.

49. The method of claim 36 further comprising:

executing instructions from the first web browser process on a first core of a multi-core processor, and

executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.

Appx189-190 (emphases added).

Notably, although the reissue applications initially sought claims that recited "browser" processes rather than "*web* browser" processes, the examiner rejected those claims over a Narin reference that disclosed using two "browser processes" in connection with video games. *E.g.*, Appx10556-10557 (RE'500 patent). To distinguish Narin's gaming processes, the patentees amended the reissue claims to recite "web browser" processes rather than "browser" processes. *E.g.*, Appx10626-10627 (RE'500 patent).

### B. The asserted product claims cover single-processor structures

Although the applicants had amended their claims during prosecution of the original ’247 patent to surrender single-processor structures and claim only multi-processor structures, Appx10146, Appx10149-10150, they pursued and obtained reissue claims covering single-processor structures. Via incorporated independent claim 41, claim 43 of the RE’500 patent requires

> [a] computer program product … having *at least one* electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space ….

Appx136 (emphasis added). And via incorporated independent claim 64, claim 67 of the RE’528 patent similarly requires

> [a] computer program product … having *at least one* electronic data processor communicatively coupled to a first and second memory space ….

Appx163-164 (emphasis added).

## III. Google’s Accused Products and Their Shared Memory Space for Browsing and Rendering Processes

Plaintiffs accused various Chrome web browsers of infringement. The accused web browsers ran a “Browser” process that conducted web browsing and a “Renderer” process that rendered results for display. Plaintiffs identified the Browser process as the claimed “first web browser process” and the Renderer process as the claimed “second [or protected] web browser process.”

The district court construed the claims to require the "first memory space" used for the "first web browser process" to be "distinct" from the "second memory space" used for the "second web browser process." Appx2524-2532. Plaintiffs thus agreed that (a) there must be no overlap between the two memory spaces, Appx4318-4319, and (b) the "second web browser process" must have access only to the "second memory space" and not to the "first memory space." Appx4316-4317.

Google contended that its products did not infringe because their Browser and Renderer processes shared a memory space. When Chrome started up, the Browser process was given exclusive access to certain memory space, and the Renderer process had access to none of that memory space. Appx5144-5147 (Plaintiffs' expert Rubin). During operation, however, the Browser process granted temporary access to some of that memory to the Renderer process so that the two processes could communicate via shared memory. Appx4868-4879 (Google's expert Kogan); Appx4603-4604 (Chrome engineer Upson); Appx4719-4721 (Chrome engineer Larson); Appx11613-11809 (Browser and Renderer code); Appx11810-11820 (article about Chrome's security architecture).

As a result, the memory spaces for the Browser and Renderer processes overlapped, and the alleged "second web browser process" (the Renderer) could access memory used by the alleged "first web browser process" (the Browser), as shown by the hatching in this demonstrative exhibit from trial:




Plaintiffs did not dispute that the Browser and Renderer processes shared memory space that was initially allocated to the Browser exclusively. Appx4321-4322; Appx5146-5149. Instead, Plaintiffs contended that Google infringed on the theory that any memory space that the Renderer process could ever access constituted "second memory space"—even memory space that had been exclusively reserved for the Browser/"first web browser process." Appx5137-5139. Plaintiffs identified nothing in the patents suggesting that exclusively reserved "first memory space" could be relabeled shareable "second memory space" on the fly.

## IV. This Litigation and the Judgment Against Google

This lawsuit began in 2013, when Plaintiffs sued Google for infringing four reissues of the original ’247 patent targeted toward “web browser processes.” Appx1001-1019 (original and amended complaints); *see also* Appx1020-1027 (response to amended complaint). In 2014, Plaintiffs stipulated to non-infringement after the district court construed “web browser process” to require an ability to access a website directly, without using another web browser process. Appx2620-2626. Plaintiffs appealed that construction along with the district court’s ruling that the “critical file” limitation of the RE’103 patent was indefinite because it included a subjective “critical user file” component. This Court reversed and remanded, holding that a “web browser process” need not access files directly and that the “critical file” term was not indefinite. *Cioffi v. Google Inc.*, 632 F. App’x 1013 (Fed. Cir. 2015).

Plaintiffs later dropped the RE’103 patent and limited their case to four claims of the other three reissue patents. Google’s defenses included, among other things, non-infringement and invalidity under § 251 for violating the original-patent requirement and the rule against recapture. At a trial in 2017, the jury delivered a verdict that Google infringed the asserted claims and had not proven them invalid and awarded Plaintiffs $20,000,000 in damages in the form of a running royalty. Appx3921-3925.

The district court initially entered judgment on the verdict, Appx5624-5626, and further imposed an ongoing royalty, Appx5604-5623. In 2018, however, the court vacated the original judgment as premature because in retrospect it agreed that Google's § 251 defenses were for it to resolve rather than the jury. Appx5631-5642. Despite that ruling, the court declined to hear further testimony on the § 251 issues, Appx5813, and instead requested proposed findings of fact and conclusions of law based on the jury-trial record. The parties complied. Appx5669-5811; Appx5841-5852; Appx5854-5866; *see also* Appx6150-6151 (notice of supplemental authority).

Eventually, in late 2021, the district court issued an order rejecting Google's arguments that the asserted claims were invalid under § 251, Appx6-71, followed by orders denying Google's post-trial motions for JMOL or a new trial on issues including infringement, invalidity on other grounds, and damages, Appx72-88; Appx6251-6263. In early 2022, the court entered a final judgment based on the verdict and its post-trial orders. Appx1-5. Google timely appealed from that judgment and the underlying orders. Appx6266-6267.

## SUMMARY OF ARGUMENT

Under the original-patent requirement of § 251(a), a reissue claim must be for the same invention as the original patent. Under settled law, the specification of the originally issued patent must *clearly and unequivocally* disclose the invention claimed in a reissue patent as a separate invention. The original-patent requirement

is thus more demanding than the written-description requirement of § 112: a mere suggestion or indication in the original specification is not enough; expert testimony about what a skilled artisan would have inferred is no substitute for clear, unequivocal disclosure in the original patent's specification itself; and this Court reviews *de novo*, not for substantial evidence in support of the determination below.

Here, all four asserted reissue claims are invalid because they require running at least two "web browser processes," not just one. The original '247 patent never described running two or more web browser processes. At most, it described a second processor running a single web browser process at the behest of a first processor. The '247 specification mentioned online gaming and exchanging game-status data, but that discussion did not mention web browsing, and the patentees later (during prosecution of the reissue patents) introduced the claimed "web browser processes" to *distinguish* online gaming. The '247 patent also mentioned transmitting encrypted data, but that passage did not mention web browsers or web browsing.

The lack of any disclosure of two web browser processes is not surprising. The sandboxing theory of the invention described in the original '247 patent was to keep the first processor and its processes isolated from malware lurking on outside networks such as the World Wide Web. Yet the reissue claims contemplate that *both* processes will browse potentially dangerous website data without the protective isolation prescribed in the '247 patent.

The district court erred by focusing on generic terms in the ’247 patent’s specification and expert testimony about what skilled artisans might have inferred, rather than on what that specification clearly and unequivocally disclosed. For example, even if the patent’s reference to “interactive network process data” in a discussion of gaming applications could encompass more than game-status data, use of that vague term was hardly a clear and unequivocal disclosure of two web browser processes. The district court likewise erred in relying on expert testimony that the “logical processes” mentioned in the ’247 patent could include “web browser processes.” Expert testimony cannot substitute for explicit disclosure, and the ’247 patent simply did not mention use of two web browser processes. In divining sufficient description in the ’247 patent, the district court improperly cobbled together disparate passages and legally irrelevant inferences that were based on expert testimony. As a matter of law, the proper focus is on what the original ’247 patent clearly and explicitly disclosed.

Similar problems infected the district court’s conclusion that the ’247 patent sufficiently described a first web browser process passing web data to a second web browser process, as required by three asserted claims. References to “interactive network process status data” did not clearly, explicitly, and unequivocally describe *website* data, and the district court improperly equated *processors* P1 and P2 with web browser process*es*. The ’247 patent likewise did not clearly and unequivocally

disclose a first web browser process initializing a second web browser process, as one asserted claim requires.

If the Court agrees that all four asserted claims are invalid for violating the original-patent requirement, it need not address whether the reissued product claims also violated the rule against recapture or whether Google infringed any claim. Nevertheless, the two asserted product claims did violate the rule against recapture, and Plaintiffs failed to prove infringement of any claim.

The rule against recapture prevents patentees from using the reissue process to recapture claim scope they surrendered during earlier prosecution. This Court applies a three-step test for determining improper recapture. Plaintiffs conceded the first two steps: they agreed that the reissue claims have broader coverage than the originally issued ’247 patent because they cover single-processor structures, and they admitted that the patentees surrendered single-processor structures during original prosecution. The final step asks whether the reissue claims fully or substantially recapture the surrendered subject matter. The product claims asserted here do because they revert and recover single-processor structures. Plaintiffs have argued that the reissue claims are materially narrower in scope than the originally issued claims because they require two “web browser processes” instead of two “logical processes.” But that argument fails because to avoid improper recapture, the material narrowing must relate to the same subject matter that was previously surrendered,

and here the nature of the two claimed processes was a separate and distinct claim requirement. Simply put, requiring two "web browser" processes did not narrow the reissue claims with respect to the number of processors. And this Court has repeatedly held that narrowing reissue claims in a different respect is insufficient to avoid violating the rule against recapture.

The district court also held that the rule against recapture did not apply because the reissue claims supposedly address an "overlooked aspect," namely two "web browser processes" capable of accessing website data. But even if such an exception exists (this Court has never found that it applied), it would not apply here for two reasons. First, an embodiment can be "overlooked" only if it was previously disclosed, and the '247 specification nowhere described two web browser processes. Second, even if two web browser processes were disclosed, they were within the scope of the original '247 claims, which broadly recited "logical processes," and as a matter of law a narrowing limitation that is within the scope of an original application claim cannot qualify as an "overlooked aspect."

Google also did not infringe any asserted claim. Consistent with the principle of the invention, all four asserted claims require distinct, non-overlapping "first" and "second/protected" memory spaces. The second web browser process thus must not have access to the first memory space. But the accused Chrome browsers did not prevent the accused "second web browser process" (the Renderer) from accessing

the "first memory space" reserved for the accused "first web browser process" (the Browser). Plaintiffs' expert agreed that on launch, all memory allocated to the Browser process was accessible only to the Browser, which made it "first memory space." And it was undisputed that the accused products later granted the Renderer process access to some of that same memory. At that point the memory was shared by both processes, contrary to the claims. Plaintiffs were not entitled to manufacture infringement by unilaterally redesignating "first memory space" as "second memory space."

In addition, Plaintiffs failed to prove Google's specific intent, as required to establish inducement of or contribution to direct infringement of the asserted method claims by end-users (the only kinds of infringement they alleged). Plaintiffs presented only two pages of testimony from their technical expert, and that testimony was conclusory and insufficient—especially in view of the earlier stipulated judgment of non-infringement and the substantial non-infringing use of viewing locally stored photos and movies.

## ARGUMENT

### I. This Court reviews the § 251 issues *de novo* and the infringement issues for substantial evidence

In addition to the conditions for patentability that govern all patents, two deeply rooted constraints apply to reissued patents under § 251: the original-patent requirement and the rule against recapture. *Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d

1472, 1479-80 (Fed. Cir. 1998). Compliance with those conditions is a question of law that this Court reviews *de novo*. *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1357 (Fed. Cir. 2014).

Infringement is a factual question generally reviewed for substantial evidence after a jury trial. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009). This Court applies regional-circuit law when reviewing the denial of a motion for JMOL. *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021). The Fifth Circuit reviews such denials *de novo*. *Id.* at 1294 (citing *Cambridge Toxicology Grp. v. Exnicios*, 495 F.3d 169, 179 (5th Cir. 2007)).

## II. All four asserted claims violate the original-patent requirement because they include limitations that were not clearly and unequivocally disclosed in the original '247 patent

A patentee that fails to file a continuing application before its original patent issues may still seek additional or modified claims after issuance via reissue under § 251. But the delay "is not without cost." *Antares*, 771 F.3d at 1358. Among other things, the patentee must comply with the original-patent requirement, which, in the words of § 251(a), restricts reissue patents to claims "for the invention disclosed in the original patent." *See Swain Turbine & Mfg. Co. v. Ladd*, 102 U.S. 408, 413 (1880) ("A reissue can only be granted for the same invention which was originally patented."); *Antares*, 771 F.3d at 1358-62 (describing Supreme Court cases applying the requirement since the 1850s).

Although § 251's original-patent requirement is "analogous" to the written description requirement of § 112, *Antares*, 771 F.3d at 1362, the two are distinct, and the original-patent requirement demands more. Under § 251, "it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification." *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 676 (1942). Rather, "the specification must *clearly and unequivocally* disclose the newly claimed invention as a separate invention." *Antares*, 771 F.3d at 1362 (emphasis added).

When evaluating compliance with the original-patent requirement, courts must focus on the original patent's specification. *Id.* Extrinsic evidence may define "a technical or scientific term or term of art." *U.S. Industrial Chemicals*, 315 U.S. at 678. But evidence of what a skilled artisan would have understood or inferred from the specification cannot substitute for clear and unequivocal disclosure in the specification itself. *Forum US, Inc. v. Flow Valve, LLC*, 926 F.3d 1346, 1352 (Fed. Cir. 2019). Ultimately, "it is the duty of a court to determine for itself, by examination of the original and the reissue, whether they are for the same invention" as required by § 251. *U.S. Industrial Chemicals*, 315 U.S. at 678.

The reissue claims asserted here fail the original-patent requirement because the claimed inventions were not "clearly and unequivocally disclosed" in the original '247 patent. They recite limitations described nowhere in the '247 patent, including

running multiple "web browser processes," passing data between two web browser processes, and using a first web browser process to initiate a second web browser process. In divining support for those limitations, the district court resorted to cascading assumptions based on generic statements in the '247 patent. That was legal error. To satisfy the original-patent requirement, the specification of that original patent had to disclose, "in an explicit and unequivocal manner, the particular combinations of [security] features claimed on reissue." *Antares*, 771 F.3d at 1363. "Such an express disclosure is exactly what was missing here," *id.*, and the asserted reissue claims are therefore invalid as a matter of law.

### A. The original '247 patent did not disclose two web browser processes

#### 1. Nothing in the original '247 specification came close to clearly and unequivocally describing use of two web browser processes

All four asserted reissue claims require running at least a first and a second "web browser process." Appx136-137 (RE'500 claim 43); Appx160, Appx163-164 (RE'528 claims 5, 67); Appx189-190 (RE'529 claim 49). Each of those web browser processes must be able to access data on websites. *Cioffi*, 632 F. App'x at 1018; Appx2512-2520.

The original '247 patent never described running two web browser processes at all, much less in the clear, explicit, and unequivocal terms required to satisfy the original-patent requirement. The '247 specification contained a handful of refer-

ences to internet browsing or browser programs. Several appeared in the background section and generally referred to internet browsing and its associated security risks, Appx103-104 (3:32-35, 4:60-66, 6:15-19, 6:43-45, 6:56-58), with no mention of using two web browser processes. Later sections describing the invention mentioned internet browsing just twice more, and both instances discussed use of only a single web browser process. At columns 10 and 11, the ’247 specification described a first processor instructing a second processor to initiate a “protected process” such as a web browser program, but it said nothing about having the first processor run any such process itself. Appx106-107 (10:66-11:14). At column 16, the specification likewise described web browser functions run by only the second of two logical processes. Appx109 (16:22-34).

Other disclosures referred to network communications but said nothing about web browsing. Figure 6 depicted an embodiment that used processors for an “interactive network process, such as online gaming.” Appx97 (Figure 6), Appx108 (14:29-31). But neither Figure 6 nor the corresponding discussion in column 14 described web browsing, a web browser process, or accessing website data. Figure 6 addressed online gaming and related exchange of “game status data,” not website data. Appx108 (14:3-54). Indeed, when the patentees later introduced the claim term “web browser process” during prosecution of the reissue applications, they did so to *distinguish* online gaming. *E.g.*, Appx10556-10557 (RE’500 patent); Appx10620.

Appx10626-10627 (RE'500 patent). In particular, the examiner rejected the reissue claims over the Narin reference, which described using two "browser processes" in connection with video games. *E.g.*, Appx10556-10557. The patentees changed "browser process" to "web browser process" to distinguish gaming processes such as those disclosed in Narin. *E.g.*, Appx10626-10627. *See also Cioffi*, 632 F. App'x at 1020-21.

The '247 patent also included an embodiment in which encrypted data were sent over a network, but that passage likewise did not mention web browsers or accessing website data. Appx110 (17:11-59). Instead, it explained that when first processor P1 (element 120 of Figure 1) sent sensitive user data, it would (a) encrypt the data and send it via second processor P2 (element 140) to network interface 190, and (b) send decryption keys directly to network interface 190 via communication link 191 rather than via second processor P2 so that second processor P2—which might be infected—could not decrypt the data. *Id.* (17:33-38). Decryption keys are not website data, and this passage again nowhere said or even suggested that first processor P1 would run a web browser process and access website data.

In short, the original '247 patent never described running two web browser processes, and it certainly did not describe that combination "in an explicit and unequivocal manner" as required to satisfy the original-patent requirement. *See Antares*, 771 F.3d at 1363.

The lack of any such disclosure makes sense in view of what the inventors *did* describe in the original ’247 patent. The ’247 patent focused on insulating critical system resources from the malware risk posed by network connectivity, including internet browsing and obtaining potentially compromised data from websites or other network sources. Appx104-107 (6:56-7:11, 7:63-8:18, 10:38-43, 11:38-50). The invention lay in shifting potentially hazardous networking functions into their own restricted “second” processing and memory spaces and preventing them from accessing a separate, protected “first” processor and memory housing critical system functions. Appx89 (’247 Abstract). Consistent with that invention, the ’247 specification did not describe running web browser processes in both the “first” and “second” memory locations: allowing both processors to run web browser processes for accessing website data would have exposed the first processor to malware risks and defeated the purpose of the invention.

The asserted reissue claims are invalid under § 251 because the original ’247 patent did not clearly and unequivocally describe—and actually cautioned against—using two web browser processes.

### 2. The district court erred as a matter of law by substituting inference and expert opinion for the clear, explicit, and unequivocal disclosure required by § 251

The district court’s contrary analysis and conclusion were flawed. The court acknowledged that “the ’247 Patent specification does not expressly refer to two

instances of 'web browser' or 'browser' programs in describing the claimed invention …." Appx22. But rather than enforcing the established standard requiring clear and unequivocal disclosure, the court focused on a few generic terms in the '247 specification and surmised what a skilled artisan might have extrapolated from such limited disclosures. As shown below, the court stacked inference upon inference to impute disclosures not found in the original specification. Its conclusion thus rested on precisely the kind of "'suggestions' or 'indications' of alternative inventions" that "are not sufficient to satisfy the original patent requirement of § 251." *Antares*, 771 F.3d at 1363 (quoting *U.S. Industrial Chemicals*, 315 U.S. at 676) (cleaned up).

The district court concluded that references to an "interactive network process" and "interactive network process status data" in Figure 6 and column 14 of the '247 patent were "not limited to" online gaming or game status data. Appx49-50 (discussing Appx108 (14:28-45)). But that is a far cry from clearly and unequivocally disclosing the use of two web browser processes. To bridge the gap, the district court relied on a series of tenuous inferences.

First, the court pointed to a separate reference in column 6 to the "interactive nature" of applications such as "gaming, messaging, and browsing." Appx22 (citing Appx104 (6:16-20)); Appx50. But that stray comment was not tied to Figure 6 or column 14, and it did not equate web browsing with gaming. If anything, it *distinguished* gaming from browsing and messaging applications. Moreover, as discussed

above, the patentees expressly distinguished gaming from *web* browsing during prosecution, when they added the requirement of two "web browser" processes to overcome the examiner's rejection over Narin. *See* Appx10556-10557, Appx10626-10627. In any event, the passage in column 6 did not disclose the use of two web browser processes—at all, much less clearly and unequivocally.

Second, the court suggested that "the 'interactive network process' embodiment describes P1 120 connecting to the 'network,'" and that a "network" was elsewhere described as including the "Internet, a LAN, WAN, VPN, etc." Appx50. But even if connecting to the internet were the same as connecting to the World Wide Web through a web browser (it is not, *see* Appx4858), the district court was simply wrong in asserting that this embodiment described *P1* connecting to a network. Both Figure 6 and column 14 described P2—and only P2—connecting to a network; they described P1 as exchanging data with P2, not as connecting to a network. Appx97, Appx108 (14:3-54).

Third, the district court repeatedly relied on expert testimony to infer what a skilled artisan would "understand" or "recognize" from the original '247 patent's limited disclosures. Appx51-55. That was improper. Expert testimony may assist in "ascertain[ing] the meaning of a technical or scientific term or term of art" under the original-patent requirement, but it cannot "substitute any new combination of steps or elements or devices for the one originally described." *U.S. Industrial Chemicals*,

315 U.S. at 678. It was therefore error to rely on expert testimony "assert[ing] what a person of ordinary skill in the art would purportedly understand" from generalized disclosures that "d[id] not refer to or disclose specific embodiments" claimed through reissue. *Forum US*, 926 F.3d at 1352. Such extrinsic evidence could not substitute for the clear and unequivocal disclosure required *in the original specification*. As a matter of law, the original specification "must do more than merely suggest or indicate the invention recited in reissue claims"; it must "'clearly and unequivocally' disclose such an embodiment." *Id.* at 1351-52; *see Antares*, 771 F.3d at 1363 (requiring "explicit" disclosure of the "particular combinations" of features claimed on reissue).

Fourth, the district court made similarly improper leaps when it invoked expert testimony to infer that a skilled artisan would understand "logical processes" in column 16 to mean "web browser processes." Appx52-54. That conclusion again impermissibly used expert testimony to substitute for what the original specification explicitly said about running multiple web browser processes—nothing. Moreover, even taken at face value, the cited testimony did not justify the court's conclusion. Plaintiffs' expert testified that "[i]n the original patent, a logical process could be just about anything." Appx5047. Use of an umbrella term encompassing "just about anything" could not and did not clearly and unequivocally describe a particular application involving two web browser processes. *See In re Rowand*, 526 F.2d 558,

560 (C.C.P.A. 1975) (holding that reliance on knowledge in the art and a generic reference to manufacturing methods in the original specification did not satisfy the original-patent requirement).

Finally, the district court accused Google of making "contradictory" arguments about the scope of the original '247 patent. Appx53. That was erroneous for two reasons.

In opposing Plaintiffs' reliance on the "overlooked aspects" exception to the rule against recapture, Google argued that two web browser processes were not "overlooked" but literally covered by claims that the applicants had sought during prosecution. Appx5304-5305; Appx5732-5733. That assertion was not inconsistent with arguing, under the distinct legal standard for the original-patent requirement, that generic references to "logical processes" in the '247 specification did not describe combining two web browser processes "in an explicit and unequivocal manner," *Antares*, 771 F.3d at 1363. Asserting that two web browser processes were *covered* by broad previously sought claims is quite different from saying that two web browser processes were *clearly and unequivocally described* in the specification of the original patent.

The district court also failed to appreciate that Google's "overlooked aspects" argument focused on claims sought in the *application* that produced the '247 patent, not claims in the '247 patent *as issued*. Appx5305 (citing Appx10061); Appx5732-

5733. The claims sought in that initial application did not appear in the ’247 patent and are therefore irrelevant to the original-patent analysis because Congress limited reissue to “the invention disclosed in the *original patent*.” 35 U.S.C. § 251(a) (emphasis added). As this Court has made clear, “the original patent requirement focuses on the original specification rather than the original claims.” *Antares*, 771 F.3d at 1362 (further observing that although claims may be used in a written-description analysis “outside of the reissue context,” the original-patent requirement “must look to the specification”). The *rule-against-recapture* analysis focuses on what the applicant previously claimed and surrendered, while the *original-patent-requirement* analysis turns on the specification of the *originally issued patent*, including the issued claims but not claims that fell by the wayside during prosecution of the original patent.

In sum, the district court’s strained analysis—patching together disparate passages from the original specification and reading in new disclosures based on extrinsic evidence about the purported “understanding” of a skilled artisan—did not come close to satisfying the stringent standard of clear, explicit, and unequivocal disclosure under the original-patent requirement. All four asserted reissue claims are invalid under § 251(a), and the entire judgment should therefore be reversed.

### B. The original ’247 patent did not disclose a first web browser process passing web data to a second web browser process

Claim 43 of the RE’500 patent, claim 67 of the RE’528 patent, and claim 49 of the RE’529 patent all recite a first web browser process that passes website data to a second web browser process. These claims separately fail the original-patent requirement because that limitation was not clearly and unequivocally described in the original ’247 patent. As just explained, the ’247 specification never clearly and unequivocally described using two web browser processes. But even if it had, there was no description whatsoever of passing website data between two web browser processes, much less a clear and unequivocal description of that.

The district court identified column 14 of the ’247 patent as providing the requisite disclosure. Appx57-58. But references to “interactive network process status data” did not clearly and unequivocally describe *website* data. Moreover, the court identified P1 and P2 as web browser processes in column 14 and Figure 1, yet the ’247 specification plainly described P1 and P2 as *processors*, not *processes*. Appx106 (9:37-47, 10:29-37), Appx108 (14:28-45). Mr. Cioffi and Plaintiffs’ expert *agreed* that the references to “P1” and “P2” in the original specification referred to physical processors 120 and 140 in Figure 1. Appx4165-4166; Appx5072-5073. Column 14’s disclosure of passing generic information between *processors* P1 and P2 did not clearly and unequivocally describe passing website data between two web browser *processes*.

Asserted claims 43, 67, and 49 are invalid for this reason as well.

### C. The original ’247 patent did not disclose a first web browser process initializing a second web browser process

Claim 49 of the RE’529 patent requires “a first web browser process initializing a second web browser process.” In addition to the two bases described above, claim 49 fails the original-patent requirement because the original ’247 specification did not clearly and unequivocally describe the “initializing” limitation.

Nothing in the ’247 specification clearly and unequivocally disclosed one web browser process initializing another web browser process. The district court posited that the ’247 patent disclosed that “processor P1 is capable of opening and/or initializing the processes on processor P2.” Appx58-59 (citing Appx92 (Figure 2), Appx101 (Figure 10), Appx106-107 (10:64-11:10), Appx110 (17:11-18)). But in each of those instances, the original specification described a first *processor* (P1) instructing a second *processor* (P2) to initiate a process. There was no disclosure of a *web browser process* initializing another *web browser process*. Claim 49 is invalid for this reason as well.

## III. The two product claims violate the rule against recapture because they cover single-processor implementations that the patentees surrendered during original prosecution

Section 251(a) permits reissue of a patent only when the patent is inoperative or invalid “through error.” Surrendering subject matter to avoid prior art during patent examination is not “error”; it is a deliberate choice. In this Court’s words,

"[e]rror under the reissue statute does not include a deliberate decision to surrender specific subject matter in order to overcome prior art, a decision which in light of subsequent developments in the marketplace might be regretted." *Mentor Corp. v. Coloplast, Inc.*, 998 F.2d 992, 996 (Fed. Cir. 1993).

It is thus well settled that patentees may not use the reissue process to recapture claim scope that they surrendered during earlier prosecution. *See*, *e.g.*, *In re Clement*, 131 F.3d 1464, 1468 (Fed. Cir. 1997) ("[Reissue] claims that are 'broader than the original patent claims in a manner directly pertinent to the subject matter surrendered during prosecution' are impermissible." (citation omitted)). This rule has been named the "rule against recapture" or the "recapture rule." *See*, *e.g.*, *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1267 (Fed. Cir. 2012) ("Under the rule against recapture, a patentee's reissue claims are invalid when those claims were broadened to include subject matter that the patentee previously surrendered during prosecution of the original patent."); *In re Youman*, 679 F.3d 1335, 1343 (Fed. Cir. 2012) ("The recapture rule bars a patentee from recapturing subject matter, through reissue, that the patentee intentionally surrendered during the original prosecution in order to overcome prior art and obtain a valid patent.").

This Court has adopted a three-step test for determining whether reissue claims violate the rule against recapture. "The first step is to 'determine whether and in what "aspect" the reissue claims are broader than the [originally issued] patent

claims.'" *In re Mostafazadeh*, 643 F.3d 1353, 1358 (Fed. Cir. 2011) (quoting *Clement*, 131 F.3d at 1468). "Next, the court must 'determine whether the broader aspects of the reissue claims relate to surrendered subject matter.'" *Id.* (quoting *Clement*, 131 F.3d at 1468-69). Finally, "the court must 'determine whether the surrendered subject matter has crept into the reissue claim.'" *Id.* (quoting *Clement*, 131 F.3d at 1469). Under the third step, "[v]iolation of the rule against recapture may be avoided … if the reissue claims 'materially narrow' the claims relative to the original claims such that full or substantial recapture of the subject matter surrendered during prosecution is avoided." *Id.* (quoting *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1349 (Fed. Cir. 2005)).

Here, the two asserted product claims, claim 43 of the RE'500 patent and claim 67 of the RE'528 patent, are invalid because they recapture single-processor structures that the applicants surrendered to obtain the original '247 patent.

### A. Plaintiffs conceded that the reissue claims broadened the '247 claims by covering single-processor structures and that the patentees surrendered single-processor structures during original prosecution to overcome prior art

Plaintiffs conceded, and the district court found, that the first two prongs of the three-part recapture test were satisfied. Appx64-67. Correctly so.

The first prong determines whether the reissue claims are broader than the originally issued claims. *See In re Gen. Elec. Co.*, 789 F. App'x 857, 859-60 (Fed. Cir. 2019); *Mostafazadeh*, 643 F.3d at 1358. "A reissue claim that deletes a

limitation or element from the [originally issued] patent claims is broader with respect to the modified limitation." *Mostafazadeh*, 643 F.3d at 1358 (cleaned up).

Here, claims 43 and 67 are undisputedly broader than the claims in the original '247 patent. The '247 patent claims required at least two processors because they recited both a "first" and a "second" "electronic data processor." Appx110-111. Reissue claims 43 and 67 delete that two-processor requirement, return to the language of the original application claims that required "at least one electronic data processor," and thus cover single-processor structures in addition to multiple-processor embodiments. Appx136-137; Appx163-164.

The second prong assesses whether the broadening relates to subject matter surrendered during prosecution. *General Electric*, 789 F.3d at 859; *Mostafazadeh*, 643 F.3d at 1358. Here, the applicants undisputedly surrendered single-processor structures when they narrowed their claims to require a "first" and a "second" "electronic data processor" to overcome prior art (Corthell, Policard, and Brown) that disclosed single-processor systems. Appx10146, Appx10149-10150. The applicants specifically relied on that amendment to distinguish the cited art. For example, they argued that "[i]n stark contrast [to Corthell], Applicants teach the use of a *multi-processor* computer *having at least a first and second electronic data processor*," Appx10153-10154, and they asserted that their amendments "specify[ing] a computer system *having at least a first and second electronic data processor* … distin-

guish[ed] [the amended claims] … from the teachings of Policard and Brown," Appx10159. The examiner allowed the claims because "the prior art d[id] not show a single operating system that executes on multiprocessors." Appx10183.

### B. The reissue claims were not materially narrowed in a way related to their broadening to cover single-processor systems

The third and sole disputed prong of the recapture test evaluates whether the reissue claims have improperly reclaimed the surrendered subject matter. *Clement*, 131 F.3d at 1469; *General Electric*, 789 F. App'x at 859. The analysis is complicated when, as here, the patentee has both broadened and narrowed the reissue claims. This Court has held that the rule against recapture is not violated "if the reissue claims 'materially narrow' the claims relative to the original [application] claims such that full or substantial recapture of the subject matter surrendered during prosecution is avoided." *General Electric*, 789 F. App'x at 859 (quoting *Mostafazadeh*, 643 F.3d at 1359). But to avoid recapture, "[t]he narrowing must ... *relate to the surrendered subject matter*." *Id.* at 859-60 (emphasis added). Adding other limitations that address distinct features does *not* avoid recapture. *E.g.*, *id.* at 860-61 (adding limitations relating to *positioning* of a synthetic jet assembly did not save reissue claims where the surrender related to the *attachment* of the jet assembly). The recapture rule is thus "violated when a limitation added during prosecution is eliminated *entirely*, even if other narrowing limitations are added to the claim." *Mostafazadeh*, 643 F.3d at 1361 (emphasis added); *see also Youman*, 679 F.3d at

1345 ("[W]here the patentee eliminates the added limitation in its entirety …, it is clear that the surrendered subject matter has been recaptured.").

Here, the patentees eliminated entirely the multiple-processor limitation of the original '247 claims by rewriting the two product claims to cover single-processor structures. Instead of requiring "first" and "second" "electronic data processors," the claims as reissued now require only "at least one electronic data processor." Appx136-137; Appx163-164. The applicants did add other limitations, but none required or related to multiple processors. Because there was no "material narrowing" regarding the critical limitation (the number of processors), the patentees violated the rule against recapture, and these claims are invalid.

In ruling otherwise, the district court focused on the fact that the reissue claims added another limitation that narrows the claims in another dimension. In particular, the court observed that to distinguish Narin, the applicants amended reissue claims 43 and 67 to require two "web browser processes" rather than two "logical processes." Appx68-70. But that is irrelevant to the rule against recapture because those amendments added limitations unrelated to the number of processors. Indeed, the single-processor claims in the original '247 patent separately recited "first" and "second" "logical processes," Appx110-111, and the requirement of two logical processes was also present in the earlier version of the claims reciting "at least one"

processor, Appx10065. The required number of *processes* is thus independent of the number of permitted *processors*.

Even if the applicants thought the role of the two web browser processes was somehow related to the role of the two processors—we do not know what they thought because the specification does not describe two web browser processes—recapture cannot be avoided simply by adding a limitation having *some* connection to the surrendered subject matter. For example, in *Pannu v. Storz Instruments, Inc.*, 258 F.3d 1366 (Fed. Cir. 2001), the patentee distinguished prior art during original prosecution by amending its claims to require the claimed haptics to have the shape of a continuous, substantially circular arc. The reissue claims deleted that requirement but added another limitation requiring the claimed "snag resistant means" to have a width three times greater than the width of the haptics and to be substantially coplanar with the haptics. *Id.* at 1371-72. The patentee argued that it had not recaptured surrendered subject matter because both amendments related to the configuration of the haptics. But this Court rejected that argument, noting that the amendment during prosecution related to the shape of the haptics, whereas the amendment on reissue related to the positioning and dimensions of the "snag resistant means." *Id.* at 1372. The patentee was "estopped from attempting to recapture the precise limitation he added to overcome prior art rejections," and the reissue claims were invalid. *Id.* Likewise, in *General Electric*, the narrowing amend-

ment to the original application claims and the limitations added during reissue both involved the claimed synthetic jet assembly. But that did not save the reissue claims because the applicant's surrender during prosecution specifically related to *attachment* of that assembly to a sidewall, whereas the new limitations on reissue involved *positioning* of that assembly—a distinct issue. 789 F. App'x at 860-61.

The same analysis applies here. The claims initially sought during prosecution of the original application covered one or more processors; the claims that issued in the '247 patent were restricted to multi-processor embodiments; and the reissue claims now eliminate that restriction and again extend to one or more processors. That is recapture of the surrendered territory even if the patentees narrowed the claims in another respect during reissue prosecution. Avoiding the rule against recapture requires related narrowing "*such that full or substantial recapture of the subject matter surrendered during prosecution is avoided*." *General Electric*, 789 F. App'x at 859 (emphasis added; citation omitted); *Mostafazadeh*, 643 F.3d at 1358. The patentees here fully or at least substantially recaptured single-processor structures.

Plaintiffs contended, and the district court concluded, that the narrowing from "logical processes" to "web browser processes" obviated the need for multiple processors. But the original prosecution history makes clear that the number of processors does not depend on the number of processes or vice versa. The claims

have always required two or more logical processes of some sort. Yet the claims of the original application permitted one or more processors. The applicants' actions during prosecution of the '247 make clear that the claims were narrowed to require two or more processors not because two or more processors were necessary to run two logical processes, but because the applicants wanted to distinguish prior art. These reissue claims now specify two or more "web browser processes," but that has no bearing on the number of processors needed to run those processes. Indeed, the reissue claims allow either a single processor or multiple processors. As a matter of law, the narrowing on reissue to two "web browser processes" cannot be an excuse for recapturing single-processor structures.

### C. The reissue claims do not address an "overlooked aspect"

This Court has suggested in dicta that the rule against recapture would not apply when reissue claims are directed to "overlooked aspects" of an invention, i.e., "patentably distinct (1) inventions; (2) embodiments; or (3) species not originally claimed—not mere incidental features of the originally-claimed invention." *Mostafazadeh*, 643 F.3d at 1360 (citation omitted). The theory of this exception is that overlooking a separate and patentably distinct invention, embodiment, or species disclosed in the original application but not previously claimed may be an "error" and thus correctable by reissue. *See Youman*, 679 F.3d at 1347; MPEP § 1412.01(I) (9th ed. rev. June 2020).

In practice, however, the "overlooked aspects" exception is largely theoretical and rarely applied. Indeed, this Court has rejected patentees' attempts to invoke the exception in several cases, *see General Electric*, 789 F. App'x at 861; *Mostafazadeh*, 643 F.3d at 1360-61; *Hester*, 142 F.3d at 1482-84, and no opinion of this Court has held that the exception applied. The Court has also cautioned against conflating the "overlooked aspects" exception with step three of the test for the rule against recapture. Whereas step three considers whether there was a *related narrowing* as well as a broadening in the reissue claims, the "overlooked aspects" exception can apply only when the subject matter of the reissue claims is "*wholly unrelated* to the subject matter that was surrendered during prosecution …." *Mostafazadeh*, 643 F.3d at 1360 (emphasis added).

Here, the district court held that reissue claims 43 and 67 were directed to an overlooked embodiment of two "web browser processes," each capable of accessing website data. Appx60-64. The court erred for multiple reasons.

First, an embodiment can be "overlooked" only if it was disclosed in the first place. As explained above in connection with the original-patent requirement, the '247 specification nowhere described an embodiment with two web browser processes. Column 6 of the specification mentioned that "a network interface program (a browser, for example)" may be resident on the same processor as trusted programs and share common memory. Appx104. But it did not discuss *two* web

browser processes and certainly did not describe a dual-browser embodiment as an alternative to a dual-processor embodiment. *Id.* Figure 6 and its accompanying text never mentioned web browser processes at all—they dealt with online computer games rather than web browsing. Appx97 (Figure 6), Appx108 (14:28-54).

Second, even if two web browser processes had been disclosed, they were within the scope of the claims the applicants originally sought during prosecution because those claims recited two "logical processes," Appx10061, and a "web browser process" is a species of "logical process," Appx5047 (Plaintiffs' expert Dunsmore testifying that "a logical process could be just about anything," including "a process working with web browsers"). Indeed, dependent application claim 3 expressly recognized that the "second logical process" could be "an internet browser process." Appx10061 (reciting "an internet browser process" as one of six alternatives for that "logical process"). Moreover, Plaintiffs' expert asserted that Figure 6 fully disclosed all limitations of original application claims 1 and 15, which covered multi-processor embodiments. Appx5075. Thus, although the original '247 patent did not *clearly and unequivocally* call out two web browser processes, as required to satisfy the original-patent requirement, two web browser processes were still within the scope of what the applicants originally claimed via the broad "logical process" term.

As a matter of law, a narrowing limitation that was within the scope of an original claim cannot qualify as an "overlooked aspect." *General Electric*, 789 F. App'x at 861 (holding that a narrowing limitation within the scope of an original application claim cannot be an "overlooked aspect" and that reissue claims to a jet assembly subcombination were not an overlooked aspect because the original application claims encompassed that subcombination); *Hester*, 142 F.3d at 1483 ("overlooked aspects" exception did not apply because an original claim also required "high humidity steam" and a "spiral conveyance path"). That is the case here.

Third, the district court's analysis of the "overlooked aspects" exception was inconsistent with its analysis of the third step of the recapture test. By definition, an "overlooked aspect" is something "*wholly unrelated*" to and "patentably distinct" from what was claimed previously. *Mostafazadeh*, 643 F.3d at 1360. In analyzing step three, the district court focused on the narrowing from two "logical processes" to two "web browser processes" and concluded that that amendment was *related* to the recovery of single-processor structures. In analyzing the "overlooked aspects" exception, the district court relied on the same basis and limitation, reasoning that the overlooked aspect was use of two web browser processes rather than one. But if use of two web browser processes was related to use of a single processor, which the applicants had previously claimed, for purposes of step three, then it cannot also be

"wholly unrelated," let alone a patentably distinct invention, as required to qualify as an "overlooked aspect."

Finally, the district court suggested that the applicants had originally focused on isolating the first logical process from external networks. Appx62. According to the district court, the patentees claimed *non*-isolated first processes in reissue after they had originally (a) treated isolated first processes as the essence of their invention and (b) distinguished art that lacked an isolated first process. *See* Appx36, Appx62; Appx10155-10156. But even accepting all that as true, the patentees still violated the rule against recapture. Arguments can trigger the rule against recapture just as much as narrowing amendments. *Hester*, 142 F.3d at 1481-82. And the patentees were not entitled to tell the Patent Office and the public that their invention was isolation of the first process and then claim *non*-isolated first processes in reissues.

* * *

As this Court has recognized for decades, "[t]he realm of corrections contemplated within § 251 does not include recapturing surrendered subject matter, without the addition of materially-narrowing limitations, in an attempt to 'custom-fit' the reissue claims to a competitor's product." *Hester*, 142 F.3d at 1483-84. The patentees here violated that principle, and claims 43 and 67 should be declared invalid.

## IV. Google did not infringe any claim

Even if the claims were valid, Google did not infringe them as a matter of law.

### A. The accused first and second web browser processes share memory and thus lack distinct memory spaces

All four asserted claims require a "first web browser process" that accesses a "first memory space" and a "second [or protected] web browser" that accesses a "second [or protected] memory space." Appx136-137; Appx160, Appx163-164; Appx189-190. At claim construction, the district court ruled that the "first" and "second/protected" memory spaces must be "distinct" from each other. Appx2524-2532. And Plaintiffs' expert agreed that, as a result, the two memory spaces must not overlap. Appx4318-4319.

Thus, although the second web browser may access the second memory space, it must *not* have access to the distinct first memory space. Indeed, Plaintiffs' expert and inventor Cioffi agreed that preventing the second process running on the second processor from accessing the first memory was the essence of the claimed invention, whose goal is to isolate malware. Appx4236-4237; Appx4119-4123, Appx4139-4140; *see also* Appx4317 (Plaintiffs' expert agreeing that "the second processor has to be prevented from accessing the first memory space.").

Plaintiffs failed to prove infringement because the accused Chrome browsers did *not* prevent the accused "second web browser process" from accessing the "first

memory space" reserved for the "first web browser process."[1] Under Plaintiffs' infringement theory, Chrome's Browser process was the claimed "first web browser process," while Chrome's Renderer Process was the claimed "second web browser process." According to Plaintiffs' expert, Dr. Rubin, Chrome's "first memory space" was "the hard disk and *that portion of the browser process memory that cannot be accessed by the rendering processes*." Appx5134 (emphasis added).

Plaintiffs' expert agreed that when Chrome started up, all memory allocated to the Browser process's memory space was accessible *only* to the Browser process—the Renderer process could not access any of it. Appx5144-5147. Thus, under Plaintiffs' expert's own definition, all memory allocated to the Browser was "first memory space." *Id.*

The problem—for Plaintiffs—was that Chrome's Renderer process (the alleged "second web browser process") later gained access to some of that "first memory space" allocated to the Browser. Numerous Google witnesses confirmed that the Browser process passed the Renderer process a "handle" giving the Renderer process access to that portion of the memory, and the Browser and Renderer then proceeded to *share* that memory to communicate with each other. Appx4603-4604 (Upson); Appx4719-4721 (Larson); Appx4868-4879 (expert Kogan). Chrome's

[1] Google preserved this argument by moving for JMOL both during trial, Appx3909-3910, and after trial, Appx5359-5366.

documentation and source code confirmed this memory-sharing. Appx11613-11820; *see* Appx4872-4878 (expert Kogan explaining this evidence).

The following demonstrative exhibit from trial illustrates how the accused "first memory" and "second memory" overlapped:




Plaintiffs did not dispute the critical facts. Indeed, their expert *agreed* that Chrome's Browser and Renderer processes shared memory allocated to the Browser:

> Q Some of the memory that is allocated to the browser kernel is also shared with the renderer process, correct?
>
> A Correct.
>
> …
>
> Q … [T]hat shared memory is a set of addresses that both the browser kernel and the renderer process can access?
>
> A Correct.

Appx4321-4322; *see also* Appx5146-5149. Because the accused "second browser process" (the Renderer process) had access to "first memory space" that must be reserved solely for the "first browser process" (the Browser process), Google did not infringe.

In contending that the accused products did infringe, Plaintiffs recharacterized the "second memory space" as whatever memory the Renderer could access. Appx5139 (Rubin). To illustrate this counterargument, Plaintiffs' expert recolored the shared-memory region green and unilaterally declared it to be part of the "second memory space":







But Plaintiffs and their expert were not entitled to put on green eyeshades and recolor the world to suit their infringement theory. As discussed above, Plaintiffs conceded that when Chrome started up, the memory space labeled "Shared Memory" was accessible only to the first (Browser) process and not to the second (Renderer)

process. As such, that memory space was necessarily "first memory space" under Plaintiffs' expert's own definition of the term as "that portion of the browser process memory that cannot be accessed by the rendering process." Appx5134. That memory space was later shared with the Renderer process when the Browser process sent a "handle" to the Renderer process, Appx5146-5149 (Rubin), but that could not and did not change the fact that that memory was "first memory space" allocated to the Browser process. Indeed, it would make no sense to call a memory space created and allocated for a "first web browser process" a "second memory space" for use by a "second web browser process."

Nothing in the patents supports Plaintiffs' notion that "first memory space" can be converted into "second memory space" to permit the very sharing of memory resources that the patents condemn as unsafe. These patents do not treat memory as a chameleon that can change color and status at will. Figure 1 shows first processor 120 and second process 140 sharing access to *second* memory space 130, but *first* memory space 110 remains off limits to second processor 140 throughout:




Again, the point is to ensure that the second, suspect process cannot corrupt memory being used by the first process.

Contrary to the district court's suggestion, Appx78-80, there was no material fact dispute, and this was not an issue of expert credibility for the jury to resolve. As discussed above, the experts *agreed* on how the accused web browser processes work, including the fact that certain memory first allocated exclusively to and accessible only by the Browser process was later shared with the Renderer process. The dispute here is whether that undisputed operation falls within the claims' scope, which is a matter of *law*, not fact. *See, e.g.*, *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996) ("Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of [the claims] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment.").

Simply put, the claimed invention requires that once memory is allocated to the "first memory space" (i.e., is accessible only to the "first web browser process"), that memory must remain off-limits to the "second web browser process." Because the accused Chrome browsers undisputedly did not isolate the "first web browser process" and "first memory space" in this way, they did not infringe. This Court should therefore reverse the district court and direct entry of judgment of non-infringement of all four claims even if it deems those claims valid under § 251(a).

### B. Plaintiffs failed to show that Google intended infringement, as required for indirect infringement of the method claims

As to the two method claims, claim 5 of the RE'528 patent and claim 49 of the RE'529 patent, Plaintiffs asserted only that Google had actively induced or contributed to infringement by non-party end-users. *See* Appx4289. Both active inducement of and contribution to third-party infringement require the defendant to have a specific intent to cause infringement, including knowledge of the asserted patent—not just an intent to cause acts that happen to infringe. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 638-43 (2015); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc). More specifically, as the district court instructed, active inducement under 35 U.S.C. § 271(b) requires knowledge of another's infringement and intent to induce acts that constitute infringement, while contributory infringement under 35 U.S.C. § 271(c) requires knowledge of another's infringement

and knowledge that the accused component has no substantial non-infringing uses. Appx5210-5211.

This Court should direct entry of judgment of no infringement of claims 5 and 49 because Plaintiffs did not prove the necessary intent to cause infringement.[2] Plaintiffs' entire case on both inducement and contributory infringement consisted of two pages of testimony from its technical expert. That expert had no personal knowledge of or expertise regarding Google's intent, Appx4290-4291, and his conclusory testimony could not and did not provide substantial evidence on that issue, which Plaintiffs bore the burden of proving, *see*, *e.g.*, *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006).

As to inducement, Plaintiffs' expert first testified that Chrome was "configured to infringe when it opens" because it launches both a browser kernel and a rendering process. Appx4290. But as shown above, Chrome *could not* infringe when opened because at that point in time, portions of what Plaintiffs asserted was the "second memory space" were allocated solely to the Browser (the alleged "first browser process"). That fact was undisputed. Moreover, evidence that Chrome by

---

[2] Google preserved this issue by moving for JMOL both during and after trial. Appx3911; Appx5351-5354.

default launched both Browser and Renderer processes was not proof that Google specifically sought to encourage infringement.

The expert next testified that Google "discourage[d] end users from using [the] non-infringing mode of Chrome" because Google "documentation" said that single-process mode was not safe or robust. *Id.* But he identified neither the documentation nor who would have seen it, and he did not explain how it showed a specific intent to cause patent infringement.

Finally, the expert asserted that Google marketed the features accused of infringement. Appx4290-4291 (citing two exhibits). But the fact that Google's marketing materials mentioned the accused features is hardly evidence that Google specifically intended to cause *patent infringement*. Even assuming Google intended to cause acts that were ultimately found to infringe, Plaintiffs did not show, as required, that Google knew at the time that it was causing others to infringe and actively encouraged such infringement.

Plaintiffs' evidence of contributory infringement was even thinner. As just discussed, Plaintiffs failed to prove that Google specifically intended to cause patent infringement. Moreover, their expert merely testified that there was no substantial non-infringing use of Chrome because "running in single process mode [wa]s discouraged by Google." Appx4291. But even assuming Google discouraged *a* non-infringing use, that did not show that that use was insubstantial, much less that there

were no *other* substantial non-infringing uses. Plaintiffs took a shortcut, skipped second base, and the district court erred by not calling them out.

Moreover, although Google did not bear the burden of proof, other evidence undermined Plaintiffs' assertion. First, Google won judgment of non-infringement based on the district court's original claim construction. Appx2624-2626. Having actually prevailed, it could not have had a specific intent to cause infringement until this Court reversed that judgment on November 17, 2015.[3] Second, Google established a substantial non-infringing use both before and after that date. Plaintiffs' expert conceded that Chrome could be used to view locally stored files (e.g., photos and movies), and such uses have no network connection as the claims require. Appx5149-5150. Google's supposed discouragement of "single process mode" in networked contexts was irrelevant to such non-networked use.

The Court should therefore enter judgment of non-infringement of the two asserted method claims even if those claims are deemed valid reissue claims.

---

[3] The pretrial order prevented the jury from hearing about the original claim construction and judgment for Google, Appx3514-3515 ¶ 51, but the fact of that judgment establishes no indirect infringement before November 17, 2015, as a matter of law.

## CONCLUSION

The Court should reverse the judgment for Plaintiffs and direct entry of judgment for Google.

Respectfully submitted,

PERKINS COIE LLP

by /s/Dan L. Bagatell

Dan L. Bagatell

O'MELVENY & MYERS LLP

by /s/Darin W. Snyder

Darin W. Snyder

Counsel for Google LLC

## ADDENDUM

Final Judgment (Appx1-5)

Opinion and Order Resolving the § 251 Issues (Appx6-71)

Opinion and Order Denying Google's Motion for JMOL of Non-Infringement (Appx72-88)

The Original '247 Patent (Appx89-111)

The RE'500 Patent (Appx112-137)

The RE'528 Patent (Appx138-164)

The RE'529 Patent (Appx165-191)

Case: 22-1049 Document: 23 Page: 80 Filed: 05/16/2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CIOFFI et al.,<br>*Plaintiffs*,<br>v.<br><br>GOOGLE LLC,<br>*Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:13-cv-103 |

**STIPULATED FINAL JUDGMENT**

A jury trial commenced in this case on February 6, 2017. The jury returned a unanimous verdict (Dkt. No. 259) finding infringement and that the claims in suit were not invalid.

Thereafter, Defendant Google, LLC moved for judgment as a matter of law and new trial on (i) invalidity under 35 U.S.C. §§ 102, 103 and 251 (Dkt. No. 292), and (ii) non-infringement, damages, patent ineligibility, and intervening rights (Dkt. No. 293).

On March 29, 2018, the Court granted Google's motion for new trial in part as to Google's § 251 invalidity defenses, instructing the parties to submit proposed findings of fact and conclusions of law, and carried Google's § 102 and 103 invalidity arguments.

On August 26, 2021, the Court issued its findings of facts and conclusions of law denying Google's invalidity defenses under 35 U.S.C. § 251 (Dkt. No. 340).

On September 3, 2021, the Court issued a memorandum and order denying Google's motion for judgment as a matter of law and new trial as to a non-infringement, damages, patent ineligibility, and intervening rights (Dkt. No. 342).

On December 6, 2021, the Court issued a memorandum and order denying Google's motion for judgment as a matter of law and new trial as to invalidity under 35 U.S.C. § 102 and 103 (Dkt. No. 344).

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's verdict, the Court's post-trial rulings and findings, and the entirety of the record available to the Court, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. Defendant Google infringes claim 43 of U.S. Patent No. RE43,500; claims 5 and 67 of U.S. Patent No. RE43,528; and claim 49 of U.S. Patent No. RE43,529.

2. The asserted claims are not invalid under 35 U.S.C. §§ 102 and103, pursuant to the jury verdict returned in this case.

3. The asserted claims are not invalid under § 251, pursuant to the Court's findings of fact and conclusions of law (Dkt. Nos. 340, 341).

4. The asserted claims are not ineligible for patent protection under 35 U.S.C. § 101 (*see* Dkt. Nos. 212, 226, 342).

5. Plaintiffs are hereby awarded compensatory damages against Google and shall accordingly have and recover from Google the sum of $20,000,000 U.S. Dollars ($20 million), which amount is a running royalty.

6. As explained in the Court's Order regarding ongoing royalties (Dkt. No. 307), Google is **ORDERED** to pay an ongoing royalty of $0.002601 per Chrome user per month. Such royalty rate shall apply to infringing uses that occurred during the period from February 1, 2017, through the entry of this Final Judgment, as well as for all future infringing uses during the remaining life of the asserted patents.

7. Twice a year, Google shall produce a report of 7-day active users of all infringing versions of Chrome as of the 1st day of each month beginning February 1, 2017 and there forward for all ongoing and future infringing uses during the remaining life of the asserted patents (Dkt. No. 307). During the appeal of this judgment to the Federal

Circuit, Google shall deliver to Plaintiffs such reports by the last day of each month of February and August of the year. For avoidance of doubt, in 2022, the first report shall be due by February 28, 2022, and the second report shall be due by August 31, 2022.

8. Pursuant to 35 U.S.C. § 284, the Court awards Plaintiffs pre-judgment interest based on the 5-Year Treasury Note (constant maturity) rate,[1] compounded monthly, and calculated based on monthly payments. The Court also awards pre-judgment interest at the corresponding per-diem rate from February 11, 2017 (the day after the jury's verdict) through entry of this Final Judgment.

9. Pursuant to 28 U.S.C. § 1961, the Court awards Plaintiffs post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Final Judgment until paid.

10. Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiffs are the prevailing party in this matter and are entitled to recover their costs from Google. Pursuant to the agreed Bill of Costs filed by Plaintiffs (Dkt. No. 281, Ex.B), Plaintiffs are awarded $89,931.28 in costs.

11. All other relief requested by either party and not specifically addressed herein is **DENIED**.

12. In accordance with the parties' agreement as reflected herein, this judgment is stayed during its appeal to the Federal Circuit, except for the bi-annual reporting of 7-day active users discussed above. If this judgment becomes enforceable after appeal, Google will continue to provide bi-annual reports of 7-day active users according to the same schedule and also make corresponding

[1] Said rate further described at: http://www.bankrate.com/rates/interest-rates/5-year-treasury-bill.aspx.

bi-annual payments on the judgment on the same schedule, with the first payment covering past damages and ongoing royalties through to the last date reported in the first report provided after the appeal.

The Clerk is directed to **CLOSE** the above referenced case.

**So ORDERED and SIGNED this 19th day of January, 2022.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

AGREED TO IN SUBSTANCE AND FORM:

*/s/ Eric W. Benisek*
Eric W. Benisek
Jeffrey T. Lindgren
Richard C. Vasquez
Robert S. McArthur
Vasquez, Benisek & Lindgren
LLP 1550 Parkside Drive, Suite
130 Walnut Creek, CA 94596
925-627-4250
ebenisek@vbllaw.com

*/s/ William E. Davis III*
William E. Davis III
Davis Firm PC
213 N. Fredonia St., Suite 230
Longview, Texas 857-1
903-230-9090
bdavis@davisfirm.com

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt
Charles Ainsworth
Parker Bunt & Ainsworth
100 E. Ferguson, Suite 418
Tyler, Texas 75702
903-531-3535
rcbunt@pbatyler.com

ATTORNEYS FOR PLAINTIFFS

*/s/ Darin W. Snyder*
Darin W. Snyder
O'Melveny & Myers
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
415-984-8700
dsnyder@omm.com

*/s/ Michael E. Jones*
Michael E. Jones
Potter Minton
110 N. College Avenue, Suite 500
Tyler, Texas 75702
903-597-8311
mikejones@potterminton.com

ATTORNEYS FOR DEFENDANT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ALFONSO CIOFFI, MELANIE ROZMAN, MEGAN ROZMAN, MORGAN ROZMAN,<br><br>*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br><br>*Defendant*. | § § § § § § § § § § § § § | CIVIL ACTION NO. 2:13-CV-00103-JRG |

**ORDER AND MEMORANDUM OPINION REGARDING DEFENDANT'S RULE 50(B) MOTIONS BASED ON 35 U.S.C. § 251 AND THE RULE AGAINST RECAPTURE SUPPORTED BY FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court held a jury trial in this case from February 6 to 10, 2017. (Dkt. Nos. 255–58, 261). At the conclusion of the trial, the jury returned a unanimous verdict finding that the patents asserted by Plaintiffs Alfonso Cioffi, Melanie Rozman, Megan Rozman, and Morgan Rozman (collectively, "Plaintiffs") against Defendant Google Inc. ("Google") were infringed and not invalid. (Dkt. No. 259). After the trial, Google filed a Motion for Post-Trial Relief on Invalidity Under 35 U.S.C. §§ 102, 103 and 251, seeking either entry of judgment as a matter of law under Fed. R. Civ. P. 50(b) or the granting of a new trial pursuant to Fed. R. Civ. P. 59 (the "Motion"). (Dkt. No. 292). The Court granted-in-part Google's Motion as to the issue of invalidity pursuant to 35 U.S.C. § 251 on March 29, 2018, and ordered that the § 251 issues be adjudicated to the bench. (Dkt. No. 319). The Court now separately issues the following Findings of Fact ("FF") and Conclusions of Law ("CL") addressing Google's § 251 defenses. After careful consideration

of the evidence and the parties' arguments, and for the reasons set forth herein, the Court concludes that Google has not shown by clear and convincing evidence that U.S. Reissue Patent Nos. RE43,500 (the "'500 Patent"), RE43,528 (the "'528 Patent"), and RE43,529 (the "'529 Patent") (collectively, the "Asserted Patents") are invalid under 35 U.S.C. § 251. Accordingly, the Motion as to § 251 is **DENIED**.

## I. FINDINGS OF FACT

### A. The Parties

**[FF1]** Plaintiff Alfonso J. Cioffi ("Mr. Cioffi") and the late Allen F. Rozman ("Mr. Rozman") (collectively, "Inventors" or "Applicants") are co-Inventors of U.S. Reissue Patent Nos. RE43,500 (the "'500 Patent"), RE43,528 (the "'528 Patent"), and RE43,529 (the "'529 Patent") (collectively, the "Asserted Patents"), which reissued from U.S. Patent No. 7,484,247 (the "'247 Patent"). *See* PTX-001 ('247 Patent); PTX-002 ('529 Patent); PTX-003 ('500 Patent); and PTX-004 ('528 Patent). Mr. Cioffi lives in Murphy, Texas. (Dkt. No. 1 ¶ 1).

**[FF2]** Plaintiffs Melanie Rozman, Morgan Rozman, and Megan Rozman (the "Rozmans") are the daughters of the late Mr. Rozman. (*Id.* ¶¶ 5–7). The Rozmans each live in Murphy, Texas. (*Id.* ¶¶ 5–7).

**[FF3]** Mr. Cioffi and the Rozmans are the joint and one hundred percent (100%) owners of the Asserted Patents. (*Id.* ¶ 8).

**[FF4]** Google is a Delaware Corporation having its principal place of business at 1600 Amphitheater Parkway, Mountain View, California 94043. (Dkt. No. 1 ¶ 9; Dkt. No. 8 ¶ 9).

### B. Procedural History

**[FF5]** On February 5, 2013, Plaintiffs sued Google for patent infringement. (Dkt. No. 1). Plaintiffs alleged that Google infringed the Asserted Patents based on features of Google's

Chrome web browser. (*See id.* ¶¶ 15–26; *see also* Dkt. Nos. 179, 183 (narrowing this case to the Asserted Patents)).

**[FF6]** Each of the Asserted Patents is titled "System and Method for Protecting a Computer System from Malicious Software" and is a reissue patent derived from U.S. Patent No. 7,484,247 ("the '247 Patent"). *See* PTX-001 ('247 Patent); PTX-002 ('529 Patent); PTX-003 ('500 Patent); PTX-004 ('528 Patent). The '247 Patent issued from U.S. Patent Application No. 10/913,609 (the "'609 Application"). PTX-001 at 1.

### 1. Relevant Claim Construction

**[FF7]** On August 28, 2014, the Court construed the term "web browser process," as recited in the claims of the Asserted Claims, to mean a "process that can access data on websites." (Dkt. No. 71 at 15). The Court's construction also explained that the "'web browser process' must be capable of accessing a website without using another web browser process." (*Id.* at 14).

**[FF8]** On November 26, 2014, Plaintiffs filed a stipulation and proposed final judgment of non-infringement based in part on the Court's construction of "web browser process." (Dkt. No. 99). The Court entered the proposed judgment on December 2, 2014. (Dkt. No. 104).

**[FF9]** Plaintiffs appealed the Court's claim construction of "web browser process" to the Court of Appeals for the Federal Circuit. (Dkt. No. 105.) The Federal Circuit agreed with the Court's construction of "web browser process" as a "process that can access data on websites" but clarified the construction by noting that the "'web browser process' alone does not have a 'direct' access capability requirement." *Cioffi v. Google, Inc.*, 632 F. App'x. 1013, 1021–22 (Fed. Cir. 2015). The Federal Circuit remanded this case for further proceedings pursuant to its guidance. *Id.* at 1023–24. (*See also* Dkt No. 200 (Joint Pre-Trial Order) § V.D. (Stipulated Claim Construction)).

### 2. Jury Trial

**[FF10]** On remand from the Federal Circuit, the parties proceeded through discovery, pretrial practice, and trial.

**[FF11]** A jury trial was conducted from February 6 to 10, 2017. (Dkt. Nos. 263–273). Plaintiffs asserted four claims of the Asserted Patents at trial: Claim 43 of the '500 Patent; Claims 5 and 67 of the '528 Patent; and Claim 49 of the '529 Patent (collectively, the "Asserted Claims").

**[FF12]** Google did not use the full 12 hours allotted to present its case to the jury. (*See* Dkt. No. 297 at 3 (admitting that "Google did not use its full 12 hours")).

**[FF13]** On February 10, 2017, the jury returned a unanimous verdict finding that the Asserted Claims were infringed and not invalid. (Dkt. No. 259). As to invalidity, the jury found that Google did not prove by clear and convincing evidence: (1) invalidity of Claim 67 of the '528 Patent as anticipated, as violating the rule against recapture, or as violating the original patent requirement; (2) invalidity of Claim 43 of the '500 Patent as obvious, as violating the rule against recapture, or as violating the original patent requirement; (3) invalidity of Claim 5 of the '528 Patent as obvious, or as violating the original patent requirement; or (4) invalidity of Claim 49 of the '529 Patent as obvious, or as violating the original patent requirement. (*Id.*)

**[FF14]** On September 15, 2017, the Court entered Final Judgment in accordance with the jury's verdict. (Dkt. No. 308).

### 3. Rule 50(a) Motions

**[FF15]** Before the jury was charged, Google filed a Motion for Judgment as a Matter of Law under Fed. R. Civ. P. 50(a). (Dkt. No. 251). Google argued, among other things, that since "[t]wo asserted claims violate the recapture rule[] and all [asserted claims] violate the original-patent requirement[,] [a]ll [Asserted Claims] are thus invalid under § 251." (*Id.* at 4). As to the

original patent requirement, Google argued that the Asserted Claims "cover[ed] subject matter that was not disclosed in the '247 patent's specification" on four grounds: (1) "Two of the asserted reissue claims now operate on a single processor or processor core"; (2) "All of the asserted claims require both a first and a second 'web browser process'; (3) "asserted claims require passing network data from the first to the second web browser process"; and (4) "asserted claim 49 of the '529 patent requires the first web browser process to open or initialize the second web browser process." (*Id.* at 6).

**[FF16]** The Court subsequently provided Google with an opportunity to present its § 251 defenses outside the presence of the jury. (*See* Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 122:9–11, 131:18–134:22 ("Counsel, the Court will now entertain motions under Rule 50(a) of the Federal Rules of Civil Procedure. . . . Let me hear anything that falls under Section 251. . . .")); *see also Biscotti Inc. v. Microsoft Corp.*, No. 2:13-cv-01015, Dkt. No. 310 at 1 (E.D. Tex. Oct. 3, 2017) ("After the close of evidence, and while the jury was deliberating, the Court provided the parties an opportunity to present evidence and argument in support of and in opposition to, as appropriate, any equitable defenses urged by Microsoft."); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-cv-201, Dkt. No. 895 at 1 (E.D. Tex. Dec. 28, 2017) ("[A]fter both sides finished presenting evidence to the jury and before the Court submitted to the jury those issues proper for its consideration, the Court conducted a bench trial outside the presence of the jury on [defendant]'s equitable estoppel defense.").

**[FF17]** However, Google did not offer any evidence or argument related to its third and fourth original patent requirement grounds under § 251. (*Compare* Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 131:17–132:12 ("Google moves for invalidity under 35 U.S.C. Section 251 that Claim 43 of the '500 patent and Claim 67 of the '528 patent are invalid because the Plaintiffs recaptured

surrendered claim scope, and these claims are not directed to overlooked aspects . . . . Google also moves for judgment as a matter of law that all asserted claims are invalid under 35 U.S.C. [§ 251] and the original patent requirement, including at least because, number one, for Claim 43 of the ’500 patent and Claim 67 of the ’528 patent, original ’247 patent does not clearly and unequivocally disclose a single-core processor. And number two, the original ’247 patent does not clearly and unequivocally disclose a first web browser process with access to a network.”) *with* Dkt. No. 251 at 6 (identifying four asserted invalidity grounds under the original patent requirement of § 251)).

### 4. Rule 50(b) Motions

**[FF18]** After acceptance of the verdict and entry of judgment, Google filed a Motion for Post-Trial Relief on Invalidity under 35 U.S.C. §§ 102, 103, and 251, seeking either entry of judgment as a matter of law under Fed. R. Civ. P. 50(b) or a new trial pursuant to Fed. R. Civ. P. 59. (Dkt. No. 292). Google argued, among other things, that a new trial should be granted on all issues because the § 251 issues—that is, invalidity under the rule against recapture and original patent requirement—should not have been presented to and decided by the jury. (*Id.* at 2–20). Specifically, Google argued that Claim 43 of the ’500 Patent and Claim 67 of the ’528 Patent violated the rule against recapture by improperly recapturing surrendered subject matter of a system with just one processor. (*Id.* at 6–14) Google also argued that the Asserted Claims violated the original patent requirement under § 251 because the ’247 Patent specification does not clearly and unequivocally disclose: (1) the limitations of all the Asserted Claims requiring two or more “web browser processes”; (2) the limitations of Claim 43 of the ’500 Patent and Claim 67 of the ’528 Patent encompassing an embodiment with only one processor; (3) the limitations of Claim 43 of the ’500 Patent, Claim 67 of the ’528 Patent, and Claim 49 of the ’529 Patent requiring that

a "first web browser process" pass data to a "second web browser process"; and (4) the limitations of Claim 49 of the '529 Patent requiring a "first web browser process" to initialize a "second web browser process." (*Id.* at 14–20).

**[FF19]** On March 29, 2018, the Court granted-in-part Google's motion for a new trial and ordered that final judgment be vacated, the jury verdict be preserved except as to invalidity under § 251, and that the § 251 invalidity issues be adjudicated before the bench. (Dkt. No. 319).

**C. Trial Witnesses**

**[FF20]** The Court finds the witnesses' live testimony in this case credible, including that of Mr. Cioffi, Dr. Aviel Rubin, Dr. Hubert Dunsmore, Dr. William Arbaugh, and Dr. Michael Kogan.

**[FF21]** Mr. Cioffi testified at trial as a fact witness and was precluded from offering expert opinions. (*See* Dkt. No. 217 (Order on Motions *in Limine*) at 5 ("Exclude fact/lay witnesses from offering opinions regarding whether or not any accused product or asserted prior art reference reads on the asserted claims. To be clear, Mr. Alfonso Cioffi . . . . may not reference any specific patent claims or offer any infringement analysis for specific claims or limitations as part of his testimony")).

**[FF22]** Google's expert—Dr. Michael Kogan ("Dr. Kogan")—and Plaintiffs' expert—Dr. Hubert Dunsmore ("Dr. Dunsmore")—each testified on, among other things, invalidity under 35 U.S.C. § 251—including both the rule against recapture and the original patent requirement. (*See* Dkt. Nos. 268 (Trial Tr. 2/8/17 pm), 270 (Trial Tr. 2/9/17 am), 271 (Trial Tr. 2/9/17 pm)).

**[FF23]** Dr. William Arbaugh ("Dr. Arbaugh") testified on behalf of Google on the issues of invalidity under 35 U.S.C. §§ 102 and 103, including general technical issues. (*See* Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 52:8–18).

**[FF24]** The Court further finds the experts proffered by the Plaintiffs and by Google were qualified to offer the expert testimony that they provided in this case.

**D. Disclosure of the '247 Patent**

**[FF25]** The '247 Patent discloses a security architecture for protecting a computer system from malicious software. *See* PTX-001 at 1:6–7, 2:1–2. The '247 Patent explains that with the growing usage of the Internet and networked services, "malicious software generally known a[s] malware" had emerged as a significant threat to computer users. *Id.* at 3:46–47. When downloaded to a user's computer, malware "interferes with the smooth operation of the computer system, and in the extreme, can lead to the unauthorized disclosure of confidential information stored on the computer system, significant degradation of computer system performance, or the complete collapse of computer system function." *Id.* at 3:57–62.

**[FF26]** Figure 1 below depicts this architecture in a "computer system 100," which may be a "personal computer (PC) system, a server, a portable computer, such as a notebook computer, or any data processing system, a personal digital assistant (PDA), [or] a communication device such as a cell phone." *Id.* at Fig. 1, 9:30–37.




Fig. 1

**[FF27]** The '247 Patent specification teaches that the computer system 100 includes: (1) "a first processor 120 (P1)" connected to a "first memory and data storage area 110 (M1)" and (2) a "second processor 140 (P2)" connected to a "second memory and data storage area 130 (M2)." *Id.* at 9:37–39, 10:29–37. P1 may be physical hardware processor:

> P1 100 may comprise, for example, a microprocessor, such as a Pentium® 4 processor, manufactured by the Intel Corporation, or a Power PC® processor, manufactured by the IBM Corporation. Other electronic data processors manufactured by other companies, including but not limited to electronic data processors realized in Application Specific Integrated Circuits (ASICs) or in Field Programmable Gate Arrays (FPGAs), are within the spirit and scope of the present invention.

*Id.* at 9:39–47. Likewise, "second processor 140 (P2) . . . may comprise any electronic data processor, such as the devices previously described as applicable to first processor 120." *Id.* at 10:31–34.

### E. Google's § 251 Invalidity Grounds

**[FF28]** Google identified 35 U.S.C. § 251 as a defense in its pre-trial statement. (Dkt. No. 18-1 ¶¶ 22, 120).

**[FF29]** Google alleges four grounds of invalidity under the original patent requirement of § 251. (*See* Dkt. No. 292 at 15–20). *See also* FF ¶ 15.

**[FF30]** Google also alleges one invalidity ground under the rule against recapture of § 251. (*See* Dkt. No. 292 at 6–14). *See also* FF ¶ 15.

#### 1. Facts Relevant to Google's Original Patent Requirement Defense

##### *a. Two or More "Web Browser Processes" Limitation of the Asserted Claims*

**[FF31]** The originally issued claims of the '247 Patent recited two "logical processes": (1) a "first logical process," and (2) a "second logical process." PTX-001 at Claims 1–20.

**[FF32]** All four Asserted Claims replace the two "logical processes" limitations as claimed in the '247 Patent with limitations requiring two "web browser processes." *See* PTX-003 at Claim 41; PTX-004 at Claim 1; PTX-002 at Claim 36. In particular, each Asserted Claim recites a "first web browser process" and a "second web browser process." PTX-003 at Claim 41; PTX-004 at Claim 1; PTX-002 at Claim 36.

**[FF33]** Asserted Claim 43 of the '500 Patent depends from independent Claim 41, which recites:

> 41. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on a portable computer and communication device capable of executing instructions using a common operating

Case: 18-1049 Document: 23 Page: 95 Filed: 05/16/2022

> system and having at least one electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space, the portable computer and communication device including a network interface device configured to exchange data across a network of one or more computers using a wireless connection, and an intelligent cellular telephone capability with a secure web browser including ***a first web browser process and a second web browser process***, configured to:
>
> open the ***first web browser process*** within the common operating system, wherein the first web browser process is capable of accessing data of a website via the network and accessing data contained in the first memory space;
>
> open the ***second web browser process*** within the common operating system on command from the ***first web browser process***, wherein the ***second web browser process*** is capable of accessing data contained in the second memory space and is further capable of generating data;
>
> pass data from the ***first web browser process*** to the ***second web browser process***; and process data from the ***second web browser process***;
>
> wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the ***second web browser process***.

PTX-003 at Claim 41 (emphasis added).

**[FF34]** Asserted Claim 5 of the '528 Patent depends from independent Claim 1, which recites:

> 1. A method of operating a computer system capable of exchanging data across a network of one or more computers and having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising:
>
> executing a ***first web browser process***, capable of accessing data of a website via the network, in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space;
>
> executing a ***second web browser process*** in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space; and
>
> displaying data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to a display;
>
> wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the ***second web browser process***.

PTX-004 at Claim 1 (emphasis added).

**[FF35]** Claim 67 of the '528 Patent depends from independent Claim 64, which recites:

64. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device configured to exchange data across a network of one or more computers and access at least one website, configured to:

store at least one system file within the first memory space;

open a ***first web browser process***, capable of accessing data of the at least one website via the network, in a first logical process, the first logical process being configured to access data contained in the first memory space;

open a ***second web browser process*** in a second logical process, the second logical process being configured to access data contained in the second memory space; and

pass data from the ***first web browser process*** to the ***second web browser process***, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the ***second web browser process***.

*Id*. at Claim 64 (emphasis added).

**[FF36]** Asserted Claim 49 of the '529 Patent depends from independent Claim 36, which recites:

36. A method of operating a portable computer based system employing a common operating system and configured with a first memory space and a second protected memory space and at least one electronic data processor, comprising:

storing at least one system file within the first memory space;

downloading website content potentially containing malware from a network of one or more computers using a secure web browser process, wherein the secure web browser process is configured to execute on the at least one electronic data processor, and comprises ***a first web browser process*** and at least ***one second protected web browser process***, the ***first web browser process*** and the at least one ***second protected web browser process*** being configured to access the website content via the network of one or more computers;

executing instructions in the ***first web browser process***, wherein the ***first web browser process*** is configured to access data contained in the first memory space and to initialize the at least one ***second protected web browser process***;
passing data from the ***first web browser process*** to the at least one ***second protected web browser process***;

passing data from the ***first web browser process*** to the at least one ***second protected web browser process***;

> executing instructions in the at least one ***second protected web browser process***, wherein the at least one ***second protected web browser process*** is configured to access data contained in the second protected memory space and to execute instructions from the downloaded website content, wherein the downloaded website content is capable of accessing the second protected memory space but is denied access to the first memory space;
>
> displaying digital content generated by the secure web browser process;
>
> wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by website content potentially containing malware downloaded from the network and executing as part of the at least one ***second protected web browser process***.

PTX-002 at Claim 36 (emphasis added).

**[FF37]** The '247 Patent specification discloses the use of "logical processes." *See, e.g.*, PTX-001 at 16:34–43. The specification identifies a number of exemplary functions carried out by such logical processes: "executing instructions," PTX-001 at 7:64–65, 8:2–3; "accessing data contained in a first memory space and a second memory space," PTX-001 at 7:65–67; "exchanging data across a network of one or more computers," PTX-001 at 8:5–6; providing data for display, PTX-001 at 8:8–10; "a malware program" executing as part of a logical process, PTX-001 at 8:15–17; "executing instructions necessary to carry out the functions of an operating system," PTX-001 at 16:25–27; "executing instructions necessary to carry out a first computer program, including but not limited to a word processor," PTX-001 at 16:27–30; "executing instructions necessary to carry out the functions of a web browser program," PTX-001 at 16:30–32; and "executing instructions necessary to carry out the functions of an instant messenger program," PTX-001 at 16:32–34.

**[FF38]** The '247 Patent specification also discloses that "the functions carried out by processors 920 and 940 may comprise separate, secure logical processes executing on the same physical processor." PTX-001 at 16:22–24. The specification teaches that "[a] computer system 100 constructed in accordance with the principles of the present invention would be capable of

disallowing a secure logical process, such as the ***second logical process*** described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process." PTX-001 at 16:34–39 (emphasis added). The specification continues: "For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M1 110 or another ***logical process performing the functions of P1*** 120." PTX-001 at 16:39–43.

**[FF39]** Additionally, Processors P1 and P2 described in Column 14 of the '247 Patent specification refer back to elements 120 and 140 of Figure 1. *See* FF ¶¶ 25–27. (*See also* Dkt. No. 292 at 19 (Google's JMOL Motion) (arguing that "both P1 and P2 refer back to elements 120 and 140 in Figure 1"); Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 145:5–10 (Testimony of Dr. Kogan) ("Figure 6 is a different thing. As we can see in the text that's blocked here, Figure 6 is about online gaming carried out on computer system 100. Now, the computer system 100, that's the two processor/two memory space thing we keep seeing in Figure 1."); Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 37:23–25 (Testimony of Dr. Dunsmore) ("Q: So Figure 6 describes using the processors 120 and 140 of Figure 1, right? A: Yes.")).

**[FF40]** Figure 1 of the '247 Patent discloses a first processor P1 120 with direct access to the network interface via item 191:




PTX-001, Fig. 1 (highlighting added).

**[FF41]** Further, Google concedes that "web browser processes" are a narrower sub-species of "logical processes" as described throughout the specification. (*See* Dkt. No. 292 at 11 (arguing that "by broadly reciting 'logical processes,' the originally filed '247 Patent claims indisputably encompassed web browser processes, including a first web browser process"); *id.* at 12 (arguing that "[c]hanging the originally filed claims of the '247 Patent to recite a 'first web browser process' requires revising only one term, 'first logical process,' to a 'first web browser process.' This change is minor given that ***a 'web browser process' is a type of 'logical process.'***") (emphasis added)).

**[FF42]** Google's invalidity expert also explained that logical processes encompass web browser processes. (*See* Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 67:21–68:4 ("Q: What about the first logical process. . . . Where is that? A: It's the same as the first web browser process. . . . A web browser process is going to be a logical process. . . . It's the way the computer works. It starts processes. And a web browser process would be a logical process.") (Testimony of Dr. Arbaugh)).

**[FF43]** Dr. Dunsmore testified, consistent with Dr. Arbaugh's explanation, that "a logical process could be just about anything. It could be a process that was running, working with

a gaming system. It could be a process that's running working with email. It could be a ***process working with web browsers***." (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 12:16–13:2 (Testimony of Dr. Dunsmore)). When asked about the types of programs that would be included as "secure logical processes," Dr. Dunsmore testified that Column 16 of the '247 Patent specification discloses to a person of ordinary skill in the art "that there could be . . . a number of things that could be done by these processes. And among those would be . . . processes that are part of a web browser. So the specification specifically talks about . . . a web browser program and processes that work with that." (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 6:24–9:1).

**[FF44]** As such, Dr. Dunsmore explained that those skilled in the art reading Column 14 would understand that P1 and P2 can refer to two processes, both of which are accessing data from the Internet, which thus meet the Court's construction of "web browser process"—*i.e.*, a process that can access data on websites. (*See id.* at 9:21–10:21 ("Here we have two processes, P1 and P2. And both of them are retrieving data from the network, and that's exactly what needs to be done by the processes of a web browser. Q: And does P1 and P2 accessing website data meet . . . the Court's definition of what a web browser process is? A: Yes, it does.")).

**[FF45]** Dr. Dunsmore also explained that Column 16 of the '247 Patent specification would disclose to a person of skill in the art the various types of processes that could be executed in a secure logical process, including the "functions of a web browser program." (*Id.* at 7:14-8:9 ("Q: Professor Dunsmore, how would a person of ordinary skill understand or interpret these disclosures that we've just looked at in column 16? A: Well, a person of ordinary skill would realize that there could be . . . a number of things that could be done by these process [*sic*]. And among those would be . . . processes that are part of a web browser.")).

**[FF46]** However, Dr. Dunsmore also noted at trial that the term "web browser process" is never used in the '247 Patent specification to describe Figure 6. (*Id.* at 38:1–6). Although the '247 Patent specification does not expressly refer to two instances of "web browser" or "browser" programs in describing the claimed invention, the Court notes that the '247 Patent specification explains that prior art solutions "could significantly slow or preclude the ***interactive nature of many applications such as*** gaming, messaging, and ***browsing***." PTX-001 at 6:16–20.

**[FF47]** As further stated in the '247 Patent specification, the "interactive network process" embodiment describes P1 120 connecting to the "network," PTX 001 at 14:23–24, which is defined as the "Internet, a LAN, WAN, VPN, etc.," *id.* at 10:5–7.

**[FF48]** Google's expert, Dr. Kogan, disputed Dr. Dunsmore's opinion and testified that the embodiment disclosed in Figure 6 and Column 14 of the '247 Patent was limited to "online gaming." (Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 145:1–23). Dr. Kogan's opinion was that there was no disclosure of web browser processes in the '247 Patent specification:

> A: . . . Well, Figure 6 kind of goes along with some text that's in the specification. There's a bunch of text that talks all about that Figure 1, and you've heard people talking about that. And that ***Figure 1 is about browsing the Internet. Figure 6 is a different thing. As we can see in the text that's blocked here, Figure 6 is about online gaming carried out on computer system 100***. Now, the computer system 100, that's the two processor/two memory space thing we keep seeing in Figure 1. So this is just a use case of how that works with respect to running games. So, you know, you're – I'm sure you've had kids or grandkids or – they're all playing Call of Duty and games with their friends, and you can't get the headphones off their heads.
>
> Q: How does Figure 6 relate to web browsers?
>
> A: Well, ***Figure 6 doesn't relate to web browsers because games deal with game servers on the Internet.*** There's a lot of stuff on the Internet, and everything on the Internet is not a website. And everything that comes and goes on the Internet is not website data. So when you have a game running on your computer, your game is talking to a specific game server, and that game server is providing you game data, not website data.

(*Id.*). Dr. Kogan testified that many types of data are exchanged over the Internet, not just website data for web browsing. Thus, Dr. Kogan's expert opinion was that processes that access "interactive network process status data" from a network are not accessing "website data" and cannot fit the Court's definition of "web browser process." (*Id.*).

**[FF49]** Figure 6 refers to the broader "interactive network process" and denotes "interactive network process status data" being received from the network connection (step 620), the first process on P1 receiving the "interactive network process status data" from P2 (step 640), and that the "updated interactive network process status data" is passed back to the network via the network connection (step 660). PTX-001, Figure 6. Online gaming is never mentioned in Figure 6, which instead refers more broadly to an "interactive network process." *Id.* The specification also makes clear that online gaming is just one example of an "interactive network process" described in Figure 6. (*Id.*, at 14:3-4, 14:28-30).

*b. "One Processor" Limitation of Claim 43 of the '500 Patent and Claim 67 of the '528 Patent*

**[FF50]** Asserted Claim 43 of the '500 Patent depends from independent Claim 41, which recites in relevant part: "A computer program product . . . having ***at least one electronic data processor*** communicatively coupled to a first memory space with at least one system file and a second memory space. . . ." FF ¶ 33 (emphasis added).

**[FF51]** Asserted Claim 67 of the '528 Patent depends from independent Claim 64, which recites in relevant part: "A computer program product . . . having ***at least one electronic data processor*** communicatively coupled to a first and second memory space. . . ." FF ¶ 35 (emphasis added).

**[FF52]** Both parties' experts testified at trial that these two Asserted Claims require only one processor. (Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 148:2–22 (Testimony of Dr. Kogan); Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 33:8–25 (Testimony of Dr. Dunsmore)).

**[FF53]** The parties' experts also agreed that although two processor cores may be on a single processor chip, each processor core still constitutes a separate processor. (Dkt. No. 264 (Trial Tr. 2/7/17 am) at 51:5–16; Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 148:2–10).

**[FF54]** Although Figure 1 of the '247 Patent specification depicts the first processor P1 120 and second processor P2 140 as physically separate data processors, PTX-001 at Fig. 1, Figure 9 depicts an alternative embodiment using a single, physical processor chip:




Fig. 9

PTX-001 at Fig. 9.

**[FF55]** Column 16 of the '247 Patent specification explains: "In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system 100 is illustrated in FIG. 9. Computer system 100 comprises a video processor 970, ***processor 960***, and a memory data storage area 950." PTX-001 at 16:8–10 (emphasis added).

**[FF56]** Column 16 of the '247 Patent specification further discloses: "Processor 960 ***may further*** comprise multiple processor cores, illustrated by 1st processor 920 and 2nd processor 940." *Id.* at 16:10–12. (emphasis added). Since "[m]icroprocessors manufactured with multiple processor cores are becoming common in the industry, and such multi-core processors may be particularly advantageous when used in accordance with the present teachings," the '247 Patent explains that "[i]t is understood that processor 960 may contain more than 2 processor cores." *See id.* at 16:12–17.

**[FF57]** Additionally, the '247 Patent specification teaches that "the functions carried out by processors 920 and 940 may comprise separate, secure logical processes executing on ***the same physical processor***." PTX-001 at 16:22–24 (emphasis added). The specification continues immediately thereafter with examples of embodiments of the invention implemented using two logical processes:

> For example, a first logical process may comprise ***executing instructions*** necessary to carry out the functions of an operating system, or the first logical process may comprise ***executing instructions*** necessary to carry out the functions of a first computer program, including but not limited to a word processor. A second logical process may comprise ***executing instructions*** necessary to carry out the functions of a web browser program, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example. A computer system 100 constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M1 110 or another logical process ***performing the functions of P1 120***.

PTX-001 at 16:24–34 (emphasis added).

**[FF58]** However, Dr. Dunsmore testified that the ’247 Patent specification’s teaching that “[p]rocessor 960 may further comprise multiple processor cores,” FF ¶ 56, signals to those skilled in the art that the invention may be executed on multiple processor cores, but could also be executed on a single processor. (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 6:24–7:11, 8:2–15 (opining that the “specification in the patent says that, in fact, instead of being separate processors, these can simply be separate processes that are executing on the same physical processor, a single processor. . . . [and that] the patent specification speaks to . . . both doing this on a single processor or on a multi-core processor”)).

**[FF59]** Moreover, the Summary of the Invention never refers to physical processors, but instead notes that an “object of the present invention” is to provide a computer system capable of executing instructions in a “first logical process” and “second logical process,” and that malware “downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space.” PTX-001 at 7:63–8:19. This is described in column 16, which makes clear that the functions carried out by the processors “may comprise separate, secure logical processes.” *Id.* at 16:23–24.

**[FF60]** The ’247 Patent specification notes specifically that the functions of P1 120 in Figure 1 may be carried out by a first logical process, and the functions of P2 140 may be carried out by a second logical process:

> [a] computer system 100 constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically

> initiate access to either M1 110 or another logical process performing the functions of P1 120.

*Id.* at 16:34–43.

**[FF61]** Google's expert, Dr. Kogan, provided conclusory testimony—without reference to any portion of the intrinsic record of the '247 Patent—that the single processor limitation is not disclosed by the '247 Patent specification:

> Q. And finally, have you heard of something called the original patent rule?
> A. Yes, I have.
> Q. And have you reached any conclusions regarding that rule?
> A. Yes, I have. The original patent rule, as a result of it, the – the patents that the ***claims with one single processor are not supported by the specification***, and, therefore, by the original patent rule, they are invalid. ***Trust me***, the original patent rule is big and ugly, and I can't remember all the legal standards specifically, but it speaks to if the specification doesn't call out exactly what's being asked for, you can't have it. And so the original patent rule is – renders the two claims with a single processor invalid. . . .

(Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 150:15–151:6). In post-trial briefing, Google argues that Figure 9 of the '247 Patent, which depicts two processors, informs the disclosure of Column 16 of the '247 Patent's specification and indicates that Column 16 does not clearly disclose a single processor embodiment. (Dkt. No. 292 at 17–19).

*c. A First Web Browser Process Passing Data to a Second Web Browser Process Limitation of Claim 43 of the '500 Patent, Claim 67 of the '528 Patent, and Claim 49 of the '529 Patent*

**[FF62]** Claim 43 of the '500 Patent depends from Claim 41, which recites in relevant part: "pass data from the first web browser process to the second web browser process." FF ¶ 33.

**[FF63]** Claim 49 of the '529 Patent depends from Claim 36, which recites in relevant part: "passing data from the first web browser process to the at least one second protected web browser process." FF ¶ 36.

**[FF64]** Claim 67 of the ’528 Patent depends from Claim 64, which recites in relevant part: “pass data from the first web browser process to the second web browser process.” FF ¶ 35.

**[FF65]** Google contends that Claim 43 of the ’500 Patent, Claim 49 of the ’529 Patent, and Claim 67 of the ’528 Patent are invalid under § 251 for failure to disclose a first web browser process that passes and/or exchanges website data with the second web browser process. (Dkt. No. 292 at 23).

**[FF66]** Google submitted this § 251 invalidity ground in its Rule 50(a) motion on the papers and did not present oral argument to the Court. FF ¶¶ 15–17.

**[FF67]** Plaintiffs argue that Google waived this argument because it failed to offer evidence at trial on the question of whether a person of ordinary skill in the art would consider the “passing” or “exchanging” of website data between the first and second web browser processes as adequately disclosed. (Dkt. No. 295 at 12). Google admits that it did not present any expert testimony regarding this argument at trial. (Dkt. No. 320 at 3–4 (acknowledging that “[t]he record from the jury trial provides an incomplete record of extrinsic evidence on Google’s § 251 invalidity defenses” and recognizing that “neither party presented separate extrinsic evidence on th[is original patent] defense[]”)).

**[FF68]** Although Google “request[ed] that the parties be permitted to present evidence and live witness testimony at the bench trial to provide the Court with a complete record on which to decide § 251 invalidity” (Dkt. No. 320), the Court clarified that it did “not intend to conduct a new evidentiary hearing in this regard” because Google already had an opportunity to provide such evidence before the jury and the Court. (*See* Dkt. No. 327). *See also* FF ¶¶ 16–17.

**[FF69]** The Court finds that Figure 6 of the ’247 Patent is a flow chart that discloses: (1) processor P2 retrieving “interactive network process” status data, (2) processor P2 passing the

data to processor P1, and (3) then processor P1 passing the updated "interactive network process status data" back to processor P2:




Fig. 6

PTX-001 at Fig. 6.

**[FF70]** When describing Figure 6, the '247 Patent specification notes that a "interactive network process" could be an "interactive game" but does not limits an "interactive network process" to online games. PTX-001 at 14:3–4 ("Interactive network process *such as* interactive gaming") (emphasis added); *id.* at 14:30–31 "allows an interactive network process, *such as* online gaming") (emphasis added).

**[FF71]** The ’247 Patent specification makes a similar distinction between “interactive network process status data” and “game status data” or “game status information,” signifying that “interactive network process status data” is broader than just “game status data.” *See* PTX-001 at 14:49–51 (“By using *exemplary* process 600 (or an equivalent). . . . The 120-120 system *may* be advantageously configured to *only* accept game status information. . . .”) (emphases added); *see also id.* at 14:28–31 (“In accordance with a preferred embodiment of the present invention, an *exemplary* process flow 600, illustrated in FIG. 6, allows an interactive network process, *such as* online gaming, to be carried out on computer system 100.”) (emphasis added).

**[FF72]** Therefore, the Court views the specification of the ’247 Patent as clearly disclosing the first and second processes, P1 and P2, exchanging “interactive network process status data” (PTX-001 at 14:28–45). The term “interactive network process” on its face includes web browser processes, which by definition interact with the network. The Court finds that, consistent with Figure 6, Column 14 of the ’247 Patent specification discloses passing “interactive network process status data” from processor P1 to processor P2 and back to processor P1. *See* PTX-001 at 14:32–45; *see also* FF ¶ 69.

**[FF73]** Additionally, Plaintiffs’ expert Dr. Dunsmore testified at trial with respect to Claim 43 of the ’500 Patent, Claim 67 of the ’528 Patent, and Claim 49 of the ’529 Patent, that the “data” passed from the “first web browser process” to the “second web browser process” must be “website data.” (Dkt. No. 270 (Trial Tr. 2/9/17 am) at 119:2–23). He testified that a POSITA would interpret P1 and P2 as “web browser processes” because both are capable of accessing website data. (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 7:14–8:9, 9:21–10:21, 12:16–24, 67:21–68:4).

**[FF74]** This is consistent with Figure 1, which discloses a two-way communication arrow between P1 and P2. *Compare* FF ¶¶ 61–63 *with* PTX-001 at Fig. 1.




Fig. 1

PTX-001 at Fig. 1 (highlighting added).

**[FF75]** Dr. Dunsmore testified that a person of ordinary skill in the art would interpret P1 and P2 as "web browser processes" because both are capable of accessing website data. *See* FF ¶¶ 43–46.

*d. A First Web Browser Process Initializing a Second Web Browser Process Limitation of Claim 49 of the '529 Patent*

**[FF76]** Claim 49 of the '529 Patent recites an additional feature of the two "web browser processes," requiring that the "first web browser" "initialize" the "second web browser process." Specifically, Claim 49 depends from Claim 36 of the '529 Patent, which recites in relevant part: "executing instructions in the first web browser process, wherein the first web

browser process is configured to access data contained in the first memory space and ***to initialize the at least one second protected web browser process***." FF ¶ 36.

**[FF77]** Google submitted this § 251 invalidity ground in its Rule 50(a) motion on the papers and did not present oral argument to the Court. FF ¶¶ 15–17.

**[FF78]** Plaintiffs argue that Google waived this argument because it failed to offer evidence at trial on this issue. (Dkt. No. 295 at 13). Google admits that it did not present any expert testimony regarding this argument at trial. (Dkt. No. 320 at 3–4 (acknowledging that "[t]he record from the jury trial provides an incomplete record of extrinsic evidence on Google's § 251 invalidity defenses" and recognizing that "neither party presented separate extrinsic evidence on th[is original patent] defense[]")).

**[FF79]** Although Google "request[ed] that the parties be permitted to present evidence and live witness testimony at the bench trial to provide the Court with a complete record on which to decide § 251 invalidity" (Dkt. No. 320), the Court clarified that it did "not intend to conduct a new evidentiary hearing in this regard" because Google already had an opportunity to provide such evidence before the jury and the Court. (*See* Dkt. No. 327). *See also* FF ¶¶ 16–17.

**[FF80]** Figure 2 of the '247 Patent specification describes "(P1)" instructing "(P2)" to initiate a "protected process" and open one or more process windows (step 220). PTX-001 at Fig. 2. The discussion of Figure 2 discloses the user launching of a "protected process" such as Internet Explorer or Netscape Navigator. *Id.* at 10:64–11:2. A user inputs commands to launch the overall program. *Id.* at 11:2–4; *see also id.* at Fig. 2, step 210. The '247 Patent specification then describes "1st processor 120" (P1) instructing the "2nd processor 140" (P2) to initiate the protected process and open one or more process windows. *Id.* at 11:4–6. The specification further explains that the protected process may be "browsing the internet." *Id.* at 11:6–10.

**[FF81]** Figure 10 of the '247 Patent specification further discloses "1st processor (P1) instruct[ing] 2nd processor (P2) to initiate protected process and open process window." PTX-001, Fig. 10. The '247 Patent specification then describes Figure 10 as disclosing "processor P1 120 instruct[ing] processor P2 140 to initiate a protected process and open a process window." *Id.* at 17:16–18. The specification also explains that that the "method of operating a computer system involving data encryption" prior to sending data to processor P2 " as set forth in Figure 10 and described in Column 17 is "[i]n accordance with the present teachings" and "[i]n accordance with a preferred embodiment of the present invention." *See id.* at 17:11–13, 33–35.

**[FF82]** The Court finds that the '247 Patent specification (in the figures and in multiple places throughout the detailed description) discloses that processor P1 is capable of opening and/or initializing processes on processor P2. The specification further discloses that the functions carried out by processor P1 and processor P2 can also be carried out by, and referred to as, "logical processes." *See* FF ¶ 59–60. It is undisputed that "logical processes" can be any number of computer program processes including "web browser processes." *See* FF ¶¶ 37, 41–47. Additionally, the '247 Patent specification discloses a user opening a web browser program, followed by P1 instructing P2 to open one or more protected process windows for web browsing. FF ¶ 80–81.

### 2. Facts Relevant to Google's Recapture Defense

**[FF83]** At trial, Plaintiffs' expert Dr. Dunsmore agreed that the Claim 43 of the '500 Patent and Claim 67 of the '528 Patent encompass a single processor system, whereas the '247 Patent's issued claims do not. (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 33:8–25.) Google's expert Dr. Kogan testified that the first step of the recapture is met. (Dkt. No. 268 (Trial Tr. 2/8/17 pm)

at 148:2–22). Plaintiffs did not dispute the first step of the recapture test in post-trial briefing. (*See* Dkt. No. 295 at 14–23).

*a. Threshold Inquiry Regarding Overlooked Aspects of the '247 Patent*

**[FF84]** While the '247 Patent describes a system that includes two processors, the original claims of the '247 Patent were not so limited. Originally filed Claim 1 of the '609 Application recited a method of operating a computer system with "a first logical process" and "a second logical process," but it did not specify how many *processors* the system included:

> 1. A method of operating a computer system, comprising the steps of:
>
> executing instructions in ***a first logical process***, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space;
>
> executing instructions in ***a second logical process***, wherein the second logical process is capable of accessing data contained in the second memory space, the ***second logical process being further capable of exchanging data across a network*** of one or more computers;
>
> . . .
>
> wherein the computer system is configured such that malware program downloaded from the network and executing as part of the ***second logical process*** is incapable of initiating access to the first memory space.

*See* PTX-007 at R00000587 (emphasis added).

**[FF85]** Similarly, originally filed Claim 15 of the '609 Application, reproduced in part below, recited executing a "first logical process" and "second logical process" on "at least one electronic data processor":

> 15. A computer system, comprising:
>
> ***at least one electronic data processor*** capable of executing instructions;
>
> . . .
>
> wherein the electronic data processor, first and second memory space, and video processor are configured for performing the steps of:
>
> executing instructions in a ***first logical process***, wherein the ***first logical process*** is capable of accessing data contained in the first memory space and the second memory space;
>
> executing instructions in a ***second logical process***, wherein the

> ***second logical process*** is capable of accessing data contained in the second memory space, the ***second logical process being further capable of exchanging data across a network*** of one or more computers;
> . . . .

*Id.* at R00000591 (emphasis added).

**[FF86]** Although the originally filed Claims 1 and 15 of the '609 Application recited a first logical process with access only to the first memory space and second memory space, the claims further recited a second logical process with access to the second memory space *and* that was capable of exchanging data across a network of computers. *See* FF ¶¶ 84, 85. Accordingly, the originally filed Claims 1 and 15 of the '247 Patent set forth a first and second logical process where only the second logical process had access to the network. (*See id.*)

**[FF87]** In contrast, the challenged reissue claims (Claim 43 of the '500 Patent and Claim 67 of the '528 Patent) contain a first and second *web browser* processes (not merely *logical* processes of any type), and thus by definition ***both*** processes require access to the network. *See* FF ¶¶ 33, 35; *see also* FF ¶¶ 7–9, 40–47.

**[FF88]** Google's expert, Dr. Arbaugh, opined that the original '247 Patent required a second processor to isolate the computer system from the network. (Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 112:10–113:7). Additionally, Dr. Kogan, another Google expert, testified that the Asserted Patents (*i.e.*, the reissue patents) disclosed a different invention from the '247 Patent (the original patent), albeit he inconsistently couched his opinion as applying only for the original patent rule and not the rule against recapture. (Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 30:5–31:5).

**[FF89]** Google argues that Dr. Dunsmore essentially conceded on cross-examination that, were the original filed-for claims read broadly enough, they could encompass a first logical process with access to the network (*i.e.*, a "web browser process"). (*E.g.*, Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 41:6–23). Such a reading, however, would eschew any reliance on the intrinsic

record and the critical context it provides—essentially reading the '247 Patent's claim language in a vacuum.

**[FF90]** Furthermore, the Court previously determined that "the essence of the invention claimed in the '247 Patent was isolation—only the second logical process could access the network; the rest of the system could not." (Dkt. No. 212 at 8 (Magistrate Judge's Report and Recommendation); *see also* Dkt. No. 226 (Order Adopting)). In contrast, the Court found that the Asserted Claims of the reissue patents are "directed to processes that occur on web browsers and thus are not related to isolation." (Dkt. No. 212 at 8; *see also* Dkt. No. 226). This conclusion is consistent with the Inventors' representations to the PTO to advance prosecution on the '609 Application. (*See* PTX-007 at R00000681 ("[T]he physical hardware separation or partitioning of instruction execution on physically separate processors (or processor cores), as taught by the Applicants, allows malicious instructions to be executed within the second logical process, using the second electronic data processor operating in a protected mode.").

**[FF91]** The Court also noted that determination of whether a reissue claim was patentably distinct over the original claims required consideration of whether the reissue claims were obvious in light of the original claims. (Dkt. No. 212 at 9). Neither party at summary judgment presented evidence on the issue of obviousness, and the Court denied Google's motion because of unresolved issues of fact. (*Id.* at 10). Notwithstanding the opportunity to present evidence on obviousness at trial, Google failed to do so.

**[FF92]** Additionally, the Court finds that Google's argument (for its original patent requirement challenge under § 251) to be a concession that reinforces the Court's prior conclusion that the Asserted Patents are in essence directed to a different invention than the original claims of the '247 Patent. (Dkt. No. 251 at 5–6 (Google's Rule 50(a) Motion) (arguing that "the invention

disclosed in the reissue patents is ***entirely different*** from the one disclosed in the original '247 Patent . . . [The] first logical process ran on the first processor and a second logical process ran on the second processor, and ***only the second process*** . . . ***was a network-interface program or browser***.") (emphasis added)).

*b. Facts Relevant to the Recapture Test*

**[FF93]** Originally filed Claim 1 of the '609 Application claimed a "first logical process" and "second logical process." FF ¶ 84.

**[FF94]** Originally filed Claim 15 of the '609 Application claimed "at least one electronic data processor" executing a "first logical process" and "second logical process." FF ¶ 85.

**[FF95]** During prosecution of the '609 Application, the PTO examiner rejected originally filed Claim 1 as anticipated by U.S. Patent No. 6,192,477 ("Corthell"). PTX-007 at R00000651–52. With respect to originally filed Claim 1, the examiner did not discuss whether Corthell discloses multiple processors, presumably because Claim 1 was not limited to a particular number of processors. *Id.* at R00000651; *see also* FF ¶ 84.

**[FF96]** During prosecution of the '609 Application, the PTO examiner also rejected the originally filed Claim 15 as obvious in view of U.S. Patent Nos. 6,578,140 ("Policard") and 5,673,403 ("Brown"). (PTX-007 at R00000656.) With respect to originally filed Claim 15, the examiner reasoned that since the claim could be interpreted to encompass a multiprocessor system executing on multiple operating systems, Claim 15 was obvious over Policard in view of Brown because Policard describes a system in which two processors operated in "dual, separate operating systems." *See id.* at R00000650, 656.

**[FF97]** On April 29, 2008, Plaintiffs responded by amending Claims 1 and 15 to recite at least two processors. Specifically, Plaintiffs amended Claim 1 of the '609 Application, reproduced in part below, to require "having at least a first and second electronic data processor":

> 1. (Currently Amended) A method of operating a computer system **having at least a first and second electronic data processor capable of executing instructions using a common** ~~running an~~ operating system, comprising the steps of:
>
> executing instructions in a first logical process within the **common** operating system **using the first electronic data processor**, wherein the first logical process is capable of accessing data contained in a first ~~electronic~~ memory space **and a second memory space**;
>
> executing instructions in a second logical process within the common operating system **using the second electronic data processor**, wherein the second logical process is capable of accessing data contained in ~~a~~ **the** second ~~electronic~~ memory space, the second logical process being further capable of exchanging data across a network of one or more computers;
>
> . . .
>
> wherein the computer system is configured such that **the second electronic data processor is operating in a protected mode and** data residing on the first ~~electronic~~ memory space is protected from corruption by a malware process downloaded from the network and executing ~~on~~ **as part of** the second logical process.

PTX-007 at R00000672 (amendments indicated).

**[FF98]** Likewise, Claim 15 of the '609 Application, reproduced in part below, was amended to require a "multi-processor" system with "a first and second electronic data processor":

> 15. (Currently Amended) A **multi-processor** computer system **using a common operating system**, comprising:
>
> at least **a first and second** ~~one~~ electronic data processor capable of executing instructions **using the common operating system**;
>
> . . .
>
> wherein the **first and second** electronic data ~~processor~~ **processors**, first and second memory space, and video processor are configured for performing the steps of:
>
> executing instructions in a first logical process **with the first electronic data processor**, wherein the first logical process is executing within **the common** ~~an~~ operating system and is capable of accessing data contained in the first memory space and the second memory space;
>
> executing instructions in a second logical process **with the second electronic data processor**, wherein the second logical process is executing within the **common** operating system and is capable of accessing data contained in the second memory space, the second logical process being further capable of

exchanging data across a network of one or more computers;

. . . .

*Id.* at R00000675–76 (4/29/2008 Amendment at 5–6); *see also id.* at R00000672.

**[FF99]** The Inventors relied on these amendments to traverse Corthell, Policard, and Brown. To distinguish Corthell, the Inventors argued that adding a "second electronic data processor" provides "physical isolation" between the first and second logical processes:

> As per claim 1, Examiner believes that Corthell discloses the Applicant's claimed invention. . . . ***Corthell teaches the use of a computer system using a single electronic data processor*** (Figure 1, [block 102]), utilizing a redirector (Figure 2, [block 214]) and filter (Figure 2, [block 216]) mechanism to protect against attacks by malware. ***Corthell, therefore, teaches the use of a single electronic data processor that is necessarily executing all instructions***. . . . While Corthell does teach partitioning of the memory space into a primary partition (Figure 2, [block 204]) and a protected partition (Figure 2, [block 206]), ***he does not teach or suggest the partitioning of "secure" and "unsecure" instruction execution onto separate electronic data processors.***
>
> ***In stark contrast, Applicants teach the use of a multi-processor computer having at least a first and second electronic data processor*** capable of executing instructions using a common operating system. . . . Such a configuration allows for a physical hardware separation or partitioning of instruction execution on physically separate processors (or processor cores), in contrast to Corthell's teaching of executing all instructions on a single electronic data processor. ***By physically separating the execution of trusted instructions*** (the operating system running on the first electronic data processor, for example) ***from untrusted network process instructions*** (a Java script downloaded for the internet, for example), a higher level of security may be achieved.

*Id.* at R00000679–80 (4/29/2008 Amendments/Remarks at 9–10) (emphasis added); *compare with* FF ¶¶ 84, 93.

**[FF100]** The Inventors made similar arguments as to the Policard and Brown references:

> Applicants understand the Examiners suggestion regarding independent claims 10 and 15, and have amended the claims to specify a computer system having at least a first and second electronic data processor capable of executing instructions ***using a common operating system***. Additionally, Applicants have incorporated elements of amended independent claim 1 . . . into the amended claims 10 and 15, further patentably distinguishing claims 10 and 15 from the teachings of Policard and Brown.

*Id.* at R00000685 (4/29/2008 Amendments/Remarks at 15) (emphasis added); *compare with* FF ¶¶ 85, 94.

**[FF101]** In issuing the Notice of Allowance for the '609 Application, the examiner accepted "the Applicant's argument that the prior art does not show a single operating system that executes on multiprocessors such that ***one processor handles processes from the Internet*** and other potentially malicious data in order ***to protect the file system on the other processors***." *Id.* at R00000709 (emphasis added). Thus, in order for the '247 Patent to issue, the Inventors added the second processor limitation—which added physical isolation of the first logical process—to distinguish the isolated and non-isolated processes of Corthell, Policard, and Brown, which execute on the same processor. The '609 Application—reciting at least two processors—issued as the '247 Patent on January 27, 2009. PTX-001 at 1.

**[FF102]** As to prosecution of the Asserted Claims (*e.g.*, of the reissue patents), Mr. Cioffi testified at trial that the Inventors intended to cover unclaimed embodiments that were originally disclosed in the'247 Patent specification. (Dkt. No. 263 at 97:24–98:6, 122:15–124:19.) In particular, the Inventors claimed "browser processes," whereby the first logical process was no longer isolated from the network. PTX-010 at R00001550 (Claim 1), R00001557 (Claim 21). The Inventors also eliminated the requirement of a second electronic data processor for many of the reissue claims. (*See id.*).

**[FF103]** Dr. Dunsmore also testified at trial that the Inventors added the second electronic data processor requirement to the original '247 Patent claims to physically isolate the first logical process from the network. (Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 13:8–20). Since the first logical process in the reissued Asserted Patents was now a "browser process" with access to the network (*i.e.* non-isolated), there was no longer a need for the physical isolation from the

network afforded by the previously claimed the second electronic data processor. (*Id.*). Dr. Dunsmore agreed that these amendments surrendered all single-processor embodiments in the '247 Patent and were made for the purpose of distinguishing prior art. (*Id.* at 27:8–21, 30:5–18).

**[FF104]** Dr. Kogan similarly opined that Inventors' amendment was made to distinguish prior art and had the effect of surrendering single-processor embodiments. (Dkt. No. 268 (Trial Tr. 2/8/17 pm) at 147:1–148:1).

**[FF105]** The issue of § 251 recapture was raised by the PTO during the prosecution of the challenged reissue claims on two occasions. PTX-010 at R00001657–59, ¶¶ 4–8; PTX-11 at R00002194–95, ¶¶ 4–5. The PTO withdrew both recapture rejections in response to the Inventors' explanatory remarks. PTX-010 at R00001660–65, 1657–59, 1747–50, 1786–1805.

**[FF106]** In the first office action for the '528 Patent, the PTO examiner raised rejections under recapture and anticipation, noting that the Inventors had "removed the limitation that the 'second logical process executing on the second electronic data processor is' capable of exchanging data across a network of one more computers" and that "the reissue claims were not materially narrowed in other respects, and therefore recapture exists." PTX-010 at R00001657–59. The examiner explained that the claims of the '247 Patent were interpreted "as having a processor dedicated to network communications and the claimed system to display the data from both processors in a windowed format. This interpretation was supported by the Applicant's final amendment prior to allowance, which further specified that the system comprised two processors, one of which was capable of exchanging data across a network." *Id.* at R00001659. However, the examiner did not re-raise Corthell as an anticipating prior art reference. *See id.* at R00001660–65.

**[FF107]** The Inventors explained that "the claims of [the '247 Patent] do not include a limitation wherein a processor is dedicated to communicating across a network [and t]hus[]

recapture cannot apply . . . inasmuch as the claims of the ['247 Patent] do not recite a dedicated processor for communicating across the network." *Id.* at R00001747. In response to the Inventors' argument, the PTO withdrew its rejection, finding the Inventors' arguments "persuasive." *Id.* at R00001786.

**[FF108]** However, the examiner subsequently raised a new anticipatory reference, U.S. Patent Application Publication No. 2002/0002673 ("Narin"), against all the reissue claims because, among other reasons, Narin disclosed two "browser processes." *See* PTX-009 ('500 Patent File History) at R00001389–90 (11/17/2011 Final Rejection at 2–3); PTX-010 ('528 Patent File History) at R00001911–12 (11/14/2011 Final Rejection at 2–3); PTX-011 ('529 File History) at R00002314–15 (11/8/2011 Final Rejection at 2–3).

**[FF109]** The Inventors attempted to traverse Narin by explaining that Narin's "closed [first] process" was not the same "first browser process" found in the reissue patents because Narin's closed first process did not have access to the network. *Id.* at R00001866–871. The examiner acknowledged the Inventors' argument that their "first browser process is a web process," but noted the claims did not specify the "claimed browsers are actually web browsers." *Id.* at R00001911–12.

**[FF110]** Based on the examiner's remarks, the Inventors subsequently narrowed the term "browser process" to "web browser process" and specified that the "first browser process" is "capable of accessing data of a website via the network." *Id.* at R00001973, 1979, 1990–91. As a result, the reissue claims were allowed. *Id.* at 2025.

**[FF111]** Dr. Dunsmore explained at trial that the Inventors, in claiming "web browser processes" in the reissue claims rather than the broader species of "logical processes," materially narrowed the reissue claims by excluding all types of processes other than "web browser processes."

(Dkt. No. 271 (Trial Tr. 2/9/17 pm) at 12:1–13:2). He further explained that this narrowing related directly to the surrendered subject matter: a single-processor embodiment where the first logical process was isolated from the network but the second process was not. (Dkt. No. 263 (Trial Tr. 2/6/17 am) at 13:3–20, 14:12–19, 14:21–15:22). This is consistent with Mr. Cioffi's testimony on the subject. (*Id.* at 181:3–9).

**[FF112]** Google argues that Asserted Claims 43 and 67 are not materially narrowed with respect to the surrendered subject matter because a single processor has been added back into the claims. This argument assumes that the surrendered subject matter in its totality was the single-processor embodiment. As the Court has noted, however, the surrendered subject matter was not merely a single-processor embodiment, but also the first process being isolated from the network and the second process not being isolated. *See, e.g.*, FF ¶ 90.

## II. CONCLUSIONS OF LAW

### A. Legal Standard

#### 1. Issues Tried to the Bench

**[CL1]** "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 51(a)(1). "If a party has been fully heard on an issue . . . the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). Such a judgment "must be supported by findings of fact and conclusions of law." *Id.*

**[CL2]** The purpose of these findings is to "afford[] . . . a clear understanding of the ground or basis of the decision of the trial court." *S. S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965) (internal quotation marks omitted); *see also*

*Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (explaining that trial courts need not "recite every piece of evidence" or "sort through the testimony of . . . dozen[s] [of] witnesses").

**[CL3]** In making a particular finding, the district court "does not . . . draw any inferences in favor of the non-moving party and . . . [instead] make[s] a determination in accordance with its own view of the evidence." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 n.1 (5th Cir. 2016) (internal quotation marks omitted). However, a district court must still arrive at each of its factual determinations based on the applicable burden of proof. *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (reversing the district court because it applied the preponderance of the evidence standard rather than the clear and convincing standard in making its factual determinations under Rule 52).

**2. Reissue of Patents under 35 U.S.C. § 251**

**[CL4]** The reissue statute provides in relevant part that "[w]henever any patent is, through error, deemed wholly or partly inoperative . . . the Director shall . . . reissue the patent for the invention disclosed in the original patent. . . . No new matter shall be introduced into the application for reissue." 35 U.S.C. § 251. Compliance with the statutory requirements of § 251 is a question of law for the Court that may involve underlying determinations of fact. *In re Youman*, 679 F.3d 1335, 1343 (Fed. Cir. 2012); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263, 1270 (Fed. Cir. 2007); *Medtronic, Inc. v. Guidant Corp.*, 465 F.3d 1360, 1373 (Fed. Cir. 2006); *Pannu v. Storz Instruments, Inc.*, 258 F.3d 1366, 1370 (Fed. Cir. 2001); *Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1479 (Fed. Cir. 1998); *In re Clement*, 131 F.3d 1464, 1468 (Fed. Cir. 1997).

**[CL5]** Google's § 251 defenses present questions of law for determination by the Court analogous to claim construction and prosecution history estoppel. *See Hester*, 142 F.3d at 1481. Nonetheless, where a question of law turns on how a person having ordinary skill in the art

would interpret disclosures in a specification, it is within the Court's purview to make factual findings. *Cf. Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017) (noting the question of indefiniteness is a part of claim construction and therefore a question of law, but clarifying that "the district court's underlying determination, based on extrinsic evidence, of what a person of ordinary skill would understand" is a question of fact reviewed for "clear error").

*a. Original Patent Requirement Under 35 U.S.C. § 251*

**[CL6]** The original patent requirement derives from the reissue statute's language stating that a reissue patent must be "for the invention disclosed in the original patent." 35 U.S.C. § 251(a) (emphasis added). The Federal Circuit has applied this language to require that the reissue claims be for the "same invention" as the original patent. *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1358–59 (Fed. Cir. 2014).

**[CL7]** A "reissue claim is for the 'same invention' if the original patent specification fully describes the claimed inventions." *Id.* at 1359 (citing *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 676 (1942)). However, "for broadening reissue claims, the specification of the original patent must do more than merely suggest or indicate the invention recited in reissue claims; '[i]t must appear *from the face of the instrument* that what is covered by the reissue was intended to have been covered and secured by the original." *Forum US, Inc. v. Flow Valve, LLC*, 926 F.3d 1346, at 1351–52 (Fed. Cir. 2019) (quoting *U.S. Indus. Chems.*, 315 U.S. at 676) (emphasis in original). Thus, "the essential inquiry under the 'original patent' clause of § 251 . . . is whether one skilled in the art, reading the specification, would identify the subject matter of the new claims as invented and disclosed by the patentees." *In re Amos*, 953 F.2d 613, 618 (Fed. Cir. 1991).

**[CL8]** As the original patent requirement of § 251 compares the reissue claims to the disclosure of the original patent specification, it is "analogous to the written description requirement" of 35 U.S.C. § 112. *See Antares,* 771 F.3d at 1362 (Fed. Cir. 2014); *see also In re Depomed Patent Litig.*, No. 13-4507, 2016 WL 7163647 at *28 (D.N.J. Sept. 30, 2016) ("'[A] reissue application must find support in the original patent's description such that the original description 'clearly allow[s] persons of ordinary skill in the art to recognize that the inventor invented what is claimed.'" (quoting *Antares*, 771 F.3d at 1362)). However, unlike the written description requirement of § 112, to satisfy the original patent requirement of § 251, the reissue claims' subject matter must be "clearly and unequivocally" disclosed—i.e., the "exact embodiment claimed on reissue" must be "expressly disclosed in the [original patent] specification." *See Antares*, 771 F.3d at 1362–63; *see also Depomed*, 2016 WL 7163647 at *28 ("The original patent rule requires that reissue claims must be to matter 'explicitly disclosed and taught rather' than merely 'suggested or indicated in the specification.'" (quoting *Antares*, 771 F.3d 1354, 1361)).

*b. Rule Against Recapture Under 35 U.S.C. § 251*

**[CL9]** "The recapture rule bars a patentee from recapturing subject matter, through reissue, that the patentee intentionally surrendered during the original prosecution in order to overcome prior art and obtain a valid patent." *Youman*, 679 F.3d at 1343. "Under this rule, claims that are 'broader than the ***original patent claims*** in a manner directly pertinent to the subject matter surrendered during prosecution' are impermissible." *Clement*, 131 F.3d at 1468 (emphasis added).

**[CL10]** "Whether the claims of a reissue patent violate" the recapture rule under "35 U.S.C. § 251, and thus are invalid, is a question of law." *In re Mostafazadeh*, 643 F.3d 1353, 1358 (Fed. Cir. 2011). Recapture is assessed using the following three-step inquiry:

> (1) whether and in what respect the reissue claims are broader in scope than the original patent claims;

(2) whether the broader aspects of the reissue claims relate to subject-matter surrendered in an original application; and

(3) whether the reissue claims were materially narrowed in other respects, so that the claims may not have been enlarged.

*Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1267 (Fed. Cir. 2012). If the answer to the first two questions is yes, and the last is no, "the surrendered subject matter has crept into the reissue claims and they are barred under the recapture rule." *Youman*, 679 F.3d at 1345.

**[CL11]** However, the recapture rule is not triggered if the reissued claims are directed to "overlooked aspects" of the invention, such as "patentably distinct (1) inventions; (2) embodiments; or (3) species not originally claimed—not mere incidental features of the originally claimed invention." *Mostafazadeh*, 643 F.3d at 1360.

## B. Analysis

**[CL12]** The Court first considers whether Google has met its burden to show by clear and convincing evidence that the Asserted Claims are invalid under the original patent requirement of 35 U.S.C. § 251. *See U.S. Indus. Chems.*, 315 U.S. at 678 ("[I]t is the duty of a court to determine for itself, by examination of the original and the reissue, whether they are for the same invention."); *cf. Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 F. App'x 387, 393 (Fed. Cir. 2004) (explaining that the accused infringer has "the burden of proving by clear and convincing evidence that the written description requirement [i]s not met").

### 1. Original Patent Requirement of § 251

#### *a. Two or More "Web Browser Processes" Limitation of the Asserted Claims*

**[CL13]** Each of Asserted Claims require two or more "web browser processes." FF ¶¶ 32–36. A "web browser process" as set forth in the Asserted Claims is a "process that can

[directly or indirectly] access data on websites." *See* FF ¶ 7–9. Accordingly, for the Asserted Claims to satisfy the original patent requirement of § 251, the '247 Patent specification must "clearly and unequivocally" disclose an "exact embodiment" with two or more "process[es] that can [directly or indirectly] access data on websites." *See Antares*, 771 F.3d at 1362–63; *see also* FF ¶¶ 7–9.

**[CL14]** Google argues that "[t]here is no clear and unequivocal disclosure in the '247 Patent specification" of the term "first web browser process." (Dkt. No. 292 at 15). Specifically, Google contends that the '247 Patent specification only discloses a second logical process capable of accessing website data, and thus there is no disclosure of a first process that can access data on websites (*i.e.*, a "first web browser process"). (*Id.* at 19). Google relies on Dr. Kogan's opinion that Figure 6 and Column 14 of the '247 Patent specification are limited to online gaming such that "interactive network process status data" is not "website data," and therefore Figure 6 and Column 14 cannot refer to "web browser processes." FF ¶ 48.

**[CL15]** Plaintiffs counter that Dr. Kogan's opinions narrowly interpret the embodiment disclosed at Figure 6 and Column 14 of the '247 Patent specification. They assert that Column 14 describes "online gaming" as an *example* of an "interactive network process." (Dkt. No. 295 at 56.) They further contend that Figure 6 of the '247 Patent identifies the broader "interactive network process" embodiment and specifies (1) that "interactive network process status data" is received from the network connection (step 620); (2) the first process on P1 receiving the "interactive network process status data" from P2 (step 640), and (3) the "updated interactive network process status data" being passed back to the network via the network connection (step 660). FF ¶¶ 49. Moreover, Plaintiffs note Dr. Dunsmore's disagreement with Dr. Kogan's narrow interpretation of Figure 6 and Column 14. Dr. Dunsmore instead opined that a skilled artisan

would recognize these portions of the specification as disclosing two processes executing on two processors, both accessing data from the network—and therefore, disclosing first and second web browser processes. FF ¶¶ 44, 58.

**[CL16]** Google also argues that P1 and P2 in Column 14 refer to *physical* processors, not processes. (Dkt. No. 292 at 15). Plaintiffs respond that Google's interpretation contradicts the clear language of the '247 Patent specification when read as a whole. (Dkt. No. 295 at 6). Plaintiffs assert that the specification specifically notes (1) the functions of P1 120 in Figure 1 may be carried out by a first logical process, and (2) the functions of P2 140 may be carried out by a second logical process. (*Id.* at 67). The Court addresses this below in relation to the parties' dispute over whether the "one processor" claim limitations violate § 251. *See* CL ¶¶ 31–38. In short, the Court agrees that the specification teaches an embodiment with two processes on a single processor. *Id.*

**[CL17]** On balance, the Court is persuaded that Google has not shown by clear and convincing evidence that the Asserted Claims violate the original patent rule. Despite Google's arguments to the contrary, the Court finds that the '247 Patent specification clearly and unequivocally discloses both first and second web browser processes.

**[CL18]** First, "interactive network process" is not limited online gaming processes. Google's interpretation of the "interactive network process" embodiment of Column 14 of the '247 Patent is unduly narrow and is not supported by the specification's express teachings. Figure 6 refers more broadly to an "interactive network process" and is not limited to online gaming. FF ¶¶ 69–71. Column 16 of the '247 Patent corresponds to Figure 6 and clearly indicates that online gaming is just one example of the "interactive network process" described in Figure 6. *Id.* Accordingly, the Court is persuaded that the '247 Patent specification discloses online gaming as an *example* of an interactive network process. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792

F.3d 1339, 1346–47 (Fed. Cir. 2015) ("This court has repeatedly 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'").

**[CL19]** Second, the "interactive network process status data" disclosed in Column 14 of the '247 Patent is likewise not limited to "game status data." Although the '247 Patent specification teaches that an "interactive network process" ***may be used***, for online "gaming," the specification teaches that "messaging[] and browsing" are also applications that have an "interactive nature." *See* FF ¶ 46. Furthermore, the "interactive network process" embodiment describes P1 120 connecting to the "network," which is defined in the '247 Patent specification as the "Internet, a LAN, WAN, VPN, etc." FF ¶ 47. Accordingly, the Court is persuaded that "interactive network process status data" includes "website data."

**[CL20]** The specification does not use the terms "interactive network process" and "online game" interchangeably, but instead describes an online game as one example of an interactive network process. The Court finds that Figure 6 and Column 14 of the '247 Patent specification are not limited to online gaming and game status data as Dr. Kogan suggests.

**[CL21]** Having rejected Google's argument that the "interactive network process" embodiment of the '247 Patent is limited to gaming processes and gaming data, the Court finds that Dr. Dunmore's and Dr. Arbaugh's trial testimonies are helpful in aiding the Court to understand what the '247 Patent specification "actually say[s]."[1] *See U.S. Indus. Chems.*, 315 U.S. at 678 ("[I]t is permissible, and often necessary, to receive expert evidence to ascertain the meaning

[1] Since Mr. Cioffi testified as a *fact witness* and *inventor*, his testimony is not helpful in determining what those skilled in the art would recognize as being disclosed by the '247 Patent specification. FF ¶¶ 1, 21; *see also Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984) ("It should be clear that that hypothetical person is not the inventor, but an imaginary being possessing 'ordinary skill in the art' created by Congress to provide a *standard of patentability*. . . . Realistically, courts never have judged patentability by what the real inventor/applicant/patentee could or would do.").

of a technical or scientific term or term of art so that the court may be aided in understanding not what the instruments mean but what they actually say."). Their testimonies indicate that those skilled in the art would understand that web browser processes are *narrower* members of the broader class of "interactive network processes"— a class that also includes gaming applications. *Cf. U.S. Indus. Chems.*, 315 U.S. at 678 ("It is inadmissible to *enlarge* the scope of the original patent by recourse to expert testimony to the effect that a process described and claimed in the reissue, different from that described and claimed in the original patent, is, because equally efficacious, in substance that claimed originally.") (emphasis added) (footnotes omitted).

**[CL22]** The Federal Circuit's decision in *Forum US, Inc. v. Flow Valve, LLC*, outlines how expert testimony may be properly used to resolve the factual questions raised by Google's "original patent" defense. *See* 926 F.3d at 1352 ("We apply the standard set forth in *Industrial Chemicals* and *Antares* to this case."). In *Forum*, the specification disclosed, and all the original claims claimed, use of "arbors" in all embodiments of the invention. *Id.* at 1348–50. Although the plaintiff conceded there was no disclosure of an "arbor-less" embodiment of the invention, the plaintiff's expert testified that a person of ordinary skill in the art would recognize an arbor-less embodiment was possible based on "boilerplate language [in the specification] that modifications can be made to the original disclosed invention." *Id.* at 1352.

**[CL23]** The Federal Circuit affirmed summary judgment of invalidity and rejected the patentee's reliance on a a person of ordinary skill's understanding, stating that "[e]ven if a person of ordinary skill in the art would understand that the newly claimed, arbor-less invention would be possible, that is insufficient to comply with the" original patent requirement. *Id.* at 1353. The court specifically rejected the plaintiff's expert declaration because it "d[id] not aid the court in understanding what the 'instruments . . . actually say,' but instead assert[ed] what a person of

ordinary skill in the art would purportedly understand *in the absence* of the disclosure of an arbor-less embodiment." *Id* at 1352 (emphasis added).

**[CL24]** Here, in contrast to *Forum*, Plaintiffs have not conceded that the '247 Patent specification fails to disclose the challenged limitations of the Asserted Claims. Instead of relying on a POSITA's understanding that "modifications to the invention are possible," Plaintiffs identify specific portions of the '247 Patent specification corresponding to each challenged limitation and provide expert testimony explaining what such disclosures convey to a person of ordinary skill in the art. Simply put, the parties' disputes here focus on whether such as skilled person would understand such portions of the '247 Patent specification as clearly and unequivocally disclosing the Asserted Claims.

**[CL25]** Dr. Dunsmore testified that a person of skill in the art would recognize that (1) "interactive network process" encompasses web browser processes, and (2) "interactive network process status data" encompasses "website data." FF ¶¶ 69–75. Dr. Dunsmore also opined that a logical process could be just about any process, including a "process working with web browsers." FF ¶ 43. Indeed, the parties agree that a "logical process" includes a "web browser process." Google concedes that "web browser processes" are a narrower subspecies of "logical processes" described throughout the specification. FF ¶ 41. Moreover, Google's invalidity expert, Dr. Arbaugh, called the "first logical process" the "same as the first web browser process." FF ¶¶ 42.

**[CL26]** Accordingly, substantial evidence indicates that the '247 Patent specification clearly and unequivocally discloses both a first process capable of accessing website data (*i.e.*, a "first web browser process") and a second web browser process, in satisfaction of § 251. *Antares*, 771 F.3d at 1362; *see also Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1367 (Fed. Cir. 2009) (explaining that the § 251 "inquiry is analogous to the written description

requirement under § 112, ¶ 1."); *cf. In re Wilder*, 736 F.2d 1516, 1520 (Fed. Cir. 1984) (explaining in the context of the analogous § 112 analysis that "[i]t is not necessary that the claimed subject matter be described identically, but the disclosure originally filed must convey to those skilled in the art that applicant had invented the subject matter later claimed").

**[CL27]** Moreover, Google's § 251 arguments regarding web browser processes are contradictory. Google contends that the '247 Patent specification does not clearly disclose a first "web browser process" for purposes of the *original patent requirement* because the specification's disclosure of a first "logical process" is not specific enough and that "logical processes" could refer to a number of different software processes besides "web browser processes" (Dkt. No. 292 at 19.) However, when alleging *improper recapture*, Google contends that the patents' "first logical process" includes a process that "could 'access website data,'" which is the precise definition of a "web browser process." (*Id.* at 14–15). If a person of ordinary skill would recognize that the '247 Patent specification's disclosure of a "first logical process" encompasses a "web browser process," then narrowing the disclosed "logical process" to directly claim a known sub-species (*i.e.*, the "web browser process" of the Asserted Claims) is clearly and unequivocally within the scope of the original invention disclosed in the '247 Patent specification.

**[CL28]** Furthermore, the '247 Patent's Summary of the Invention never refers to physical processors, but instead repeatedly notes that an "object of the present invention" is to provide a computer system capable of executing instructions in a "first logical process" and "second logical process," and that malware "downloaded from the network and executing as part of the second logical process is incapable of initiating access to the 'first memory space'." FF ¶¶ 59–60. *See Wireless Agents LLC v. Sony Ericsson Mobile Comm'cns AB*, 189 F. App'x 965, 966 (Fed. Cir. 2006) ("This description is not merely referring to a preferred embodiment; rather,

as part of the 'Summary of the Invention,' it is 'commensurate with the invention as claimed.'"). (citing 37 C.F.R. 1.73). This is described in Column 16 of the '247 Patent specification, which discloses that the functions carried out by the processors "may comprise separate, secure logical processes." FF ¶¶ 59–60.

**[CL29]** While the exact term "web browser process" does not appear in the '247 Patent specification, Google has not presented clear and convincing evidence demonstrating that those skilled in the art would not recognize the first and second "web browser processes" recited in the Asserted Claims as being disclosed by the '247 Patent specification. As such, the Court is persuaded that those skilled in the art would recognize that the '247 Patent specification's "interactive network processes" embodiment encompasses the dual-web-browser process limitations set forth in the Asserted Claims. Such is sufficient to comply with the clear and unequivocal disclosure standard set forth in *U.S. Industrial Chemicals* and *Antares*. *See Forum*, 926 F.3d at 1352.

**[CL30]** Accordingly, the Court finds that the '247 Patent specification uses the terms "first" and "second" "logical processes" to refer interchangeably to P1 and P2, and that "logical processes" refer to a number of possible computer processes including "web browser processes." *See* FF ¶¶ 31–47. As a result, the Court is persuaded that Google has not shown by clear and convincing evidence that the dual-web-browser processes of the Asserted Claims violate the original patent requirement of § 251.

#### b. *"One Processor" Limitation of Claim 43 of the '500 Patent and Claim 67 of the '528 Patent*

**[CL31]** Google contends that Claim 43 of the '500 Patent and Claim 67 of the '528 Patent violate the original patent requirement of § 251 for claiming a "single processor." (Dkt. No. 292 at 17–19; Dkt. No. 297 at 7).

**[CL32]** Google argues that Dr. Dunsmore misreads the '247 Patent specification because Column 16—which discloses that "the functions carried out by processors 920 and 940 may comprise separate, secure logical processes executing on the same physical processor," FF ¶¶ 38, 56–57—should be interpreted as describing "processes running on two processors, not one." (Dkt. No. 292 at 18). Plaintiffs argue that processor 960 depicted in Figure 9 and described in Column 16 of the '247 Patent specification teaches a single processor embodiment. (*See* Dkt. No. 295 at 10–11).

**[CL33]** The '247 Patent specification supports Plaintiffs' position. "In accordance with a preferred embodiment of the present invention . . . Computer system 100 comprises a video processor 970, ***processor 960***, and a memory data storage area 950. Processor 960 ***may further*** comprise multiple processor ***cores***, illustrated by 1st processor 920 and 2nd processor 940." FF ¶ 55–56 (emphasis added). The first sentence discloses processor 960 in isolation; the second sentence *further* discloses that processor 960 *may* comprise two processor *cores*. *Id.*

**[CL34]** As to this particular disclosure, Google argues that the word "may," in context, indicates that the disclosed embodiment has only two or more processor cores but excludes the possibility of having only one core. (Dkt. No. 292 at 18). However, such an interpretation reads out the word "further." FF ¶ 56. "Every word has consequences." *See* Arthur Hirsh, THE FRENCH LEFT: A HISTORY & OVERVIEW 41 (Black Rose Books 1982) (quoting and translating Jean-Paul Sartre, *Présentation*, 1 LES TEMPS MODERNES: REVUE MENSUELLE, Oct. 1945, at 1, 5). Giving meaning to every word of Column 16, dual- and multi-processor configurations are disclosed as additive to the initial disclosure of singular processor 960. *See* FF ¶ 54–60 *see also U.S. Indus. Chems.*, 315 U.S. at 678 (explaining that although "it is permissible, and often necessary, to receive expert evidence to ascertain the meaning of a technical or scientific term or term of art," "it is the

duty of a court to determine ***for itself***, by examination of the original and the reissue, whether they are for the same invention.") (emphasis added).

**[CL35]** The Court's conclusion is also confirmed by the subsequent disclosure of Column 16: "[T]he functions carried out by processors 920 and 940 may comprise separate, secure logical processes executing on ***the same physical processor***." FF ¶ 38, 57.

**[CL36]** Google argues that this passage discloses only that "logical processes" and related "functions" are "carried out" or executed on two different processors (P1 and P2) and does not disclose that processors P1 or P2 are themselves software processes. (Dkt. No. 292 at 18)

**[CL37]** However, the '247 Patent specification explains that the "first logical process may comprise ***executing instructions*** necessary to carry out the functions of a first computer program" and the "second logical process may comprise ***executing instructions*** necessary to carry out the functions of a web browser program." FF ¶ 57. The first and second logical processes therefore are not instructions or functions executing *on* processors P1 or P2. Instead, the first and second logical processes—"executing on ***the same physical processor***"—*actually execute* instructions to "carry out the functions of a first computer program" or "the functions of a web browser program," respectively, that would have been executed by the physical processors P1 and P2 of the alternative Figure 1 embodiment. This reading is confirmed by the '247 Patent specification explaining that "***the functions carried*** out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be able to automatically initiate access to either M1 110 or ***another logical process performing the functions of P1 120***." FF ¶¶ 38, 57.

**[CL38]** In summary, Column 16 of the '247 Patent specification clearly and unequivocally discloses a single processor embodiment. Accordingly, Google has failed to prove

by clear and convincing evidence that the single processor claim limitations of Claim 43 of the '500 Patent and Claim 67 of the '528 Patent violate the original patent requirement of § 251.

*c. A First Web Browser Process Passing Data to a Second Web Browser Process Limitation of Claim 43 of the '500 Patent, Claim 67 of the '528 Patent, and Claim 49 of the '529 Patent*

**[CL39]** Google next contends that Claim 43 of the '500 Patent, Claim 49 of the '529 Patent, and Claim 67 of the '528 Patent are invalid under the original patent rule for failure to disclose a first web browser process that passes and/or exchanges website data with the second web browser process. (Dkt. No. 292 at 23).

**[CL40]** Although Google did not present any expert testimony or offer oral argument on this § 251 defense at trial, *see* FF ¶¶ 16–17, 78, the Court finds that Google has not waived this § 251 defense. Google identified § 251 as defense in its pre-trial statement and specifically identified this defense in its Rule 50(a) motion. *See* FF ¶¶ 15, 28.

**[CL41]** The Court has already determined that (1) the '247 Patent specification clearly and unequivocally discloses an "interactive network process" embodiment that includes two web browser processes; and (2) "interactive network process data" encompasses "website data." CL ¶¶ 13–30.

**[CL42]** Moreover, the '247 Patent specification clearly and unequivocally discloses the passing of website data from a first web browser process to a second web browser process by disclosing the passing and exchange of "interactive network process status data" between the two processes. *See* FF ¶ 72. As discussed above, Column 14 discloses passing "interactive network process status data" from the network between P1 and P2. *Id*. "Interactive network processes" on its face would include "web browser processes" and would be understood by a person of ordinary skill in the art to include "web browser processes" because both are capable of accessing website

data. FF ¶¶ 72, 73. "Interactive network process data" exchanged between P1 and P2 would include website data. FF ¶¶ 72, 73. Finally, Figure 1 discloses a first process (P1 120) and second process (P2 140) with two-way communication arrows between each other, which further supports the exchange of data between the first and second web browser processes. FF ¶ 74.

**[CL43]** As a result, Google has not met its burden of clear and convincing evidence to prove that the '247 Patent specification does not clearly and unequivocally disclose a first web browser process passing website data to or exchanging website data with a second web browser process.

*d. A First Web Browser Process Initializing a Second Web Browser Process Limitation of Claim 49 of the '529 Patent*

**[CL44]** Google's last argument under the original patent requirement is that the specification does not disclose the "first web browser process initializing a second web browser process," as recited by of Claim 49.

**[CL45]** Although Google did not present any expert testimony or offer oral argument on this § 251 defense at trial, *see* FF ¶¶ 16–17, 78, the Court finds that Google has not waived this § 251 defense. Google identified § 251 as defense in its pre-trial statement and specifically identified this defense in its Rule 50(a) motion. *See* FF ¶¶ 15, 28.

**[CL46]** The Court has already determined that (1) the '247 Patent specification clearly and unequivocally discloses "interactive network process" embodiment that includes two web browser processes; and (2) "interactive network process data" encompasses "website data." CL ¶¶ 13–30.

**[CL47]** The '247 Patent specification provides specific language that clearly and unequivocally discloses a "first web browser process initializing a second web browser process." Specifically, the figures and written description disclose in several instances that processor P1 is

capable of opening and/or initializing the processes on processor P2. FF ¶¶ 80, 82. For example, Figure 2 of the '247 Patent describes processor P1 instructing processor P2 to initiate a "protected process" and open a process window (step 220). *Id.* The specification's description of Figure 2 notes the "1st processor 120 instruct[ing] 2nd processor 140 to initiate the protected process and open one or more process windows." *Id.* The specification further explains that the protected process may be "browsing the internet." *Id.*

**[CL48]** In another embodiment, the '247 Patent specification again discloses "processor P1 120 instruct[ing] processor P2 140 to initiate a protected process and open a process window." FF ¶¶ 81, 82. This embodiment discloses a user opening a web browser program, followed by processor P1 instructing processor P2 to open one or more protected process windows for web browsing. *Id.* Although this particular disclosure involves a Figure 10 of the '247 Patent, the specification explains that the disclosure is "[i]n accordance with the present teachings"—*i.e.*, the disclosure of Figure 2—and "[i]n accordance with a preferred embodiment of the present invention." *See id.*

**[CL49]** Since P1 and P2 also refer to "logical processes" and not just processors, the Court is persuaded that the '247 Patent specification clearly and unequivocally discloses in multiple places a first web browser process (P1) capable of initializing a second web browser process (P2). Accordingly, Google has not met its burden to prove that the '247 Patent specification does not clearly and unequivocally disclose "first web browser process initializing a second web browser process."

### 2. The Rule Against Recapture Under § 251

#### *a. Threshold Inquiry Regarding Overlooked Aspects*

**[CL50]** The Federal Circuit has explained that the recapture rule is not triggered if the reissue claims are directed to "overlooked aspects" of the invention, which are "patentably distinct (1) inventions; (2) embodiments; or (3) species not originally claimed—not mere incidental features of the originally claimed invention." *Mostafazadeh*, 643 F.3d at 1360. "The purpose of this exception to the recapture rule is to allow the patentee to obtain through reissue a scope of protection to which he is rightfully entitled for such overlooked aspects." *Hester*, 142 F.3d at 1483.

**[CL51]** Google raises three arguments why the challenged reissue claims were not directed towards overlooked aspects of the original '247 Patent claims. (Dkt. No. 292 at 9–13).

**[CL52]** Google first argues that the originally filed claims of the '609 Application were broad enough to encompass "web browser processes" and therefore "web browser processes" were originally "claimed." (*See* Dkt. No. 292 at 9–11 (citing *Hester*, 142 F.3d at 1483)). The original '247 Patent claimed first and second "logical processes" where the reissue patents claim first and second "web browser processes." *See* FF ¶ 32; *compare also, e.g.*, FF ¶¶ 84–85, 93–94 *with* FF ¶¶ 33–36. Google argues that since the embodiments set forth in Claim 43 of the '500 Patent and Claim 67 of the '528 Patent were "potentially" covered by the originally filed claims of the '609 Application, the challenged reissue claims cannot be considered "overlooked." (Dkt. No. 292 at 10).

**[CL53]** However, *Hester* is not applicable to the facts of this case. In *Hester*, the allegedly overlooked claim features were *not narrower* than the original claims or were *explicitly* recited in the originally filed patent claims, and thus the claimed features could not be considered "overlooked." *See* 142 F.3d at 1483 ("Hester argues that the claims are materially narrower by the

additional of the 'spiral conveyance path' and 'high humidity stream' limitations. . . . However, the term 'high humidity stream' is actually *the same as or broader* than the limitation in [the] original claim . . . . [and] Hester concedes that the term 'high humidity steam' is not narrower. . . . [Accordingly,] these aspects were included in original claim 1. Additionally, with regard to the 'spiral conveyance path' limitation, original dependent claim 12 *explicitly recites* 'a spiral path.'") (emphasis added).

**[CL54]** Here, however, the originally filed Claim 1 of the '609 Application set forth a first logical process with access to the first memory space and second memory space. FF ¶¶ 84. The second logical process was claimed as "being further capable of exchanging data across a network of one or more computers." *Id.*

**[CL55]** Although Google cites Professor Dunsmore's testimony for the proposition that the "logical processes" of the '609 Application's originally filed claims do not *per se* exclude a first web browser process with access to website data, the claims cannot be construed in a vacuum—*i.e.*, without reference to the intrinsic record and how it informs those skilled in the art.[2] FF ¶ 89.

**[CL56]** Google's own experts and the Court have already interpreted the original '247 Patent as excluding the very embodiment Google claims is covered by the original claims. FF ¶¶ 86–90. Google's expert, Dr. Arbaugh, confirmed it was his opinion that the original '247 Patent required a second processor to isolate the computer system from the network. FF ¶ 88. Google's other expert, Dr. Kogan, opined that the reissue patents disclosed a different invention from the

[2] *See David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 993 (Fed. Cir. 2016) (explaining that patent claims are construed with reference to the intrinsic record).

original '247 Patent, but inconsistently couched his opinion as applying only for the original patent rule, not for recapture. FF ¶ 88.

**[CL57]** Moreover, the Court agrees with the Magistrate Judge's ruling that "the essence of the invention claimed in the '247 Patent was isolation—only the second logical process could access the network; the rest of the system could not." (*See* Dkt. No. 212 at 8).

**[CL58]** Finally, Google conceded as a part of its original patent rule arguments in its Rule 50(a) motion for JMOL that "the invention disclosed in the reissue patents is entirely different from the one disclosed in the original '247 Patent . . . . [The] first logical process ran on the first processor and a second logical process ran on the second processor, and only the second process . . . was a network-interface program or browser." FF 92 (Dkt. No. 251 at 5–6). *Cf. Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way . . . and another" (internal quotation marks omitted)).

**[CL59]** Accordingly, the Court finds that both a first and second "web browser process," though disclosed in the '247 Patent specification, were not originally claimed by the '247 Patent. *Hester* is therefore inapplicable.

**[CL60]** Google's second argument for why Claim 43 of the '500 Patent and Claim 67 of the '528 Patent are not directed to overlooked aspects similarly falls short. Google argues that the '247 Patent specification does not at all disclose an embodiment with "two web browsers." (Dkt. No. 292 at 11). However, this argument is the same as Google's previously considered argument that the '247 Patent specification fails to disclose a first "web browser process" in violation of the original patent rule, and the Court is unpersuaded for the reasons previously discussed. *See* CL ¶¶ 13–30.

**[CL61]** Google's third argument is that the narrowing from first a "logical process" in the '247 Patent to a first "web browser process" in Claim 43 of the '500 Patent and Claim 67 of the '528 Patent was not a patentable distinction because changing "logical" to "web browser" is too minor, given that a "web browser process" is a type of logical process. (Dkt. No. 292 at 12). Google had the opportunity but failed to offer evidence at trial to establish that Claims 43 and 67 were obvious (*e.g.*, not patentably distinct) over the original claims, given the Court's ruling that a genuine dispute of material fact remained as to overlooked aspects that precluded summary judgment. *See* FF ¶ 91.

**[CL62]** The only evidence Google presented at trial as to whether Claims 43 and 67 are patentably distinct over the original '247 Patent claims was the intrinsic record and prosecution history of the reissue patents. FF ¶¶ 91, 93–101, 104–109. However, the Court has already determined that the '247 Patent claims are directed towards a different invention than the challenged reissue claims. FF ¶ 90. The '247 Patent's original claims were directed toward isolation, where only the second process could access the network and the rest of the system could not. *Id.* Claim 43 of the '500 Patent and Claim 67 of the '528 Patent are distinct because they no longer claim an isolated first process. *See* FF ¶¶ 33–36, 86, 87, 90, 92. Indeed, Google and its experts have acknowledged on several occasions that the invention disclosed in the '247 Patent claims is materially different than the invention disclosed in the challenged reissue claims. FF ¶ 88. The Court is not persuaded that Claim 43 of the '500 Patent and Claim 67 of the '528 Patent fail to claim inventions patentably distinct from those of in the original '247 Patent.

**[CL63]** Accordingly, the Court is persuaded that Google has not proven by clear and convincing evidence that a first and a second "web browser process" were originally claimed by the '247 Patent. Google's argument that "web browser processes" were "claimed" in the original

patent (1) cannot overcome the intrinsic record and its own admissions and (2) is not supported by the cited case law. As the web browser processes are supported by the specification and have not been shown to be patentably indistinct from those claimed in the '247 Patent, the Court agrees with Plaintiffs that the challenged Asserted Claims are directed t overlooked aspects of the specification.

*b. Test for the Rule Against Recapture*

**[CL64]** In addition to the Court's findings that Claim 43 of the '500 Patent and Claim 67 of the '528 Patent are directed towards "overlooked aspects" of the '247 Patent, and thus would not trigger the rule against recapture, the Court is independently persuaded that Google could not show by clear and convincing evidence that challenged claims violate the rule against recapture.

i. <u>Step 1: Claim 43 of the '500 Patent and Claim 67 of the '528 Patent Are Broader than the '247 Patent's Originally Issued Claims</u>

**[CL65]** The first step of the recapture test is to "determine whether and in what 'aspect' the reissue claims are broader than the [original] patent claims." *Mostafazadeh*, 643 F.3d at 1358. "A reissue claim that deletes a limitation or element from the [original] patent claims is broader with respect to the modified limitation." *Id.*

**[CL66]** The '247 Patent's originally issued claims require two or more physical processors because they each recite having a "first" and a "second" "electronic data processor." FF ¶ 31. By comparison, Claim 43 of the '500 Patent and Claim 67 of the '528 Patent do not require two or more processors because they recite having "at least one electronic data processor." FF ¶¶ 33, 35.

**[CL67]** The parties agree that the first step of the recapture test is met. Professor Dunsmore and Dr. Kogan agreed on this point, and Plaintiffs did not dispute this in their briefing. FF ¶ 83.

**[CL68]** Accordingly, the Court is persuaded that Claim 43 of the ’500 Patent and Claim 67 of the ’528 Patent are broader than the ’247 Patent’s originally issued claims with respect to the number of required processors. Claims 43 and 67 encompass systems with either a single processor or two or more processors, rather than only encompassing systems with two or more processors, as the ’247 Patent’s originally issued claims required. Indeed, the two reissue claims delete the ’247 Patent’s claim limitations that require at least a “second electronic data processor.” The first step of the recapture test is met with respect to Claim 43 of the ’500 Patent and Claim 67 of the ’528 Patent.

ii. Step 2: The Broadened Subject Matter Relates to Surrendered Subject Matter

**[CL69]** The second step of the recapture test is to “determine whether the broader aspects of the reissue claims relate to surrendered subject matter.” *Mostafazadeh*, 643 F.3d at 1358 (quotations omitted). “To determine whether an applicant surrendered particular subject matter, [courts] look to the prosecution history for arguments and changes to the claims made in an effort to overcome a prior art rejection.” *Id.*

**[CL70]** For example, in *North American Container, Inc. v. Plastipak Packaging, Inc.*, reissue claims covering plastic bottle structures were broadened to “no longer require the ‘inner walls’ to be ‘generally convex.’” 415 F.3d 1335, 1350 (Fed. Cir. 2005). The Federal Circuit found that the broadened subject matter was surrendered during prosecution because the applicants had “amended [the claims] to refer to the convex nature of the inner wall portions” and “argued that

the 'shape of the base as now defined in the claims differs from those of . . . the [prior art] patent, wherein the corresponding wall portions are slightly concave.'" *Id*.

**[CL71]** Here, the second step is met because the broadened subject matter of a single processor system was surrendered during prosecution of the original '247 Patent. To overcome the prior art references Corthell, Policard, and Brown, the Inventors amended the originally filed Claims 1 and 15 of the '609 Application to require at least a "first and second electronic data processor." *Compare* FF ¶¶ 84–85 *with* FF ¶¶ 93–94.

**[CL72]** In accompanying remarks, the Inventors relied on these amendments to distinguish the prior art, stating: "In stark contrast [to Corthell], ***Applicants teach the use of a multi-processor computer*** having at least a first and second electronic data processor," and "amend[ments to] the claims to specify a computer system ***having at least a first and second electronic data processor*** . . . distinguish[] claims 10 and 15 from the teachings of Policard and Brown." *See* FF ¶¶ 99–101 (emphasis added). Based on these amendments and remarks, the examiner allowed the claims because "the prior art does not show a single operating system that executes on multiprocessors." FF ¶ 101.

**[CL73]** The parties agree that step two of the recapture test is met. Plaintiffs' expert Dr. Dunsmore confirmed in his jury trial testimony that the Asserted Claims were amended to require two processors to distinguish prior art. FF ¶ 103. Dr. Dunsmore also confirmed that these amendments surrendered all single-processor embodiments in the '247 Patent. *Id*. Additionally, Google's expert Dr. Kogan testified that the second step is met because Plaintiffs surrendered the subject matter of a single processor to distinguish prior art. FF ¶ 104. Lastly, Plaintiffs also did not dispute the second step of the recapture test in in post-trial proceedings. (Dkt. No. 295 at 14–23).

**[CL74]** The Court is persuaded that the second step of the recapture test is met with respect to the Claim 43 of the '500 Patent and Claim 67 of the '528 Patent because the broadened subject matter of a single processor set forth in the aforementioned claims was surrendered during prosecution of the '247 Patent.

iii. Step 3: Claim 43 of the '500 Patent and Claim 67 of the '528 Patent Are Materially Narrowed With Respect to Surrendered Subject Matter

**[CL75]** The third step of the recapture analysis is to "determine whether the reissue claims were materially narrowed in other respects, so that the claims may not have been enlarged, and hence avoid the recapture rule." *N. Am. Container*, 415 F.3d at 1349. "[T]he recapture rule is violated when a limitation added during prosecution [of the original patent] is eliminated entirely, even if other [unrelated] narrowing limitations are added to the claim." *Mostafazadeh*, 643 F.3d at 1361; *see also Youman*, 679 F.3d at 1345 ("[W]here the patentee eliminates the added limitation in its entirety . . . [,] it is clear that the surrendered subject matter has been recaptured."). The Federal Circuit has also explained the policy motivation underlying the third step: "a limitation that is added during prosecution to overcome prior art cannot be entirely eliminated on reissue because doing so would constitute recapture of the surrendered subject matter." *In re Mostafazadeh*, 643 F.3d at 1359.

**[CL76]** However, a "[v]iolation of the rule against recapture may be avoided . . . if the reissue claims 'materially narrow' the claims relative to the original claims such that full or substantial recapture of the subject matter surrendered during prosecution is avoided." *In re Mostafazadeh*, 643 F.3d at 1358, 1361 ("[T]he narrowing must relate to the subject matter surrendered during the original prosecution (i.e., the applicant cannot recapture the full scope of what was surrendered)."); *see also In re Youman*, 679 F.3d 1335; *N. Am. Container*, 415 F.3d at

1350 (applying recapture rule bar because the narrowing of claims did not relate to the surrendered subject matter).

**[CL77]** It is undisputed that the reissue claims (*e.g.*, the Asserted Claims) have been narrowed from first and second logical processes to first and second "web browser processes." Google argues that the narrowing does not relate to the surrendered subject matter in violation of the rule against recapture. Plaintiffs respond that narrowing the claims to two "web browser processes" was directly related to the surrendered subject matter. As discussed below, the Court agrees with Plaintiffs, and finds that Google has failed to prove by clear and convincing evidence that the challenged claims violate the rule against recapture.

**[CL78]** During the prosecution of the original '247 Patent, the examiner rejected the original claims, citing Corthell as disclosing every limitation. FF ¶ 95. In response, the Inventors amended the original claims, adding a "second electronic data processor" to provide physical isolation between the first and second logical processes. FF ¶¶ 96–99. The Inventors explained why the pending claims were no longer anticipated by Corthell. FF ¶ 99. To distinguish Corthell's isolated process and non-isolated processes executing on the same processor, the Inventors claimed a physically isolated first processor and a non-isolated second processor. FF ¶¶ 96–99.

**[CL79]** This distinction between the '247 Patent claims and the Asserted Claims is evident from the Inventors' attempts to traverse a rejection based on Narin when prosecuting the Asserted Patents. FF ¶ 108–09. The Inventors explained that Narin's "closed process" was not the same "first browser process" in the reissue patent claims because Narin's closed process did not have access to the network. FF ¶ 109. The examiner acknowledged the Inventors' argument that their "first browser process is a web process," but noted the claims did not specify the "claimed browsers are actually web browsers." *Id.* In response to this second rejection, the Inventors

narrowed the term "browser process" to "web browser process" and specified that the "first browser process" is "capable of accessing data of a website via the network." FF ¶ 110. Physical isolation was no more.

**[CL80]** Dr. Dunsmore explained to the jury that by claiming "web browser processes" in the reissue claims instead of the original "logical processes," the Inventors materially narrowed the reissue claims because they now excluded all types of processes other than "web browser processes." FF ¶ 111. Dr. Dunsmore also explained that this narrowing was directly related to the surrendered subject matter—*i.e.*, a single processor embodiment where the first logical process was isolated from the network but the second logical process was not. *Id.* Thus, the reissue claims, though broader in the sense that they reclaimed a single processor and no longer required isolation, were also materially narrowed from logical processes to web browser processes.

**[CL81]** Mr. Cioffi also testified that narrowing to web browser processes in reissue was a material narrowing directly related to reclaiming the use of a single processor. FF ¶ 111. Professor Dunsmore also explained that this narrowing was directly related to the surrendered subject matter—a single processor embodiment where the first logical process was isolated from the network, but the second logical process was not. FF ¶ 111.

**[CL82]** As the Court previously recognized, the invention claimed in the '247 Patent was "isolation" where "the second logical process could access the network [but] the rest of the system could not." FF ¶ 90; CL ¶ 57; (ECF No. 212 at 8). When the Inventors amended the '247 Patent's original claims over Corthell, they added a second electronic processor to provide physical isolation between the first and second logical processes. FF ¶¶ 97, 99. Accordingly, by adding the second physical processor during prosecution of the '247 Patent, the Inventors surrendered the isolation embodiment using a single processor. FF ¶¶ 97, 99.

**[CL83]** Dr. Dunsmore also explained that the Inventors narrowing of the reissue claims to web browser processes results in the first logical process no longer being isolated because web browser processes must be capable of accessing website data. FF ¶¶ 103, 111. Since the Inventors were no longer claiming isolation of the first logical process from the network, reintroducing single processor claims was not improper recapture because the Inventors directly and materially narrowed the surrendered subject matter to web browser processes.

**[CL84]** Google's argument that the Inventors surrendered all single processor embodiments over Corthell abstracts the language of the '247 Patent's original claims—without acknowledging that the invention set forth in the originally filed claims of the '247 Patent was directed to a first logical process isolated from the network, executing on at least a single processor. FF ¶ 112. Accordingly, when the Inventors surrendered their single processor embodiment, it was with respect to the isolation embodiment of the invention—not with respect to a single processor full stop. FF ¶¶ 103–11. Since (1) the originally filed claims of the '609 Application (i.e., the '247 Patent) were directed to isolation of a first logical process, and (2) the reissue claims are directed toward a first logical process without isolation (i.e., a first "web browser process), the Court finds that Claim 43 of the '500 Patent and Claim 67 of the '528 Patent are materially narrowed with respect to the surrendered subject matter (i.e., a single processor executing a first, isolated logical process and a second, unisolated logical process).

**[CL85]** Accordingly, the Court finds Google failed to prove by clear and convincing evidence that the challenged claims violate the rule against recapture under 35 U.S.C. § 251.

## III. CONCLUSION

For the reasons set forth above, the Court concludes that Defendants have not shown by clear and convincing evidence that the Asserted Claims are invalid under 35 U.S.C. § 251.

Accordingly, Google's Motion for Post-Trial Relief on Invalidity under 35 U.S.C. § 251 (Dkt. No. 292) is **DENIED**.

**So ORDERED and SIGNED this 26th day of August, 2021.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ALFONSO CIOFFI, MELANIE ROZMAN, MEGAN ROZMAN, MORGAN ROZMAN, | § | |
| *Plaintiffs*, | § | CIVIL ACTION NO. 2:13-CV-00103-JRG |
| v. | § | **FILED UNDER SEAL** |
| GOOGLE LLC, | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Google LLC's ("Google") Motion for Post-Trial Relief on Non-Infringement, Damages, Patent Ineligibility, and Intervening Rights (Dkt. No. 293) (the "Motion") regarding Reissued U.S. Patent No. 43,500 (the "'500 Patent), Reissued U.S. Patent No. 43,528 (the "'528 Patent"), and Reissued U.S. Patent No. 43,529 (the "'529 Patent") (collectively, the "Patents-in-Suit" or individually, an "Asserted Patent"). For the reasons stated herein, the Motion is **DENIED**.

## I. LEGAL STANDARD

### A. Judgement as a Matter of Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

**B. New Trial**

A new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-00744, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground

for granting a new trial . . . . the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

## II. DISCUSSION

### A. Infringement

#### 1. Indirect Infringement

Google first argues that Plaintiffs failed to present evidence as to the mental state required for indirect infringement of Claim 5 of the '528 Patent and Claim 49 of the '529 Patent. (Dkt. No. 293 at 3–6). Google argues that Plaintiffs' only evidence of the specific intent required for induced and contributory infringement was provided by Plaintiffs' infringement expert, Dr. Aviel Rubin, "who is in no position to know of Google's intent to infringe." (*Id.* at 4). Google further argues that the evidence actually supports the opposite conclusion: that Google had a reasonable, good-faith belief of non-infringement; that the accused product had substantial non-infringing uses; and that post-suit knowledge is insufficient for indirect infringement. (*Id.* at 5–6).

Plaintiffs respond that they presented substantial evidence that Google had the requisite mental state and that Google knew of the Patents-in-Suit at least as of December 11, 2012. (Dkt. No. 294 at 3). Plaintiffs contend that post-suit knowledge is sufficient for indirect infringement. (*Id.* at 4). Plaintiffs also argue that the accused product, Chrome, had no substantial non-infringing uses. (*Id.* at 3).

Both induced and contributory infringement require knowledge that the induced acts constitute patent infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011). Whether an accused infringer has the requisite mental state for indirect infringement considers the totality of the circumstances and may be supported by circumstantial evidence. *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683. 698–99 (Fed. Cir. 2008); *see also Suprema, Inc. v. Int'l Trade Comm'n*, 626 F. App'x 273, 280–81 (Fed. Cir. 2015). Post-suit knowledge is

sufficient. *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-52, 2017 WL 1129951, at *3 (E.D. Tex. Feb. 21, 2017).

The Court finds that Plaintiffs presented substantial evidence to support a finding of indirect infringement. The parties apparently dispute the December 11, 2021 date and whether Plaintiffs' reliance on that date is proper. (Dkt. No. 294 at 3; Dkt. No. 296 at 2 n.1). The Court need not resolve that dispute to resolve this Motion given that post-suit knowledge is sufficient to support a finding of indirect infringement. Plaintiffs presented substantial evidence that Google had the requisite knowledge that the induced acts constituted indirect infringement. Plaintiffs' expert, Dr. Rubin, identified how Google encouraged its end users to infringe the Patents-in-Suit. (Dkt. No. 264 at 74:1–6, 74:9–12, 74:15–22). In particular, Plaintiffs presented evidence that Chrome is configured to infringe upon opening. (*Id.* at 74:7–12). Further, Plaintiffs presented evidence, based on Google documentation, that Google discourages users from operating Chrome in a manner that does not infringe. (*Id.* at 74:13–22). Finally, Plaintiffs presented evidence that Google emphasized the accused infringing features in its marketing materials. (*Id.* at 74:24–75:2). Plaintiffs point out, and Google does not dispute, that this testimony went unrebutted. (Dkt. No. 294 at 3). Google argues that this evidence was "conclusory" and that similar facts have been rejected by this Court in *Tierra Intelectual Borinquin, Inc. v. ASUS Computer Int'l, Inc.*, No. 2:13-CV-0038, 2014 WL 894805 (E.D. Tex. Mar. 4, 2014). (Dkt. No. 296 at 2). The Court disagrees. As shown above, the record contains evidence, including documents and testimony, supporting the requisite intent for indirect infringement. Based on the totality of the evidence, the Court concludes that a reasonable juror could have found the requisite intent for indirect infringement.

The Court also finds that there is substantial evidence supporting a finding of no substantial non-infringing uses of Chrome. (Dkt. No. 264 at 75:5–12). Google's post-trial argument

regarding Chrome's local file viewing capability (Dkt. No. 293 at 5) does not show a substantial non-infringing use. Rather, the cited testimony merely shows that a non-infringing mode may be possible. Such a showing provides no insight into if (and how often) the allegedly non-infringing functionality" is ***used***—the central analysis under substantial non-infringing ***use***. *Google Inc. v. Beneficial Innovations, Inc.*, No. 2:11-cv-00229, 2014 WL 4215402, at *7 (E.D. Tex. Aug. 22, 2014). Accordingly, the Court is persuaded that the jury's finding of no substantial non-infringing use is supported by substantial evidence.

**2. Direct Infringement: Claim 5 of the '528 Patent and Claim 49 of the '529 Patent**

Google argues that there are no fact disputes relevant to its defense of non-infringement for Claim 5 of the '528 Patent and Claim 49 of the '529 Patent. (Dkt. No. 293 at 6). Google argues that it raised this issue at summary judgment, and according to Google, the Court recognized that the defense raised a claim construction issue, but that claim construction issue was nonetheless sent to the jury. (*Id.*) In parsing the patent claims and specification, Google contends that substantial evidence does not support the verdict under a correct reading of the claims. (*Id.*)

Plaintiffs respond that Google is barred from raising this argument at this stage in the case under the doctrines of judicial estoppel and/or waiver. (Dkt. No. 294 at 5–6). Plaintiffs argue that Google is taking a view contrary to its stated position during trial. (*Id.* at 5). During trial, Google successfully argued that its expert, Dr. Michael Kogan, would not present testimony on claim construction, but instead would present testimony regarding the application of the plain and ordinary meaning of the claims at issue. (*Id.*). Plaintiffs argue this is directly contrary to the position Google now takes: that the claims at issue require claim construction and the Court erred in submitting that issue to the jury. (*Id.* at 5–6). In reviewing the patent claims and specification

and trial testimony, Plaintiffs also contend that, in the alternative, the merits of Google's claim construction position is baseless. (*Id.* at 8–11).

The Court is persuaded by Plaintiffs' claims of judicial estoppel. The Fifth Circuit analyzes three factors to determine if judicial estoppel applies: whether "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012).

A comparison of Google's Opposition to Plaintiffs' Bench Memo (the "Google Opposition") (Dkt. No. 249) and the present Motion reveal the tension in Google's position. In the Google Opposition, Google relied on Magistrate Judge Payne's order stating that "[t]he parties' experts can opine on whether the plain and ordinary meaning of the first and second process terms encompasses a system in which…" to argue that Dr. Kogan's testimony was proper and not claim construction. (Dkt. No. 249 at 1–2). Indeed, Google acknowledged that its expert was simply providing his "opinion on the application of the plain and ordinary meaning of unconstrued terms" and called Plaintiffs' attempts to limit Dr. Kogan's testimony "wrong on the merits." (*Id.* at 2, 4). Now, however, Google argues that very same order was incorrect. (Dkt. No. 293 at 6) ("Failure to resolve that claim construction dispute before submitting the case to the jury was an error of law that, at a minimum, requires a new trial.") (*see also* Dkt. No. 296 at 4). In other words, Google is now arguing that the experts were opining on claim construction and that issue was submitted to the jury. This is directly contrary to Google's trial position that the experts were merely opining on the application of the plain meaning of unconstrued terms. The Court finds these two positions irreconcilable. They are plainly inconsistent. During trial, the Court accepted Google's position that in allowing Dr. Kogan's testimony the jury would hear testimony on the application of the

plain and ordinary meaning of the claim terms. The Court finds that Google did not act inadvertently. Instead, Google now argues that the issue of claim construction was improperly sent to the jury to obtain a new trial. Though Google is unhappy with the outcome of the trial, it cannot now take this type of opposite position. The Court finds that Google is judicially estopped from raising those inconsistent arguments in its post-trial briefing.

The Court also finds that Google waived its argument regarding claim construction of the claim terms. Google's current Motion plainly contends that Magistrate Judge Payne erred in not construing the claim language at issue. However, such an objection is nowhere within Google's objections to Magistrate Judge Payne's Report and Recommendation. (Dkt. No. 221). Instead, in its objections, Google argued that the "plain meaning" of the claim language warranted a grant of summary judgment of non-infringement. (*Id.* at 4–5). Google cannot now raise new objections to the Report and Recommendation.

**3. Direct Infringement: Memory Space Limitations**

Google argues that "[t]he trial record shows that Chrome does not have two 'distinct' memory spaces because it allows the 'second web browser process' to access the 'first memory space.'" (Dkt. No. 293 at 12). Google points to testimony by Plaintiffs' expert, Dr. Rubin, Google witnesses, and its own expert, Dr. Kogan, as allegedly confirming that the two memory spaces are not distinct (i.e., there is a section of shared memory between the two processes). (*Id.* at 13). Google argues that Plaintiffs do not dispute any of the facts about the shared memory in Chrome. (*Id.* at 14).

Plaintiffs respond that Google's argument is "a factual dispute regarding the identification of a 'first memory space' and a 'second memory space' in Chrome." (Dkt. No. 294 at 11). Plaintiffs argue that their expert, Dr. Rubin, and Google's expert, Dr. Kogan, "provided contradictory testimony regarding what constituted the first and second memory spaces in

Chrome," and the jury "believed Dr. Rubin over Dr. Kogan and found that Google infringed all asserted claims." (*Id.* at 11–12). Plaintiffs point out that "Google does not argue that the jury's verdict lacked a sufficient evidentiary basis nor that Dr. Rubin committed legal error by straying from the Court's construction." (*Id.* at 12).

The Court finds this to be a classic battle of the experts, and the jury, not the Court, is the appropriate body to make the credibility determinations necessary to resolve conflicting testimony. As explained below, the Court finds that substantial evidence supports a finding of infringement with respect to these claim limitations.

Plaintiffs' expert, Dr. Rubin, explained, relying-in-part on Google documents, how Chrome's two web browser processes (the browser process and the renderer process, respectively) each have their own distinct memory spaces as this Court's claim construction required. (Dkt. No. 264 at 37:1–20, 38:14–39:11). These distinct memory spaces are the claimed first and second memory spaces—the first memory space being distinct to the browser process and the second memory space being distinct to the renderer process. (*Id.*). Dr. Rubin explained his understanding in the context of the Patents-in-Suit. (Dkt. No. 264 at 19:15–21:1, 86:6–87:13, 102:17–103:16). In particular, Dr. Rubin explained that the claimed first and second memory spaces cannot overlap (i.e., each browser process must have its own memory space), but the Patents-in-Suit contemplate shared memory in addition to the distinct memory spaces. (*Id.* at 20:13–21:1, 86:6–87:13).

Although Google's expert, Dr. Kogan, provided contrary testimony that Chrome's browser and renderer processes did not have the claimed distinct memory space because they used shared memory for communication (Dkt. No. 268 at 153:10–23, 154:17–166:1), the jury was free to choose which expert it found more credible. The Court finds that a reasonable juror could have found for Plaintiffs—supported by Dr. Rubin's testimony. This conclusion is further confirmed

by Dr. Rubin's rebuttal testimony where he explained his position and the flaws in Dr. Kogan's analysis. (Dkt. No. 271 at 98:14–101:13, 99:10–100:14). Although not evidence, Dr. Kogan provided the following demonstrative (cited by both parties in their briefing) that illustrates the differences in the opinions of Dr. Rubin and Dr. Kogan.

| Kogan Direct - Slide 17 (Demonstrative illustrating Chrome) | Rubin Rebuttal Video At 0:07 (Demonstrative illustrating Rubin's theory) |
|---|---|
|  |  |





(Dkt. No. 293 at 15; Dkt. No. 294 at 14). This provides further support that the dispute between the experts was factual in nature—the identification of the first and second memory spaces. It was appropriate for the jury to resolve this dispute as the fact finder. The Court does not agree that Google has shown that no reasonable juror could have found for Plaintiff. The Court finds that the verdict is supported by substantial evidence. For these reasons, Google's Motion for JMOL or new trial on non-infringement is **DENIED**.

### B. Damages

Google also moves for either JMOL or a new trial on the issue of damages. Google raises several arguments—none of which the Court finds persuasive. As explained below, Plaintiffs' damages case was supported by substantial evidence and did not taint the verdict by introducing any prejudicial error.

**Confidential Information Redacted**

### 1. Mr. Bratic's Royalty Base and Rate

Google's first argument is that Plaintiffs' damages expert, Mr. Walter Bratic, conflated two separate revenue pools to determine a royalty base and royalty rate. Google argues that Mr. Bratic should not have both (1) relied on the *total* number of monthly Chrome users to develop a royalty base; and (2) relied on the estimated incremental revenue from *new* Chrome users to develop a royalty rate. (Dkt. No. 293 at 20–22).

Determining a reasonable royalty award is not an exact science and necessarily involves some approximation and uncertainty. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). As a hypothetical negotiation analysis inherently attempts to predict the outcome of an event that never occurred, it is not surprising that the most reliable sources that inform a hypothetical negotiation are often not perfect analogues. *Cf. ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("This court observes as well that the most reliable license in this record arose out of litigation. On other occasions, this court has acknowledged that the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation.").

The Court is persuaded that Mr. Bratic's testimony as to his royalty base and rate are supported by substantial evidence. Mr. Bratic explained that he relied on an internal Google analysis regarding the per-user incremental revenue Google would receive with and without inclusion of technology from another company, [redacted]. (Dkt. No. 265 at 21:23–22:23). Mr. Bratic was permitted some leeway in adapting or modifying the figures in Google's "[redacted] Model" to appropriately inform the hypothetical negotiation. Moreover, Google's counsel cross-examined Mr. Bratic on his use of the [redacted] Model. (*Id.* at 53:21–58:24). Google also presented competing testimony from its own damages expert, Mr. Chris Bakewell. (*See generally* Dkt. No. 270 at 41–75). The jury was entitled to believe or disbelieve either of the damages experts and assign

appropriate weight to their respective testimony. In fact, the verdict suggests that the jury did exactly that: rather than award Mr. Bratic's conclusion of $26,275,887, the jury awarded Plaintiffs $20,000,000.

### 2. Advertising Revenue

Google next argues that it was improper for Mr. Bratic to base his valuation of Google's Chrome browser on advertising revenue. (Dkt. No. 293 at 22–25). It argues, in essence, that Mr. Bratic's reliance on the [redacted] Model—which ultimately derives its per-user valuation of Chrome from advertising revenue—is tantamount to inclusion of a separate, unrelated, unaccused product in the royalty base. The Court disagrees. The hypothetical negotiation analysis recognizes and allows for the fact that the value of a product may not always derive from direct sales of such product, and there are several possible factors that may contribute to the value of the patented invention. *See Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970). Mr. Bratic testified that the [redacted] Model is not merely a valuation of Google's advertising revenue, but an attempt to capture the value of Chrome itself. (Dkt. No. 265 at 21:23–24:11, 25:8–24, 29:8–16, 31:13–19, 42:1–17). Google also argues that advertising revenue does not sufficiently inform the value of Chrome because Google's ads are displayed across many different browsers, including unaccused browsers and third-party browsers. (Dkt. No. 293 at 24). Nonetheless, Mr. Bratic accounted for this by basing his royalty calculation only on the Chrome browsers accused by Plaintiffs. (Dkt. No. 265 at 25:8–24, 31:13–19). He further tailored his royalty calculation by considering other information, including depositions of Google witnesses, Google financial documents and filings, and Google marketing documents. (*E.g.*, Dkt. No. 265 at 30:8–31:9, 32:4–34:2). Mr. Bratic's damages calculation is not, as Google contends, a one-for-one substitution of Google Chrome for Google advertising revenue. Mr. Bratic was entitled to

give his opinions on the value of the accused products, and the jury was entitled to give his testimony the weight it felt was appropriate.

### 3. Apportionment

Google argues that Mr. Bratic failed to apportion his royalty base and rate to the value attributable to the infringing features of the product. (Dkt. No. 293 at 25–28); *see Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Google contends that Mr. Bratic improperly relied on the technical apportionment analysis performed by Plaintiffs' infringement expert, Dr. Aviel Rubin, but failed to conduct an economic analysis. (*Id.*). Plaintiffs counter that it was not improper for Mr. Bratic to rely on Dr. Rubin for technical matters, and that he relied on several other sources to develop his economic apportionment analysis. (Dkt. No. 294 at 23–24). Plaintiffs note that Mr. Bratic relied on testimony from Google's engineering representative, Mr. Mark Larson, about the four most important features in Chrome's success: speed, security, simplicity, and stability. (*Id.* at 16). Mr. Bratic also relied on Ms. Vivian Leung, Google's marketing representative, who testified and identified marketing documents (including a research study) showing that the same four "pillars" are identified by customers as the most important features. (*Id.*). Mr. Bratic then relied on Dr. Rubin's analysis of the relative contribution of the patented technology to each of these four features. (*Id.*).

The Court is persuaded that Mr. Bratic's apportionment analysis is supported by substantial evidence. The jury was entitled to believe or disbelieve his testimony, taking into account the testimony he relied on, and the competing expert testimony from Mr. Bakewell. Further, the Court finds there was no prejudicial error of the type identified in the cases cited by Google. *E.g.*, *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012) (grossly excessive, unsupported by the evidence, or speculative); *LaserDynamics, Inc. v. Quanta*

*Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (25% "rule of thumb"); *Ericsson*, 773 F.3d at 1226–27 (Fed. Cir. 2014) (entire market value rule).

The Court is persuaded that Plaintiffs' damages theory is supported by substantial evidence. Likewise, the Court is not persuaded that Plaintiffs' damages theory introduced prejudicial error into the trial record. For these reasons, Google's Motion for JMOL or new trial on damages is **DENIED**.

### C. Subject Matter Eligibility

Next, Google argues that JMOL of ineligibility should be granted under 28 U.S.C. § 101. The Court disagrees. Magistrate Judge Payne recommended denial of Google's § 101 summary judgment motion, and the Court adopted those recommendations. (Dkt. Nos. 208, 226). The Court denied the motion because it could not "conclude that representative claim 30 is abstract under the first step of the *Alice* test," noting that the representative claim was similar to those at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) and *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). (Dkt. No. 208).

The Court previously found Claim 30 of the '500 Patent to be representative of the asserted claims:

> 30. A method of operating a portable computing and communication device capable of executing instructions using a common operating system, comprising:
>
> exchanging data across a network of one or more computers with a network interface device using a wireless connection;
>
> providing an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process;
>
> storing at least one system file within a first memory space;
>
> executing the first web browser process within the common operating system using at least one electronic data processor, wherein the first web browser process is configured to access data of a website via the network, access data

contained in the first memory space and is further configured to initialize the second web browser process;

executing the second web browser process within the common operating system using the at least one electronic data processor, wherein the second web browser process is configured to access data contained in the second memory space and is capable of generating data;

passing data from the first web browser process to the second web browser process; and

displaying data from the second web browser process;

wherein the portable computing and communication device is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

'500 Patent at 21:29–58.

With the benefit of the entire trial record, the Court is not persuaded that the claims of the Patents-in-Suit are directed to an abstract idea. Rather, the claims are directed to an improvement in the prevention and containment of computer malware, implemented through a combination of hardware and software. Such an improvement in computer functionality is not a mere abstract idea and is eligible for patent protection under 28 U.S.C. § 101. *See Enfish*, 88 F.3d at 1335 ("[S]ome improvements in computer-related technology when appropriately claimed are undoubtedly not abstract . . . . Software can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route.").

For these reasons, the Motion on patent ineligibility is **DENIED**.

**D. Intervening Rights**

Google next argues that it is entitled to JMOL that it has intervening rights to the invention claimed in the asserted reissue patents, extinguishing all liability for infringement. The reissue statute provides:

> A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252. This provision gives rise to two types of intervening rights: (1) absolute intervening rights, which are "intervening rights that abrogate liability for infringing claims added to or modified from the original patent if the accused products were made or used before the reissue," and (2) equitable intervening rights, which are "intervening rights that apply as a matter of judicial discretion to mitigate liability for infringing such claims even as to products made or used after the reissue if the accused infringer made substantial preparations for the infringing activities prior to reissue." *Marine Polymer Techs., Inc. v. Hemcon, Inc.*, 672 F.3d 1350, 1361–62 (Fed. Cir. 2012).

The doctrine of absolute intervening rights cannot apply in this case for the simple reason that Plaintiffs did not seek and the jury did not award any damages prior to the reissue dates of each Asserted Patent. (*See* Jury Instructions, Dkt. No. 272 (Trial Tr. 2/10/17 am) at 48:12–17 ("The parties in this case agree that . . . that the date damages could be due regarding the '528 patent and the '529 patent is December the 11th, 2012, and with regard to the '500 patent, is February the 5th, 2013. *Plaintiffs, therefore, cannot recover damages for infringement prior to those dates.*" (emphasis added))). The damages period for each Asserted Patent post-date each

patent's (re)issue date. (*See* Dkt. No. 200 (Joint Pre-Trial Order, Stipulations) ¶¶ 30–32). The jury is presumed to have followed the Court's instructions.

As to equitable intervening rights, Google has not made an adequate showing. Equitable intervening rights are a matter of judicial discretion. 35 U.S.C. § 252. Google must show, at a minimum, that it made "substantial preparation" of the accused products prior to reissue. If this showing is made, the Court has discretion to mitigate liability on equitable terms. Here, however, the only evidence Google presented in its Motion is that it first released an iteration of Chrome 2008 and has continued to release various versions on different platforms with varying functionality. (*E.g.*, Dkt. No. 267 at 37:25–38:3). Consequently, Google tells the Court that Chrome ***as a whole*** predated the reissue patents, but Google is silent as to the specific features actually accused. Equitable intervening rights cannot immunize an entire product with a large set of features simply because some version of the product is amorphously stated to have predated the reissue patents. Further, Google has not attempted to present any evidence as to its "investments made or business commenced" or what terms might equitably protect the same. In short, Google demands complete and total excusal of all liability. On this meager record, the Court declines to find Google has equitable intervening rights.

For these reasons, the Motion on no liability due to intervening rights is **DENIED**.

### E. Venue

Lastly, Google contends (conclusorily) that a new trial should be granted for improper venue. The Court disagrees. Google has waived any objection to the propriety of venue by failing to timely file a motion to dismiss or transfer under Fed. R. Civ. P. 12(b)(3) or 28 U.S.C. §§ 1404 or 1406. Further, Google admitted that venue was proper in its Amended Answer. (Dkt. No. 15 ¶ 3). Under these facts, Google cannot now seek dismissal, transfer, or a new trial. The Motion is **DENIED** as to this ground.

## III. CONCLUSION

For the reasons stated herein and in all respects, Google's Motion is **DENIED**.

**So ORDERED and SIGNED this 2nd day of September, 2021.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

US007484247B2

(12) **United States Patent**
**Rozman et al.**

(10) **Patent No.:** **US 7,484,247 B2**
(45) **Date of Patent:** **Jan. 27, 2009**

(54) **SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE**

(76) Inventors: **Allen F Rozman**, 735 Mockingbird Dr., Murphy, TX (US) 75094; **Alfonso J Cioffi**, 719 Mockingbird Dr., Murphy, TX (US) 75094

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 710 days.

(21) Appl. No.: **10/913,609**

(22) Filed: **Aug. 7, 2004**

(65) **Prior Publication Data**

US 2006/0031940 A1 Feb. 9, 2006

(51) **Int. Cl.**
***G06F 1/26*** (2006.01)
***G06F 12/14*** (2006.01)
*G06F 11/30* (2006.01)
*H04L 9/32* (2006.01)

(52) **U.S. Cl.** .......................... **726/34**; 713/192; 713/193

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,890,098 A 12/1989 Dawes et al.
5,280,579 A 1/1994 Nye
5,502,808 A 3/1996 Goddard et al.
5,555,364 A 9/1996 Goldstein
5,666,030 A 9/1997 Parson
5,673,403 A * 9/1997 Brown et al. ................ 715/744
5,751,979 A 5/1998 McCrory
5,826,013 A 10/1998 Nachenberg
5,918,039 A 6/1999 Buswell et al.
5,978,917 A 11/1999 Chi
5,995,103 A 11/1999 Ashe
6,134,661 A 10/2000 Topp
6,167,522 A 12/2000 Lee et al.
6,192,477 B1 * 2/2001 Corthell ....................... 726/11
6,199,181 B1 3/2001 Rechef et al.
6,216,112 B1 4/2001 Fuller et al.
6,275,938 B1 8/2001 Bond et al.
6,351,816 B1 2/2002 Mueller et al.
6,385,721 B1 * 5/2002 Puckette ........................ 713/2
6,480,198 B2 11/2002 Kang
6,507,904 B1 1/2003 Ellison et al.

(Continued)

OTHER PUBLICATIONS

Kevin Townsend; "Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" © Pest Patrol, 2003.

(Continued)

*Primary Examiner*—Christian LaForgia
(74) *Attorney, Agent, or Firm*—Allen F Rozman

(57) **ABSTRACT**

In a computer system, a first electronic data processor is communicatively coupled to a first memory space and a second memory space. A second electronic data processor is communicatively coupled the second memory space and to a network interface device. The second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device. A video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format. The computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

**20 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,507,948 | B1 * | 1/2003 | Curtis et al. | 717/174 |
| 6,546,554 | B1 | 4/2003 | Schmidt et al. | |
| 6,553,377 | B1 | 4/2003 | Eschelbeck et al. | |
| 6,578,140 | B1 | 6/2003 | Policard | |
| 6,581,162 | B1 | 6/2003 | Angelo et al. | |
| 6,633,963 | B1 | 10/2003 | Ellison et al. | |
| 6,658,573 | B1 | 12/2003 | Bischof et al. | |
| 6,663,000 | B1 | 12/2003 | Muttik et al. | |
| 6,678,712 | B1 * | 1/2004 | McLaren et al. | 718/100 |
| 6,678,825 | B1 | 1/2004 | Ellison et al. | |
| 6,735,700 | B1 | 5/2004 | Flint et al. | |
| 7,146,640 | B2 * | 12/2006 | Goodman et al. | 726/16 |
| 7,260,839 | B2 * | 8/2007 | Karasaki | 726/11 |
| 2002/0066016 | A1 | 5/2002 | Riordan | |
| 2002/0174349 | A1 | 11/2002 | Wolff et al. | |
| 2003/0023857 | A1 | 1/2003 | James et al. | |
| 2003/0097591 | A1 | 5/2003 | Phan et al. | |
| 2003/0177397 | A1 | 9/2003 | Samman | |
| 2004/0006715 | A1 | 1/2004 | Skrepetos | |
| 2004/0034794 | A1 | 2/2004 | Mayer et al. | |
| 2004/0039944 | A1 * | 2/2004 | Karasaki | 713/201 |
| 2004/0054588 | A1 | 3/2004 | Jacobs et al. | |
| 2005/0240810 | A1 * | 10/2005 | Safford et al. | 714/10 |
| 2006/0004667 | A1 * | 1/2006 | Neil | 705/59 |

OTHER PUBLICATIONS

David Stang, PhD; "Beyond Viruses: Why Anti-Virus Software is No Longer Enough", © Pest Patrol 2002.

"The Web: Threat or Menace?" From "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003 ©.

* cited by examiner


100
110
1st memory data storage area
130
2nd memory data storage area
140
120
1st processor
2nd processor
190
Network interface
191
171
150
170
User interface
Video processor
151
180
160
195
User
Video display
Network

Fig. 1


200
210
User opens protected process
220
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
230
P1 passes user interface data to P2 when P2 window is selected or active
240
P2 generates video data for P2 process window(s) and passes video data to video processor
250
Video processor interleaves video data from all P1 and P2 processes
260
End

Fig. 2


300
310
User selects data file(s) to download via browser
320
Data downloaded from network to 2nd processor (P2) and written to 2nd memory (M2)
330
User directs 1st processor (P1) to move file from M2 to 1st memory (M1)
340
P2 performs malware scan on downloaded data file in M2, either in real time as data is transferred, or while data file resides in M2
350
Malware detected in data file ?
No
360
Move or copy data file to M1
Yes
370
Quarantine data file on M2, alert user
380
Delete, clean or quarantine data file on M2
390
End

Fig. 3


400
410
Malware detected or suspected in 2nd processor (P2), 2nd memory (M2) system
420
User instructs 1st processor (P1) to reload critical system files onto 2nd memory (M2) from protected image on 1st memory (M1)
430
P1 may scan all or part of the data contained on M2 for malware. P1 may delete or quarantine infected files on M2
440
P1 may delete all or part of the data contained on M2. P1 may reset P2 and flush RAM coupled to P2
450
Critical system files for P2 system are loaded onto M2 from M1
460
P2 system reinitializes (reboots) from clean critical system files
470
End

Fig. 4


510
User opens protected process
520
Critical system files for P2 system are loaded onto M2 from M1
530
Go to step 220 (Figure 2)

Fig. 5A


540
User closes protected process
550
P1 or P2 may initiate a malware scan on the P2-M2 system
560
P1 or P2 may delete all or part of the data contained on M2.
570
P1 may reset P2 and flush RAM coupled to P2
580
End

Fig. 5B


600
610
User initiates interactive network process via 2nd processor (P2)
620
P2 receives interactive network process status data from network connection
630
P2 informs 1st processor (P1) that interactive network process status data is available
640
P1 retrieves interactive network process status data from P2 and uses status data to run interactive network process and update video display
650
P1 passes updated interactive network process status data to P2
660
P2 sends updated interactive network process status data to network via network connection
670
End

Fig. 6


100
700
730
110
1st memory data storage area
2nd memory data storage area
740
120
190
1st processor
2nd processor
Network interface
150
770
User interface
Video processor
151
180
160
195
User
Video display
Network

Fig. 7


100
800
830
810
1st memory data storage area
2nd memory data storage area
820
1st processor
890
Network interface
150
840
2nd processor
Video processor
870
User interface
151
180
160
195
User
Video display
Network

Fig 8


100
910
1st memory
data storage area
930
950
2nd memory
data storage area
920
190
940
2nd processor
Network interface
960
1st processor
150
970
User interface
Video
processor
151
180
160
195
User
Video display
Network

Fig. 9


1000
1010
User opens protected process
1020
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
1030
P1 encrypts user interface data and passes user interface data to P2 when P2 window is selected or active
1040
P2 generates video data for P2 process window(s) and passes video data to video processor
1050
Video processor decrypts user interface data and interleaves video data from all P1 and P2 processes
1060
P2 passes encrypted user interface data to network interface device
1070
Network interface device decrypts user interface data and passes decrypted user interface data to network
1080
End

Fig. 10

# SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE

## TECHNICAL FIELD

The present invention relates generally to computer hardware and software, and more particularly to a system and method for protecting a computer system from malicious software.



## CROSS REFERENCE TO RELATED PATENTS AND APPLICATIONS

This application is related to the following U.S. patents and applications:

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| 5,826,013 | Polymorphic virus detection module. | Nachenberg |
| 5,978,917 | Detection and elimination of macro viruses. | Chi |
| 6,735,700 | Fast virus scanning using session stamping. | Flint, et al |
| 6,663,000 | Validating components of a malware scanner. | Muttik, et al. |
| 6,553,377 | System and process for maintaining a plurality of remote security applications using a modular framework in a distributed computing environment. | Eschelbeck, et al. |
| 6,216,112 | Method for software distribution and compensation with replenishable advertisements. | Fuller, et al. |
| 4,890,098 | Flexible window management on a computer display. | Dawes, et al. |
| 5,555,364 | Windowed computer display. | Goldstein |
| 5,666,030 | Multiple window generation in computer display. | Parson |
| 5,995,103 | Window grouping mechanism for creating, manipulating and displaying windows and window groups on a display screen of a computer system. | Ashe |
| 5,502,808 | Video graphics display system with adapter for display management based upon plural memory sources. | Goddard, et al. |
| 5,280,579 | Memory mapped interface between host computer and graphics system. | Nye |
| 5,918,039 | Method and apparatus for display of windowing application programs on a terminal. | Buswell, et al |
| 6,480,198 | Multi-function controller and method for a computer graphics display system. | Kang |
| 6,167,522 | Method and apparatus for providing security for servers executing application programs received via a network | Lee, et al. |
| 6,199,181 | Method and system for maintaining restricted operating environments for application programs or operating systems. | Rechef, et al. |
| 6,275,938 | Security enhancement for untrusted executable code. | Bond, et al. |
| 6,321,337 | Method and system for protecting operations of trusted internal networks. | Reshef, et al. |
| 6,351,816 | System and method for securing a program's execution in a network environment. | Mueller, et al. |
| 6,546,554 | Browser-independent and automatic apparatus and method for receiving, installing and launching applications from a browser on a client computer. | Schmidt, et al. |
| 6,658,573 | Protecting resources in a distributed computer system. | Bischof, et al |
| 6,507,904 | Executing isolated mode instructions in a secure system running in privilege rings. | Ellison, et al. |
| 6,633,963 | Controlling access to multiple memory zones in an isolated execution environment. | Ellison, et al. |
| 6,678,825 | Controlling access to multiple isolated memories in an isolated execution environment. | Ellison, et al. |
| 5,751,979 | Video hardware for protected, multiprocessing systems. | McCrory |
| 6,581,162 | Method for securely creating, storing and using encryption keys in a computer system. | Angelo, et al. |
| 6,134,661 | Computer network security device and method. | Topp |
| 6,578,140 | Personal computer having a master computer system and in internet computer system and monitoring a condition of said master and internet computer systems | Policard |
| PUB Application # 20040054588 | E-mail software and method and system for distributing advertisements to client devices that have such e-mail software installed thereon. | Jacobs, Paul E., et al. |
| PUB Application # 20040034794 | System and method for comprehensive general generic protection for computers against malicious programs that may steal information and/or cause damages. | Mayer, Yaron; et al. |
| PUB Application # 20040006715 | System and method for providing security to a remote computer over a network browser interface. | Skrepetos, Nicholas C. |
| PUB Application # 20030177397 | Virus protection in an internet environment. | Samman, Ben |
| PUB Application # 20030097591 | System and method for protecting computer users from web sites hosting computer viruses. | Pham, Khai; et al. |
| PUB Application # 20030023857 | Malware infection suppression. | Hinchliffe, Alexander James; et al. |
| PUB Application # 20020066016 | Access control for computers. | Riordan, James |

-continued

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| PUB Application # 20020174349 | Detecting malicious alteration of stored computer files. | Wolff, Daniel Joseph; et al. |

The above-listed U.S. Patents and U.S. patent applications are incorporated by reference as if reproduced herein in their entirety.

BACKGROUND

The very popular and ubiquitous rise of the 'personal' computer system as an essential business tool and home appliance, together with the exponential growth of the Internet as a means of providing information flows across a wide variety of connected computing devices, has changed the way people live and work. Information in the form of data files and executable software programs regularly flows across the planetary wide system of interconnected computers and data storage devices.

Popular and ubiquitous computer hardware and software architectures have typically been designed to allow for open interconnection via, for example, the internet, a VPN, a LAN, or a WAN, with information often capable of being freely shared between the interconnected computers. This open interconnection architecture has contributed to the adoption and mainstream usage of these computers and the subsequent interconnection of vast networks of computers. This easy to use system has given rise to the explosive popularity of applications such as email, internet browsing, search engines, interactive gaming, instant messaging, and many, many more.

Although there are definite benefits to this open interconnection architecture, a lack of security against unwanted incursions into the computers main processing and non-volatile memory space has emerged as a significant problem. An aspect of some current computer architectures that has contributed to the security problem is that by default programs are typically allowed to interact with and/or alter other programs and data files, including critical operating system files, such as the windows registry, for example. Current open interconnection architectures have opened the door to a new class of unwanted malicious software generally known a malware. This malware is capable of infiltrating any computer system which is connected to a network of interconnected computer systems. Malware is comprised of, but not limited to, classes of software files known as viruses, worms, Trojan horses, browser hijackers, adware, spyware, pop-up windows, data miners, etc. Such malware attacks are capable of stealing data by sending user keystrokes or information stored on a user's computer back to a host, changing data or destroying data on personal computers and/or servers and/or other computerized devices, especially through the Internet. In the least, these items represent a nuisance that interferes with the smooth operation of the computer system, and in the extreme, can lead to the unauthorized disclosure of confidential information stored on the computer system, significant degradation of computer system performance, or the complete collapse of computer system function.

Malware has recently become much more sophisticated and much more difficult for users to deal with. Once resident on a computer system, many malware programs are designed to protect themselves from deletion. For example, some malware programs comprise a pair of programs running simultaneously, with each program monitoring the other for deletion. If one of the pair of programs is deleted, the other program installs a replacement within milliseconds. In another example, some malware will run as a Windows program with a .dlls extension, which Windows may not allow a user to delete while it is executing. Malware may also reset a user's browser home page, change browser settings, or hijack search requests and direct such requests to another page or search engine. Further, the malware is often designed to defeat the user's attempts to reset the browser settings to their original values. In another example, some malware programs secretly record user input commands (such as keystrokes), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, credit account numbers, etc.

Many existing computers rely on a special set of instructions which define an operating system (O/S) in order to provide an interface for computer programs and computer components such as the computer's memory and central processing unit (CPU). Many current operating systems have a multi-tasking capability which allows multiple computer programs to run simultaneously, with each program not having to wait for termination of another in order to execute instructions. Multi-tasking O/S's allow programs to execute simultaneously by allowing programs to share resources with other programs. For example, an operating system running multiple programs executing at the same time allows the programs to share the computer's CPU time. Programs which run on the same system, even if not simultaneously with other programs, share space on the same nonvolatile memory storage medium. Programs which are executing simultaneously are presently able to place binaries and data in the same physical memory at the same time, limited to a certain degree by the O/S restrictions and policy, to the extent that these are properly implemented. Memory segments are shared by programs being serviced by the O/S, in the same manner. O/S resources, such as threads, process tables and memory segments, are shared by programs executing simultaneously as well.

While allowing programs to share resources has many benefits, there are resulting security related ramifications, particularly regarding malware programs. Security problems include allowing the malware program: to capitalize CPU time, leaving other programs with little or no CPU time; to read, forge, write, delete or otherwise corrupt files created by other programs; to read, forge, write, delete or otherwise corrupt executable files of other programs, including the O/S itself; and to read and write memory locations used by other programs to thus corrupt execution of those programs.

In the case of a computer connected to the Internet, the computer may run an O/S, with several user applications, together comprising a known and trusted set of programs, concurrently with an Internet browser, possibly requiring the execution of downloaded code, such as Java applets, or EXE/COM executables, with the latter programs possibly containing malware. Many security features and products are being built by software manufacturers and by O/S programmers to

prevent malware infiltrations from taking place, and to ensure the correct level of isolation between programs. Among these are architectural solutions such as rings-of-protection in which different trust levels are assigned to memory portions and tasks, paging which includes mapping of logical memory into physical portions or pages, allowing different tasks to have different mapping, with the pages having different trust levels, and segmentation which involves mapping logical memory into logical portions or segments, each segment having its own trust level wherein each task may reference a different set of segments. Since the sharing capabilities using traditional operating systems are extensive, so are the security features. However, the more complex the security mechanism is, the more options a malware practitioner has to bypass the security and to hack or corrupt other programs or the O/S itself, sometimes using these very features that allow sharing and communication between programs to do so.

Further, regarding malware programs, for virtually every software security mechanism, a malware practitioner has found a way to subvert, or hack around, the security system, allowing a malware program to cause harm to other programs in the shared environment. This includes every operating system and even the Java language, which was designed to create a standard interface, or sandbox, for Internet downloadable programs or applets.

Major vulnerabilities of existing computer systems lies in the architectures of the computer system and of the operating system itself. A typical multi-tasking O/S environment includes an O/S kernel loaded in the computer random access memory (RAM) at start-up of the computer. The O/S kernel is a minimal set of instructions which loads and off-loads resources and resource vectors into RAM as called upon by individual programs executing on the computer. Sometimes, when two or more executing programs require the same resource, such as printer output, for example, the O/S kernel leaves the resource loaded in RAM until all programs have finished with that resource. Other resources, such as disk read and write, are left in RAM while the operating system is running because such resources are more often used than others. The inherent problem with existing architectures is that resources, such as RAM, or a hard disk, are shared by programs simultaneously, giving a malware program a conduit to access and corrupt other programs, or the O/S itself through the shared resource. Furthermore, as many application programs are of a general nature, many features are enabled by default or by the O/S, thus in many cases bypassing the O/S security mechanism. Such is the case when a device driver or daemon is run by the O/S in kernel mode, which enables it unrestricted access to many if not all the resources.

The most common state-of-the-art solutions for preventing malware infiltration are software based, such as blockers, sweepers and firewalls, for example, and hardware based solutions such as router/firewalls. Examples of software designed to counter malware are Norton Systems Works, distributed by the Symantec Corporation, Ad-aware, distributed by the Lavasoft Corporation of Sweeden, Spy Sweeper, distributed by the Webroot Software Corporation, Spyware Guard, distributed by Javacool Software LLC, among others. Currently there are a plethora of freeware, shareware and purchased software programs designed to counter malware by a variety of means. Such anti-malware programs are limited because they can only detect known malware that has already been identified (usually after the malware has already attacked one or more computers).

Network firewalls are typically based on packet filtering, which is limited in principle, since the rules determining which packets to accept and which to reject may contain subjective decisions based on trusting known sites or known applications. However, once security is breached for any reason (for example, due to a software or hardware error, a new piece of malware unrecognized by the anti-malware program or firewall, or an intended deception), a malicious application may take over the computer or server or possibly the entire network and create unlimited damages (directly or indirectly by opening the door to additional malicious applications).

The methods in the prior art are typically comprised of embedded software countermeasures that detect and filter unwanted intrusions in real time, or scan the computer system either at the direction of a user or as a scheduled event. Two problems arise from these methods. In the first instance, a comprehensive scan, detect, and elimination of malware from desired incoming data streams could significantly slow or preclude the interactive nature of many applications such a gaming, messaging, and browsing. In the second instance, newly implemented software screens may be quickly circumvented by malware practitioners who are determined to pass their files through the screen. Newly discovered malware leads to the development of additional screens, which lead to more malware, etc., thus creating an escalating cycle of measure, countermeasure. The basic flaw is that all incoming executable data files must be resident on the computers main processor to perform their desired function. Once resident on that processor, access may be gained to non-volatile memory and other basic computer system elements. Malware exploits this key architectural flaw to infiltrate and compromise computer systems.

The majority of these applications rely upon a scanning engine which searches suspect files for the presence of predetermined malware signatures. These signatures are held in a database which must be constantly updated to reflect the most recently identified malware. Typically, users regularly download replacement databases, either over the Internet, from a received e-mail, or from a CDROM or floppy disc. Users are also expected to update their software engines every so often in order to take advantage of new virus detection techniques (e.g. which may be required when a new strain of malware is detected).

Many of the aforementioned applications are also not effective against security holes, for example, in browsers or e-mail programs, or in the operating system itself. Security holes in critical applications are discovered quite often, and just keeping up with all the patches is cumbersome. Also, without proper generic protection against, for example, Trojan horses, even VPNs (Virtual Private Networks) and other forms of data encryption, including digital signatures, are not totally safe because information can be stolen before or below the encryption layer. Even personal firewalls are typically limited, because once a program is allowed to access the Internet, there are often few limitations on what files may be accessed and transmitted back to a host.

A major problem faced by computer users connected to a network is that the network interface program (a browser, for example) is resident on the same processor as the O/S and other trusted programs, and shares space on a common memory storage medium. Even with security designed into the O/S, malware practitioners have demonstrated great skill in circumventing software security measures to create malware capable of corrupting critical files on the shared memory storage medium. When this happens, users are often faced with a lengthy process of restoring their computer systems to the correct configuration, and often important files are simply lost because no backup exists.

Therefore, what is needed in the art is a means of isolating the network interface program from the main computer system such that the network interface program does not share a common memory storage area with other trusted programs. The network interface program may be advantageously given access to a separate, protected memory area, while being unable to initiate access to the main computer's memory storage area. With the network interface program constrained in this way, malware programs are rendered unable to automatically corrupt critical system and user files located on the main memory storage area. If a malware infection occurs, a user would be able to completely clean the malware infection from the computer using a variety of methods. A user could simply delete all files contained in the protected memory area, and restore them from an image residing on the main memory area, for example.

Other discussions of malware, its effects on computer systems, techniques used by malware practitioners to install malware, and techniques for detection and removal, may be found in the published literature, and in some of the patents and applications previously incorporated by reference. Reference to malware may be found in a technical white paper entitled "Spyware, Adware, and Peer-to-Peer Networks: The Hidden Threat to Corporate Security.", by Kevin Townsend, © Pest Patrol Inc. 2003. Pest Patrol is a Carlisle; Pa. based developer of software security tools. Another reference is a technical white paper entitled "Beyond Viruses: Why anti-virus software is no longer enough." by David Stang, PhD, © Pest Patrol Inc. 2002. Yet another reference is "The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wily Hacker", Second Edition, Addison-Wesley. ISBN 0-201-63466-X, Copyright 2003. The foregoing references are incorporated by reference as if reproduced herein in their entirety.

## SUMMARY OF THE INVENTION

Embodiments of the present invention achieve technical advantages as a system and method for protecting a computer system from malicious software attacks via a network connection.

It is an object of the present invention to provide a computer system capable of preventing malware programs from automatically corrupting critical user and system files.

It is another object of the present invention to confine any malware infection that may occur to a separate, protected part of the computer system.

It is another object of the present invention to provide a user with an easy and comprehensive method of removing the malware infection, even if the user's anti-malware software is incapable of detecting and/or removing the malware infection.

It is another object of the present invention to provide a user with an easy and comprehensive method of restoring critical system and user files that may have been corrupted by a malware infection.

It is another object of the present invention to provide a computer system configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked.

It is another object of the present invention to provide a computer system capable of executing instructions in a first logical process, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space.



It is another object of the present invention to provide a computer system capable of executing instructions in a second logical process, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers.

It is another object of the present invention to provide a computer system capable of displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal

It is another object of the present invention to provide a computer system configured such that a malware program downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space.

It is another object of the present invention to provide a computer system configured such that corrupted data files residing on the second memory space may be restored from an image residing on the first memory space.

It is another object of the present invention to provide a computer system configured such that data files residing on the second memory space may be automatically deleted when the second logical process is terminated.

It is another object of the present invention to provide a computer system configured such that the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

These objects and other advantages are provided by a preferred embodiment of the present invention wherein a computer system comprising a first electronic data processor is communicatively coupled to a first memory space and to a second memory space, a second electronic data processor is communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device, a video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format, wherein the computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **2** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention;

FIG. **3** illustrates a preferred embodiment of an exemplary file download process according to the principles of the present invention;

FIG. **4** illustrates a preferred embodiment of an exemplary memory restoration process according to the principles of the present invention;

FIG. **5** illustrates a preferred embodiment of an exemplary automatic memory restoration and cleaning process according to the principles of the present invention;

FIG. **6** illustrates a preferred embodiment of an exemplary interactive network process flow according to the principles of the present invention;

FIG. **7** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **8** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **9** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **10** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention.

## DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

The making and using of the presently preferred embodiments are discussed in detail below. It should be appreciated, however, that the present invention provides many applicable inventive concepts that can be embodied in a wide variety of specific contexts. The specific embodiments discussed are merely illustrative of specific ways to make and use the invention, and do not limit the scope of the invention.

A computer system, constructed in accordance with a preferred embodiment of the present invention, is illustrated in FIG. **1**. Computer system **100** may represent, for example, a personal computer (PC) system, a server, a portable computer, such as a notebook computer, or any data processing system, a personal digital assistant (PDA), a communication device such as a cell phone, or device that is capable of being connected to a network of one or more computers. System **100** comprises a first processor **120** (P**1**) communicatively coupled to a first memory and data storage area **110** (M**1**). P**1** **100** may comprise, for example, a microprocessor, such as a Pentium® 4 processor, manufactured by the Intel Corporation, or a Power PC® processor, manufactured by the IBM Corporation. Other electronic data processors manufactured by other companies, including but not limited to electronic data processors realized in Application Specific Integrated Circuits (ASICs) or in Field Programmable Gate Arrays (FPGAs), are within the spirit and scope of the present invention.

The first memory and data storage area **110** may comprise both volatile and nonvolatile memory devices, such as DRAMs and hard drives, respectively. Any memory structure and/or device capable of being communicatively coupled to P**1** may be advantageously used in the present invention. M**1** may be used to store, for example, critical operating system files, user data and applications, interim results of calculations, etc. The many uses of computer memory are well understood by those skilled in the art, and will not be discussed further here. One may refer to several of the aforementioned patents and applications incorporated by reference, in addition to other references, for a discussion of existing computer architectures and uses of computer memory. Also part of system **100** is user interface **150**, which may comprise, for example, a keyboard, mouse or other pointing device, microphone, pen pad, etc. Any device or method capable of inputting commands and/or data from a user **160** to computer system **100** may be used to advantage. A video processor **170** is used to format information for display and transmit the display information to a video dis-



play device **180**, which is viewed by user **160**. Video processor **170** typically includes an associated video memory area, which may be dedicated to the video processor, or shared with other resources. It is understood in the art that the video processor **170** may be part of processor P**1** **120**, in that it may be integrated onto the microprocessor chip. Video processor **170** may also comprise a processor IC located on a video graphics card, which is communicatively coupled to a computer motherboard. Additionally, video processor **170** may comprise circuitry located on the computer motherboard. Further still, functions of video processor **170** may be split between the processor, motherboard, or separate video graphics card.

It is often desirable to connect computer system **100** to a network of one or more computer devices **195**, such as the Internet, a LAN, WAN, VPN, etc. This connection may be accomplished via network interface device **190**, which may comprise, for example, a telephone modem, a cable modem, a DSL line, a router, gateway, hub, etc. Any device capable of interfacing with the network **195** may be used, via a wired connection, a wireless connection, or an optical connection, for example. Network interface device **190** may connect to network **195** through one or more additional network interface devices (not shown). For example, network interface device **190** may comprise a gateway or router, connected to a cable modem, with the cable modem connected to network **195**. Of course, other configurations are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, network **195** is isolated from the first processor **120** and memory **110** by a second processor **140** (P**2**). Second processor **140** may comprise any electronic data processor, such as the devices previously described as applicable to first processor **120**. Communicatively coupled to P**2** **140** is second memory and data storage area **130** (M**2**), which may comprise any memory device or devices, such as the devices previously described as applicable to first memory **110**.

The architecture of computer system **100** is designed to be capable of protecting memory **110** from malware initiated intrusions, and preventing malware from initiating unwanted processes on first processor **120**. This is accomplished by using second processor **140** to isolate **110** and **120** from network **195**. In a preferred embodiment, P**2** **140** is communicatively coupled to memory storage area M**2** **130**, and may be configured such that P**2** **140** is incapable of initiating access to memory storage area M**1** **110**. For example, P**2** **140** may be capable of accessing memory storage area M**1** **110** with the strict permission of user **160**, either through a real time interaction or via stored configuration or commands. Such a configuration may be desirable in a multi-core or multi processor system, where user **160** may wish to use P**2** **140** in either a protected mode or an unprotected mode, depending on the application. However, user **160** is capable of denying P**2** **140** the capability of initiating access to memory storage area M**1** **110** without the user's permission. P**1** **120** is communicatively coupled to both memory areas M**1** **110** and M**2** **130**, thereby enabling P**1** **120** to access data downloaded from the network **195**. In the presently described embodiment, any malware that has intruded the **130-140** system is thus confined to the **130-140** system, and may be configured to be incapable of automatically corrupting data contained on M**1** **110**, or of automatically initiating an unwanted process on P**1** **120**.

This and other features of the present teachings may be illustrated with reference to the example process flow **200** of FIG. **2**. Computer user **160** wishes to connect to network **195** via for example, a browser program such as Internet Explorer

or Netscape Navigator. Of course, other methods of connecting to network **195** may be used. User **160** inputs commands to open a protected process (e.g. a browser program in this example) at step **210**. At step **220**, 1st processor **120** instructs 2nd processor **140** to initiate the protected process and open one or more process windows. Second processor **140**, in conjunction with memory **130**, then interacts with the network **195** via network interface device **190**, receiving and transmitting the data necessary to execute the desired protected process, such as browsing the internet or communication via e-mail. Second processor **140** and memory **130** act as a separate computer system, interacting with network **195** while isolating network **195** from the first processor **120** and memory **110**. Memory **130** may store critical application and system files required by second processor **140** to execute the desired tasks. Memory **130** also stores data necessary to carry out the desired protected process. In the example of FIG. **2**, first processor **120** receives user interface data from user **160**, and passes user interface data to second processor **140** when the protected process window is selected or active, illustrated at step **230**. User interface data, such as keystrokes for example, may be advantageously encrypted by P**1 120** before passing the data to P**2 140**, with network interface device **190** possibly decrypting the data prior to transmitting the data to network **195**. Encrypting, for example keystroke data, may disrupt the efforts of spyware programs designed to store user keystrokes for later transmission to a host computer. Second processor **140** generates video data for the protected process window(s) and passes the video data to video processor **170**, for eventual display on video display **180**, shown at step **240**. Video processor **170** then interleaves the video data from all processes being executed by first processor **120** and second processor **140**, at step **250**. While there are many applicable methods for displaying video data from multiple sources, one such method was described in U.S. Pat. No. 5,751,979, entitled "Video hardware for protected, multiprocessing systems", previously incorporated by reference.

In accordance with a preferred embodiment of the present invention, if any malware is downloaded from network **195**, it is stored in memory **130**, and/or run as a process on second processor **140**. In the configuration of computer system **100**, any downloaded malware is rendered incapable of self initiating access to memory **110** or first processor **120**, because second processor **140** is rendered incapable of initiating access to **110** and **120** without a direct or stored command from user **160**. Any malware infection is thus confined. If a malware attack corrupts files and/or disrupts the operation of the **130-140** system, the user may easily shut down the corrupted process and restore the corrupted files from a protected image stored on memory **110**, for example.

In accordance with a preferred embodiment of the present invention, the operating system controlling the **110-120** system may be different from an operating system controlling the protected **130-140** system. Conversely, a common operating system may control both the **110-120** system and the protected **130-140** system.

A user **160** may find it desirable to transfer files from the protected **130-140** system to the **110-120** system. User **160** may find it necessary, for example, to transfer an attachment from an e-mail message stored on memory **130** to the **110-120** system for further processing, modification, etc. In this case, the computer system **100** may go through a process whereby a file or other data is transferred from the **130-140** system to the **110-120** system, exemplified by the process **300** illustrated in FIG. **3**.

In accordance with a preferred embodiment of the present invention, at step **310**, user **160** selects one or more data files to download from network **195**. The desired data is downloaded to the **130-140** system at step **320**. The user **160** then directs computer system **100** to move the desired file(s) from the **130-140** system to the **110-120** system at step **330**. P**1 120** may then perform a malware scan on the desired files, either in real time as the data is being transferred, or while the data still resides in M**2 130** (step **340**). Alternatively, P**2 140** may perform the malware scan. At step **350**, processor P**2 140** (or P**1 120**) determines if malware has been detected in the desired file(s), and thus P**1 120** makes a decision. If no malware is detected, the file(s) are moved or copied onto M**2 110** at step **360**. If malware is detected, the data file(s) are quarantined on M**2 130**, and the data file(s), if transferred to M**1 100**, are erased or quarantined. Once malware is detected, the user **160** may be alerted of the detection (step **370**). Either as a result of user input or stored configuration commands, the infected file(s) are deleted, cleaned, or quarantined on M**2 130**, at step **380**.

The user **160** would of course understand the dangers inherent in transferring downloaded files from the **130-140** system to the **110-120** system. For example, the user's anti-malware software may not be up to date, or may simply be unable to detect certain types of malware. Also, the malware itself may be so new that the user's anti-malware definitions have not been updated as yet. Therefore the user may wish to keep the files on the **130-140** system for some period of time. Consequently, it may be desirable to have resident on the **130-140** system a variety of application software such as readers, thereby allowing the user to examine the files without risking transferring the files to the **110-120** system. These reader programs, such as Adobe Acrobat Reader, by the Adobe Systems Corporation, or Visio reader, by the Microsoft Corporation, are typically subset application programs of the full featured application programs, and may thus require far less memory space than the full application. Additionally, software companies often distribute the reader programs for free (or a nominal fee), thereby providing advertising for the full featured application in the hopes that it will be eventually purchased by the user. This reader application may be opened and executed on the **130-140** system in a manner similar to the process described in FIG. **2**. Of course, a user **160** may also load a full application into the **130-140** system, enabling processing and modification of a downloaded file fully in the protected space, without risking a transfer of the file to the **110-120** system.

In the event the **130-140** system becomes infected with malware, the user **160** may wish to clean the **130-140** system. This cleaning may be accomplished by running an anti-malware application on the **130-140** system. However, if the infection is too severe for the anti-malware software to clean, or if the malware is undetectable by the user's anti-malware software, the user may wish to restore critical system files (or other user data files) for the **130-140** system from a protected image stored on M**1 100**, for example. It is of course understood that the critical system file image may be restored from another device, such as a removable drive or a CD, for example. The user may however consider it more convenient to restore the critical system files from an image on M**1 100**.

In accordance with a preferred embodiment of the present invention, an exemplary process for restoring M**2 130** from M**1 110** is illustrated by process **400** in FIG. **4**. At step **410**, malware is detected or suspected to be infecting the **130-140** system. The user instructs P**1 120** to reload critical system files onto M**2 130** from a protected image on M**1 110**, at step **420**. Depending on the severity of the infection, P**1 120** may scan all or part of the data contained on M**2 130** for malware, and may scan all processes currently running on P**2 140**. The

scan may be initiated by direct instructions from the user, or by stored configuration commands, for example (step **430**). P**1 120** may delete all or part of the data contained on M**2**. P**1 120** may also reset P**2 140** and/or delete the contents of any RAM communicatively coupled to P**2 140** (step **440**). Once the **130-140** system has been adequately cleaned, clean critical system files are loaded onto M**2 130** from any of the sources previously mentioned, preferably an image stored on M**1 110** (step **450**). The **130-140** may now be rebooted and/or reinitialized from the clean critical system files. In an extreme case where the malware resists deletion by the operating system, the user may elect to do a low level format on the M**1 110** memory in order to ensure that the malware infection has been cleaned.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically reinitialized from clean critical system files when a protected process window is opened. In this way, the new protected process is much less likely to be affected by an infection from a previous protected process session. Of course, a user may have a plurality of protected processes open and running during a protected process session. It may only be necessary to automatically reinitialize from clean critical system files when the first protected process is opened during a session. Subsequent protected processes may not require automatic re-initialization from clean critical system files. An exemplary automatic re-initialization from clean critical system files is illustrated by steps **510**, **520** and **530** in FIG. **5***a*. Additionally, processes running on P**2 140** may be automatically scanned and compared with an allowed process list, particularly as a protected process is started up. If any process is detected which is not on the allowed list, the user may be alerted that a possible malware infection has occurred. A user may then choose to scan or clean the system, or inspect the unknown process to determine if the process will be allowed to continue to execute. A user may also update the list of allowed processes from time to time as new, legitimate processes are added, for example, by a browser software update.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically cleaned when a protected process window is closed. In this way, any detected or undetected malware infections are much less likely to affect a future protected process session. It may only be necessary to automatically clean the **130-140** system when the last protected process is closed during a session. An exemplary automatic cleaning process is illustrated by steps **540**, **550**, **560**, **570** and **580** in FIG. **5***b*. The memory M**2 130** and processor P**2 140** may be automatically scanned for malware infections as the protected process session closes. Infected files may be deleted or quarantined automatically. Additionally, there may be a variety of files that a user may wish to have automatically cleaned or deleted upon closing a protected process session. For example, temporary internet files, cookies, browser plugins, etc., may be deleted or scanned for malware automatically. A user may also wish to have websites that contributed to a malware infection noted, and may wish to place the offending websites in a block list, such that the offending websites cannot be accessed in the future without the user specifically authorizing access. As part of the malware scan, the malware scanner may automatically log the offending website(s), and block future access. Also, the P**2 140** processor and any associated non-volatile memory may be reset and/or erased as the protected process session is closed. The exemplary automatic cleaning process illustrated in FIG. **5***b* may therefore reduce the risk of a malware infection being carried over to a future protected process session.



Interactive network processes such as interactive gaming have become very popular in recent years. In current interactive gaming processes, a user may log onto a game host located on network **195**, or connect to other computers whose users wish to participate in the game. Computer games, such as Quake 3. Arena, by Id Software Incorporated, or Call of Duty, by Activision Incorporated, are just two examples of the plethora of games available that may be played interactively over a network. The user's computer system typically provides the bulk of the processing power and video graphics generation required to display the often fast moving and richly detailed three dimensional game environments. Information about the current and new state of the game is exchanged between various users' computer systems, often in real time. With this type of process, a relatively modest amount of data is required to be exchanged between users, or a user and the host, with the bulk of the processing, data manipulation, and graphics generation being handled by the user's local machine. However, this open network connection may become a conduit for malware practitioners to exploit, allowing malware to be downloaded onto a user's computer during a gaming session, often without the user being aware of the malware transfer. It would be advantageous, therefore, for a computer system to be much less susceptible to malware attacks during gaming sessions.

In accordance with a preferred embodiment of the present invention, an exemplary process flow **600**, illustrated in FIG. **6**, allows an interactive network process, such as online gaming, to be carried out on computer system **100**. A user initiates an interactive network process via 2nd processor P**2 140** (step **610**). P**2 140** receives interactive network process status data from network connection (step **620**). P**2 140** informs 1st processor P**1 120** that interactive network process status data is available (step **630**). P**1 120** retrieves interactive network process status data from P**2 140** and uses the status data to update the interactive network process and update video display (step **640**). P**1 120** then passes the updated interactive network process status data to P**2 140** (step **650**). P**2 140** then sends the updated interactive network process status data to the network via network connection **195** (step **660**). The exemplary process **600**, or a process functionally equivalent, is carried out continuously as long as the interactive process is running.

By using exemplary process **600** (or an equivalent), computer system **100** is capable of actively deciding what data to download and use, and what data to discard or scan for malware. The game status data is buffered prior to loading it onto the **110-120** system. The **110-120** system may be advantageously configured to only accept game status information in the proper format, thereby minimizing the chance that a malware practitioner could deceptively load malware onto the **110-120** system.

Additionally, computer system **100** could be configured such that system **130-140** is powerful enough to process the interactive network process without exchanging information with the **110-120** system. Such a configuration may be more secure, as a conduit between the **110-120** system and the **130-140** system may not be necessarily opened. The **130-140** system may contain all the necessary files to facilitate the interactive network process. Higher end computers, workstations, and servers often contain dual (or more) processors, such as the Mac G5, manufactured by the Apple Computer Corporation, or a single physical processor with a multiple processor core. Often, the processors in these multi-processor machines are of equal or comparable processing power. In

such a configuration, one processor may be dedicated to performing functions equivalent to those described for P**1** **120**, with a second processor performing the functions equivalent to those described for P**2** **140**. A computer system **100** employing multiple processors may be advantageously configured such that one of the processors is dedicated to protected processes only when a network process is active. When a user is not accessing a network, the multiple processors in a computer system may be dedicated to other processes, such as performing complex calculations or simulations, or running complex non-network interactive gaming processes, for example. Alternatively, the computer system **100** may be configured such that the **110**-**120** system simply transfers required files to the video processor **170** or the **130**-**140** system at the appropriate time to facilitate the interactive network process. The **110**-**120** system could be commanded to retrieve and transfer the files at the command of the video processor, or at the command of the **130**-**140** system, or a combination of both.

In accordance with embodiments of the present invention, computer system **100** may be configured in a variety of ways, while still remaining within the spirit and scope of the present teachings. One such exemplary embodiment is illustrated in FIG. **7**. Subsystem **700** of computer system **100** comprises a video processor **770**, a second processor **740**, and a second memory data storage area **730**. The demarcation line illustrated by subsystem **700** may be either physical or logical. For example, subsystem **700** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of the teachings of the present invention. Subsystem **700** may be plugged into the main motherboard of an existing computer, for example. The motherboard connector may be already communicatively coupled to the **110**-**120** system, thereby facilitating the system upgrade. The network interface device **190** may be connected directly to subsystem **700**, or network interface device **190** could be integrated as part of subsystem **700**. Memory data storage area **730** may comprise any of the volatile and/or non-volatile memory types previously described, or any combination thereof, or any suitable memory storage medium, for example. Alternatively, subsystem **700** may be located on the motherboard, as opposed to an add-on card. Further still, portions of subsystem **700**, such as video processor **770**, and/or second processor **740**, for example, may be integrated together with P**1** **120**. It is understood that functions described herein may be configured in a wide variety of ways, without departing from the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **8**. Subsystem **800** of computer system **100** comprises a video processor **870**, a second processor **840**, and a second memory data storage area **830**. The demarcation line illustrated by subsystem **800** may be either physical or logical. For example, subsystem **800** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of features of the present invention. In the exemplary embodiment of FIG. **8**, second processor **840** and video processor **870** are integrated together, perhaps on a common integrated circuit. Such a configuration may help to reduce the cost of subsystem **800**, and/or improve the performance. Additionally, a circuit designer may find it advantageous to integrate **840** and **870** together to facilitate communication between the functions. It is understood that such an integration of functions may create a device in which an external user may find it difficult to distinguish where the function of **870** ends and the function of **840** begins, and vice versa. Such a device, however, would remain within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **9**. Computer system **100** comprises a video processor **970**, processor **960**, and a memory data storage area **950**. Processor **960** may further comprise multiple processor cores, illustrated by 1st processor **920** and 2nd processor **940**. It is understood that processor **960** may contain more than 2 processor cores. Microprocessors manufactured with multiple processor cores are becoming common in the industry, and such multi-core processors may be particularly advantageous when used in accordance with the present teachings. Memory data storage area **950** may further comprise 1st memory data storage area **910** and 2nd memory data storage area **930**. Memory areas **910** and **930** may comprise, for example, different partitions on a single hard drive, and/or different address ranges in a RAM bank.

Referring again to FIG. **9**, the functions carried out by processors **920** and **940** may comprise separate, secure logical processes executing on the same physical processor. For example, a first logical process may comprise executing instructions necessary to carry out the functions of an operating system, or the first logical process may comprise executing instructions necessary to carry out the functions of a first computer program, including but not limited to a word processor. A second logical process may comprise executing instructions necessary to carry out the functions of a web browser program, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example. A computer system **100** constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P**2** **140** (FIG. **1**) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M**1** **110** or another logical process performing the functions of P**1** **120**. Additionally, memory areas **910** and **930** may comprise separate, isolated memory zones within a common physical memory space, such as separate partitions within the same hard drive, for example.

Some malware programs are designed to secretly record user input commands (such as keystrokes, for example), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, bank account numbers, social security numbers, driver's license numbers, credit account numbers, etc. Theft of such personal information could result in the theft of actual assets (money or securities, etc.) or perhaps used for identity theft, among other malicious intents. Clearly, a computer system capable of ensuring the protection of such sensitive information would be desirable.

In accordance with an embodiment of the present invention, a computer system is configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked. Encryption of user input data, such as keystrokes, is an effective means of protecting such data from theft by malware. Specific techniques used for data encryption and decryption are well known in the art, and need not be dis-

cussed further here. There are many examples in the art that may be examined to better understand various encryption/decryption techniques and the use of encryption/decryption in computer systems. Among these are U.S. Pat. No. 6,581,162 entitled "Method for securely creating, storing and using encryption keys in a computer system." issued to Angelo, et al., and U.S. Pat. No. 6,134,661 entitled "Computer network security device and method." Issued to Topp. The aforementioned patents have been previously incorporated by reference.

In accordance with the present teachings, a method of operating a computer system involving data encryption is described. In step **1010**, a user opens a protected process where some level of data encryption is desired, for example, the encryption of sensitive user interface data or user files. Other data may be encrypted as desired. At step **1020**, processor P**1 120** instructs processor P**2 140** to initiate a protected process and open a process window. P**1 120** encrypts the sensitive data and passes the user interface data to P**2 140** when a P**2 140** window is selected or active (step **1030**). P**2 140** generates video data for the P**2 140** process window(s) and passes the video data to video processor **170** (step **1040**). Video processor **170** decrypts the sensitive data and interleaves the video data from all P**1** and P**2** processes (step **1050**). P**2 140** passes the encrypted sensitive data to network interface device **190** (step **1060**). Network interface device **190** decrypts the sensitive data and passes the decrypted sensitive data to network **195**. Of course, other methods of operating a computer system in which data is encrypted prior to being passed to P**2 140**, and decrypted after leaving the control of P**2 140**, are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, data desired to be protected is encrypted prior to sending the data to processor P**2 140**, which may be running one or more malware processes. Processor P**2 140** does not have visibility to the decryption keys, and is therefore unable to decrypt the data. Data may be decrypted by network interface device **190** prior to forwarding the data on to network **195**. Conversely, encrypted data may be sent directly over the network for decryption by another computer system, including, for example, an internet banking host computer. Decryption keys may be passed between P**1 120** and network interface device **190** via a communication link **191**. Video processor **170** may decrypt the data prior to displaying the data on video display **180**, with decryption keys possibly passed between P**1 120** and video processor **170** via a communication link **171**. Conversely, data may be passed directly to video processor **170** via a communication link **151**.

A user **160** may wish to encrypt just a portion of the data destined for the network, such as passwords, credit card numbers, etc. Conversely, a user may wish to encrypt large blocks of data, such as e-mails or large application files containing sensitive text and/or graphics. Instructions may be passed to network interface device **190** directing **190** to decrypt one or more specific data blocks prior to sending the data blocks to network **195**. Conversely, instructions may be passed to network interface device **190** directing **190** to pass one or more specific data blocks to network **195** without decryption.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is therefore intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**1**. A method of operating a computer system having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising the steps of:

executing instructions in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space;

executing instructions in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.

**2**. The method of claim **1** wherein the first memory space and the second memory space comprise separate regions of a common memory space.

**3**. The method of claim **1** wherein the second logical process is selected from the group consisting of; an electronic mail process, an instant messaging process, an internet browser process, an interactive gaming process, a virtual private network (VPN) process, and a reader application process.

**4**. The method of claim **1** wherein the first logical process receives user interface data, and passes the user interface data to the second logical process.

**5**. The method of claim **1** wherein the first and second electronic data processors are part of a multi-core electronic data processor.

**6**. The method of claim **1** and further comprising the step of restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.

**7**. The method of claim **1** and further comprising the step of automatically deleting at least one data file residing on the second memory space when the second logical process is terminated.

**8**. The method of claim **1** and further comprising the steps of:

encrypting data with the first logical process;

transferring the encrypted data from the first logical process to the second logical process;

transferring the encrypted data from the second logical process to the network interface device.

**9**. The method of claim **8** and further comprising the steps of:

decrypting the data with the network interface device;

transferring the decrypted data from the network interface device to the network.

**10**. A multi-processor computer system using a common operating system, comprising:

a first electronic data processor capable of executing instructions using the common operating system and communicatively coupled to a first memory space and a second memory space;

a second electronic data processor capable of executing instructions using the common operating system and communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device;

a video processor adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing on the second electronic data processor.

**11**. The computer system of claim **10** wherein the first memory space and the second memory space comprise separate regions of a common memory space.

**12**. The computer system of claim **10** wherein the first and second electronic data processors are part of a dual processor computer system.

**13**. The computer system of claim **10** wherein the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

**14**. The computer system of claim **10** wherein the computer system is configured such that the first electronic data processor is protected from executing instructions initiated by a malware process downloaded from the network and executing on the second electronic data processor.

**15**. A multi-processor computer system using a common operating system, comprising:

at least a first and second electronic data processor capable of executing instructions using the common operating system;

at least a first and second memory space;

a video processor;

wherein the first and second electronic data processors, first and second memory space, and video processor are configured for performing the steps of:



executing instructions in a first logical process with the first electronic data processor, wherein the first logical process is executing within the common operating system and is capable of accessing data contained in the first memory space and the second memory space;

executing instructions in a second logical process with the second electronic data processor, wherein the second logical process is executing within the common operating system and is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein the video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.

**16**. The computer system of claim **15** wherein the computer system is further configured such that the first logical process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second logical process.

**17**. The computer system of claim **15** and further comprising: at least one network interface device capable of exchanging data with both the second logical process and with the network.

**18**. The computer system of claim **17** wherein the network interface device is capable of decrypting data received from the second logical process and transmitting the decrypted data to the network while preventing the second logical process from accessing the decrypted data.

**19**. The computer system of claim **15** wherein the at least one electronic data processor is selected from the group consisting of: a multi-core electronic data processor; dual electronic data processors; and multiple electronic data processors.

**20**. The computer system of claim **15** and further configured for performing the step of: restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.

* * * * *

US00RE43500E

(19) **United States**
(12) **Reissued Patent**
**Rozman et al.**

(10) **Patent Number: US RE43,500 E**
(45) **Date of Reissued Patent: *Jul. 3, 2012**

(54) **SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE**

(76) Inventors: **Allen F. Rozman**, Garland, TX (US); **Alfonso J. Cioffi**, Murphy, TX (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/720,207**

(22) Filed: **Mar. 9, 2010**

**Related U.S. Patent Documents**

Reissue of:

(64) Patent No.: **7,484,247**
Issued: **Jan. 27, 2009**
Appl. No.: **10/913,609**
Filed: **Aug. 7, 2004**

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/06*** | (2006.01) |
| *G06F 11/00* | (2006.01) |
| *G06F 12/14* | (2006.01) |
| *G06F 12/16* | (2006.01) |
| *G08B 23/00* | (2006.01) |

(52) **U.S. Cl.** .......... **713/152**; 713/151; 713/188; 726/22; 726/23; 726/24

(58) **Field of Classification Search** .................. 713/188, 713/151–152; 726/22–24
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,890,098 | A | | 12/1989 | Dawes et al. | |
| 5,280,579 | A | | 1/1994 | Nye | |
| 5,502,808 | A | | 3/1996 | Goddard et al. | |
| 5,555,364 | A | | 9/1996 | Goldstein | |
| 5,564,051 | A | * | 10/1996 | Halliwell et al. | 1/1 |
| 5,666,030 | A | | 9/1997 | Parson | |
| 5,673,403 | A | * | 9/1997 | Brown et al. | 715/744 |
| 5,751,979 | A | * | 5/1998 | McCrory | 715/803 |
| 5,826,013 | A | | 10/1998 | Nachenberg | |
| 5,918,039 | A | | 6/1999 | Buswell et al. | |
| 5,974,549 | A | * | 10/1999 | Golan | 726/23 |
| 5,978,917 | A | | 11/1999 | Chi | |
| 5,995,103 | A | | 11/1999 | Ashe | |
| 6,091,412 | A | | 7/2000 | Simonoff et al. | |
| 6,108,715 | A | | 8/2000 | Leach et al. | |
| 6,134,661 | A | | 10/2000 | Topp | |
| 6,167,522 | A | | 12/2000 | Lee et al. | |

(Continued)

OTHER PUBLICATIONS

Architecture of Virtual Machines by R. P. Goldberg, Honeywell Information Systems, Inc. and Harvard University presented at the AFIPS National Computer Conference, New York, New York, Jun. 4-8, 1973.

(Continued)

*Primary Examiner* — Christian Laforgia
(74) *Attorney, Agent, or Firm* — Slater & Matsil, L.L.P.

(57) **ABSTRACT**

In a computer system, a first electronic data processor is communicatively coupled to a first memory space and a second memory space. A second electronic data processor is communicatively coupled the second memory space and to a network interface device. The second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device. A video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format. The computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

**51 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,183,366 | B1 | 2/2001 | Goldberg et al. | |
| 6,192,477 | B1 * | 2/2001 | Corthell | 726/11 |
| 6,199,181 | B1 * | 3/2001 | Rechef et al. | 714/38 |
| 6,216,112 | B1 | 4/2001 | Fuller et al. | |
| 6,275,938 | B1 | 8/2001 | Bond et al. | |
| 6,285,987 | B1 | 9/2001 | Roth et al. | |
| 6,321,337 | B1 | 11/2001 | Rechef et al. | |
| 6,351,816 | B1 | 2/2002 | Mueller et al. | |
| 6,385,721 | B1 * | 5/2002 | Puckette | 713/2 |
| 6,397,242 | B1 | 5/2002 | Devine et al. | |
| 6,401,134 | B1 | 6/2002 | Razavi et al. | |
| 6,433,794 | B1 | 8/2002 | Beadle et al. | |
| 6,438,600 | B1 | 8/2002 | Greenfield et al. | |
| 6,480,198 | B2 | 11/2002 | Kang | |
| 6,492,995 | B1 | 12/2002 | Atkin et al. | |
| 6,505,300 | B2 | 1/2003 | Chan et al. | |
| 6,507,904 | B1 | 1/2003 | Ellison et al. | |
| 6,507,948 | B1 | 1/2003 | Curtis et al. | |
| 6,546,554 | B1 | 4/2003 | Schmidt et al. | |
| 6,553,377 | B1 | 4/2003 | Eschelbeck et al. | |
| 6,578,140 | B1 * | 6/2003 | Policard | 713/1 |
| 6,581,162 | B1 | 6/2003 | Angelo et al. | |
| 6,633,963 | B1 | 10/2003 | Ellison et al. | |
| 6,658,573 | B1 | 12/2003 | Bischof | |
| 6,663,000 | B1 | 12/2003 | Muttick et al. | |
| 6,678,712 | B1 * | 1/2004 | McLaren et al. | 718/100 |
| 6,678,825 | B1 | 1/2004 | Ellison et al. | |
| 6,691,230 | B1 | 2/2004 | Bardon | |
| 6,735,700 | B1 | 5/2004 | Flint et al. | |
| 6,754,815 | B1 * | 6/2004 | Ellison et al. | 713/1 |
| 6,756,236 | B2 | 6/2004 | Ford et al. | |
| 6,757,685 | B2 | 6/2004 | Rafaelle et al. | |
| 6,772,345 | B1 | 8/2004 | Shetty | |
| 6,804,780 | B1 | 10/2004 | Touboul | |
| 6,836,885 | B1 | 12/2004 | Buswell et al. | |
| 6,871,348 | B1 * | 3/2005 | Cooper | 719/310 |
| 6,873,988 | B2 | 3/2005 | Herrmann et al. | |
| 6,880,110 | B2 | 4/2005 | Largman et al. | |
| 6,990,630 | B2 | 1/2006 | Landsman et al. | |
| 6,996,828 | B1 * | 2/2006 | Kimura et al. | 719/319 |
| 7,013,484 | B1 * | 3/2006 | Ellison et al. | 726/26 |
| 7,024,555 | B2 * | 4/2006 | Kozuch et al. | 726/22 |
| 7,024,581 | B1 * | 4/2006 | Wang et al. | 714/2 |
| 7,039,801 | B2 * | 5/2006 | Narin | 713/152 |
| 7,062,672 | B2 | 6/2006 | Owhadi et al. | |
| 7,082,615 | B1 * | 7/2006 | Ellison et al. | 726/26 |
| 7,085,928 | B1 | 8/2006 | Schmid et al. | |
| 7,096,381 | B2 | 8/2006 | Largman et al. | |
| 7,139,890 | B2 | 11/2006 | Moran et al. | |
| 7,146,305 | B2 * | 12/2006 | van der Made | 703/22 |
| 7,146,640 | B2 * | 12/2006 | Goodman et al. | 726/16 |
| 7,181,768 | B1 | 2/2007 | Ghosh et al. | |
| 7,191,469 | B2 | 3/2007 | Erlingsson | |
| 7,246,374 | B1 | 7/2007 | Simon et al. | |
| 7,260,839 | B2 * | 8/2007 | Karasaki | 726/11 |
| 7,284,274 | B1 | 10/2007 | Walls et al. | |
| 7,367,057 | B2 * | 4/2008 | Das et al. | 726/24 |
| 7,373,505 | B2 | 5/2008 | Seltzer et al. | |
| 7,401,230 | B2 | 7/2008 | Campbell et al. | |
| 7,421,689 | B2 | 9/2008 | Ross et al. | |
| 7,444,412 | B2 | 10/2008 | Owhadi | |
| 7,484,247 | B2 * | 1/2009 | Rozman et al. | 726/34 |
| 7,565,522 | B2 | 7/2009 | Sastry et al. | |
| 7,577,871 | B2 | 8/2009 | Largman et al. | |
| 7,596,694 | B1 | 9/2009 | Karp et al. | |
| 7,650,493 | B2 * | 1/2010 | Narin | 713/152 |
| 7,657,419 | B2 * | 2/2010 | van der Made | 703/22 |
| 7,676,842 | B2 | 3/2010 | Carmona et al. | |
| 7,694,328 | B2 | 4/2010 | Joshi et al. | |
| 7,730,318 | B2 | 6/2010 | Kurien et al. | |
| 7,818,808 | B1 * | 10/2010 | Neiger et al. | 726/26 |
| 7,849,310 | B2 * | 12/2010 | Watt et al. | 713/164 |
| 7,854,008 | B1 * | 12/2010 | Huang et al. | 726/24 |
| 2002/0002673 | A1 * | 1/2002 | Narin | 713/152 |
| 2002/0052809 | A1 * | 5/2002 | Toedtli | 705/28 |
| 2002/0066016 | A1 | 5/2002 | Riordan | |
| 2002/0174349 | A1 | 11/2002 | Wolff et al. | |
| 2003/0023857 | A1 | 1/2003 | Hinchliffe et al. | |
| 2003/0097591 | A1 | 5/2003 | Pham et al. | |
| 2003/0131152 | A1 | 7/2003 | Erlingsson | |
| 2003/0177397 | A1 | 9/2003 | Samman | |
| 2003/0221114 | A1 * | 11/2003 | Hino et al. | 713/189 |
| 2004/0006706 | A1 | 1/2004 | Erlingsson | |
| 2004/0006715 | A1 | 1/2004 | Skrepetos | |
| 2004/0034794 | A1 | 2/2004 | Mayer et al. | |
| 2004/0039944 | A1 * | 2/2004 | Karasaki | 713/201 |
| 2004/0054588 | A1 | 3/2004 | Jacobs et al. | |
| 2004/0199763 | A1 | 10/2004 | Freund | |
| 2004/0230794 | A1 * | 11/2004 | England et al. | 713/164 |
| 2004/0267929 | A1 * | 12/2004 | Xie | 709/225 |
| 2005/0005153 | A1 * | 1/2005 | Das et al. | 713/200 |
| 2005/0091661 | A1 * | 4/2005 | Kurien et al. | 719/310 |
| 2005/0149726 | A1 * | 7/2005 | Joshi et al. | 713/164 |
| 2005/0198692 | A1 * | 9/2005 | Zurko et al. | 726/24 |
| 2005/0240810 | A1 | 10/2005 | Safford et al. | |
| 2006/0004667 | A1 | 1/2006 | Neil | |

OTHER PUBLICATIONS

The Duality of Memory and Communication in the Implementation of a Multiprocessor Operating System by Michael Young, Avadis Tevanian, Richard Rasheed, David Golub, Jeffery Eppinger, Jonathan Crew, William Bolosky, David Black and Robert Baron, Computer Science Department Carnegie-Mellon University Appeared in Proceedings of the 11th Operating Systems Principles, Nov. 1987.

Application-Controlled Physical Memory using External Page-Cache Management by Keiran Harty and David R. Cheriton, Computer Science Department, Stanford University, 1992.

Efficient Software-Based Fault Isolation by Robert Wahbe, Steven Lucco, Thomas Anderson, Susan Graham, Computer Science Division University of California, Berkeley, SIGOPS 1993.

Tron: Process-Specific File Protection for the Unix Operating System by Andrew Berman, Virgil Bourassa, Erik Selberg, Department of Computer Science and Engineering, University of Washington, Jan. 23, 1995.

A Secure Environment for Untrusted Helper Applications (Confining the Wily Hacker) by Ian Goldberg, David Wagner, Randi Thomas, and Eric Brewer, Computer Science Division, University of California, Berkeley, Sixth Usenix Unix Security Symposium San Jose, California, Jul. 1996.

Building Systems that Flexibly Control Downloaded Executable Context by Trent Jaeger and Atul Prakash, Software Systems Research Lab, University of Michigan and Aviel D. Rubin, Security Research Group, Bellcore Sixth Usenix Unix Security Symposium San Jose, California, Jul. 1996.

Java Security: From HotJava to Netscape and Beyond by Drew Dean, Edward W. Felten, Dan S. Wallach Department of Computer Science, Princeton University, Princeton, NJ 08544 1996 IEEE Symposium on Security and Privacy, Oakland, CA, May 6-8, 1996.

ChakraVyuha (CV) : A Sandbox Operating SystemEnvironment for Controlled Execution of Alien Code by Asit Dan, Ajay Mohindra, Rajiv Ramaswami, and Dinkar Sitaram IBM Research Division T.J. Watson Research Center Yorktown Heights, New York RC 20742 (Feb. 20, 1997) Computer Science IBM Research Report Limited Distribution.

Vulnerability of Secure Web Browsers by Flavio De Paoli, Andre Dos Santos, Richard Kemmerer Reliable Software Group Computer Science Department, University of California, Santa Barbara, 1997.

Security of Web Browser Scripting Languages: Vulnerabilities, Attacks, and Remedies by Vinod Anupam and Alain Mayer, Bell Laboratories, Lucent Technologies 7th Usenix Security Symposium San Antonio, Texas, Jan. 26-29, 1998.

"Virtual Memory in Contemporary Microprocessors" by Bruce Jacob University of Maryland and Trevor Mudge University of Michigan, IEEE Micro Jul.-Aug. 1998.

"Flexible Control of Downloaded Executable Content" by Trent Jaeger and Jochen Liedtke and Nayeem Islam, IBM Thomas J. Watson Research Center, and Atul Prakash University of Michigan, Ann Arbor ACM Transactions on Information and System Security, vol. 2, No. 2, May 1999, pp. 177-228.

"J2ME Building Blocks for Mobile Devices: White Paper on KVM and the Connected", Limited Device Configuration Sun Microsystems May 19, 2000.
"User-level Resource-constrained Sandboxing" by Fangzhe Chang, Ayal Itzkovitz, and Vijay Karamcheti Department of Computer Science, Courant Institute of Mathematical Sciences, New York University Usenix Windows System Symposium, Aug. 2000.
"Verifying the EROS Confinement Mechanism" by Jonathan S. Shapiro and San Weber IBM T.J. Watson Research Center 0-7695-0665-8/00 2000 IEEE.
"WindowBox: A Simple Security Model for the Connected Desktop" by Dirk Balfanz, Princeton University and Daniel R. Simon, Microsoft Research, 2000.
"Building a Secure Web Browser" by Sotiris Ioannidis, University of Pennsylvania, and Steven M. Bellovin, AT&T Labs Research 2001 Usenix Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"Virtualizing I/O Devices on VMware Workstation's Hosted Virtual Machine Monitor" by Jeremy Sugerman, Ganesh Venkitachalam and Beng-Hong Lim, VMware, Inc. 3145 Porter Dr, Palo Alto, CA 943042001 Usenix Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"When Virtual Is Better Than Real" by Peter M. Chen and Brian D. Noble, Department of Electrical Engineering and Computer Science University of Michigan 2001.
"A Flexible Containment Mechanism for Executing Untrusted Code" by David Peterson, Matt Bishop, and Raju Pandey, Department of Computer Science University of California, Davis Usenix Security Symposium San Francisco, California, USA Aug. 5-9, 2002.
"ReVirt: Enabling Intrusion Analysis through Virtual-Machine Logging and Replay" by George W. Dunlap, Samuel T. King, Sukru Cinar, Murtaza A. Basrai, Peter M. Chen, Department of Electrical Engineering and Computer Science, University of Michigan Proceedings of the 2002 Symposium on Operating Systems Design and Implementation (OSDI).
"Trusted Paths for Browsers: An Open-Source Solution to Web Spoofing"by Zishuang (Eileen) Ye and Sean Smith Department of Computer Science Dartmouth College Technical Report TR2002-418 Feb. 4, 2002.
"User Interaction Design for Secure Systems" by Ka-Ping Yee http://zesty.ca/sid/2002.
BAA-00-06-SNK Focused Research Topic 5 by Marc Stiegler and Mark Miller Report Name: "A Capability Based Client: The DarpaBrowser" Jun. 26, 2002.
"A Virtual Machine Introspection Based Architecture for Intrusion Detection" by Tal Garfinkel and Mendel Rosenblum, Computer Science Department, Stanford University 2003.
"Terra: A Virtual Machine-Based Platform for Trusted Computing" by Tal Garfinkel, Ben Pfaff, Jim Chow, Dan Boneh and Mendel Rosenblum, Computer Science Department, Stanford University SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
Microsoft® Virtual PC 2004 Technical Overview by Jerry Honeycutt Published Nov. 2003 http://download.microsoft.com/download/c/f/b/cfb100a7-463d-4b86-ad62-064397178b4f/Virtual$_{13}$ PC__Technical__Overview.doc.
"Xen and the Art of Virtualization" by Paul Barham, Boris Dragovic, Keir Fraser, Steven Hand, Tim Harris, Alex Ho, Rolf Neugebaurey, Ian Pratt, Andrew Warfield University of Cambridge Computer Laboratory 15 JJ Thomson Avenue, Cambridge, UK, CB3 0FD SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
"Design of the EROS Trusted Window System" by Jonathan S. Shapiro, John Venderburgh, Eric Northrup, Systems Research Laboratory Johns Hopkins University, and, David Chizmadia, Promia, Inc. 2004.
"Survey of System Virtualization" Techniques by Robert Rose Mar. 8, 2004.
White Paper: "Smart Phone Security Issues" by Luc Delpha and Maliha Rasheed, Cyber Risk Consulting Blackhat Briefings Europe May 2004.
"Software Security and Privacy Risks in Mobile E-Commerce" by Anup K. Ghosh and Tara M. Swaminatha, Communications of the ACM Feb. 2001 vol. 44, No. 2.
T. Jaeger, A. D. Rubin, and A. Prakash. "Building systems that flexibly control downloaded executable content." In Proceedings of the 1996 Usenix Security Symposium, pp. 131-148, San Jose, Ca., 1996.
David A. Wagner, "Janus: an approach for confinement of untrusted applications."Master's thesis, University of California, Berkeley, 1999.. Also available, Technical Report CSD-99-1055, UC Berkeley, Computer Science Division. http://www.cs.berkeley.edu/~daw/papers/janus-masters.ps.
Richard West and Jason Gloudon, "User-Level Sandboxing: a Safe and Efficient Mechanism for Extensibility", Technical Report, 2003-014, Boston University, Jun. 2003.
Shaya Potter, Jason Nieh, Dinesh Subhraveti, "Secure Isolation and Migration of Untrusted Legacy Applications." Columbia University Technical Report CUCS-005-04, Jan. 2004.
M. Schmid, F. Hill, A. Ghosh, "Protecting Data from Malicious Software." Annual Computer Security Applications Conference (ACSAC'02), Las Vegas, NV, Dec. 2002.
Valentin Razmov "Security in Untrusted Code Environments: Missing Pieces of the Puzzle." Dept. of Computer Science and Engineering, University of Washington, Mar. 30, 2002.
Sotiris Ioannidis and Steven M. Bellovin. "Sub-Operating Systems: A New Approach to Application Security." Technical Report MS-CIS-01-06, University of Pennsylvania, Feb. 2000.
"Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" by Kevin Townsend, Pest Patrol, 2003.
Beyond Viruses: Why Anti-Virus Software is No Longer Enough by David Stang PhD, Pest Patrol, 2002.
"The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003.
Kevin Townsend; "Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security"© Pest Patrol, 2003.
David Stang, PhD; "Beyond Viruses: Why Anti-Virus Software is No Longer Enough", © Pest Patrol 2002.
"The Web: Threat or Menace?" From "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003 ©.

* cited by examiner


100
110
1st memory data storage area
130
2nd memory data storage area
140
120
1st processor
2nd processor
190
Network interface
191
171
150
User interface
170
Video processor
151
160
User
180
Video display
195
Network

Fig. 1


200
210
User opens protected process
220
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
230
P1 passes user interface data to P2 when P2 window is selected or active
240
P2 generates video data for P2 process window(s) and passes video data to video processor
250
Video processor interleaves video data from all P1 and P2 processes
260
End

Fig. 2



300
310
User selects data file(s) to download via browser
320
Data downloaded from network to 2nd processor (P2) and written to 2nd memory (M2)
330
User directs 1st processor (P1) to move file from M2 to 1st memory (M1)
340
P2 performs malware scan on downloaded data file in M2, either in real time as data is transferred, or while data file resides in M2
350
Malware detected in data file ?
No
360
Move or copy data file to M1
Yes
370
Quarantine data file on M2, alert user
380
Delete, clean or quarantine data file on M2
390
End


Fig. 3


400
410
Malware detected or suspected in 2nd processor (P2), 2nd memory (M2) system
420
User instructs 1st processor (P1) to reload critical system files onto 2nd memory (M2) from protected image on 1st memory (M1)
430
P1 may scan all or part of the data contained on M2 for malware. P1 may delete or quarantine infected files on M2
440
P1 may delete all or part of the data contained on M2. P1 may reset P2 and flush RAM coupled to P2
450
Critical system files for P2 system are loaded onto M2 from M1
460
P2 system reinitializes (reboots) from clean critical system files
470
End

Fig. 4


510
User opens protected process
520
Critical system files for P2 system are loaded onto M2 from M1
530
Go to step 220 (Figure 2)

Fig. 5A


540
User closes protected process
550
P1 or P2 may initiate a malware scan on the P2-M2 system
560
P1 or P2 may delete all or part of the data contained on M2.
570
P1 may reset P2 and flush RAM coupled to P2
580
End

Fig. 5B


600
610
User initiates interactive network process via 2nd processor (P2)
620
P2 receives interactive network process status data from network connection
630
P2 informs 1st processor (P1) that interactive network process status data is available
640
P1 retrieves interactive network process status data from P2 and uses status data to run interactive network process and update video display
650
P1 passes updated interactive network process status data to F2
660
P2 sends updated interactive network process status data to network via network connection
670
End

Fig. 6


100
700
730
110
1st memory data storage area
2nd memory data storage area
740
120
190
1st processor
2nd processor
Network interface
150
770
User interface
Video processor
151
180
160
195
User
Video display
Network

Fig. 7


100
800
830
810
1st memory data storage area
2nd memory data storage area
820
1st processor
890
Network interface
150
840
2nd processor
User interface
Video processor
870
151
180
160
195
User
Video display
Network

Fig 8


100
910
1st memory
data storage area
930
950
2nd memory
data storage area
920
190
940
2nd processor
Network interface
960
1st processor
150
970
User interface
Video
processor
151
180
160
195
User
Video display
Network

Fig. 9


1000
1010
User opens protected process
1020
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
1030
P1 encrypts user interface data and passes user interface data to P2 when P2 window is selected or active
1040
P2 generates video data for P2 process window(s) and passes video data to video processor
1050
Video processor decrypts user interface data and interleaves video data from all P1 and P2 processes
1060
P2 passes encrypted user interface data to network interface device
1070
Network interface device decrypts user interface data and passes decrypted user interface data to network
1080
End

Fig. 10

# SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## *CROSS REFERENCE TO MULTIPLE REISSUE APPLICATIONS*

*This application is a reissue application of U.S. Pat. No. 7,484,247, entitled "System and Method for Protecting a Computer System from Malicious Software," issued on Jan. 27, 2009, and is related to another reissue application designated U.S. patent application Ser. No. 12/720,147 from U.S. Pat. No. 7,484,247 filed concurrently herewith, which are incorporated herein by reference. This application is also related to another reissue application designated U.S. patent application Ser. No. 12/854,149 (now, U.S. Pat. No. Re. 43,103) from U.S. Pat. No. 7,484,247 filed on Aug. 10, 2010 and a continuation application therefrom designated U.S. patent application Ser. No. 13/015,186 filed on Jan. 27, 2011, which are incorporated herein by reference. This application is also related to another reissue application designated U.S. patent application Ser. No. 12/941,067 from U.S. Pat. No. 7,484,247 filed on Nov. 7, 2010, which is incorporated herein by reference.*

## TECHNICAL FIELD

The present invention relates generally to computer hardware and software, and more particularly to a system and method for protecting a computer system from malicious software.

## CROSS REFERENCE TO RELATED PATENTS AND APPLICATIONS

This application is related to the following U.S. patents and applications:

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| 5,826,013 | Polymorphic virus detection module. | Nachenberg |
| 5,978,917 | Detection and elimination of macro viruses. | Chi |
| 6,735,700 | Fast virus scanning using session stamping. | Flint, et al |
| 6,663,000 | Validating components of a malware scanner. | Muttik, et al. |
| 6,553,377 | System and process for maintaining a plurality of remote security applications using a modular framework in a distributed computing environment. | Eschelbeck, et al. |
| 6,216,112 | Method for software distribution and compensation with replenishable advertisements. | Fuller, et al. |
| 4,890,098 | Flexible window management on a computer display. | Dawes, et al. |
| 5,555,364 | Windowed computer display. | Goldstein |
| 5,666,030 | Multiple window generation in computer display. | Parson |



-continued

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| 5,995,103 | Window grouping mechanism for creating, manipulating and displaying windows and window groups on a display screen of a computer system. | Ashe |
| 5,502,808 | Video graphics display system with adapter for display management based upon plural memory sources. | Goddard, et al. |
| 5,280,579 | Memory mapped interface between host computer and graphics system. | Nye |
| 5,918,039 | Method and apparatus for display of windowing application programs on a terminal. | Buswell, et al |
| 6,480,198 | Multi-function controller and method for a computer graphics display system. | Kang |
| 6,167,522 | Method and apparatus for providing security for servers executing application programs received via a network | Lee, et al. |
| 6,199,181 | Method and system for maintaining restricted operating environments for application programs or operating systems. | Rechef, et al. |
| 6,275,938 | Security enhancement for untrusted executable code. | Bond, et al. |
| 6,321,337 | Method and system for protecting operations of trusted internal networks. | Reshef, et al. |
| 6,351,816 | System and method for securing a program's execution in a network environment. | Mueller, et al. |
| 6,546,554 | Browser-independent and automatic apparatus and method for receiving, installing and launching applications from a browser on a client computer. | Schmidt, et al. |
| 6,658,573 | Protecting resources in a distributed computer system. | Bischof, et al |
| 6,507,904 | Executing isolated mode instructions in a secure system running in privilege rings. | Ellison, et al. |
| 6,633,963 | Controlling access to multiple memory zones in an isolated execution environment. | Ellison, et al. |
| 6,678,825 | Controlling access to multiple isolated memories in an isolated execution environment. | Ellison, et al. |
| 5,751,979 | Video hardware for protected, multiprocessing systems. | McCrory |
| 6,581,162 | Method for securely creating, storing and using encryption keys in a computer system. | Angelo, et al. |
| 6,134,661 | Computer network security device and method. | Topp |
| 6,578,140 | Personal computer having a master computer system and in internet computer system and monitoring a condition of said master and internet computer systems | Policard |
| PUB Application # 20040054588 | E-mail software and method and system for distributing advertisements to client devices that have such e-mail software installed thereon. | Jacobs, Paul E., et al. |
| PUB Application # 20040034794 | System and method for comprehensive general generic protection for computers against malicious programs that may steal information and/or cause damages | Mayer, Yaron; et al. |
| PUB Application # 20040006715 | System and method for providing security to a remote computer over a network browser interface. | Skrepetos, Nicholas C. |
| PUB Application # 20030177397 | Virus protection in an internet environment. | Samman, Ben |

-continued

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| PUB Application # 20030097591 | System and method for protecting computer users from web sites hosting computer viruses. | Pham, Khai; et al. |
| PUB Application # 20030023857 | Malware infection suppression. | Hinchliffe, Alexander James; et al. |
| PUB Application # 20020066016 | Access control for computers. | Riordan, James |
| PUB Application # 20020174349 | Detecting malicious alteration of stored computer files. | Wolff, Daniel Joseph; et al. |

The above-listed U.S. Patents and U.S. patent applications are incorporated by reference as if reproduced herein in their entirety.

## BACKGROUND

The very popular and ubiquitous rise of the 'personal' computer system as an essential business tool and home appliance, together with the exponential growth of the Internet as a means of providing information flows across a wide variety of connected computing devices, has changed the way people live and work. Information in the form of data files and executable software programs regularly flows across the planetary wide system of interconnected computers and data storage devices.

Popular and ubiquitous computer hardware and software architectures have typically been designed to allow for open interconnection via, for example, the internet, a VPN, a LAN, or a WAN, with information often capable of being freely shared between the interconnected computers. This open interconnection architecture has contributed to the adoption and mainstream usage of these computers and the subsequent interconnection of vast networks of computers. This easy to use system has given rise to the explosive popularity of applications such as email, internet browsing, search engines, interactive gaming, instant messaging, and many, many more.

Although there are definite benefits to this open interconnection architecture, a lack of security against unwanted incursions into the computers main processing and non-volatile memory space has emerged as a significant problem. An aspect of some current computer architectures that has contributed to the security problem is that by default programs are typically allowed to interact with and/or alter other programs and data files, including critical operating system files, such as the windows registry, for example. Current open interconnection architectures have opened the door to a new class of unwanted malicious software generally known a malware. This malware is capable of infiltrating any computer system which is connected to a network of interconnected computer systems. Malware is comprised of, but not limited to, classes of software files known as viruses, worms, Trojan horses, browser hijackers, adware, spyware, pop-up windows, data miners, etc. Such malware attacks are capable of stealing data by sending user keystrokes or information stored on a user's computer back to a host, changing data or destroying data on personal computers and/or servers and/or other computerized devices, especially through the Internet. In the least, these items represent a nuisance that interferes with the smooth operation of the computer system, and in the extreme, can lead to the unauthorized disclosure of confidential information stored on the computer system, significant degradation of computer system performance, or the complete collapse of computer system function.



Malware has recently become much more sophisticated and much more difficult for users to deal with. Once resident on a computer system, many malware programs are designed to protect themselves from deletion. For example, some malware programs comprise a pair of programs running simultaneously, with each program monitoring the other for deletion. If one of the pair of programs is deleted, the other program installs a replacement within milliseconds. In another example, some malware will run as a Windows program with a .dlls extension, which Windows may not allow a user to delete while it is executing. Malware may also reset a user's browser home page, change browser settings, or hijack search requests and direct such requests to another page or search engine. Further, the malware is often designed to defeat the user's attempts to reset the browser settings to their original values. In another example, some malware programs secretly record user input commands (such as keystrokes), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, credit account numbers, etc.

Many existing computers rely on a special set of instructions which define an operating system (O/S) in order to provide an interface for computer programs and computer components such as the computer's memory and central processing unit (CPU). Many current operating systems have a multi-tasking capability which allows multiple computer programs to run simultaneously, with each program not having to wait for termination of another in order to execute instructions. Multi-tasking O/S's allow programs to execute simultaneously by allowing programs to share resources with other programs. For example, an operating system running multiple programs executing at the same time allows the programs to share the computer's CPU time. Programs which run on the same system, even if not simultaneously with other programs, share space on the same nonvolatile memory storage medium. Programs which are executing simultaneously are presently able to place binaries and data in the same physical memory at the same time, limited to a certain degree by the O/S restrictions and policy, to the extent that these are properly implemented. Memory segments are shared by programs being serviced by the O/S, in the same manner. O/S resources, such as threads, process tables and memory segments, are shared by programs executing simultaneously as well.

While allowing programs to share resources has many benefits, there are resulting security related ramifications, particularly regarding malware programs. Security problems include allowing the malware program: to capitalize CPU time, leaving other programs with little or no CPU time; to read, forge, write, delete or otherwise corrupt files created by other programs; to read, forge, write, delete or otherwise corrupt executable files of other programs, including the O/S itself; and to read and write memory locations used by other programs to thus corrupt execution of those programs.

In the case of a computer connected to the Internet, the computer may run an O/S, with several user applications, together comprising a known and trusted set of programs, concurrently with an Internet browser, possibly requiring the execution of downloaded code, such as Java applets, or EXE/COM executables, with the latter programs possibly containing malware. Many security features and products are being built by software manufacturers and by O/S programmers to prevent malware infiltrations from taking place, and to ensure the correct level of isolation between programs. Among these are architectural solutions such as rings-of-protection in

which different trust levels are assigned to memory portions and tasks, paging which includes mapping of logical memory into physical portions or pages, allowing different tasks to have different mapping, with the pages having different trust levels, and segmentation which involves mapping logical memory into logical portions or segments, each segment having its own trust level wherein each task may reference a different set of segments. Since the sharing capabilities using traditional operating systems are extensive, so are the security features. However, the more complex the security mechanism is, the more options a malware practitioner has to bypass the security and to hack or corrupt other programs or the O/S itself, sometimes using these very features that allow sharing and communication between programs to do so.

Further, regarding malware programs, for virtually every software security mechanism, a malware practitioner has found a way to subvert, or hack around, the security system, allowing a malware program to cause harm to other programs in the shared environment. This includes every operating system and even the Java language, which was designed to create a standard interface, or sandbox, for Internet downloadable programs or applets.

Major vulnerabilities of existing computer systems lies in the architectures of the computer system and of the operating system itself. A typical multi-tasking O/S environment includes an O/S kernel loaded in the computer random access memory (RAM) at start-up of the computer. The O/S kernel is a minimal set of instructions which loads and off-loads resources and resource vectors into RAM as called upon by individual programs executing on the computer. Sometimes, when two or more executing programs require the same resource, such as printer output, for example, the O/S kernel leaves the resource loaded in RAM until all programs have finished with that resource. Other resources, such as disk read and write, are left in RAM while the operating system is running because such resources are more often used than others. The inherent problem with existing architectures is that resources, such as RAM, or a hard disk, are shared by programs simultaneously, giving a malware program a conduit to access and corrupt other programs, or the O/S itself through the shared resource. Furthermore, as many application programs are of a general nature, many features are enabled by default or by the O/S, thus in many cases bypassing the O/S security mechanism. Such is the case when a device driver or daemon is run by the O/S in kernel mode, which enables it unrestricted access to many if not all the resources.

The most common state-of the-art solutions for preventing malware infiltration are software based, such as blockers, sweepers and firewalls, for example, and hardware based solutions such as router/firewalls. Examples of software designed to counter malware are Norton Systems Works, distributed by the Symantec Corporation, Ad-aware, distributed by the Lavasoft Corporation of Sweeden, Spy Sweeper, distributed by the Webroot Software Corporation, Spyware Guard, distributed by Javacool Software LLC, among others. Currently there are a plethora of freeware, shareware and purchased software programs designed to counter malware by a variety of means. Such anti-malware programs are limited because they can only detect known malware that has already been identified (usually after the malware has already attacked one or more computers).

Network firewalls are typically based on packet filtering, which is limited in principle, since the rules determining which packets to accept and which to reject may contain subjective decisions based on trusting known sites or known applications. However, once security is breached for any reason (for example, due to a software or hardware error, a new piece of malware unrecognized by the anti-malware program or firewall, or an intended deception), a malicious application may take over the computer or server or possibly the entire network and create unlimited damages (directly or indirectly by opening the door to additional malicious applications).



The methods in the prior art are typically comprised of embedded software countermeasures that detect and filter unwanted intrusions in real time, or scan the computer system either at the direction of a user or as a scheduled event. Two problems arise from these methods. In the first instance, a comprehensive scan, detect, and elimination of malware from desired incoming data streams could significantly slow or preclude the interactive nature of many applications such a gaming, messaging, and browsing. In the second instance, newly implemented software screens may be quickly circumvented by malware practitioners who are determined to pass their files through the screen. Newly discovered malware leads to the development of additional screens, which lead to more malware, etc., thus creating an escalating cycle of measure, countermeasure. The basic flaw is that all incoming executable data files must be resident on the computers main processor to perform their desired function. Once resident on that processor, access may be gained to non-volatile memory and other basic computer system elements. Malware exploits this key architectural flaw to infiltrate and compromise computer systems.

The majority of these applications rely upon a scanning engine which searches suspect files for the presence of predetermined malware signatures. These signatures are held in a database which must be constantly updated to reflect the most recently identified malware. Typically, users regularly download replacement databases, either over the Internet, from a received e-mail, or from a CDROM or floppy disc. Users are also expected to update their software engines every so often in order to take advantage of new virus detection techniques (e.g. which may be required when a new strain of malware is detected).

Many of the aforementioned applications are also not effective against security holes, for example, in browsers or e-mail programs, or in the operating system itself. Security holes in critical applications are discovered quite often, and just keeping up with all the patches is cumbersome. Also, without proper generic protection against, for example, Trojan horses, even VPNs (Virtual Private Networks) and other forms of data encryption, including digital signatures, are not totally safe because information can be stolen before or below the encryption layer. Even personal firewalls are typically limited, because once a program is allowed to access the Internet, there are often few limitations on what files may be accessed and transmitted back to a host.

A major problem faced by computer users connected to a network is that the network interface program (a browser, for example) is resident on the same processor as the O/S and other trusted programs, and shares space on a common memory storage medium. Even with security designed into the O/S, malware practitioners have demonstrated great skill in circumventing software security measures to create malware capable of corrupting critical files on the shared memory storage medium. When this happens, users are often faced with a lengthy process of restoring their computer systems to the correct configuration, and often important files are simply lost because no backup exists.

Therefore, what is needed in the art is a means of isolating the network interface program from the main computer system such that the network interface program does not share a common memory storage area with other trusted programs.

The network interface program may be advantageously given access to a separate, protected memory area, while being unable to initiate access to the main computer's memory storage area. With the network interface program constrained in this way, malware programs are rendered unable to automatically corrupt critical system and user files located on the main memory storage area. If a malware infection occurs, a user would be able to completely clean the malware infection from the computer using a variety of methods. A user could simply delete all files contained in the protected memory area, and restore them from an image residing on the main memory area, for example.

Other discussions of malware, its effects on computer systems, techniques used by malware practitioners to install malware, and techniques for detection and removal, may be found in the published literature, and in some of the patents and applications previously incorporated by reference. Reference to malware may be found in a technical white paper entitled "Spyware, Adware, and Peer-to-Peer Networks: The Hidden Threat to Corporate Security.", by Kevin Townsend, © Pest Patrol Inc. 2003. Pest Patrol is a Carlisle; Pa. based developer of software security tools. Another reference is a technical white paper entitled "Beyond Viruses: Why antivirus software is no longer enough." by David Stang, PhD, © Pest Patrol Inc. 2002. Yet another reference is "The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wily Hacker", Second Edition, Addison-Wesley. ISBN 0-201-63466-X, Copyright 2003. The foregoing references are incorporated by reference as if reproduced herein in their entirety.

## SUMMARY OF THE INVENTION

Embodiments of the present invention achieve technical advantages as a system and method for protecting a computer system from malicious software attacks via a network connection.

It is an object of the present invention to provide a computer system capable of preventing malware programs from automatically corrupting critical user and system files.

It is another object of the present invention to confine any malware infection that may occur to a separate, protected part of the computer system.

It is another object of the present invention to provide a user with an easy and comprehensive method of removing the malware infection, even if the user's anti-malware software is incapable of detecting and/or removing the malware infection.

It is another object of the present invention to provide a user with an easy and comprehensive method of restoring critical system and user files that may have been corrupted by a malware infection.

It is another object of the present invention to provide a computer system configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked.

It is another object of the present invention to provide a computer system capable of executing instructions in a first logical process, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space.

It is another object of the present invention to provide a computer system capable of executing instructions in a second logical process, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers.

It is another object of the present invention to provide a computer system capable of displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal

It is another object of the present invention to provide a computer system configured such that a malware program downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space.

It is another object of the present invention to provide a computer system configured such that corrupted data files residing on the second memory space may be restored from an image residing on the first memory space.

It is another object of the present invention to provide a computer system configured such that data files residing on the second memory space may be automatically deleted when the second logical process is terminated.

It is another object of the present invention to provide a computer system configured such that the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

These objects and other advantages are provided by a preferred embodiment of the present invention wherein a computer system comprising a first electronic data processor is communicatively coupled to a first memory space and to a second memory space, a second electronic data processor is communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device, a video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format, wherein the computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **2** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention;

FIG. **3** illustrates a preferred embodiment of an exemplary file download process according to the principles of the present invention;

FIG. **4** illustrates a preferred embodiment of an exemplary memory restoration process according to the principles of the present invention;

FIG. **5** illustrates a preferred embodiment of an exemplary automatic memory restoration and cleaning process according to the principles of the present invention;

FIG. **6** illustrates a preferred embodiment of an exemplary interactive network process flow according to the principles of the present invention;

FIG. **7** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **8** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **9** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **10** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention.

## DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

The making and using of the presently preferred embodiments are discussed in detail below. It should be appreciated, however, that the present invention provides many applicable inventive concepts that can be embodied in a wide variety of specific contexts. The specific embodiments discussed are merely illustrative of specific ways to make and use the invention, and do not limit the scope of the invention.

A computer system, constructed in accordance with a preferred embodiment of the present invention, is illustrated in FIG. **1**. Computer system **100** may represent, for example, a personal computer (PC) system, a server, a portable computer, such as a notebook computer, or any data processing system, a personal digital assistant (PDA), a communication device such as a cell phone, or device that is capable of being connected to a network of one or more computers. System **100** comprises a first processor **120** (P1) communicatively coupled to a first memory and data storage area **110** (M**1**). P**1** **100** may comprise, for example, a microprocessor, such as a Pentium® 4 processor, manufactured by the Intel Corporation, or a Power PC® processor, manufactured by the IBM Corporation. Other electronic data processors manufactured by other companies, including but not limited to electronic data processors realized in Application Specific Integrated Circuits (ASICs) or in Field Programmable Gate Arrays (FPGAs), are within the spirit and scope of the present invention.

The first memory and data storage area **110** may comprise both volatile and nonvolatile memory devices, such as DRAMs and hard drives, respectively. Any memory structure and/or device capable of being communicatively coupled to P**1** may be advantageously used in the present invention. M**1** may be used to store, for example, critical operating system files, user data and applications, interim results of calculations, etc. The many uses of computer memory are well understood by those skilled in the art, and will not be discussed further here. One may refer to several of the aforementioned patents and applications incorporated by reference, in addition to other references, for a discussion of existing computer architectures and uses of computer memory. Also part of system **100** is user interface **150**, which may comprise, for example, a keyboard, mouse or other pointing device, microphone, pen pad, etc. Any device or method capable of inputting commands and/or data from a user **160** to computer system **100** may be used to advantage. A video processor **170** is used to format information for display and transmit the display information to a video display device **180**, which is viewed by user **160**. Video processor **170** typically includes an associated video memory area, which may be dedicated to the video processor, or shared with other resources. It is understood in the art that the video processor **170** may be part of processor P**1** **120**, in that it may be integrated onto the microprocessor chip. Video processor **170** may also comprise a processor IC located on a video graphics card, which is communicatively coupled to a computer motherboard. Additionally, video processor **170** may comprise circuitry located on the computer motherboard. Further still, functions of video processor **170** may be split between the processor, motherboard, or separate video graphics card.



It is often desirable to connect computer system **100** to a network of one or more computer devices **195**, such as the Internet, a LAN, WAN, VPN, etc. This connection may be accomplished via network interface device **190**, which may comprise, for example, a telephone modem, a cable modem, a DSL line, a router, gateway, hub, etc. Any device capable of interfacing with the network **195** may be used, via a wired connection, a wireless connection, or an optical connection, for example. Network interface device **190** may connect to network **195** through one or more additional network interface devices (not shown). For example, network interface device **190** may comprise a gateway or router, connected to a cable modem, with the cable modem connected to network **195**. Of course, other configurations are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, network **195** is isolated from the first processor **120** and memory **110** by a second processor **140** (P**2**). Second processor **140** may comprise any electronic data processor, such as the devices previously described as applicable to first processor **120**. Communicatively coupled to P**2** **140** is second memory and data storage area **130** (M**2**), which may comprise any memory device or devices, such as the devices previously described as applicable to first memory **110**.

The architecture of computer system **100** is designed to be capable of protecting memory **110** from malware initiated intrusions, and preventing malware from initiating unwanted processes on first processor **120**. This is accomplished by using second processor **140** to isolate **110** and **120** from network **195**. In a preferred embodiment, P**2** **140** is communicatively coupled to memory storage area M**2** **130**, and may be configured such that P**2** **140** is incapable of initiating access to memory storage area M**1** **110**. For example, P**2** **140** may be capable of accessing memory storage area M**1** **110** with the strict permission of user **160**, either through a real time interaction or via stored configuration or commands. Such a configuration may be desirable in a multi-core or multi processor system, where user **160** may wish to use P**2** **140** in either a protected mode or an unprotected mode, depending on the application. However, user **160** is capable of denying P**2** **140** the capability of initiating access to memory storage area M**1** **110** without the user's permission. P**1** **120** is communicatively coupled to both memory areas M**1** **110** and M**2** **130**, thereby enabling P**1** **120** to access data downloaded from the network **195**. In the presently described embodiment, any malware that has intruded the **130-140** system is thus confined to the **130-140** system, and may be configured to be incapable of automatically corrupting data contained on M**1** **110**, or of automatically initiating an unwanted process on P**1** **120**.

This and other features of the present teachings may be illustrated with reference to the example process flow **200** of FIG. **2**. Computer user **160** wishes to connect to network **195** via for example, a browser program such as Internet Explorer or Netscape Navigator. Of course, other methods of connecting to network **195** may be used. User **160** inputs commands to open a protected process (e.g. a browser program in this

example) at step **210**. At step **220**, 1st processor **120** instructs 2nd processor **140** to initiate the protected process and open one or more process windows. Second processor **140**, in conjunction with memory **130**, then interacts with the network **195** via network interface device **190**, receiving and transmitting the data necessary to execute the desired protected process, such as browsing the internet or communication via e-mail. Second processor **140** and memory **130** act as a separate computer system, interacting with network **195** while isolating network **195** from the first processor **120** and memory **110**. Memory **130** may store critical application and system files required by second processor **140** to execute the desired tasks. Memory **130** also stores data necessary to carry out the desired protected process. In the example of FIG. **2**, first processor **120** receives user interface data from user **160**, and passes user interface data to second processor **140** when the protected process window is selected or active, illustrated at step **230**. User interface data, such as keystrokes for example, may be advantageously encrypted by P**1** **120** before passing the data to P**2** **140**, with network interface device **190** possibly decrypting the data prior to transmitting the data to network **195**. Encrypting, for example keystroke data, may disrupt the efforts of spyware programs designed to store user keystrokes for later transmission to a host computer. Second processor **140** generates video data for the protected process window(s) and passes the video data to video processor **170**, for eventual display on video display **180**, shown at step **240**. Video processor **170** then interleaves the video data from all processes being executed by first processor **120** and second processor **140**, at step **250**. While there are many applicable methods for displaying video data from multiple sources, one such method was described in U.S. Pat. No. 5,751,979, entitled "Video hardware for protected, multiprocessing systems", previously incorporated by reference.

In accordance with a preferred embodiment of the present invention, if any malware is downloaded from network **195**, it is stored in memory **130**, and/or run as a process on second processor **140**. In the configuration of computer system **100**, any downloaded malware is rendered incapable of self initiating access to memory **110** or first processor **120**, because second processor **140** is rendered incapable of initiating access to **110** and **120** without a direct or stored command from user **160**. Any malware infection is thus confined. If a malware attack corrupts files and/or disrupts the operation of the **130-140** system, the user may easily shut down the corrupted process and restore the corrupted files from a protected image stored on memory **110**, for example.

In accordance with a preferred embodiment of the present invention, the operating system controlling the **110-120** system may be different from an operating system controlling the protected **130-140** system. Conversely, a common operating system may control both the **110-120** system and the protected **130-140** system.

A user **160** may find it desirable to transfer files from the protected **130-140** system to the **110-120** system. User **160** may find it necessary, for example, to transfer an attachment from an e-mail message stored on memory **130** to the **110-120** system for further processing, modification, etc. In this case, the computer system **100** may go through a process whereby a file or other data is transferred from the **130-140** system to the **110-120** system, exemplified by the process **300** illustrated in FIG. **3**.

In accordance with a preferred embodiment of the present invention, at step **310**, user **160** selects one or more data files to download from network **195**. The desired data is downloaded to the **130-140** system at step **320**. The user **160** then directs computer system **100** to move the desired file(s) from the **130-140** system to the **110-120** system at step **330**. P**1** **120** may then perform a malware scan on the desired files, either in real time as the data is being transferred, or while the data still resides in M**2** **130** (step **340**). Alternatively, P**2** **140** may perform the malware scan. At step **350**, processor P**2** **140** (or P**1** **120**) determines if malware has been detected in the desired file(s), and thus P**1** **120** makes a decision. If no malware is detected, the file(s) are moved or copied onto M**2** **110** at step **360**. If malware is detected, the data file(s) are quarantined on M**2** **130**, and the data file(s), if transferred to M**1** **100**, are erased or quarantined. Once malware is detected, the user **160** may be alerted of the detection (step **370**). Either as a result of user input or stored configuration commands, the infected file(s) are deleted, cleaned, or quarantined on M**2** **130**, at step **380**.



The user **160** would of course understand the dangers inherent in transferring downloaded files from the **130-140** system to the **110-120** system. For example, the user's anti-malware software may not be up to date, or may simply be unable to detect certain types of malware. Also, the malware itself may be so new that the user's anti-malware definitions have not been updated as yet. Therefore the user may wish to keep the files on the **130-140** system for some period of time. Consequently, it may be desirable to have resident on the **130-140** system a variety of application software such as readers, thereby allowing the user to examine the files without risking transferring the files to the **110-120** system. These reader programs, such as Adobe Acrobat Reader, by the Adobe Systems Corporation, or Visio reader, by the Microsoft Corporation, are typically subset application programs of the full featured application programs, and may thus require far less memory space than the full application. Additionally, software companies often distribute the reader programs for free (or a nominal fee), thereby providing advertising for the full featured application in the hopes that it will be eventually purchased by the user. This reader application may be opened and executed on the **130-140** system in a manner similar to the process described in FIG. **2**. Of course, a user **160** may also load a full application into the **130-140** system, enabling processing and modification of a downloaded file fully in the protected space, without risking a transfer of the file to the **110-120** system.

In the event the **130-140** system becomes infected with malware, the user **160** may wish to clean the **130-140** system. This cleaning may be accomplished by running an anti-malware application on the **130-140** system. However, if the infection is too severe for the anti-malware software to clean, or if the malware is undetectable by the user's anti-malware software, the user may wish to restore critical system files (or other user data files) for the **130-140** system from a protected image stored on M**1** **100**, for example. It is of course understood that the critical system file image may be restored from another device, such as a removable drive or a CD, for example. The user may however consider it more convenient to restore the critical system files from an image on M**1** **100**.

In accordance with a preferred embodiment of the present invention, an exemplary process for restoring M**2** **130** from M**1** **110** is illustrated by process **400** in FIG. **4**. At step **410**, malware is detected or suspected to be infecting the **130-140** system. The user instructs P**1** **120** to reload critical system files onto M**2** **130** from a protected image on M**1** **110**, at step **420**. Depending on the severity of the infection, P**1** **120** may scan all or part of the data contained on M**2** **130** for malware, and may scan all processes currently running on P**2** **140**. The scan may be initiated by direct instructions from the user, or by stored configuration commands, for example (step **430**). P**1** **120** may delete all or part of the data contained on M**2**. P**1**

120 may also reset P2 140 and/or delete the contents of any RAM communicatively coupled to P2 140 (step 440). Once the 130-140 system has been adequately cleaned, clean critical system files are loaded onto M2 130 from any of the sources previously mentioned, preferably an image stored on M1 110 (step 450). The 130-140 may now be rebooted and/or reinitialized from the clean critical system files. In an extreme case where the malware resists deletion by the operating system, the user may elect to do a low level format on the M1 110 memory in order to ensure that the malware infection has been cleaned.

In accordance with a preferred embodiment of the present invention, a user 160 may consider it advantageous for the 130-140 system to be automatically reinitialized from clean critical system files when a protected process window is opened. In this way, the new protected process is much less likely to be affected by an infection from a previous protected process session. Of course, a user may have a plurality of protected processes open and running during a protected process session. It may only be necessary to automatically reinitialize from clean critical system files when the first protected process is opened during a session. Subsequent protected processes may not require automatic re-initialization from clean critical system files. An exemplary automatic re-initialization from clean critical system files is illustrated by steps 510, 520 and 530 in FIG. 5a. Additionally, processes running on P2 140 may be automatically scanned and compared with an allowed process list, particularly as a protected process is started up. If any process is detected which is not on the allowed list, the user may be alerted that a possible malware infection has occurred. A user may then choose to scan or clean the system, or inspect the unknown process to determine if the process will be allowed to continue to execute. A user may also update the list of allowed processes from time to time as new, legitimate processes are added, for example, by a browser software update.

In accordance with a preferred embodiment of the present invention, a user 160 may consider it advantageous for the 130-140 system to be automatically cleaned when a protected process window is closed. In this way, any detected or undetected malware infections are much less likely to affect a future protected process session. It may only be necessary to automatically clean the 130-140 system when the last protected process is closed during a session. An exemplary automatic cleaning process is illustrated by steps 540, 550, 560, 570 and 580 in FIG. 5b. The memory M2 130 and processor P2 140 may be automatically scanned for malware infections as the protected process session closes. Infected files may be deleted or quarantined automatically. Additionally, there may be a variety of files that a user may wish to have automatically cleaned or deleted upon closing a protected process session. For example, temporary internet files, cookies, browser plugins, etc., may be deleted or scanned for malware automatically. A user may also wish to have websites that contributed to a malware infection noted, and may wish to place the offending websites in a block list, such that the offending websites cannot be accessed in the future without the user specifically authorizing access. As part of the malware scan, the malware scanner may automatically log the offending website(s), and block future access. Also, the P2 140 processor and any associated non-volatile memory may be reset and/or erased as the protected process session is closed. The exemplary automatic cleaning process illustrated in FIG. 5b may therefore reduce the risk of a malware infection being carried over to a future protected process session.

Interactive network processes such as interactive gaming have become very popular in recent years. In current interactive gaming processes, a user may log onto a game host located on network 195, or connect to other computers whose users wish to participate in the game. Computer games, such as Quake 3. Arena, by Id Software Incorporated, or Call of Duty, by Activision Incorporated, are just two examples of the plethora of games available that may be played interactively over a network. The user's computer system typically provides the bulk of the processing power and video graphics generation required to display the often fast moving and richly detailed three dimensional game environments. Information about the current and new state of the game is exchanged between various users' computer systems, often in real time. With this type of process, a relatively modest amount of data is required to be exchanged between users, or a user and the host, with the bulk of the processing, data manipulation, and graphics generation being handled by the user's local machine. However, this open network connection may become a conduit for malware practitioners to exploit, allowing malware to be downloaded onto a user's computer during a gaming session, often without the user being aware of the malware transfer. It would be advantageous, therefore, for a computer system to be much less susceptible to malware attacks during gaming sessions.

In accordance with a preferred embodiment of the present invention, an exemplary process flow 600, illustrated in FIG. 6, allows an interactive network process, such as online gaming, to be carried out on computer system 100. A user initiates an interactive network process via 2nd processor P2 140 (step 610). P2 140 receives interactive network process status data from network connection (step 620). P2 140 informs 1st processor P1 120 that interactive network process status data is available (step 630). P1 120 retrieves interactive network process status data from P2 140 and uses the status data to update the interactive network process and update video display (step 640). P1 120 then passes the updated interactive network process status data to P2 140 (step 650). P2 140 then sends the updated interactive network process status data to the network via network connection 195 (step 660). The exemplary process 600, or a process functionally equivalent, is carried out continuously as long as the interactive process is running.

By using exemplary process 600 (or an equivalent), computer system 100 is capable of actively deciding what data to download and use, and what data to discard or scan for malware. The game status data is buffered prior to loading it onto the 110-120 system. The 110-120 system may be advantageously configured to only accept game status information in the proper format, thereby minimizing the chance that a malware practitioner could deceptively load malware onto the 110-120 system.

Additionally, computer system 100 could be configured such that system 130-140 is powerful enough to process the interactive network process without exchanging information with the 110-120 system. Such a configuration may be more secure, as a conduit between the 110-120 system and the 130-140 system may not be necessarily opened. The 130-140 system may contain all the necessary files to facilitate the interactive network process. Higher end computers, workstations, and servers often contain dual (or more) processors, such as the Mac G5, manufactured by the Apple Computer Corporation, or a single physical processor with a multiple processor core. Often, the processors in these multi-processor machines are of equal or comparable processing power. In such a configuration, one processor may be dedicated to performing functions equivalent to those described for P1 120, with a second processor performing the functions equivalent to those described for P2 140. A computer system

**100** employing multiple processors may be advantageously configured such that one of the processors is dedicated to protected processes only when a network process is active. When a user is not accessing a network, the multiple processors in a computer system may be dedicated to other processes, such as performing complex calculations or simulations, or running complex non-network interactive gaming processes, for example. Alternatively, the computer system **100** may be configured such that the **110-120** system simply transfers required files to the video processor **170** or the **130-140** system at the appropriate time to facilitate the interactive network process. The **110-120** system could be commanded to retrieve and transfer the files at the command of the video processor, or at the command of the **130-140** system, or a combination of both.

In accordance with embodiments of the present invention, computer system **100** may be configured in a variety of ways, while still remaining within the spirit and scope of the present teachings. One such exemplary embodiment is illustrated in FIG. **7**. Subsystem **700** of computer system **100** comprises a video processor **770**, a second processor **740**, and a second memory data storage area **730**. The demarcation line illustrated by subsystem **700** may be either physical or logical. For example, subsystem **700** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of the teachings of the present invention. Subsystem **700** may be plugged into the main motherboard of an existing computer, for example. The motherboard connector may be already communicatively coupled to the **110-120** system, thereby facilitating the system upgrade. The network interface device **190** may be connected directly to subsystem **700**, or network interface device **190** could be integrated as part of subsystem **700**. Memory data storage area **730** may comprise any of the volatile and/or non-volatile memory types previously described, or any combination thereof, or any suitable memory storage medium, for example. Alternatively, subsystem **700** may be located on the motherboard, as opposed to an add-on card. Further still, portions of subsystem **700**, such as video processor **770**, and/or second processor **740**, for example, may be integrated together with P**1 120**. It is understood that functions described herein may be configured in a wide variety of ways, without departing from the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **8**. Subsystem **800** of computer system **100** comprises a video processor **870**, a second processor **840**, and a second memory data storage area **830**. The demarcation line illustrated by subsystem **800** may be either physical or logical. For example, subsystem **800** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of features of the present invention. In the exemplary embodiment of FIG. **8**, second processor **840** and video processor **870** are integrated together, perhaps on a common integrated circuit. Such a configuration may help to reduce the cost of subsystem **800**, and/or improve the performance. Additionally, a circuit designer may find it advantageous to integrate **840** and **870** together to facilitate communication between the functions. It is understood that such an integration of functions may create a device in which an external user may find it difficult to distinguish where the function of **870** ends and the function of **840** begins, and vice versa. Such a device, however, would remain within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **9**. Computer system **100** comprises a video processor **970**, processor **960**, and a memory data storage area **950**. Processor **960** may further comprise multiple processor cores, illustrated by 1st processor **920** and 2nd processor **940**. It is understood that processor **960** may contain more than 2 processor cores. Microprocessors manufactured with multiple processor cores are becoming common in the industry, and such multi-core processors may be particularly advantageous when used in accordance with the present teachings. Memory data storage area **950** may further comprise 1st memory data storage area **910** and 2nd memory data storage area **930**. Memory areas **910** and **930** may comprise, for example, different partitions on a single hard drive, and/or different address ranges in a RAM bank.

Referring again to FIG. **9**, the functions carried out by processors **920** and **940** may comprise separate, secure logical processes executing on the same physical processor. For example, a first logical process may comprise executing instructions necessary to carry out the functions of an operating system, or the first logical process may comprise executing instructions necessary to carry out the functions of a first computer program, including but not limited to a word processor. A second logical process may comprise executing instructions necessary to carry out the functions of a web browser program, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example. A computer system **100** constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P**2 140** (FIG. **1**) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M**1 110** or another logical process performing the functions of P**1 120**. Additionally, memory areas **910** and **930** may comprise separate, isolated memory zones within a common physical memory space, such as separate partitions within the same hard drive, for example.

Some malware programs are designed to secretly record user input commands (such as keystrokes, for example), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, bank account numbers, social security numbers, driver's license numbers, credit account numbers, etc. Theft of such personal information could result in the theft of actual assets (money or securities, etc.) or perhaps used for identity theft, among other malicious intents. Clearly, a computer system capable of ensuring the protection of such sensitive information would be desirable.

In accordance with an embodiment of the present invention, a computer system is configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked. Encryption of user input data, such as keystrokes, is an effective means of protecting such data from theft by malware. Specific techniques used for data encryption and decryption are well known in the art, and need not be discussed further here. There are many examples in the art that may be examined to better understand various encryption/decryption techniques and the use of encryption/decryption in computer systems. Among these are U.S. Pat. No. 6,581,162 entitled "Method for securely creating, storing and using

encryption keys in a computer system." issued to Angelo, et al., and U.S. Pat. No. 6,134,661 entitled "Computer network security device and method." Issued to Topp. The aforementioned patents have been previously incorporated by reference.

In accordance with the present teachings, a method of operating a computer system involving data encryption is described. In step **1010**, a user opens a protected process where some level of data encryption is desired, for example, the encryption of sensitive user interface data or user files. Other data may be encrypted as desired. At step **1020**, processor P**1 120** instructs processor P**2 140** to initiate a protected process and open a process window. P**1 120** encrypts the sensitive data and passes the user interface data to P**2 140** when a P**2 140** window is selected or active (step **1030**). P**2 140** generates video data for the P**2 140** process window(s) and passes the video data to video processor **170** (step **1040**). Video processor **170** decrypts the sensitive data and interleaves the video data from all P**1** and P**2** processes (step **1050**). P**2 140** passes the encrypted sensitive data to network interface device **190** (step **1060**). Network interface device **190** decrypts the sensitive data and passes the decrypted sensitive data to network **195**. Of course, other methods of operating a computer system in which data is encrypted prior to being passed to P**2 140**, and decrypted after leaving the control of P**2 140**, are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, data desired to be protected is encrypted prior to sending the data to processor P**2 140**, which may be running one or more malware processes. Processor P**2 140** does not have visibility to the decryption keys, and is therefore unable to decrypt the data. Data may be decrypted by network interface device **190** prior to forwarding the data on to network **195**. Conversely, encrypted data may be sent directly over the network for decryption by another computer system, including, for example, an interne banking host computer. Decryption keys may be passed between P**1 120** and network interface device **190** via a communication link **191**. Video processor **170** may decrypt the data prior to displaying the data on video display **180**, with decryption keys possibly passed between P**1 120** and video processor **170** via a communication link **171**. Conversely, data may be passed directly to video processor **170** via a communication link **151**.

A user **160** may wish to encrypt just a portion of the data destined for the network, such as passwords, credit card numbers, etc. Conversely, a user may wish to encrypt large blocks of data, such as e-mails or large application files containing sensitive text and/or graphics. Instructions may be passed to network interface device **190** directing **190** to decrypt one or more specific data blocks prior to sending the data blocks to network **195**. Conversely, instructions may be passed to network interface device **190** directing **190** to pass one or more specific data blocks to network **195** without decryption.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is therefore intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**[**1. A method of operating a computer system having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising the steps of:

executing instructions in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space;

executing instructions in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.**]**

**[**2. The method of claim **1** wherein the first memory space and the second memory space comprise separate regions of a common memory space.**]**

**[**3. The method of claim **1** wherein the second logical process is selected from the group consisting of; an electronic mail process, an instant messaging process, an internet browser process, an interactive gaming process, a virtual private network (VPN) process, and a reader application process.**]**

**[**4. The method of claim **1** wherein the first logical process receives user interface data, and passes the user interface data to the second logical process.**]**

**[**5. The method of claim **1** wherein the first and second electronic data processors are part of a multi-core electronic data processor.**]**

**[**6. The method of claim **1** and further comprising the step of restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.**]**

**[**7. The method of claim **1** and further comprising the step of automatically deleting at least one data file residing on the second memory space when the second logical process is terminated.**]**

**[**8. The method of claim **1** and further comprising the steps of:

encrypting data with the first logical process;

transferring the encrypted data from the first logical process to the second logical process;

transferring the encrypted data from the second logical process to the network interface device.**]**

**[**9. The method of claim **8** and further comprising the steps of:

decrypting the data with the network interface device;

transferring the decrypted data from the network interface device to the network.**]**

**[**10. A multi-processor computer system using a common operating system, comprising:

a first electronic data processor capable of executing instructions using the common operating system and communicatively coupled to a first memory space and a second memory space;

a second electronic data processor capable of executing instructions using the common operating system and communicatively coupled to the second memory space

and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device;

a video processor adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing on the second electronic data processor.]

[**11**. The computer system of claim **10** wherein the first memory space and the second memory space comprise separate regions of a common memory space.]

[**12**. The computer system of claim **10** wherein the first and second electronic data processors are part of a dual processor computer system.]

[**13**. The computer system of claim **10** wherein the second electronic data processor and the video processor are colocated on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.]

[**14**. The computer system of claim **10** wherein the computer system is configured such that the first electronic data processor is protected from executing instructions initiated by a malware process downloaded from the network and executing on the second electronic data processor.]

[**15**. A multi-processor computer system using a common operating system, comprising:

at least a first and second electronic data processor capable of executing instructions using the common operating system;

at least a first and second memory space;

a video processor;

wherein the first and second electronic data processors, first and second memory space, and video processor are configured for performing the steps of:

executing instructions in a first logical process with the first electronic data processor, wherein the first logical process is executing within the common operating system and is capable of accessing data contained in the first memory space and the second memory space;

executing instructions in a second logical process with the second electronic data processor, wherein the second logical process is executing within the common operating system and is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein the video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.]

[**16**. The computer system of claim **15** wherein the computer system is further configured such that the first logical process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second logical process.]



[**17**. The computer system of claim **15** and further comprising: at least one network interface device capable of exchanging data with both the second logical process and with the network.]

[**18**. The computer system of claim **17** wherein the network interface device is capable of decrypting data received from the second logical process and transmitting the decrypted data to the network while preventing the second logical process from accessing the decrypted data.]

[**19**. The computer system of claim **15** wherein the at least one electronic data processor is selected from the group consisting of: a multi-core electronic data processor; dual electronic data processors; and multiple electronic data processors.]

[**20**. The computer system of claim **15** and further configured for performing the step of: restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.]

*21. A portable computing and communication device capable of executing instructions using a common operating system, comprising:*

*a network interface device configured to exchange data across a network of one or more computers using a wireless connection;*

*an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process;*

*at least a first memory space and a second memory space, the first memory space containing at least one system file; and*

*at least one electronic data processor communicatively coupled to the network interface device and to the first and second memory space;*

*the at least one electronic data processor configured to execute the first web browser process within the common operating system, wherein the first web browser process is capable of accessing data of a website via the network, accessing data contained in the first memory space and is further capable of initializing the second web browser process;*

*the at least one electronic data processor further configured to execute the second web browser process within the common operating system, wherein the second web browser process is capable of accessing data contained in the second memory space and is further capable of generating data;*

*the at least one electronic data processor further configured to pass data from the first web browser process to the second web browser process;*

*wherein the portable computing and communication device is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing within the second web browser process.*

*22. The portable computing and communication device of claim 21 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*23. The portable computing and communication device of claim 22 wherein the first web browser process is capable of passing data downloaded from the network to the second web browser process.*

*24. The portable computing and communication device of claim 21 wherein the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*25. The portable computing and communication device of claim 21 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*

*a Field Programmable Gate Array;*

*a plurality of electronic data processors; and*

*a multi-core electronic data processor.*

*26. The portable computing and communication device of claim 21 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

*27. The portable computing and communication device of claim 21 wherein at least one corrupted file is capable of being restored from a protected image.*

*28. The portable computing and communication device of claim 21 configured to close the second web browser process and automatically delete at least one file selected from the group consisting of a temporary internet file, a cookie and at least one corrupted file.*

*29. The portable computing and communication device of claim 21 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*30. A method of operating a portable computing and communication device capable of executing instructions using a common operating system, comprising:*

*exchanging data across a network of one or more computers with a network interface device using a wireless connection;*

*providing an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process;*

*storing at least one system file within a first memory space;*

*executing the first web browser process within the common operating system using at least one electronic data processor, wherein the first web browser process is configured to access data of a website via the network, access data contained in the first memory space and is further configured to initialize the second web browser process;*

*executing the second web browser process within the common operating system using the at least one electronic data processor, wherein the second web browser process is configured to access data contained in the second memory space and is capable of generating data;*

*passing data from the first web browser process to the second web browser process; and*

*displaying data from the second web browser process;*

*wherein the portable computing and communication device is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.*

*31. The method of claim 30 wherein the portable computing and communication device is configured such that the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*32. The method of claim 31 further comprising downloading data from the network and passing the data from the first web browser process to the second web browser process.*

*33. The method of claim 30 wherein the portable computing and communication device is configured such that the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*34. The method of claim 30 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

*35. The method of claim 30 further comprising restoring at least one corrupted data file from a protected image.*

*36. The method of claim 30 further comprising closing the second web browser process and automatically deleting at least one file selected from the group consisting of a temporary internet file, a cookie and at least one corrupted file.*

*37. The method of claim 30 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*

*a Field Programmable Gate Array;*

*a plurality of electronic data processors; and*

*a multi-core electronic data processor.*

*38. The method of claim 30 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*39. The method of claim 30 further comprising displaying data from the first web browser process.*

*40. The method of claim 30 wherein attempts by malware to record data entry by a portable computing and communication device user are effectively blocked.*

*41. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on a portable computer and communication device capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space, the portable computer and communication device including a network interface device configured to exchange data across a network of one or more computers using a wireless connection, and an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process, configured to:*

*open the first web browser process within the common operating system, wherein the first web browser process is capable of accessing data of a website via the network and accessing data contained in the first memory space;*

*open the second web browser process within the common operating system on command from the first web browser process, wherein the second web browser process is capable of accessing data contained in the second memory space and is further capable of generating data;*

*pass data from the first web browser process to the second web browser process; and*

*process data from the second web browser process;*

*wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.*

*42. The computer program product of claim 41 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*43. The computer program product of claim 42 wherein the program code stored in the non-transitory computer readable medium is further configured to download data from the*

*network and pass the downloaded data from the first web browser process to the second web browser process.*

*44. The computer program product of claim 43 wherein the program code stored in the non-transitory computer readable medium is further configured to store the downloaded data on the second memory space.*

*45. The computer program product of claim 41 wherein the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*46. The computer program product of claim 41 wherein at least one corrupted file is capable of being restored from a protected image.*

*47. The computer program product of claim 46 wherein the protected image is stored at a location selected from the group consisting of:*

*a removable drive;*

*the first memory space;*

*a partition on a memory device; and*

*volatile and nonvolatile memory.*

*48. The computer program product of claim 41 wherein the program code stored in the non-transitory computer readable medium is further configured to close the second web browser process and automatically delete at least one file selected from the group consisting of a temporary internet file, a cookie and at least one corrupted file.*

*49. The computer program product of claim 41 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*50. The computer program product of claim 41 wherein attempts by malware to record data entry by a user are effectively blocked.*

*51. The computer program product of claim 41 wherein the network comprises a cellular data carrier network.*

*52. The computer program product of claim 41 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*

*a Field Programmable Gate Array;*

*a plurality of electronic data processors; and*

*a multi-core electronic data processor.*

*53. The computer program product of claim 41 wherein the second web browser process is capable of generating video data and the program code stored in the non-transitory computer readable medium is further configured to process the video data from the second web browser process.*

*54. The computer program product of claim 41 wherein the portable computing and communication device is a smart phone.*

*55. The computer program product of claim 41 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

*56. The portable computing and communication device of claim 21 wherein the network comprises a cellular data carrier network.*

*57. The portable computing and communication device of claim 21 wherein the portable computing and communication device is a smart phone.*

*58. The method of claim 30 wherein the network comprises a cellular data carrier network.*

*59. The method of claim 30 wherein the portable computing and communication device is a smart phone.*

*60. The portable computing and communication device of claim 21 wherein the secure web browser is a built-in secure web browser.*

*61. The portable computing and communication device of claim 21 wherein the second web browser process is capable of executing a gaming process played interactively over the network.*

*62. The method of claim 30 wherein the secure web browser is a built-in secure web browser.*

*63. The method of claim 30 wherein the second web browser process is capable of executing a gaming process played interactively over the network.*

*64. The computer program product of claim 41 wherein the secure web browser is a built-in secure web browser.*

*65. The computer program product of claim 41 wherein the second web browser process is capable of executing a gaming process played interactively over the network.*

*66. The portable computing and communication device of claim 21 wherein the at least one electronic data processor is further configured to initialize a third web browser process with the first web browser process and pass data from the first web browser process to the third web browser process, the third web browser process being capable of accessing data contained in a third memory space and is further capable of generating data, wherein the portable computing and communication device is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing within the third web browser process.*

*67. The portable computing and communication device of claim 66 wherein the portable computing and communication device is configured to disallow the malware process downloaded from the network and executing within the second web browser process from initiating access to the third web browser process or to the third memory space.*

*68. The method of claim 30 further comprising initializing a third web browser process with the first web browser process and passing data from the first web browser process to the third web browser process, the third web browser process being configured to access data contained in a third memory space and is capable of generating data, wherein the portable computing and communication device is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the third web browser process.*

*69. The method of claim 68 wherein the portable computing and communication device is configured to disallow the malware process downloaded from the network and executing as part of the second web browser process from initiating access to the third web browser process or to the third memory space.*

*70. The computer program product of claim 41 wherein the program code stored in the non-transitory computer readable medium is further configured to pass data from the first web browser process to the third web browser process, the third web browser process being capable of accessing data contained in a third memory space and is further capable of generating data, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the third web browser process.*

*71. The computer program product of claim 70 wherein the program code stored in the non-transitory computer readable medium is further configured to disallow the malware process downloaded from the network and executing as part of the second web browser process from initiating access to the third web browser process or to the third memory space.*

* * * * *

US00RE43528E

(19) **United States**
(12) **Reissued Patent**
**Rozman et al.**

(10) **Patent Number: US RE43,528 E**
(45) **Date of Reissued Patent: *Jul. 17, 2012**

(54) **SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE**

(76) Inventors: **Allen F. Rozman**, Garland, TX (US); **Alfonso J. Cioffi**, Murphy, TX (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/720,147**

(22) Filed: **Mar. 9, 2010**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,484,247**
Issued: **Jan. 27, 2009**
Appl. No.: **10/913,609**
Filed: **Aug. 7, 2004**

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/06*** | (2006.01) |
| *G06F 11/00* | (2006.01) |
| *G06F 12/14* | (2006.01) |
| *G06F 12/16* | (2006.01) |
| *G08B 23/00* | (2006.01) |

(52) **U.S. Cl.** ............ **713/152**; 713/151; 726/22; 726/23; 726/24

(58) **Field of Classification Search** .............. 726/22–24; 713/152, 151; 709/225
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 4,890,098 A | | 12/1989 | Dawes et al. | |
| 5,280,579 A | | 1/1994 | Nye | |
| 5,502,808 A | | 3/1996 | Goddard et al. | |
| 5,555,364 A | | 9/1996 | Goldstein | |
| 5,564,051 A | * | 10/1996 | Halliwell et al. | 1/1 |
| 5,666,030 A | | 9/1997 | Parson | |
| 5,673,403 A | * | 9/1997 | Brown et al. | 715/744 |
| 5,751,979 A | * | 5/1998 | McCrory | 715/803 |
| 5,826,013 A | | 10/1998 | Nachenberg | |
| 5,918,039 A | | 6/1999 | Buswell et al. | |
| 5,974,549 A | * | 10/1999 | Golan | 726/23 |
| 5,978,917 A | | 11/1999 | Chi | |
| 5,995,103 A | | 11/1999 | Ashe | |
| 6,091,412 A | | 7/2000 | Simonoff et al. | |
| 6,108,715 A | | 8/2000 | Leach et al. | |
| 6,134,661 A | | 10/2000 | Topp | |
| 6,167,522 A | | 12/2000 | Lee et al. | |
| 6,183,366 B1 | | 2/2001 | Goldberg et al. | |

(Continued)

OTHER PUBLICATIONS

Architecture of Virtual Machines by R. P. Goldberg, Honeywell Information Systems, Inc. and Harvard University presented at the AFIPS National Computer Conference, New York, New York, Jun. 4-8, 1973.

(Continued)


*Primary Examiner* — Christian LaForgia
(74) *Attorney, Agent, or Firm* — Slater & Matsil, L.L.P.

(57) **ABSTRACT**

In a computer system, a first electronic data processor is communicatively coupled to a first memory space and a second memory space. A second electronic data processor is communicatively coupled the second memory space and to a network interface device. The second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device. A video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format. The computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

**73 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,192,477 | B1 * | 2/2001 | Corthell | 726/11 |
| 6,199,181 | B1 * | 3/2001 | Rechef et al. | 714/38 |
| 6,216,112 | B1 | 4/2001 | Fuller et al. | |
| 6,275,938 | B1 | 8/2001 | Bond et al. | |
| 6,285,987 | B1 | 9/2001 | Roth et al. | |
| 6,321,337 | B1 | 11/2001 | Reshef et al. | |
| 6,351,816 | B1 | 2/2002 | Mueller et al. | |
| 6,385,721 | B1 * | 5/2002 | Puckette | 713/2 |
| 6,397,242 | B1 | 5/2002 | Devine et al. | |
| 6,401,134 | B1 | 6/2002 | Razavi et al. | |
| 6,433,794 | B1 | 8/2002 | Beadle et al. | |
| 6,438,600 | B1 | 8/2002 | Greenfield et al. | |
| 6,480,198 | B2 | 11/2002 | Kang | |
| 6,492,995 | B1 | 12/2002 | Atkin et al. | |
| 6,505,300 | B2 | 1/2003 | Chan et al. | |
| 6,507,904 | B1 | 1/2003 | Ellison et al. | |
| 6,507,948 | B1 | 1/2003 | Curtis et al. | |
| 6,546,554 | B1 | 4/2003 | Schmidt et al. | |
| 6,553,377 | B1 | 4/2003 | Eschelbeck et al. | |
| 6,578,140 | B1 * | 6/2003 | Policard | 713/1 |
| 6,581,162 | B1 | 6/2003 | Angelo et al. | |
| 6,633,963 | B1 | 10/2003 | Ellison et al. | |
| 6,658,573 | B1 | 12/2003 | Bischof | |
| 6,663,000 | B1 | 12/2003 | Muttik et al. | |
| 6,678,712 | B1 * | 1/2004 | McLaren et al. | 718/100 |
| 6,678,825 | B1 | 1/2004 | Ellison et al. | |
| 6,691,230 | B1 | 2/2004 | Bardon | |
| 6,735,700 | B1 | 5/2004 | Flint et al. | |
| 6,754,815 | B1 * | 6/2004 | Ellison et al. | 713/1 |
| 6,756,236 | B2 | 6/2004 | Ford et al. | |
| 6,757,685 | B2 | 6/2004 | Raffaele et al. | |
| 6,772,345 | B1 | 8/2004 | Shetty | |
| 6,804,780 | B1 | 10/2004 | Touboul | |
| 6,836,885 | B1 | 12/2004 | Buswell et al. | |
| 6,871,348 | B1 * | 3/2005 | Cooper | 719/310 |
| 6,873,988 | B2 | 3/2005 | Herrmann et al. | |
| 6,880,110 | B2 | 4/2005 | Largman et al. | |
| 6,990,630 | B2 | 1/2006 | Landsman et al. | |
| 6,996,828 | B1 * | 2/2006 | Kimura et al. | 719/319 |
| 7,013,484 | B1 * | 3/2006 | Ellison et al. | 726/26 |
| 7,024,555 | B2 * | 4/2006 | Kozuch et al. | 726/22 |
| 7,024,581 | B1 * | 4/2006 | Wang et al. | 714/2 |
| 7,039,801 | B2 * | 5/2006 | Narin | 713/152 |
| 7,062,672 | B2 | 6/2006 | Owhadi et al. | |
| 7,082,615 | B1 * | 7/2006 | Ellison et al. | 726/26 |
| 7,085,928 | B1 | 8/2006 | Schmid et al. | |
| 7,096,381 | B2 | 8/2006 | Largman et al. | |
| 7,139,890 | B2 | 11/2006 | Moran et al. | |
| 7,146,305 | B2 * | 12/2006 | van der Made | 703/22 |
| 7,146,640 | B2 * | 12/2006 | Goodman et al. | 726/16 |
| 7,181,768 | B1 | 2/2007 | Ghosh et al. | |
| 7,191,469 | B2 | 3/2007 | Erlingsson | |
| 7,246,374 | B1 | 7/2007 | Simon et al. | |
| 7,260,839 | B2 * | 8/2007 | Karasaki | 726/11 |
| 7,284,274 | B1 | 10/2007 | Walls et al. | |
| 7,367,057 | B2 * | 4/2008 | Das et al. | 726/24 |
| 7,373,505 | B2 | 5/2008 | Seltzer et al. | |
| 7,401,230 | B2 | 7/2008 | Campbell et al. | |
| 7,421,689 | B2 | 9/2008 | Ross et al. | |
| 7,444,412 | B2 | 10/2008 | Owhadi | |
| 7,484,247 | B2 * | 1/2009 | Rozman et al. | 726/34 |
| 7,565,522 | B2 | 7/2009 | Sastry et al. | |
| 7,577,871 | B2 | 8/2009 | Largman et al. | |
| 7,596,694 | B1 | 9/2009 | Karp et al. | |
| 7,650,493 | B2 * | 1/2010 | Narin | 713/152 |
| 7,657,419 | B2 * | 2/2010 | van der Made | 703/22 |
| 7,676,842 | B2 | 3/2010 | Carmona et al. | |
| 7,694,328 | B2 | 4/2010 | Joshi et al. | |
| 7,730,318 | B2 | 6/2010 | Kurien et al. | |
| 7,818,808 | B1 * | 10/2010 | Neiger et al. | 726/26 |
| 7,849,310 | B2 * | 12/2010 | Watt et al. | 713/164 |
| 7,854,008 | B1 * | 12/2010 | Huang et al. | 726/24 |
| 2002/0002673 | A1 * | 1/2002 | Narin | 713/152 |
| 2002/0052809 | A1 | 5/2002 | Toedtli | |
| 2002/0066016 | A1 | 5/2002 | Riordan | |
| 2002/0174349 | A1 | 11/2002 | Wolff et al. | |
| 2003/0023857 | A1 | 1/2003 | Hinchliffe et al. | |
| 2003/0097591 | A1 | 5/2003 | Pham et al. | |
| 2003/0131152 | A1 | 7/2003 | Erlingsson | |
| 2003/0177397 | A1 | 9/2003 | Samman | |
| 2003/0221114 | A1 * | 11/2003 | Hino et al. | 713/189 |
| 2004/0006706 | A1 * | 1/2004 | Erlingsson | 713/200 |
| 2004/0006715 | A1 | 1/2004 | Skrepetos | |
| 2004/0034794 | A1 | 2/2004 | Mayer et al. | |
| 2004/0039944 | A1 * | 2/2004 | Karasaki | 713/201 |
| 2004/0054588 | A1 | 3/2004 | Jacobs et al. | |
| 2004/0199763 | A1 | 10/2004 | Freund | |
| 2004/0230794 | A1 * | 11/2004 | England et al. | 713/164 |
| 2004/0267929 | A1 * | 12/2004 | Xie | 709/225 |
| 2005/0005153 | A1 * | 1/2005 | Das et al. | 713/200 |
| 2005/0091661 | A1 * | 4/2005 | Kurien et al. | 719/310 |
| 2005/0149726 | A1 * | 7/2005 | Joshi et al. | 713/164 |
| 2005/0198692 | A1 * | 9/2005 | Zurko et al. | 726/24 |
| 2005/0240810 | A1 | 10/2005 | Safford et al. | |
| 2006/0004667 | A1 | 1/2006 | Neil | |

OTHER PUBLICATIONS

The Duality of Memory and Communication in the Implementation of a Multiprocessor Operating System by Michael Young, Avadis Tevanian, Richard Rasheed, David Golub, Jeffery Eppinger, Jonathan Crew, William Bolosky, David Black and Robert Baron, Computer Science Department Carnegie-Mellon University Appeared in Proceedings of the 11th Operating Systems Principles, Nov. 1987.

Application-Controlled Physical Memory using External Page-Cache Management by Keiran Harty and David R. Cheriton, Computer Science Department, Stanford University, 1992.

Efficient Software-Based Fault Isolation by Robert Wahbe, Steven Lucco, Thomas Anderson, Susan Graham, Computer Science Division University of California, Berkeley, SIGOPS 1993.

Tron: Process-Specific File Protection for the UNIX Operating System by Andrew Berman, Virgil Bourassa, Erik Selberg, Department of Computer Science and Engineering, University of Washington, Jan. 23, 1995.

A Secure Environment for Untrusted Helper Applications (Confining the Wily Hacker) by Ian Goldberg, David Wagner, Randi Thomas, and Eric Brewer, Computer Science Division, University of California, Berkeley, Sixth USENIX UNIX Security Symposium San Jose, California, Jul. 1996.

Building Systems that Flexibly Control Downloaded Executable Context by Trent Jaeger and Atul Prakash, Software Systems Research Lab, University of Michigan and Aviel D. Rubin, Security Research Group, Bellcore Sixth USENIX UNIX Security Symposium San Jose, California, Jul. 1996.

Java Security: From HotJava to Netscape and Beyond by Drew Dean, Edward W. Felten, Dan S. Wallach Department of Computer Science, Princeton University, Princeton, NJ 08544 1996 IEEE Symposium on Security and Privacy, Oakland, CA, May 6-8, 1996.

ChakraVyuha (CV) : A Sandbox Operating SystemEnvironment for Controlled Execution of Alien Code by Asit Dan, Ajay Mohindra, Rajiv Ramaswami, and Dinkar Sitaram IBM Research Division T.J. Watson Research Center Yorktown Heights, New York RC 20742 (Feb. 20, 1997) Computer Science IBM Research Report Limited Distribution.

Vulnerability of Secure Web Browsers by Flavio De Paoli, Andre Dos Santos, Richard Kemmerer Reliable Software Group Computer Science Department, University of California, Santa Barbara, 1997.

Security of Web Browser Scripting Languages: Vulnerabilities, Attacks, and Remedies by Vinod Anupam and Alain Mayer, Bell Laboratories, Lucent Technologies 7th USENIX Security Symposium San Antonio, Texas, Jan. 26-29, 1998.

"Virtual Memory in Contemporary Microprocessors" by Bruce Jacob University of Maryland and Trevor Mudge University of Michigan, IEEE Micro Jul.-Aug. 1998.

"Flexible Control of Downloaded Executable Content" by Trent Jaeger and Jochen Liedtke and Nayeem Islam, IBM Thomas J. Watson Research Center, and Atul Prakash University of Michigan, Ann Arbor ACM Transactions on Information and System Security, vol. 2, No. 2, May 1999, pp. 177-228.

"J2ME Building Blocks for Mobile Devices: White Paper on KVM and the Connected", Limited Device Configuration Sun Microsystems May 19, 2000.
"User-level Resource-constrained Sandboxing" by Fangzhe Chang, Ayal Itzkovitz, and Vijay Karamcheti Department of Computer Science, Courant Institute of Mathematical Sciences, New York University USENIX Windows System Symposium, Aug. 2000.
"Verifying the EROS Confinement Mechanism" by Jonathan S. Shapiro and San Weber IBM T.J. Watson Research Center 0-7695-0665-8/00 2000 IEEE.
"WindowBox: A Simple Security Model for the Connected Desktop" by Dirk Balfanz, Princeton University and Daniel R. Simon, Microsoft Research, 2000.
"Building a Secure Web Browser" by Sotiris Ioannidis, University of Pennsylvania, and Steven M. Bellovin, At&T Labs Research 2001 USENIX Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"Virtualizing I/O Devices on VMware Workstation's Hosted Virtual Machine Monitor" by Jeremy Sugerman, Ganesh Venkitachalam and Beng-Hong Lim, VMware, Inc. 3145 Porter Dr, Palo Alto, CA 943042001 USENIX Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"When Virtual Is Better Than Real" by Peter M. Chen and Brian D. Noble, Department of Electrical Engineering and Computer Science University of Michigan 2001.
"A Flexible Containment Mechanism for Executing Untrusted Code" by David Peterson, Matt Bishop, and Raju Pandey, Department of Computer Science University of California, Davis USENIX Security Symposium San Francisco, California, USA Aug. 5-9, 2002.
"ReVirt: Enabling Intrusion Analysis through Virtual-Machine Logging and Replay" by George W. Dunlap, Samuel T. King, Sukru Cinar, Murtaza A. Basrai, Peter M. Chen, Department of Electrical Engineering and Computer Science, University of Michigan Proceedings of the 2002 Symposium on Operating Systems Design and Implementation (OSDI).
"Trusted Paths for Browsers: an Open-Source Solution to Web Spoofing" by Zishuang (Eileen) Ye and Sean Smith, Department of Computer Science Dartmouth College, Technical Report TR2002-418 Feb. 4, 2002.
"User Interaction Design for Secure Systems" by Ka-Ping Yee http://zesty.ca/sid/ 2002.
BAA-00-06-SNK Focused Research Topic 5 by Marc Stiegler and Mark Miller Report Name: "A Capability Based Client: The DarpaBrowser" Jun. 26, 2002.
"A Virtual Machine Introspection Based Architecture for Intrusion Detection" by Tal Garfinkel and Mendel Rosenblum, Computer Science Department, Stanford University 2003.
"Terra: A Virtual Machine-Based Platform for Trusted Computing" by Tal Garfinkel, Ben Pfaff, Jim Chow, Dan Boneh and Mendel Rosenblum, Computer Science Department, Stanford University SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
Microsoft® Virtual PC 2004 Technical Overview by Jerry Honeycutt Published Nov. 2003 http://download.microsoft.com/download/c/f/b/cfb100a7-463d-4b86-ad62-064397178b4f/Virtual_PC_Technical_Overview.doc.
"Xen and the Art of Virtualization" by Paul Barham, Boris Dragovic, Keir Fraser, Steven Hand, Tim Harris, Alex Ho, Rolf Neugebaurey, Ian Pratt, Andrew Warfield University of Cambridge Computer Laboratory 15 JJ Thomson Avenue, Cambridge, UK, CB3 0FD SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
"Design of the EROS Trusted Window System" by Jonathan S. Shapiro, John Vanderburgh, Eric Northrup, Systems Research Laboratory Johns Hopkins University, and, David Chizmadia, Promia, Inc. 2004.
"Survey of System Virtualization" Techniques by Robert Rose Mar. 8, 2004.
White Paper: "Smart Phone Security Issues" by Luc Delpha and Maliha Rasheed, Cyber Risk Consulting Blackhat Briefings Europe May 2004.
"Software Security and Privacy Risks in Mobile E-Commerce" by Anup K. Ghosh and Tara M. Swaminatha, Communications of the ACM Feb. 2001 vol. 44, No. 2.
T. Jaeger, A. D. Rubin, and A. Prakash. "Building systems that flexibly control downloaded executable content." In Proceedings of the 1996 USENIX Security Symposium, pp. 131-148, San Jose, Ca., 1996.
David A. Wagner, "Janus: an approach for confinement of untrusted applications." Master's thesis, University of California, Berkeley, 1999. Also available. Technical Report CSD-99-1056, UC Berkeley, Computer Science Division. http://www.cs.berkeley.edu/~daw/papers/janus-masters.ps.
Richard West and Jason Gloudon, "User-Level Sandboxing: a Safe and Efficient Mechanism for Extensibility", Technical Report, 2003-014, Boston University, Jun. 2003.
Shaya Potter, Jason Nieh, Dinesh Subhraveti, "Secure Isolation and Migration of Untrusted Legacy Applications." Columbia University Technical Report CUCS-005-04, Jan. 2004.
M. Schmid, F. Hill, A. Ghosh, "Protecting Data from Malicious Software." Annual Computer Security Applications Conference (ACSAC'02), Las Vegas, NV, Dec. 2002.
Valentin Razmov "Security in Untrusted Code Environments: Missing Pieces of the Puzzle." Dept. of Computer Science and Engineering, University of Washington, Mar. 30, 2002.
Sotiris Ioannidis and Steven M. Bellovin. "Sub-Operating Systems: A New Approach to Application Security." Technical Report MS-CIS-01-06, University of Pennsylvania, Feb. 2000.
"Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" by Kevin Townsend, Pest Patrol, 2003.
Beyond Viruses: Why Anti-Virus Software is No Longer Enough by David Stang PhD, Pest Patrol, 2002.
"The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003.
Mehta, N. V., et al., "Expanding and Extending the Security Features of JAVA," Proceedings of the 7th USENIX Security Symposium, San Antonio, Texas Jan. 26-29, 1998, 15 pages.
Kevin Townsend; "Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" © Pest Patrol, 2003.
David Stang, PhD; "Beyond Viruses: Why Anti-Virus Software is No Longer Enough", © Pest Patrol 2002.
"The Web: Threat or Menace?" From "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003 ©.

* cited by examiner


100
110
1st memory data storage area
130
2nd memory data storage area
120
1st processor
140
2nd processor
190
Network interface
191
171
150
User interface
170
Video processor
151
160
User
180
Video display
195
Network

Fig. 1


200
210
User opens protected process
220
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
230
P1 passes user interface data to P2 when P2 window is selected or active
240
P2 generates video data for P2 process window(s) and passes video data to video processor
250
Video processor interleaves video data from all P1 and P2 processes
260
End

Fig. 2



300
310
User selects data file(s) to download via browser
320
Data downloaded from network to 2nd processor (P2) and written to 2nd memory (M2)
330
User directs 1st processor (P1) to move file from M2 to 1st memory (M1)
340
P2 performs malware scan on downloaded data file in M2, either in real time as data is transferred, or while data file resides in M2
350
Malware detected in data file ?
No
360
Move or copy data file to M1
Yes
370
Quarantine data file on M2, alert user
380
Delete, clean or quarantine data file on M2
390
End


Fig. 3


400
410
Malware detected or suspected in 2nd processor (P2), 2nd memory (M2) system
420
User instructs 1st processor (P1) to reload critical system files onto 2nd memory (M2) from protected image on 1st memory (M1)
430
P1 may scan all or part of the data contained on M2 for malware. P1 may delete or quarantine infected files on M2
440
P1 may delete all or part of the data contained on M2. P1 may reset P2 and flush RAM coupled to P2
450
Critical system files for P2 system are loaded onto M2 from M1
460
P2 system reinitializes (reboots) from clean critical system files
470
End

Fig. 4


510
User opens protected process
520
Critical system files for P2 system are loaded onto M2 from M1
530
Go to step 220 (Figure 2)

Fig. 5A


540
User closes protected process
550
P1 or P2 may initiate a malware scan on the P2-M2 system
560
P1 or P2 may delete all or part of the data contained on M2.
570
P1 may reset P2 and flush RAM coupled to P2
580
End

Fig. 5B


600
610
User initiates interactive network process via 2nd processor (P2)
620
P2 receives interactive network process status data from network connection
630
P2 informs 1st processor (P1) that interactive network process status data is available
640
P1 retrieves interactive network process status data from P2 and uses status data to run interactive network process and update video display
650
P1 passes updated interactive network process status data to P2
660
P2 sends updated interactive network process status data to network via network connection
670
End

Fig. 6



100
700
730
110
1st memory data storage area
2nd memory data storage area
740
120
1st processor
2nd processor
190
Network interface
150
770
User interface
Video processor
151
180
160
195
User
Video display
Network


Fig. 7


100
800
810
1st memory data storage area
830
2nd memory data storage area
820
1st processor
890
Network interface
150
User interface
840
2nd processor
Video processor
870
151
180
160
195
User
Video display
Network

Fig 8


100
910
1st memory
data storage area
930
950
2nd memory
data storage area
920
190
940
2nd processor
Network interface
960
1st processor
150
970
User interface
Video
processor
151
180
160
195
User
Video display
Network

Fig. 9


1010
1000
User opens protected process
1020
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
1030
P1 encrypts user interface data and passes user interface data to P2 when P2 window is selected or active
1040
P2 generates video data for P2 process window(s) and passes video data to video processor
1050
Video processor decrypts user interface data and interleaves video data from all P1 and P2 processes
1060
P2 passes encrypted user interface data to network interface device
1070
Network interface device decrypts user interface data and passes decrypted user interface data to network
1080
End

Fig. 10

# SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## *CROSS REFERENCE TO MULTIPLE REISSUE APPLICATIONS*

*This application is a reissue application of U.S. Pat. No. 7,484,247, entitled "System and Method for Protecting a Computer System from Malicious Software," issued on Jan. 27, 2009, and is related to another reissue application designated U.S. patent application Ser. No. 12/720,207 from U.S. Pat. No. 7,484,247 filed concurrently herewith, which are incorporated herein by reference. This application is also related to another reissue application designated U.S. patent application Ser. No. 12/854,149 (now, U.S. Pat. No. Re. 43,103) from U.S. Pat. No. 7,484,247 filed on Aug. 10, 2010 and a continuation application therefrom designated U.S. patent application Ser. No. 13/015,186 filed on Jan. 27, 2011, which are incorporated herein by reference. This application is also related to another reissue application designated U.S. patent application Ser. No. 12/941,067 from U.S. Pat. No. 7,484,247 filed on Nov. 7, 2010, which is incorporated herein by reference.*

## TECHNICAL FIELD

The present invention relates generally to computer hardware and software, and more particularly to a system and method for protecting a computer system from malicious software.

## CROSS REFERENCE TO RELATED PATENTS AND APPLICATIONS

This application is related to the following U.S. patents and applications:

| U.S. patent or PUB application No. | Title | Inventor(s) |
|---|---|---|
| 5,826,013 | Polymorphic virus detection module. | Nachenberg |
| 5,978,917 | Detection and elimination of macro viruses. | Chi |
| 6,735,700 | Fast virus scanning using session stamping. | Flint, et al |
| 6,663,000 | Validating components of a malware scanner. | Muttik, et al. |
| 6,553,377 | System and process for maintaining a plurality of remote security applications using a modular framework in a distributed computing environment. | Eschelbeck, et al. |
| 6,216,112 | Method for software distribution and compensation with replenishable advertisements. | Fuller, et al. |
| 4,890,098 | Flexible window management on a computer display. | Dawes, et al. |
| 5,555,364 | Windowed computer display. | Goldstein |
| 5,666,030 | Multiple window generation in computer display. | Parson |
| 5,995,103 | Window grouping mechanism for creating, manipulating and displaying windows and window groups on a display screen of a computer system. | Ashe |



-continued

| U.S. patent or PUB application No. | Title | Inventor(s) |
|---|---|---|
| 5,502,808 | Video graphics display system with adapter for display management based upon plural memory sources. | Goddard, et al. |
| 5,280,579 | Memory mapped interface between host computer and graphics system. | Nye |
| 5,918,039 | Method and apparatus for display of windowing application programs on a terminal. | Buswell, et al |
| 6,480,198 | Multi-function controller and method for a computer graphics display system. | Kang |
| 6,167,522 | Method and apparatus for providing security for servers executing application programs received via a network | Lee, et al. |
| 6,199,181 | Method and system for maintaining restricted operating environments for application programs or operating systems. | Rechef, et al. |
| 6,275,938 | Security enhancement for untrusted executable code. | Bond, et al. |
| 6,321,337 | Method and system for protecting operations of trusted internal networks. | Reshef, et al. |
| 6,351,816 | System and method for securing a program's execution in a network environment. | Mueller, et al. |
| 6,546,554 | Browser-independent and automatic apparatus and method for receiving, installing and launching applications from a browser on a client computer. | Schmidt, et al. |
| 6,658,573 | Protecting resources in a distributed computer system. | Bischof, et al |
| 6,507,904 | Executing isolated mode instructions in a secure system running in privilege rings. | Ellison, et al. |
| 6,633,963 | Controlling access to multiple memory zones in an isolated execution environment. | Ellison, et al. |
| 6,678,825 | Controlling access to multiple isolated memories in an isolated execution environment. | Ellison, et al. |
| 5,751,979 | Video hardware for protected, multiprocessing systems. | McCrory |
| 6,581,162 | Method for securely creating, storing and using encryption keys in a computer system. | Angelo, et al. |
| 6,134,661 | Computer network security device and method. | Topp |
| 6,578,140 | Personal computer having a master computer system and in internet computer system and monitoring a condition of said master and internet computer systems | Policard |
| PUB Application # 20040054588 | E-mail software and method and system for distributing advertisements to client devices that have such e-mail software installed thereon. | Jacobs, Paul E., et al. |
| PUB Application # 20040034794 | System and method for comprehensive general generic protection for computers against malicious programs that may steal information and/or cause damages | Mayer, Yaron; et al. |
| PUB Application # 20040006715 | System and method for providing security to a remote computer over a network browser interface. | Skrepetos, Nicholas C. |
| PUB Application # 20030177397 | Virus protection in an internet environment. | Samman, Ben |
| PUB Application # 20030097591 | System and method for protecting computer users from web sites hosting computer viruses. | Pham, Khai; et al. |
| PUB Application # 20030023857 | Malware infection suppression. | Hinchliffe, Alexander James; et al. |
| PUB Application # 20020066016 | Access control for computers. | Riordan, James |

-continued

| U.S. patent or PUB application No. | Title | Inventor(s) |
|---|---|---|
| PUB Application # 20020174349 | Detecting malicious alteration of stored computer files. | Wolff, Daniel Joseph; et al. |

The above-listed U.S. Patents and U.S. patent applications are incorporated by reference as if reproduced herein in their entirety.

## BACKGROUND

The very popular and ubiquitous rise of the 'personal' computer system as an essential business tool and home appliance, together with the exponential growth of the Internet as a means of providing information flows across a wide variety of connected computing devices, has changed the way people live and work. Information in the form of data files and executable software programs regularly flows across the planetary wide system of interconnected computers and data storage devices.

Popular and ubiquitous computer hardware and software architectures have typically been designed to allow for open interconnection via, for example, the internet, a VPN, a LAN, or a WAN, with information often capable of being freely shared between the interconnected computers. This open interconnection architecture has contributed to the adoption and mainstream usage of these computers and the subsequent interconnection of vast networks of computers. This easy to use system has given rise to the explosive popularity of applications such as email, internet browsing, search engines, interactive gaming, instant messaging, and many, many more.

Although there are definite benefits to this open interconnection architecture, a lack of security against unwanted incursions into the computers main processing and non-volatile memory space has emerged as a significant problem. An aspect of some current computer architectures that has contributed to the security problem is that by default programs are typically allowed to interact with and/or alter other programs and data files, including critical operating system files, such as the windows registry, for example. Current open interconnection architectures have opened the door to a new class of unwanted malicious software generally known a malware. This malware is capable of infiltrating any computer system which is connected to a network of interconnected computer systems. Malware is comprised of, but not limited to, classes of software files known as viruses, worms, Trojan horses, browser hijackers, adware, spyware, pop-up windows, data miners, etc. Such malware attacks are capable of stealing data by sending user keystrokes or information stored on a user's computer back to a host, changing data or destroying data on personal computers and/or servers and/or other computerized devices, especially through the Internet. In the least, these items represent a nuisance that interferes with the smooth operation of the computer system, and in the extreme, can lead to the unauthorized disclosure of confidential information stored on the computer system, significant degradation of computer system performance, or the complete collapse of computer system function.

Malware has recently become much more sophisticated and much more difficult for users to deal with. Once resident on a computer system, many malware programs are designed to protect themselves from deletion. For example, some malware programs comprise a pair of programs running simultaneously, with each program monitoring the other for deletion. If one of the pair of programs is deleted, the other program installs a replacement within milliseconds. In another example, some malware will run as a Windows program with a .dlls extension, which Windows may not allow a user to delete while it is executing. Malware may also reset a user's browser home page, change browser settings, or hijack search requests and direct such requests to another page or search engine. Further, the malware is often designed to defeat the user's attempts to reset the browser settings to their original values. In another example, some malware programs secretly record user input commands (such as keystrokes), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, credit account numbers, etc.



Many existing computers rely on a special set of instructions which define an operating system (O/S) in order to provide an interface for computer programs and computer components such as the computer's memory and central processing unit (CPU). Many current operating systems have a multi-tasking capability which allows multiple computer programs to run simultaneously, with each program not having to wait for termination of another in order to execute instructions. Multi-tasking O/S's allow programs to execute simultaneously by allowing programs to share resources with other programs. For example, an operating system running multiple programs executing at the same time allows the programs to share the computer's CPU time. Programs which run on the same system, even if not simultaneously with other programs, share space on the same nonvolatile memory storage medium. Programs which are executing simultaneously are presently able to place binaries and data in the same physical memory at the same time, limited to a certain degree by the O/S restrictions and policy, to the extent that these are properly implemented. Memory segments are shared by programs being serviced by the O/S, in the same manner. O/S resources, such as threads, process tables and memory segments, are shared by programs executing simultaneously as well.

While allowing programs to share resources has many benefits, there are resulting security related ramifications, particularly regarding malware programs. Security problems include allowing the malware program: to capitalize CPU time, leaving other programs with little or no CPU time; to read, forge, write, delete or otherwise corrupt files created by other programs; to read, forge, write, delete or otherwise corrupt executable files of other programs, including the O/S itself; and to read and write memory locations used by other programs to thus corrupt execution of those programs.

In the case of a computer connected to the Internet, the computer may run an O/S, with several user applications, together comprising a known and trusted set of programs, concurrently with an Internet browser, possibly requiring the execution of downloaded code, such as Java applets, or EXE/COM executables, with the latter programs possibly containing malware. Many security features and products are being built by software manufacturers and by O/S programmers to prevent malware infiltrations from taking place, and to ensure the correct level of isolation between programs. Among these are architectural solutions such as rings-of-protection in which different trust levels are assigned to memory portions and tasks, paging which includes mapping of logical memory into physical portions or pages, allowing different tasks to have different mapping, with the pages having different trust levels, and segmentation which involves mapping logical memory into logical portions or segments, each segment having its own trust level wherein each task may reference a

different set of segments. Since the sharing capabilities using traditional operating systems are extensive, so are the security features. However, the more complex the security mechanism is, the more options a malware practitioner has to bypass the security and to hack or corrupt other programs or the O/S itself, sometimes using these very features that allow sharing and communication between programs to do so.

Further, regarding malware programs, for virtually every software security mechanism, a malware practitioner has found a way to subvert, or hack around, the security system, allowing a malware program to cause harm to other programs in the shared environment. This includes every operating system and even the Java language, which was designed to create a standard interface, or sandbox, for Internet downloadable programs or applets.

Major vulnerabilities of existing computer systems lies in the architectures of the computer system and of the operating system itself. A typical multi-tasking O/S environment includes an O/S kernel loaded in the computer random access memory (RAM) at start-up of the computer. The O/S kernel is a minimal set of instructions which loads and off-loads resources and resource vectors into RAM as called upon by individual programs executing on the computer. Sometimes, when two or more executing programs require the same resource, such as printer output, for example, the O/S kernel leaves the resource loaded in RAM until all programs have finished with that resource. Other resources, such as disk read and write, are left in RAM while the operating system is running because such resources are more often used than others. The inherent problem with existing architectures is that resources, such as RAM, or a hard disk, are shared by programs simultaneously, giving a malware program a conduit to access and corrupt other programs, or the O/S itself through the shared resource. Furthermore, as many application programs are of a general nature, many features are enabled by default or by the O/S, thus in many cases bypassing the O/S security mechanism. Such is the case when a device driver or daemon is run by the O/S in kernel mode, which enables it unrestricted access to many if not all the resources.

The most common state-of-the-art solutions for preventing malware infiltration are software based, such as blockers, sweepers and firewalls, for example, and hardware based solutions such as router/firewalls. Examples of software designed to counter malware are Norton Systems Works, distributed by the Symantec Corporation, Ad-aware, distributed by the Lavasoft Corporation of Sweeden, Spy Sweeper, distributed by the Webroot Software Corporation, Spyware Guard, distributed by Javacool Software LLC, among others. Currently there are a plethora of freeware, shareware and purchased software programs designed to counter malware by a variety of means. Such anti-malware programs are limited because they can only detect known malware that has already been identified (usually after the malware has already attacked one or more computers).

Network firewalls are typically based on packet filtering, which is limited in principle, since the rules determining which packets to accept and which to reject may contain subjective decisions based on trusting known sites or known applications. However, once security is breached for any reason (for example, due to a software or hardware error, a new piece of malware unrecognized by the anti-malware program or firewall, or an intended deception), a malicious application may take over the computer or server or possibly the entire network and create unlimited damages (directly or indirectly by opening the door to additional malicious applications).



The methods in the prior art are typically comprised of embedded software countermeasures that detect and filter unwanted intrusions in real time, or scan the computer system either at the direction of a user or as a scheduled event. Two problems arise from these methods. In the first instance, a comprehensive scan, detect, and elimination of malware from desired incoming data streams could significantly slow or preclude the interactive nature of many applications such a gaming, messaging, and browsing. In the second instance, newly implemented software screens may be quickly circumvented by malware practitioners who are determined to pass their files through the screen. Newly discovered malware leads to the development of additional screens, which lead to more malware, etc., thus creating an escalating cycle of measure, countermeasure. The basic flaw is that all incoming executable data files must be resident on the computers main processor to perform their desired function. Once resident on that processor, access may be gained to non-volatile memory and other basic computer system elements. Malware exploits this key architectural flaw to infiltrate and compromise computer systems.

The majority of these applications rely upon a scanning engine which searches suspect files for the presence of predetermined malware signatures. These signatures are held in a database which must be constantly updated to reflect the most recently identified malware. Typically, users regularly download replacement databases, either over the Internet, from a received e-mail, or from a CDROM or floppy disc. Users are also expected to update their software engines every so often in order to take advantage of new virus detection techniques (e.g. which may be required when a new strain of malware is detected).

Many of the aforementioned applications are also not effective against security holes, for example, in browsers or e-mail programs, or in the operating system itself. Security holes in critical applications are discovered quite often, and just keeping up with all the patches is cumbersome. Also, without proper generic protection against, for example, Trojan horses, even VPNs (Virtual Private Networks) and other forms of data encryption, including digital signatures, are not totally safe because information can be stolen before or below the encryption layer. Even personal firewalls are typically limited, because once a program is allowed to access the Internet, there are often few limitations on what files may be accessed and transmitted back to a host.

A major problem faced by computer users connected to a network is that the network interface program (a browser, for example) is resident on the same processor as the O/S and other trusted programs, and shares space on a common memory storage medium. Even with security designed into the O/S, malware practitioners have demonstrated great skill in circumventing software security measures to create malware capable of corrupting critical files on the shared memory storage medium. When this happens, users are often faced with a lengthy process of restoring their computer systems to the correct configuration, and often important files are simply lost because no backup exists.

Therefore, what is needed in the art is a means of isolating the network interface program from the main computer system such that the network interface program does not share a common memory storage area with other trusted programs. The network interface program may be advantageously given access to a separate, protected memory area, while being unable to initiate access to the main computer's memory storage area. With the network interface program constrained in this way, malware programs are rendered unable to automatically corrupt critical system and user files located on the

main memory storage area. If a malware infection occurs, a user would be able to completely clean the malware infection from the computer using a variety of methods. A user could simply delete all files contained in the protected memory area, and restore them from an image residing on the main memory area, for example.

Other discussions of malware, its effects on computer systems, techniques used by malware practitioners to install malware, and techniques for detection and removal, may be found in the published literature, and in some of the patents and applications previously incorporated by reference. Reference to malware may be found in a technical white paper entitled "Spyware, Adware, and Peer-to-Peer Networks: The Hidden Threat to Corporate Security.", by Kevin Townsend, © Pest Patrol Inc. 2003. Pest Patrol is a Carlisle; Pa. based developer of software security tools. Another reference is a technical white paper entitled "Beyond Viruses: Why anti-virus software is no longer enough." by David Stang, PhD, © Pest Patrol Inc. 2002. Yet another reference is "The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wily Hacker", Second Edition, Addison-Wesley. ISBN 0-201-63466-X, Copyright 2003. The foregoing references are incorporated by reference as if reproduced herein in their entirety.

## SUMMARY OF THE INVENTION

Embodiments of the present invention achieve technical advantages as a system and method for protecting a computer system from malicious software attacks via a network connection.

It is an object of the present invention to provide a computer system capable of preventing malware programs from automatically corrupting critical user and system files.

It is another object of the present invention to confine any malware infection that may occur to a separate, protected part of the computer system.

It is another object of the present invention to provide a user with an easy and comprehensive method of removing the malware infection, even if the user's anti-malware software is incapable of detecting and/or removing the malware infection.

It is another object of the present invention to provide a user with an easy and comprehensive method of restoring critical system and user files that may have been corrupted by a malware infection.

It is another object of the present invention to provide a computer system configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked.

It is another object of the present invention to provide a computer system capable of executing instructions in a first logical process, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space.

It is another object of the present invention to provide a computer system capable of executing instructions in a second logical process, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers.

It is another object of the present invention to provide a computer system capable of displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal



It is another object of the present invention to provide a computer system configured such that a malware program downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space.

It is another object of the present invention to provide a computer system configured such that corrupted data files residing on the second memory space may be restored from an image residing on the first memory space.

It is another object of the present invention to provide a computer system configured such that data files residing on the second memory space may be automatically deleted when the second logical process is terminated.

It is another object of the present invention to provide a computer system configured such that the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

These objects and other advantages are provided by a preferred embodiment of the present invention wherein a computer system comprising a first electronic data processor is communicatively coupled to a first memory space and to a second memory space, a second electronic data processor is communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device, a video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format, wherein the computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **2** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention;

FIG. **3** illustrates a preferred embodiment of an exemplary file download process according to the principles of the present invention;

FIG. **4** illustrates a preferred embodiment of an exemplary memory restoration process according to the principles of the present invention;

FIG. **5** illustrates a preferred embodiment of an exemplary automatic memory restoration and cleaning process according to the principles of the present invention;

FIG. **6** illustrates a preferred embodiment of an exemplary interactive network process flow according to the principles of the present invention;

FIG. **7** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **8** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **9** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **10** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention.

## DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

The making and using of the presently preferred embodiments are discussed in detail below. It should be appreciated, however, that the present invention provides many applicable inventive concepts that can be embodied in a wide variety of specific contexts. The specific embodiments discussed are merely illustrative of specific ways to make and use the invention, and do not limit the scope of the invention.

A computer system, constructed in accordance with a preferred embodiment of the present invention, is illustrated in FIG. **1**. Computer system **100** may represent, for example, a personal computer (PC) system, a server, a portable computer, such as a notebook computer, or any data processing system, a personal digital assistant (PDA), a communication device such as a cell phone, or device that is capable of being connected to a network of one or more computers. System **100** comprises a first processor **120** (P**1**) communicatively coupled to a first memory and data storage area **110** (M**1**). P**1** **100** may comprise, for example, a microprocessor, such as a Pentium® 4 processor, manufactured by the Intel Corporation, or a Power PC® processor, manufactured by the IBM Corporation. Other electronic data processors manufactured by other companies, including but not limited to electronic data processors realized in Application Specific Integrated Circuits (ASICs) or in Field Programmable Gate Arrays (FPGAs), are within the spirit and scope of the present invention.

The first memory and data storage area **110** may comprise both volatile and nonvolatile memory devices, such as DRAMs and hard drives, respectively. Any memory structure and/or device capable of being communicatively coupled to P**1** may be advantageously used in the present invention. M**1** may be used to store, for example, critical operating system files, user data and applications, interim results of calculations, etc. The many uses of computer memory are well understood by those skilled in the art, and will not be discussed further here. One may refer to several of the aforementioned patents and applications incorporated by reference, in addition to other references, for a discussion of existing computer architectures and uses of computer memory. Also part of system **100** is user interface **150**, which may comprise, for example, a keyboard, mouse or other pointing device, microphone, pen pad, etc. Any device or method capable of inputting commands and/or data from a user **160** to computer system **100** may be used to advantage. A video processor **170** is used to format information for display and transmit the display information to a video display device **180**, which is viewed by user **160**. Video processor **170** typically includes an associated video memory area, which may be dedicated to the video processor, or shared with other resources. It is understood in the art that the video processor **170** may be part of processor P**1** **120**, in that it may be integrated onto the microprocessor chip. Video processor **170** may also comprise a processor IC located on a video graphics card, which is communicatively coupled to a computer motherboard. Additionally, video processor **170** may comprise circuitry located on the computer motherboard. Further still, functions of video processor **170** may be split between the processor, motherboard, or separate video graphics card.



It is often desirable to connect computer system **100** to a network of one or more computer devices **195**, such as the Internet, a LAN, WAN, VPN, etc. This connection may be accomplished via network interface device **190**, which may comprise, for example, a telephone modem, a cable modem, a DSL line, a router, gateway, hub, etc. Any device capable of interfacing with the network **195** may be used, via a wired connection, a wireless connection, or an optical connection, for example. Network interface device **190** may connect to network **195** through one or more additional network interface devices (not shown). For example, network interface device **190** may comprise a gateway or router, connected to a cable modem, with the cable modem connected to network **195**. Of course, other configurations are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, network **195** is isolated from the first processor **120** and memory **110** by a second processor **140** (P**2**). Second processor **140** may comprise any electronic data processor, such as the devices previously described as applicable to first processor **120**. Communicatively coupled to P**2** **140** is second memory and data storage area **130** (M**2**), which may comprise any memory device or devices, such as the devices previously described as applicable to first memory **110**.

The architecture of computer system **100** is designed to be capable of protecting memory **110** from malware initiated intrusions, and preventing malware from initiating unwanted processes on first processor **120**. This is accomplished by using second processor **140** to isolate **110** and **120** from network **195**. In a preferred embodiment, P**2** **140** is communicatively coupled to memory storage area M**2** **130**, and may be configured such that P**2** **140** is incapable of initiating access to memory storage area M**1** **110**. For example, P**2** **140** may be capable of accessing memory storage area M**1** **110** with the strict permission of user **160**, either through a real time interaction or via stored configuration or commands. Such a configuration may be desirable in a multi-core or multi processor system, where user **160** may wish to use P**2** **140** in either a protected mode or an unprotected mode, depending on the application. However, user **160** is capable of denying P**2** **140** the capability of initiating access to memory storage area M**1** **110** without the user's permission. P**1** **120** is communicatively coupled to both memory areas M**1** **110** and M**2** **130**, thereby enabling P**1** **120** to access data downloaded from the network **195**. In the presently described embodiment, any malware that has intruded the **130-140** system is thus confined to the **130-140** system, and may be configured to be incapable of automatically corrupting data contained on M**1** **110**, or of automatically initiating an unwanted process on P**1** **120**.

This and other features of the present teachings may be illustrated with reference to the example process flow **200** of FIG. **2**. Computer user **160** wishes to connect to network **195** via for example, a browser program such as Internet Explorer or Netscape Navigator. Of course, other methods of connecting to network **195** may be used. User **160** inputs commands to open a protected process (e.g. a browser program in this example) at step **210**. At step **220**, 1st processor **120** instructs 2nd processor **140** to initiate the protected process and open one or more process windows. Second processor **140**, in conjunction with memory **130**, then interacts with the network **195** via network interface device **190**, receiving and transmitting the data necessary to execute the desired pro-

tected process, such as browsing the internet or communication via e-mail. Second processor **140** and memory **130** act as a separate computer system, interacting with network **195** while isolating network **195** from the first processor **120** and memory **110**. Memory **130** may store critical application and system files required by second processor **140** to execute the desired tasks. Memory **130** also stores data necessary to carry out the desired protected process. In the example of FIG. **2**, first processor **120** receives user interface data from user **160**, and passes user interface data to second processor **140** when the protected process window is selected or active, illustrated at step **230**. User interface data, such as keystrokes for example, may be advantageously encrypted by P**1** **120** before passing the data to P**2** **140**, with network interface device **190** possibly decrypting the data prior to transmitting the data to network **195**. Encrypting, for example keystroke data, may disrupt the efforts of spyware programs designed to store user keystrokes for later transmission to a host computer. Second processor **140** generates video data for the protected process window(s) and passes the video data to video processor **170**, for eventual display on video display **180**, shown at step **240**. Video processor **170** then interleaves the video data from all processes being executed by first processor **120** and second processor **140**, at step **250**. While there are many applicable methods for displaying video data from multiple sources, one such method was described in U.S. Pat. No. 5,751,979, entitled "Video hardware for protected, multiprocessing systems", previously incorporated by reference.

In accordance with a preferred embodiment of the present invention, if any malware is downloaded from network **195**, it is stored in memory **130**, and/or run as a process on second processor **140**. In the configuration of computer system **100**, any downloaded malware is rendered incapable of self initiating access to memory **110** or first processor **120**, because second processor **140** is rendered incapable of initiating access to **110** and **120** without a direct or stored command from user **160**. Any malware infection is thus confined. If a malware attack corrupts files and/or disrupts the operation of the **130-140** system, the user may easily shut down the corrupted process and restore the corrupted files from a protected image stored on memory **110**, for example.

In accordance with a preferred embodiment of the present invention, the operating system controlling the **110-120** system may be different from an operating system controlling the protected **130-140** system. Conversely, a common operating system may control both the **110-120** system and the protected **130-140** system.

A user **160** may find it desirable to transfer files from the protected **130-140** system to the **110-120** system. User **160** may find it necessary, for example, to transfer an attachment from an e-mail message stored on memory **130** to the **110-120** system for further processing, modification, etc. In this case, the computer system **100** may go through a process whereby a file or other data is transferred from the **130-140** system to the **110-120** system, exemplified by the process **300** illustrated in FIG. **3**.

In accordance with a preferred embodiment of the present invention, at step **310**, user **160** selects one or more data files to download from network **195**. The desired data is downloaded to the **130-140** system at step **320**. The user **160** then directs computer system **100** to move the desired file(s) from the **130-140** system to the **110-120** system at step **330**. P**1** **120** may then perform a malware scan on the desired files, either in real time as the data is being transferred, or while the data still resides in M**2** **130** (step **340**). Alternatively, P**2** **140** may perform the malware scan. At step **350**, processor P**2** **140** (or P**1** **120**) determines if malware has been detected in the desired file(s), and thus P**1** **120** makes a decision. If no malware is detected, the file(s) are moved or copied onto M**2** **110** at step **360**. If malware is detected, the data file(s) are quarantined on M**2** **130**, and the data file(s), if transferred to M**1** **100**, are erased or quarantined. Once malware is detected, the user **160** may be alerted of the detection (step **370**). Either as a result of user input or stored configuration commands, the infected file(s) are deleted, cleaned, or quarantined on M**2** **130**, at step **380**.

The user **160** would of course understand the dangers inherent in transferring downloaded files from the **130-140** system to the **110-120** system. For example, the user's anti-malware software may not be up to date, or may simply be unable to detect certain types of malware. Also, the malware itself may be so new that the user's anti-malware definitions have not been updated as yet. Therefore the user may wish to keep the files on the **130-140** system for some period of time. Consequently, it may be desirable to have resident on the **130-140** system a variety of application software such as readers, thereby allowing the user to examine the files without risking transferring the files to the **110-120** system. These reader programs, such as Adobe Acrobat Reader, by the Adobe Systems Corporation, or Visio reader, by the Microsoft Corporation, are typically subset application programs of the full featured application programs, and may thus require far less memory space than the full application. Additionally, software companies often distribute the reader programs for free (or a nominal fee), thereby providing advertising for the full featured application in the hopes that it will be eventually purchased by the user. This reader application may be opened and executed on the **130-140** system in a manner similar to the process described in FIG. **2**. Of course, a user **160** may also load a full application into the **130-140** system, enabling processing and modification of a downloaded file fully in the protected space, without risking a transfer of the file to the **110-120** system.

In the event the **130-140** system becomes infected with malware, the user **160** may wish to clean the **130-140** system. This cleaning may be accomplished by running an anti-malware application on the **130-140** system. However, if the infection is too severe for the anti-malware software to clean, or if the malware is undetectable by the user's anti-malware software, the user may wish to restore critical system files (or other user data files) for the **130-140** system from a protected image stored on M**1** **100**, for example. It is of course understood that the critical system file image may be restored from another device, such as a removable drive or a CD, for example. The user may however consider it more convenient to restore the critical system files from an image on M**1** **100**.

In accordance with a preferred embodiment of the present invention, an exemplary process for restoring M**2** **130** from M**1** **110** is illustrated by process **400** in FIG. **4**. At step **410**, malware is detected or suspected to be infecting the **130-140** system. The user instructs P**1** **120** to reload critical system files onto M**2** **130** from a protected image on M**1** **110**, at step **420**. Depending on the severity of the infection, P**1** **120** may scan all or part of the data contained on M**2** **130** for malware, and may scan all processes currently running on P**2** **140**. The scan may be initiated by direct instructions from the user, or by stored configuration commands, for example (step **430**). P**1** **120** may delete all or part of the data contained on M**2**. P**1** **120** may also reset P**2** **140** and/or delete the contents of any RAM communicatively coupled to P**2** **140** (step **440**). Once the **130-140** system has been adequately cleaned, clean critical system files are loaded onto M**2** **130** from any of the sources previously mentioned, preferably an image stored on M**1** **110** (step **450**). The **130-140** may now be rebooted and/or

reinitialized from the clean critical system files. In an extreme case where the malware resists deletion by the operating system, the user may elect to do a low level format on the M**1** **110** memory in order to ensure that the malware infection has been cleaned.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically reinitialized from clean critical system files when a protected process window is opened. In this way, the new protected process is much less likely to be affected by an infection from a previous protected process session. Of course, a user may have a plurality of protected processes open and running during a protected process session. It may only be necessary to automatically reinitialize from clean critical system files when the first protected process is opened during a session. Subsequent protected processes may not require automatic re-initialization from clean critical system files. An exemplary automatic re-initialization from clean critical system files is illustrated by steps **510**, **520** and **530** in FIG. **5**a. Additionally, processes running on P**2** **140** may be automatically scanned and compared with an allowed process list, particularly as a protected process is started up. If any process is detected which is not on the allowed list, the user may be alerted that a possible malware infection has occurred. A user may then choose to scan or clean the system, or inspect the unknown process to determine if the process will be allowed to continue to execute. A user may also update the list of allowed processes from time to time as new, legitimate processes are added, for example, by a browser software update.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically cleaned when a protected process window is closed. In this way, any detected or undetected malware infections are much less likely to affect a future protected process session. It may only be necessary to automatically clean the **130-140** system when the last protected process is closed during a session. An exemplary automatic cleaning process is illustrated by steps **540**, **550**, **560**, **570** and **580** in FIG. **5**b. The memory M**2** **130** and processor P**2** **140** may be automatically scanned for malware infections as the protected process session closes. Infected files may be deleted or quarantined automatically. Additionally, there may be a variety of files that a user may wish to have automatically cleaned or deleted upon closing a protected process session. For example, temporary internet files, cookies, browser plugins, etc., may be deleted or scanned for malware automatically. A user may also wish to have websites that contributed to a malware infection noted, and may wish to place the offending websites in a block list, such that the offending websites cannot be accessed in the future without the user specifically authorizing access. As part of the malware scan, the malware scanner may automatically log the offending website(s), and block future access. Also, the P**2** **140** processor and any associated non-volatile memory may be reset and/or erased as the protected process session is closed. The exemplary automatic cleaning process illustrated in FIG. **5**b may therefore reduce the risk of a malware infection being carried over to a future protected process session.

Interactive network processes such as interactive gaming have become very popular in recent years. In current interactive gaming processes, a user may log onto a game host located on network **195**, or connect to other computers whose users wish to participate in the game. Computer games, such as Quake 3. Arena, by Id Software Incorporated, or Call of Duty, by Activision Incorporated, are just two examples of the plethora of games available that may be played interactively



over a network. The user's computer system typically provides the bulk of the processing power and video graphics generation required to display the often fast moving and richly detailed three dimensional game environments. Information about the current and new state of the game is exchanged between various users' computer systems, often in real time. With this type of process, a relatively modest amount of data is required to be exchanged between users, or a user and the host, with the bulk of the processing, data manipulation, and graphics generation being handled by the user's local machine. However, this open network connection may become a conduit for malware practitioners to exploit, allowing malware to be downloaded onto a user's computer during a gaming session, often without the user being aware of the malware transfer. It would be advantageous, therefore, for a computer system to be much less susceptible to malware attacks during gaming sessions.

In accordance with a preferred embodiment of the present invention, an exemplary process flow **600**, illustrated in FIG. **6**, allows an interactive network process, such as online gaming, to be carried out on computer system **100**. A user initiates an interactive network process via 2[nd] processor P**2** **140** (step **610**). P**2** **140** receives interactive network process status data from network connection (step **620**). P**2** **140** informs 1st processor P**1** **120** that interactive network process status data is available (step **630**). P**1** **120** retrieves interactive network process status data from P**2** **140** and uses the status data to update the interactive network process and update video display (step **640**). P**1** **120** then passes the updated interactive network process status data to P**2** **140** (step **650**). P**2** **140** then sends the updated interactive network process status data to the network via network connection **195** (step **660**). The exemplary process **600**, or a process functionally equivalent, is carried out continuously as long as the interactive process is running.

By using exemplary process **600** (or an equivalent), computer system **100** is capable of actively deciding what data to download and use, and what data to discard or scan for malware. The game status data is buffered prior to loading it onto the **110-120** system. The **110-120** system may be advantageously configured to only accept game status information in the proper format, thereby minimizing the chance that a malware practitioner could deceptively load malware onto the **110-120** system.

Additionally, computer system **100** could be configured such that system **130-140** is powerful enough to process the interactive network process without exchanging information with the **110-120** system. Such a configuration may be more secure, as a conduit between the **110-120** system and the **130-140** system may not be necessarily opened. The **130-140** system may contain all the necessary files to facilitate the interactive network process. Higher end computers, workstations, and servers often contain dual (or more) processors, such as the Mac G5, manufactured by the Apple Computer Corporation, or a single physical processor with a multiple processor core. Often, the processors in these multi-processor machines are of equal or comparable processing power. In such a configuration, one processor may be dedicated to performing functions equivalent to those described for P**1** **120**, with a second processor performing the functions equivalent to those described for P**2** **140**. A computer system **100** employing multiple processors may be advantageously configured such that one of the processors is dedicated to protected processes only when a network process is active. When a user is not accessing a network, the multiple processors in a computer system may be dedicated to other processes, such as performing complex calculations or simula-

tions, or running complex non-network interactive gaming processes, for example. Alternatively, the computer system **100** may be configured such that the **110-120** system simply transfers required files to the video processor **170** or the **130-140** system at the appropriate time to facilitate the interactive network process. The **110-120** system could be commanded to retrieve and transfer the files at the command of the video processor, or at the command of the **130-140** system, or a combination of both.

In accordance with embodiments of the present invention, computer system **100** may be configured in a variety of ways, while still remaining within the spirit and scope of the present teachings. One such exemplary embodiment is illustrated in FIG. **7**. Subsystem **700** of computer system **100** comprises a video processor **770**, a second processor **740**, and a second memory data storage area **730**. The demarcation line illustrated by subsystem **700** may be either physical or logical. For example, subsystem **700** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of the teachings of the present invention. Subsystem **700** may be plugged into the main motherboard of an existing computer, for example. The motherboard connector may be already communicatively coupled to the **110-120** system, thereby facilitating the system upgrade. The network interface device **190** may be connected directly to subsystem **700**, or network interface device **190** could be integrated as part of subsystem **700**. Memory data storage area **730** may comprise any of the volatile and/or non-volatile memory types previously described, or any combination thereof, or any suitable memory storage medium, for example. Alternatively, subsystem **700** may be located on the motherboard, as opposed to an add-on card. Further still, portions of subsystem **700**, such as video processor **770**, and/or second processor **740**, for example, may be integrated together with P**1 120**. It is understood that functions described herein may be configured in a wide variety of ways, without departing from the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **8**. Subsystem **800** of computer system **100** comprises a video processor **870**, a second processor **840**, and a second memory data storage area **830**. The demarcation line illustrated by subsystem **800** may be either physical or logical. For example, subsystem **800** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of features of the present invention. In the exemplary embodiment of FIG. **8**, second processor **840** and video processor **870** are integrated together, perhaps on a common integrated circuit. Such a configuration may help to reduce the cost of subsystem **800**, and/or improve the performance. Additionally, a circuit designer may find it advantageous to integrate **840** and **870** together to facilitate communication between the functions. It is understood that such an integration of functions may create a device in which an external user may find it difficult to distinguish where the function of **870** ends and the function of **840** begins, and vice versa. Such a device, however, would remain within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **9**. Computer system **100** comprises a video processor **970**, processor **960**, and a memory data storage area **950**. Processor **960** may further comprise multiple processor cores, illustrated by 1st processor **920** and 2nd processor **940**. It is understood that processor **960** may contain more than 2 processor cores. Microprocessors manufactured with multiple processor cores are becoming common in the industry, and such multi-core processors may be particularly advantageous when used in accordance with the present teachings. Memory data storage area **950** may further comprise 1st memory data storage area **910** and 2nd memory data storage area **930**. Memory areas **910** and **930** may comprise, for example, different partitions on a single hard drive, and/or different address ranges in a RAM bank.

Referring again to FIG. **9**, the functions carried out by processors **920** and **940** may comprise separate, secure logical processes executing on the same physical processor. For example, a first logical process may comprise executing instructions necessary to carry out the functions of an operating system, or the first logical process may comprise executing instructions necessary to carry out the functions of a first computer program, including but not limited to a word processor. A second logical process may comprise executing instructions necessary to carry out the functions of a web browser program, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example. A computer system **100** constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P**2 140** (FIG. **1**) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M**1 110** or another logical process performing the functions of P**1 120**. Additionally, memory areas **910** and **930** may comprise separate, isolated memory zones within a common physical memory space, such as separate partitions within the same hard drive, for example.

Some malware programs are designed to secretly record user input commands (such as keystrokes, for example), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, bank account numbers, social security numbers, driver's license numbers, credit account numbers, etc. Theft of such personal information could result in the theft of actual assets (money or securities, etc.) or perhaps used for identity theft, among other malicious intents. Clearly, a computer system capable of ensuring the protection of such sensitive information would be desirable.

In accordance with an embodiment of the present invention, a computer system is configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked. Encryption of user input data, such as keystrokes, is an effective means of protecting such data from theft by malware. Specific techniques used for data encryption and decryption are well known in the art, and need not be discussed further here. There are many examples in the art that may be examined to better understand various encryption/decryption techniques and the use of encryption/decryption in computer systems. Among these are U.S. Pat. No. 6,581,162 entitled "Method for securely creating, storing and using encryption keys in a computer system." issued to Angelo, et al., and U.S. Pat. No. 6,134,661 entitled "Computer network security device and method." Issued to Topp. The aforementioned patents have been previously incorporated by reference.

In accordance with the present teachings, a method of operating a computer system involving data encryption is

described. In step **1010**, a user opens a protected process where some level of data encryption is desired, for example, the encryption of sensitive user interface data or user files. Other data may be encrypted as desired. At step **1020**, processor P**1** **120** instructs processor P**2** **140** to initiate a protected process and open a process window. P**1** **120** encrypts the sensitive data and passes the user interface data to P**2** **140** when a P**2** **140** window is selected or active (step **1030**). P**2** **140** generates video data for the P**2** **140** process window(s) and passes the video data to video processor **170** (step **1040**). Video processor **170** decrypts the sensitive data and interleaves the video data from all P**1** and P**2** processes (step **1050**). P**2** **140** passes the encrypted sensitive data to network interface device **190** (step **1060**). Network interface device **190** decrypts the sensitive data and passes the decrypted sensitive data to network **195**. Of course, other methods of operating a computer system in which data is encrypted prior to being passed to P**2** **140**, and decrypted after leaving the control of P**2** **140**, are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, data desired to be protected is encrypted prior to sending the data to processor P**2** **140**, which may be running one or more malware processes. Processor P**2** **140** does not have visibility to the decryption keys, and is therefore unable to decrypt the data. Data may be decrypted by network interface device **190** prior to forwarding the data on to network **195**. Conversely, encrypted data may be sent directly over the network for decryption by another computer system, including, for example, an internet banking host computer. Decryption keys may be passed between P**1** **120** and network interface device **190** via a communication link **191**. Video processor **170** may decrypt the data prior to displaying the data on video display **180**, with decryption keys possibly passed between P**1** **120** and video processor **170** via a communication link **171**. Conversely, data may be passed directly to video processor **170** via a communication link **151**.

A user **160** may wish to encrypt just a portion of the data destined for the network, such as passwords, credit card numbers, etc. Conversely, a user may wish to encrypt large blocks of data, such as e-mails or large application files containing sensitive text and/or graphics. Instructions may be passed to network interface device **190** directing **190** to decrypt one or more specific data blocks prior to sending the data blocks to network **195**. Conversely, instructions may be passed to network interface device **190** directing **190** to pass one or more specific data blocks to network **195** without decryption.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is therefore intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**1**. A method of operating a computer system *capable of exchanging data across a network of one or more computers and* having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising **[**the steps of**]**:

executing **[**instructions**]** *a first web browser process, capable of accessing data of a website via the network,* in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space **[**and a second memory space**]**;

executing **[**instructions**]** *a second web browser process* in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space**[**, the second logical process being further capable of exchanging data across a network of one or more computers**]**; *and*

displaying**[**, in a windowed format on a display terminal,**]** data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to **[**the**]** *a* display **[**terminal**]**;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second **[**logical**]** *web browser* process.

**2**. The method of claim **1** wherein the **[**first memory space and the**]** second memory space **[**comprise separate regions of a common memory space**]** *comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

**3**. The method of claim **1** wherein the **[**second logical process is selected from the group consisting of; an electronic mail process, an instant messaging process, an internet browser process, an interactive gaming process, a virtual private network (VPN) process, and a reader application process**]** *first logical process is capable of accessing data contained in the second memory space.*

**4**. The method of claim **1** wherein the first logical process receives user interface data, and passes the user interface data to the second logical process.

**5**. The method of claim **1** wherein the first and second electronic data processors are part of a multi-core electronic data processor.

**6**. The method of claim **1** and further comprising **[**the step of**]** restoring at least one corrupted data file **[**residing on the second memory space**]** from **[**an**]** *a protected* image **[**residing on the first memory space**]**.

**7**. The method of claim **1** and further comprising **[**the step of**]** automatically deleting at least one data file residing on the second memory space when the second logical process is terminated.

**8**. The method of claim **1** and further comprising **[**the steps of**]**:

encrypting data with the first logical process;

transferring the encrypted data from the first logical process to the second logical process; *and*

transferring the encrypted data from the second logical process to the network interface device.

**9**. The method of claim **8** and further comprising **[**the steps of**]**:

decrypting the data with the network interface device; *and*

transferring the decrypted data from the network interface device to the network.

**10**. A multi-processor computer system using a common operating system *capable of exchanging data across a network of one or more computers via a network interface device*, comprising:

a first electronic data processor capable of executing [instructions] *a first web browser process* using the common operating system and communicatively coupled to a first memory space [and a second memory space]*, the first web browser process capable of accessing data of a website via the network*;

a second electronic data processor capable of executing [instructions] *a second web browser process* using the common operating system and communicatively coupled to [the] *a* second memory space [and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device]; *and*

a video processor adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display [terminal for displaying the combined video data in a windowed format];

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing [on the second electronic data processor] *as part of the second web browser process*.

**11**. The computer system of claim **10** wherein the [first memory space and the] second memory space [comprise separate regions of a common memory space] *comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory* (*RAM*)*; and*

*both volatile and nonvolatile memory.*

**12**. The computer system of claim **10** wherein the first and second electronic data processors are part of a dual processor computer system.

**13**. The computer system of claim **10** wherein the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

**14**. The computer system of claim **10** wherein the computer system is configured such that the first electronic data processor is protected from executing instructions initiated by a malware process downloaded from the network and executing on the second electronic data processor.

**15**. A multi-processor computer system using a common operating system *capable of exchanging data across a network of one or more computers*, comprising:

at least a first and second electronic data processor capable of executing instructions using the common operating system;

at least a first and second memory space; *and*

a video processor;

wherein the first and second electronic data processors, first and second memory space, and video processor are configured [for performing the steps of:] *to:*

[executing instructions] *execute a first web browser process, capable of accessing data of a website via the network,* in a first logical process with the first electronic data processor, wherein the first logical process is executing within the common operating system and is capable of accessing data contained in the first memory space and the second memory space;

[executing instructions] *execute a second web browser process* in a second logical process with the second electronic data processor, wherein the second logical process is executing within the common operating system and is capable of accessing data contained in the second memory space[, the second logical process being further capable of exchanging data across a network of one or more computers]; *and*

[displaying, in a windowed format on a display terminal,] *display* data from the first logical process and the second logical process, wherein the video processor is adapted to combine data from the first and second logical processes and transmit the combined data to [the] *a* display [terminal];

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second [logical] *web browser* process.

**16**. The computer system of claim **15** wherein the computer system is further configured such that the first logical process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second logical process.

**17**. The computer system of claim **15** and further comprising[:] at least one network interface device capable of exchanging data with [both the second logical process and with] the network *and with a logical process that comprises a process selected from the group consisting of:*

*the first logical process; and*

*the second logical process.*

**18**. The computer system of claim **17** wherein the network interface device is capable of decrypting data received from the second logical process and transmitting the decrypted data to the network while preventing the second logical process from accessing the decrypted data.

**19**. The computer system of claim **15** wherein the at least one electronic data processor [is] *comprises a processor* selected from the group consisting of[:] a multi-core electronic data processor; dual electronic data processors; and multiple electronic data processors.

**20**. The computer system of claim **15** and further configured [for performing the step of: restoring] *to restore* at least one corrupted data file [residing on the second memory space] from [an] *a protected* image [residing on the first memory space].

*21. A portable computer capable of executing instructions using a common operating system, comprising:*

*a network interface device configured to exchange data across a network of one or more computers and access at least one website;*

*at least a first memory space and a second memory space, the first memory space containing at least one system file;*

*at least one electronic data processor communicatively coupled to the network interface device, the first and second memory space, and to a user interface, wherein the user interface is configured to receive input from a computer user;*

*the at least one electronic data processor configured to execute a first web browser process, capable of accessing data of the at least one website via the network, in a first logical process within the common operating sys-*

*tem, wherein the first logical process is capable of accessing data contained in the first memory space;*

*the at least one electronic data processor further configured to execute a second web browser process in a second logical process within the common operating system, wherein the second logical process is capable of accessing data contained in the second memory space and is further capable of generating video data from the at least one website accessed via the network; and*

*a video processor configured to process video data from the second web browser process for display;*

*wherein the first web browser process is capable of opening the second web browser process and is further capable of passing data to the second web browser process;*

*wherein further the portable computer is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing within the second web browser process.*

*22. The portable computer of claim 21 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*23. The portable computer of claim 22 wherein the first web browser process is capable of passing data downloaded from the network to the second web browser process.*

*24. The portable computer of claim 21 wherein the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*25. The portable computer of claim 21 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*

*a Field Programmable Gate Array;*

*a plurality of electronic data processors; and*

*a multi-core electronic data processor.*

*26. The portable computer of claim 21 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

*27. The portable computer of claim 21 configured such that at least one corrupted file required for a web browser process is capable of being restored from a protected image.*

*28. The portable computer of claim 27 wherein the protected image is stored at a location selected from the group consisting of:*

*a removable drive;*

*the first memory space;*

*a partition on a memory device; and*

*a nonvolatile memory disk.*

*29. The portable computer of claim 21 configured to close the second web browser process and automatically delete at least one file selected from the group consisting of a temporary internet file, a cookie and a corrupted file.*

*30. The portable computer of claim 21 configured such that the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*31. The portable computer of claim 21 wherein attempts by malware to record data entry by the computer user are effectively blocked.*

*32. A method of operating a portable computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device, comprising:*

*exchanging data across a network of one or more computers with the network interface device and accessing at least one website;*

*storing at least one system file within the first memory space;*

*executing a first web browser process, capable of accessing data of the at least one website via the network, in a first logical process within the common operating system using the at least one electronic data processor, wherein the first logical process is configured to access data contained in the first memory space;*

*executing a second web browser process in a second logical process within the common operating system using the at least one electronic data processor, wherein the second logical process is configured to access data contained in the second memory space and is further configured to generate video data;*

*opening the second web browser process on instruction from the first web browser process;*

*passing data from the first web browser process to the second web browser process; and*

*displaying website video data from the second web browser process;*

*wherein the portable computer is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.*

*33. The method of claim 32 wherein the portable computer is configured such that the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*34. The method of claim 33 and further comprising downloading data from the network and passing the data from the first web browser process to the second web browser process.*

*35. The method of claim 32 wherein the portable computer is configured such that the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*36. The method of claim 32 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*

*a partition on a memory device;*

*random access memory (RAM); and*

*both volatile and nonvolatile memory.*

*37. The method of claim 32 and further comprising—restoring at least one corrupted file from a protected image.*

*38. The method of claim 37 wherein the protected image is stored at a location selected from the group consisting of:*

*a removable drive;*

*the first memory space;*

*a partition on a memory device; and*

*a nonvolatile memory disk.*

*39. The method of claim 32 and further comprising—deleting at least one corrupted data file residing on the second memory space when the second logical process is terminated.*

*40. The method of claim 32 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*
*a Field Programmable Gate Array;*
*a plurality of electronic data processors; and*
*a multi-core electronic data processor.*

*41. The method of claim 32 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*42. The method of claim 32 and further comprising displaying video data from the first web browser process.*

*43. The method of claim 32 wherein attempts by malware to record data entry by the computer user are effectively blocked.*

*44. A method of operating a portable computer capable of executing instructions using a common operating system and comprising a network interface device, at least a first memory space and a second memory space, and at least one electronic data processor communicatively coupled to the network interface device, the first and second memory space, and to a user interface, comprising:*

*exchanging data across a network of one or more computers with the network interface device and accessing at least one website;*

*storing at least one system file in the first memory space;*

*opening a first web browser process capable of accessing data of the at least one website via the network, wherein the first web browser process is capable of accessing data contained in the first memory space;*

*opening a second web browser process, wherein the second web browser process is capable of accessing data contained in the second memory space, and is further capable of generating data for video display; and*

*passing data from the first web browser process to the second web browser process;*

*wherein the portable computer is configured such that the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.*

*45. The method of claim 44 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.*

*46. The method of claim 45 and further comprising—downloading data from the network and passing the downloaded data from the first web browser process to the second web browser process.*

*47. The method of claim 46 and further comprising storing the downloaded data on the second memory space.*

*48. The method of claim 44 wherein the second web browser process is capable of directly exchanging data with the network interface device and with the first web browser process.*

*49. The method of claim 44 and further comprising—restoring at least one corrupted file from a protected image.*

*50. The method of claim 49 wherein the protected image is stored at a location selected from the group consisting of:*

*a removable drive;*
*the first memory space;*
*a partition on a memory device; and*
*a non-volatile memory disk.*

*51. The method of claim 44 further comprising closing the second web browser process and automatically deleting at least one file selected from the group consisting of a temporary internet file, a cookie and a corrupted file.*

*52. The method of claim 44 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*



*53. The method of claim 44 and further comprising the first web browser process instructing the second web browser process to open.*

*54. The method of claim 44 wherein attempts by malware to record data entry by a computer user are effectively blocked.*

*55. The method of claim 44 wherein the at least one electronic data processor comprises a processor selected from the group consisting of:*

*an Application Specific Integrated Circuit;*
*a Field Programmable Gate Array;*
*a plurality of electronic data processors; and*
*a multi-core electronic data processor.*

*56. The method of claim 44 wherein the second memory space comprises memory selected from the group consisting of:*

*a memory zone within a physical memory common to the first memory space;*
*a partition on a memory device;*
*random access memory (RAM); and*
*both volatile and nonvolatile memory.*

*57. The method of claim 44 and further comprising the first web browser process opening a plurality of second web browser processes.*

*58. The portable computer of claim 21 wherein the network interface device is capable of exchanging data with the network using a wireless connection.*

*59. The portable computer of claim 58 wherein the network comprises a cellular data carrier network.*

*60. The method of claim 32 wherein the network interface device is capable of exchanging data with the network using a wireless connection.*

*61. The method of claim 60 wherein the network comprises a cellular data carrier network.*

*62. The method of claim 44 wherein the network interface device is capable of exchanging data with the network using a wireless connection.*

*63. The method of claim 62 wherein the network comprises a cellular data carrier network.*

*64. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device configured to exchange data across a network of one or more computers and access at least one website, configured to:*

*store at least one system file within the first memory space;*

*open a first web browser process, capable of accessing data of the at least one website via the network, in a first logical process, the first logical process being configured to access data contained in the first memory space;*

*open a second web browser process in a second logical process, the second logical process being configured to access data contained in the second memory space; and*

*pass data from the first web browser process to the second web browser process, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.*

*65. The computer program product of claim 64 wherein the first web browser process is capable of opening the second web browser process and the program code stored in the non-transitory computer readable medium is further configured to pass data to the second web browser process.*

*66. The computer program product of claim 64 wherein the second logical process is configured to generate data for display and the program code stored in the non-transitory computer readable medium is further configured to process website video data from the second web browser process.*

*67. The computer program product of claim 64 wherein the first web browser process is capable of directly exchanging data with the network interface device and the second web browser process or the second web browser process is capable of directly exchanging data with the network interface device and the first web browser process.*

*68. The computer program product of claim 64 wherein at least one corrupted file for a web browser process is capable of being restored from a protected file.*

*69. The computer program product of claim 64 configured to close the second web browser process and automatically delete at least one file selected from the group consisting of a temporary internet file, a cookie and a corrupted file.*

*70. The computer program product of claim 64 wherein the first web browser process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second web browser process.*

*71. The computer program product of claim 64 wherein attempts by malware to record data entry by a computer user are effectively blocked.*

*72. The computer program product of claim 64 wherein the network interface device is capable of exchanging data with the network using a wireless connection.*

*73. The computer program product of claim 72 wherein the network comprises a cellular data carrier network.*

* * * * *

US00RE43529E

(19) **United States**
(12) **Reissued Patent**
**Rozman et al.**

(10) **Patent Number: US RE43,529 E**
(45) **Date of Reissued Patent: *Jul. 17, 2012**

(54) **SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE**

(76) Inventors: **Allen F. Rozman**, Garland, TX (US); **Alfonso J. Cioffi**, Murphy, TX (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/941,067**

(22) Filed: **Nov. 7, 2010**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,484,247**
Issued: **Jan. 27, 2009**
Appl. No.: **10/913,609**
Filed: **Aug. 7, 2004**

(51) **Int. Cl.**
***G06F 11/00*** (2006.01)
***G06F 12/14*** (2006.01)
***G06F 12/16*** (2006.01)
***G08B 23/00*** (2006.01)
*G06F 15/173* (2006.01)
*H04L 29/06* (2006.01)

(52) **U.S. Cl.** ............. **713/152**; 726/23; 726/24; 709/225

(58) **Field of Classification Search** .................. 713/152; 726/22–25
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,890,098 A 12/1989 Dawes et al.
5,280,579 A 1/1994 Nye
5,502,808 A 3/1996 Goddard et al.
5,555,364 A 9/1996 Goldstein
5,564,051 A * 10/1996 Halliwell et al. .................... 1/1
5,666,030 A 9/1997 Parson
5,673,403 A * 9/1997 Brown et al. ................. 715/744
5,751,979 A * 5/1998 McCrory ...................... 715/803
5,826,013 A 10/1998 Nachenberg
5,918,039 A 6/1999 Buswell et al.
5,974,549 A * 10/1999 Golan ............................ 726/23
5,978,917 A 11/1999 Chi
5,995,103 A 11/1999 Ashe
6,091,412 A 7/2000 Simonoff et al.
6,108,715 A 8/2000 Leach et al.
6,134,661 A 10/2000 Topp
6,167,522 A 12/2000 Lee et al.
6,183,366 B1 2/2001 Goldberg et al.
6,192,477 B1 * 2/2001 Corthell ......................... 726/11

(Continued)

OTHER PUBLICATIONS

"Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" by Kevin Townsend, Pest Patrol, 2003.

(Continued)

*Primary Examiner* — Christian Laforgia
(74) *Attorney, Agent, or Firm* — Slater & Matsil, L.L.P.

(57) **ABSTRACT**

In a computer system, a first electronic data processor is communicatively coupled to a first memory space and a second memory space. A second electronic data processor is communicatively coupled the second memory space and to a network interface device. The second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device. A video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format. The computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

**45 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,199,181 | B1 * | 3/2001 | Rechef et al. | 714/38.13 |
| 6,216,112 | B1 | 4/2001 | Fuller et al. | |
| 6,275,938 | B1 | 8/2001 | Bond et al. | |
| 6,285,987 | B1 | 9/2001 | Roth et al. | |
| 6,321,337 | B1 | 11/2001 | Reshef et al. | |
| 6,351,816 | B1 | 2/2002 | Mueller et al. | |
| 6,385,721 | B1 * | 5/2002 | Puckette | 713/2 |
| 6,397,242 | B1 | 5/2002 | Devine et al. | |
| 6,401,134 | B1 | 6/2002 | Razavi et al. | |
| 6,433,794 | B1 | 8/2002 | Beadle et al. | |
| 6,438,600 | B1 | 8/2002 | Greenfield et al. | |
| 6,480,198 | B2 | 11/2002 | Kang | |
| 6,492,995 | B1 | 12/2002 | Atkin et al. | |
| 6,505,300 | B2 | 1/2003 | Chan et al. | |
| 6,507,904 | B1 | 1/2003 | Ellison et al. | |
| 6,507,948 | B1 | 1/2003 | Curtis et al. | |
| 6,546,554 | B1 | 4/2003 | Schmidt et al. | |
| 6,553,377 | B1 | 4/2003 | Eschelbeck et al. | |
| 6,578,140 | B1 * | 6/2003 | Policard | 713/1 |
| 6,581,162 | B1 | 6/2003 | Angelo et al. | |
| 6,633,963 | B1 | 10/2003 | Ellison et al. | |
| 6,658,573 | B1 | 12/2003 | Bischof et al. | |
| 6,663,000 | B1 | 12/2003 | Muttik et al. | |
| 6,678,712 | B1 * | 1/2004 | McLaren et al. | 718/100 |
| 6,678,825 | B1 | 1/2004 | Ellison et al. | |
| 6,691,230 | B1 | 2/2004 | Bardon | |
| 6,735,700 | B1 | 5/2004 | Flint et al. | |
| 6,754,815 | B1 * | 6/2004 | Ellison et al. | 713/1 |
| 6,756,236 | B2 | 6/2004 | Ford et al. | |
| 6,757,685 | B2 | 6/2004 | Raffaele et al. | |
| 6,772,345 | B1 | 8/2004 | Shetty | |
| 6,804,780 | B1 | 10/2004 | Touboul | |
| 6,836,885 | B1 | 12/2004 | Buswell et al. | |
| 6,871,348 | B1 * | 3/2005 | Cooper | 719/310 |
| 6,873,988 | B2 | 3/2005 | Herrmann et al. | |
| 6,880,110 | B2 | 4/2005 | Largman et al. | |
| 6,990,630 | B2 | 1/2006 | Landsman et al. | |
| 6,996,828 | B1 * | 2/2006 | Kimura et al. | 719/319 |
| 7,013,484 | B1 * | 3/2006 | Ellison et al. | 726/26 |
| 7,024,555 | B2 * | 4/2006 | Kozuch et al. | 726/22 |
| 7,024,581 | B1 * | 4/2006 | Wang et al. | 714/2 |
| 7,039,801 | B2 * | 5/2006 | Narin | 713/152 |
| 7,062,672 | B2 | 6/2006 | Owhadi et al. | |
| 7,082,615 | B1 * | 7/2006 | Ellison et al. | 726/26 |
| 7,085,928 | B1 | 8/2006 | Schmid et al. | |
| 7,096,381 | B2 | 8/2006 | Largman et al. | |
| 7,139,890 | B2 | 11/2006 | Moran et al. | |
| 7,146,305 | B2 * | 12/2006 | van der Made | 703/22 |
| 7,146,640 | B2 * | 12/2006 | Goodman et al. | 726/16 |
| 7,181,768 | B1 | 2/2007 | Ghosh et al. | |
| 7,191,469 | B2 | 3/2007 | Erlingsson | |
| 7,246,374 | B1 | 7/2007 | Simon et al. | |
| 7,260,839 | B2 * | 8/2007 | Karasaki | 726/11 |
| 7,284,274 | B1 | 10/2007 | Walls et al. | |
| 7,373,505 | B2 | 5/2008 | Seltzer et al. | |
| 7,401,230 | B2 | 7/2008 | Campbell et al. | |
| 7,421,689 | B2 | 9/2008 | Ross et al. | |
| 7,444,412 | B2 | 10/2008 | Owhadi | |
| 7,484,247 | B2 * | 1/2009 | Rozman et al. | 726/34 |
| 7,565,522 | B2 | 7/2009 | Sastry et al. | |
| 7,577,871 | B2 | 8/2009 | Largman et al. | |
| 7,596,694 | B1 | 9/2009 | Karp et al. | |
| 7,650,493 | B2 * | 1/2010 | Narin | 713/152 |
| 7,657,419 | B2 * | 2/2010 | van der Made | 703/22 |
| 7,676,842 | B2 | 3/2010 | Carmona et al. | |
| 7,694,328 | B2 | 4/2010 | Joshi et al. | |
| 7,730,318 | B2 | 6/2010 | Kurien et al. | |
| 7,818,808 | B1 * | 10/2010 | Neiger et al. | 726/26 |
| 7,849,310 | B2 * | 12/2010 | Watt et al. | 713/164 |
| 7,854,008 | B1 * | 12/2010 | Huang et al. | 726/24 |
| 2002/0002673 | A1 * | 1/2002 | Narin | 713/152 |
| 2002/0052809 | A1 * | 5/2002 | Toedtli | 705/28 |
| 2002/0066016 | A1 | 5/2002 | Riordan | |
| 2002/0174349 | A1 | 11/2002 | Wolff et al. | |
| 2003/0023857 | A1 | 1/2003 | Hinchliffe et al. | |
| 2003/0097591 | A1 | 5/2003 | Pham et al. | |
| 2003/0131152 | A1 | 7/2003 | Erlingsson | |
| 2003/0177397 | A1 | 9/2003 | Samman | |
| 2003/0221114 | A1 * | 11/2003 | Hino et al. | 713/189 |
| 2004/0006706 | A1 * | 1/2004 | Erlingsson | 713/200 |
| 2004/0006715 | A1 | 1/2004 | Skrepetos | |
| 2004/0034794 | A1 | 2/2004 | Mayer et al. | |
| 2004/0039944 | A1 * | 2/2004 | Karasaki | 713/201 |
| 2004/0054588 | A1 | 3/2004 | Jacobs et al. | |
| 2004/0199763 | A1 * | 10/2004 | Freund | 713/154 |
| 2004/0230794 | A1 * | 11/2004 | England et al. | 713/164 |
| 2004/0267929 | A1 * | 12/2004 | Xie | 709/225 |
| 2005/0005153 | A1 * | 1/2005 | Das et al. | 713/200 |
| 2005/0091661 | A1 * | 4/2005 | Kurien et al. | 719/310 |
| 2005/0149726 | A1 * | 7/2005 | Joshi et al. | 713/164 |
| 2005/0198692 | A1 * | 9/2005 | Zurko et al. | 726/24 |
| 2005/0240810 | A1 | 10/2005 | Safford et al. | |
| 2006/0004667 | A1 | 1/2006 | Neil | |

OTHER PUBLICATIONS

"Beyond Viruses: Why Anti-Virus Software is No Longer Enough" by David Stang PhD, Pest Patrol, 2002.
"The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003.
"Architecture of Virtual Machines" by R. P. Goldberg, Honeywell Information Systems, Inc. and Harvard University Presented at the AFIPS National Computer Conference, New York, New York, Jun. 4-8, 1973.
"The Duality of Memory and Communication in the Implementation of a Multiprocessor Operating System." by Michael Young, Avadis Tevanian, Richard Rasheed, David Golub, Jeffery Eppinger, Jonathan Crew, William Bolosky, David Black and Robert Baron, Computer Science Department Carnegie-Mellon University Proceedings of the 11th Operating Systems Principles, Nov. 1987.
"Application-Controlled Physical Memory using External Page-Cache Management." by Keiran Harty and David R. Cheriton, Computer Science Department, Stanford University, 1992.
"Efficient Software-Based Fault Isolation." by Robert Wahbe, Steven Lucco, Thomas Anderson, Susan Graham, Computer Science Division University of California, Berkeley, SIGOPS 1993.
"TRON: Process-Specific File Protection for the UNIX Operating System." by Andrew Berman, Virgil Bourassa, Erik Selberg, Department of Computer Science and Engineering, University of Washington, Jan. 23, 1995.
"A Secure Environment for Untrusted Helper Applications (Confining the Wily Hacker)." by Ian Goldberg, David Wagner, Randi Thomas, and Eric Brewer, Computer Science Division, University of California, Berkeley, Sixth USENIX UNIX Security Symposium San Jose, California, Jul. 1996.
"Building Systems that Flexibly Control Downloaded Executable Context." by Trent Jaeger and Atul Prakash, Software Systems Research Lab, University of Michigan and Aviel D. Rubin, Security Research Group, Bellcore Sixth USENIX UNIX Security Symposium San Jose, California, Jul. 1996.
"Java Security: From HotJava to Netscape and Beyond." by Drew Dean, Edward W. Felten, Dan S. Wallach Department of Computer Science, Princeton University, Princeton, NJ 08544 1996 IEEE Symposium on Security and Privacy, Oakland, CA, May 6-8, 1996.
"A Sandbox Operating System Environment for Controlled Execution of Alien Code." by Asit Dan, Ajay Mohindra, Rajiv Ramaswami, and Dinkar Sitaram IBM Research Division T.J. Watson Research Center Yorktown Heights, New York RC 20742 (Feb. 20, 1997) Computer Science IBM Research Report.
"Vulnerability of Secure Web Browsers." by Flavio De Paoli, Andre Dos Santos, Richard Kemmerer Reliable Software Group Computer Science Department, University of California, Santa Barbara, 1997.
"Security of Web Browser Scripting Languages: Vulnerabilities, Attacks, and Remedies." by Vinod Anupam and Alain Mayer, Bell Laboratories, Lucent Technologies 7th USENIX Security Symposium San Antonio, Texas, Jan. 26-29, 1998.
"Virtual Memory in Contemporary Microprocessors." by Bruce Jacob University of Maryland and Trevor Mudge University of Michigan, IEEE MICRO Jul.-Aug. 1998.
"Flexible Control of Downloaded Executable Content." by Trent Jaeger and Jochen Liedtke and Nayeem Islam, IBM Thomas J.

Watson Research Center, and Atul Prakash University of Michigan, Ann Arbor ACM Transactions on Information and System Security, vol. 2, No. 2, May 1999, pp. 177-228.
"J2ME Building Blocks for Mobile Devices: White Paper on KVM and the Connected, Limited Device Configuration." Sun Microsystems May 19, 2000.
"User-level Resource-constrained Sandboxing" by Fangzhe Chang, Ayal Itzkovitz, and Vijay Karamcheti Department of Computer Science, Courant Institute of Mathematical Sciences, New York University USENIX Windows System Symposium, Aug. 2000.
"Verifying the EROS Confinement Mechanism" by Jonathan S. Shapiro and San Weber IBM T.J. Watson Research Center 0-7695-0665-8/00 2000 IEEE.
"WindowBox: A Simple Security Model for the Connected Desktop" by Dirk Balfanz, Princeton University and Daniel R. Simon, Microsoft Research, 2000.
"Building a Secure Web Browser" by Sotiris Ioannidis, Steven M. Bellovin, 2001 USENIX Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"Virtualizing I/O Devices on VMware Workstation's Hosted Virtual Machine Monitor" by Jeremy Sugerman, Ganesh Venkitachalam and Beng-Hong Lim, VMware, Inc. 3145 Porter Dr, Palo Alto, CA 943042001 USENIX Annual Technical Conference Boston, Massachusetts, USA Jun. 25-30, 2001.
"When Virtual Is Better Than Real" by Peter M. Chen and Brian D. Noble, Department of Electrical Engineering and Computer Science University of Michigan, 2001.
"A Flexible Containment Mechanism for Executing Untrusted Code" by David Peterson, Matt Bishop, and Raju Pandey, Department of Computer Science University of California, Davis USENIX Security Symposium San Francisco, California, USA Aug. 5-9, 2002.
"Software Security and Privacy Risks in Mobile E-Commerce" by Anup K. Ghosh and Tara M. Swaminatha, Communications of the ACM Feb. 2001 vol. 44, No. 2.
"ReVirt: Enabling Intrusion Analysis through Virtual-Machine Logging and Replay" by George W. Dunlap, Samuel T. King, Sukru Cinar, Murtaza A. Basrai, Peter M. Chen, Department of Electrical Engineering and Computer Science, University of Michigan Proceedings of the 2002 Symposium on Operating Systems Design and Implementation (OSDI).
"Trusted Paths for Browsers: An Open-Source Solution to Web Spoofing" by Zishuang (Eileen) Ye and Sean Smith Department of Computer Science Dartmouth College Technical Report TR2002-418 Feb. 4, 2002.
"User Interaction Design for Secure Systems" by Ka-Ping Yee Proceedings of the 4th International Conference on Information and Communications Security table of contents pp. 278-290, 2002, ISBN:3-540-00164-6.
Marc Stiegler and Mark Miller, Report Name: "A Capability Based Client: The Darpa Browser" Combex/Focused Research Topic 5/BAA-00-06-SNK, Nov. 18, 2002.
"A Virtual Machine Introspection Based Architecture for Intrusion Detection" by Tal Garfinkel and Mendel Rosenblum, Computer Science Department, Stanford University 2003.
"Terra: A Virtual Machine-Based Platform for Trusted Computing" by Tal Garfinkel, Ben Pfaff, Jim Chow, Dan Boneh and Mendel Rosenblum, Computer Science Department, Stanford University SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
Microsoft® Virtual PC 2004 Technical Overview by Jerry Honeycutt Published Nov. 2003 http://download.microsoft.com/download/c/f/b/cfb100a7-463d-4b86-ad62-064397178b4f/Virtual_PC_Technical_Overview.doc.
"Xen and the Art of Virtualization" by Paul Barham, Boris Dragovic, Keir Fraser, Steven Hand, Tim Harris, Alex Ho, Rolf Neugebaurey, Ian Pratt, Andrew Warfield University of Cambridge Computer Laboratory 15 JJ Thomson Avenue, Cambridge, UK, CB3 0FD SOSP'03, Oct. 19-22, 2003, Bolton Landing, New York, USA.
"Design of the EROS Trusted Window System" by Jonathan S. Shapiro, John Vanderburgh, Eric Northrup, Systems Research Laboratory Johns Hopkins University, and, David Chizmadia, Promia, Inc. 2004.
"Survey of System Virtualization Techniques." by Robert Rose Mar. 8, 2004.
White Paper: "Smart Phone Security Issues" by Luc Delpha and Maliha Rasheed, Cyber Risk Consulting Blackhat Briefings Europe May 2004.
T. Jaeger, A. D. Rubin, and A. Prakash. "Building systems that flexibly control downloaded executable content." In Proceedings of the 1996 USENIX Security Symposium, pp. 131-148, San Jose, CA., 1996.
Nimisha V. Mehta, Karen R. Sollins, "Expanding and Extending the Security Features of Java." Proceedings of the 7th USENIX Security Symposium, San Antonio, Texas, Jan. 26-29, 1998.
David A. Wagner, "Janus: an approach for confinement of untrusted applications." Master's thesis, University of California, Berkeley, 1999.. Also available, Technical Report CSD-99/1056, UC Berkeley, Computer Science Division. http://www.cs.berkeley.edu/~-daw/papers/janus-masters.ps.
Richard West and Jason Gloudon, "User-Level Sandboxing: a Safe and Efficient Mechanism for Extensibility", Technical Report, 2003-014, Boston University, Jun. 2003.
Shaya Potter, Jason Nieh, Dinesh Subhraveti, "Secure Isolation and Migration of Untrusted Legacy Applications." Columbia University Technical Report CUCS-005-04, Jan. 2004.
M. Schmid, F. Hill, A. Ghosh, "Protecting Data from Malicious Software." Annual Computer Security Applications Conference (ACSAC'02), Las Vegas, NV, Dec. 2002.
Valentin Razmov "Security in Untrusted Code Environments: Missing Pieces of the Puzzle." Dept. of Computer Science and Engineering, University of Washington, Mar. 30, 2002.
Sotiris loannidis and Steven M. Bellovin. "Sub-Operating Systems: A New Approach to Application Security." Technical Report MS-CIS-01-06, University of Pennsylvania, Feb. 2000.
Kevin Townsend; "Spyware, Adware, and Peer to Peer Networks; The Hidden Threat to Corporate Security" © Pest Patrol, 2003.
David Stang, PhD; "Beyond Viruses: Why Anti-Virus Software is No Longer Enough", © Pest Patrol 2002.
"The Web: Threat or Menace?" From "Firewalls and Internet Security: Repelling the Wiley Hacker", Second Edition, Addison-Wesley, ISBN 0-201-63466-X, 2003 ©.

* cited by examiner


100
110
1st memory data storage area
130
2nd memory data storage area
140
120
1st processor
2nd processor
190
Network interface
191
171
150
User interface
170
Video processor
151
180
160
195
User
Video display
Network

Fig. 1


200
210
User opens protected process
220
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
230
P1 passes user interface data to P2 when P2 window is selected or active
240
P2 generates video data for P2 process window(s) and passes video data to video processor
250
Video processor interleaves video data from all P1 and P2 processes
260
End

Fig. 2


310
300
User selects data file(s) to download via browser
320
Data downloaded from network to 2nd processor (P2) and written to 2nd memory (M2)
330
User directs 1st processor (P1) to move file from M2 to 1st memory (M1)
340
P2 performs malware scan on downloaded data file in M2, either in real time as data is transferred, or while data file resides in M2
350
Malware detected in data file ?
No
360
Move or copy data file to M1
Yes
370
Quarantine data file on M2, alert user
380
Delete, clean or quarantine data file on M2
390
End

Fig. 3



400
410
Malware detected or suspected in 2nd processor (P2), 2nd memory (M2) system
420
User instructs 1st processor (P1) to reload critical system files onto 2nd memory (M2) from protected image on 1st memory (M1)
430
P1 may scan all or part of the data contained on M2 for malware. P1 may delete or quarantine infected files on M2
440
P1 may delete all or part of the data contained on M2. P1 may reset P2 and flush RAM coupled to P2
450
Critical system files for P2 system are loaded onto M2 from M1
460
P2 system reinitializes (reboots) from clean critical system files
470
End


Fig. 4


510
User opens protected process
520
Critical system files for P2 system are loaded onto M2 from M1
530
Go to step 220 (Figure 2)

Fig. 5A


540
User closes protected process
550
P1 or P2 may initiate a malware scan on the P2-M2 system
560
P1 or P2 may delete all or part of the data contained on M2.
570
P1 may reset P2 and flush RAM coupled to P2
580
End

Fig. 5B


600
610
User initiates interactive network process via 2nd processor (P2)
620
P2 receives interactive network process status data from network connection
630
P2 informs 1st processor (P1) that interactive network process status data is available
640
P1 retrieves interactive network process status data from P2 and uses status data to run interactive network process and update video display
650
P1 passes updated interactive network process status data to F2
660
P2 sends updated interactive network process status data to network via network connection
670
End

Fig. 6


100
700
730
110
1st memory data storage area
2nd memory data storage area
740
120
190
1st processor
2nd processor
Network interface
150
770
User interface
Video processor
151
180
160
195
User
Video display
Network

Fig. 7


100
800
830
810
1st memory data storage area
2nd memory data storage area
820
1st processor
890
Network interface
150
840
2nd processor
Video processor
User interface
870
151
180
160
195
User
Video display
Network

Fig 8


100
910
1st memory
data storage area
930
950
2nd memory
data storage area
920
190
940
2nd processor
Network interface
960
1st processor
150
970
User interface
Video
processor
151
180
160
195
User
Video display
Network

Fig. 9


1000
1010
User opens protected process
1020
1st processor (P1) instructs 2nd processor (P2) to initiate protected process and open process window
1030
P1 encrypts user interface data and passes user interface data to P2 when P2 window is selected or active
1040
P2 generates video data for P2 process window(s) and passes video data to video processor
1050
Video processor decrypts user interface data and interleaves video data from all P1 and P2 processes
1060
P2 passes encrypted user interface data to network interface device
1070
Network interface device decrypts user interface data and passes decrypted user interface data to network
1080
End

Fig. 10

# SYSTEM AND METHOD FOR PROTECTING A COMPUTER SYSTEM FROM MALICIOUS SOFTWARE

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## *CROSS REFERENCE TO MULTIPLE REISSUE APPLICATIONS*

*This application is a reissue application of U.S. Pat. No. 7,484,247, entitled "System and Method for Protecting a Computer System from Malicious Software," issued on Jan. 27, 2009, and is related to reissue applications designated U.S. patent application Ser. No. 12/720,147 from U.S. Pat. No. 7,484,247, and U.S. patent application Ser. No. 12/720,207 from U.S. Pat. No. 7,484,247, both filed on Mar. 9, 2010, and is also related to reissue application designated U.S. patent application Ser. No. 12/854,149 (now, U.S. Pat. No. Re. 43,103) from U.S. Pat. No. 7,484,247, filed on Aug. 10, 2010 and a continuation application therefrom designated U.S. patent application Ser. No. 13/015,186, filed on Jan. 27, 2011. All of the above reissue applications are incorporated herein by reference.*

## TECHNICAL FIELD

The present invention relates generally to computer hardware and software, and more particularly to a system and method for protecting a computer system from malicious software.

## CROSS REFERENCE TO RELATED PATENTS AND APPLICATIONS

This application is related to the following U.S. patents and applications:

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| 5,826,013 | Polymorphic virus detection module. | Nachenberg |
| 5,978,917 | Detection and elimination of macro viruses. | Chi |
| 6,735,700 | Fast virus scanning using session stamping. | Flint, et al |
| 6,663,000 | Validating components of a malware scanner. | Muttik, et al. |
| 6,553,377 | System and process for maintaining a plurality of remote security applications using a modular framework in a distributed computing environment. | Eschelbeck, et al. |
| 6,216,112 | Method for software distribution and compensation with replenishable advertisements. | Fuller, et al. |
| 4,890,098 | Flexible window management on a computer display. | Dawes, et al. |
| 5,555,364 | Windowed computer display. | Goldstein |
| 5,666,030 | Multiple window generation in computer display. | Parson |
| 5,995,103 | Window grouping mechanism for creating, manipulating and displaying windows and window groups on a display screen of a computer system. | Ashe |
| 5,502,808 | Video graphics display system with adapter for display management based upon plural memory sources. | Goddard, et al. |



-continued

| U.S. patent or PUB Application Number | Title | Inventor(s) |
|---|---|---|
| 5,280,579 | Memory mapped interface between host computer and graphics system. | Nye |
| 5,918,039 | Method and apparatus for display of windowing application programs on a terminal. | Buswell, et al |
| 6,480,198 | Multi-function controller and method for a computer graphics display system. | Kang |
| 6,167,522 | Method and apparatus for providing security for servers executing application programs received via a network | Lee, et al. |
| 6,199,181 | Method and system for maintaining restricted operating environments for application programs or operating systems. | Rechef, et al. |
| 6,275,938 | Security enhancement for untrusted executable code. | Bond, et al. |
| 6,321,337 | Method and system for protecting operations of trusted internal networks. | Reshef, et al. |
| 6,351,816 | System and method for securing a program's execution in a network environment. | Mueller, et al. |
| 6,546,554 | Browser-independent and automatic apparatus and method for receiving, installing and launching applications from a browser on a client computer. | Schmidt, et al. |
| 6,658,573 | Protecting resources in a distributed computer system. | Bischof, et al |
| 6,507,904 | Executing isolated mode instructions in a secure system running in privilege rings. | Ellison, et al. |
| 6,633,963 | Controlling access to multiple memory zones in an isolated execution environment. | Ellison, et al. |
| 6,678,825 | Controlling access to multiple isolated memories in an isolated execution environment. | Ellison, et al. |
| 5,751,979 | Video hardware for protected, multiprocessing systems. | McCrory |
| 6,581,162 | Method for securely creating, storing and using encryption keys in a computer system. | Angelo, et al. |
| 6,134,661 | Computer network security device and method. | Topp |
| 6,578,140 | Personal computer having a master computer system and in internet computer system and monitoring a condition of said master and internet computer systems | Policard |
| PUB Application # 20040054588 | E-mail software and method and system for distributing advertisements to client devices that have such e-mail software installed thereon. | Jacobs, Paul E., et al. |
| PUB Application # 20040034794 | System and method for comprehensive general generic protection for computers against malicious programs that may steal information and/or cause damages | Mayer, Yaron; et al. |
| PUB Application # 20040006715 | System and method for providing security to a remote computer over a network browser interface. | Skrepetos, Nicholas C. |
| PUB Application # 20030177397 | Virus protection in an internet environment. | Samman, Ben |
| PUB Application # 20030097591 | System and method for protecting computer users from web sites hosting computer viruses. | Pham, Khai; et al. |
| PUB Application # 20030023857 | Malware infection suppression. | Hinchliffe, Alexander James; et al. |
| PUB Application # 20020066016 | Access control for computers. | Riordan, James |
| PUB Application # 20020174349 | Detecting malicious alteration of stored computer files. | Wolff, Daniel Joseph; et al. |

The above-listed U.S. Patents and U.S. patent applications are incorporated by reference as if reproduced herein in their entirety.

## BACKGROUND

The very popular and ubiquitous rise of the 'personal' computer system as an essential business tool and home appliance, together with the exponential growth of the Internet as a means of providing information flows across a wide variety of connected computing devices, has changed the way people live and work. Information in the form of data files and executable software programs regularly flows across the planetary wide system of interconnected computers and data storage devices.

Popular and ubiquitous computer hardware and software architectures have typically been designed to allow for open interconnection via, for example, the internet, a VPN, a LAN, or a WAN, with information often capable of being freely shared between the interconnected computers. This open interconnection architecture has contributed to the adoption and mainstream usage of these computers and the subsequent interconnection of vast networks of computers. This easy to use system has given rise to the explosive popularity of applications such as email, internet browsing, search engines, interactive gaming, instant messaging, and many, many more.

Although there are definite benefits to this open interconnection architecture, a lack of security against unwanted incursions into the computers main processing and non-volatile memory space has emerged as a significant problem. An aspect of some current computer architectures that has contributed to the security problem is that by default programs are typically allowed to interact with and/or alter other programs and data files, including critical operating system files, such as the windows registry, for example. Current open interconnection architectures have opened the door to a new class of unwanted malicious software generally known a malware. This malware is capable of infiltrating any computer system which is connected to a network of interconnected computer systems. Malware is comprised of, but not limited to, classes of software files known as viruses, worms, Trojan horses, browser hijackers, adware, spyware, pop-up windows, data miners, etc. Such malware attacks are capable of stealing data by sending user keystrokes or information stored on a user's computer back to a host, changing data or destroying data on personal computers and/or servers and/or other computerized devices, especially through the Internet. In the least, these items represent a nuisance that interferes with the smooth operation of the computer system, and in the extreme, can lead to the unauthorized disclosure of confidential information stored on the computer system, significant degradation of computer system performance, or the complete collapse of computer system function.

Malware has recently become much more sophisticated and much more difficult for users to deal with. Once resident on a computer system, many malware programs are designed to protect themselves from deletion. For example, some malware programs comprise a pair of programs running simultaneously, with each program monitoring the other for deletion. If one of the pair of programs is deleted, the other program installs a replacement within milliseconds. In another example, some malware will run as a Windows program with a .dlls extension, which Windows may not allow a user to delete while it is executing. Malware may also reset a user's browser home page, change browser settings, or hijack search requests and direct such requests to another page or search engine. Further, the malware is often designed to



defeat the user's attempts to reset the browser settings to their original values. In another example, some malware programs secretly record user input commands (such as keystrokes), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, credit account numbers, etc.

Many existing computers rely on a special set of instructions which define an operating system (O/S) in order to provide an interface for computer programs and computer components such as the computer's memory and central processing unit (CPU). Many current operating systems have a multi-tasking capability which allows multiple computer programs to run simultaneously, with each program not having to wait for termination of another in order to execute instructions. Multi-tasking O/S's allow programs to execute simultaneously by allowing programs to share resources with other programs. For example, an operating system running multiple programs executing at the same time allows the programs to share the computer's CPU time. Programs which run on the same system, even if not simultaneously with other programs, share space on the same nonvolatile memory storage medium. Programs which are executing simultaneously are presently able to place binaries and data in the same physical memory at the same time, limited to a certain degree by the O/S restrictions and policy, to the extent that these are properly implemented. Memory segments are shared by programs being serviced by the O/S, in the same manner. O/S resources, such as threads, process tables and memory segments, are shared by programs executing simultaneously as well.

While allowing programs to share resources has many benefits, there are resulting security related ramifications, particularly regarding malware programs. Security problems include allowing the malware program: to capitalize CPU time, leaving other programs with little or no CPU time; to read, forge, write, delete or otherwise corrupt files created by other programs; to read, forge, write, delete or otherwise corrupt executable files of other programs, including the O/S itself; and to read and write memory locations used by other programs to thus corrupt execution of those programs.

In the case of a computer connected to the Internet, the computer may run an O/S, with several user applications, together comprising a known and trusted set of programs, concurrently with an Internet browser, possibly requiring the execution of downloaded code, such as Java applets, or EXE/COM executables, with the latter programs possibly containing malware. Many security features and products are being built by software manufacturers and by O/S programmers to prevent malware infiltrations from taking place, and to ensure the correct level of isolation between programs. Among these are architectural solutions such as rings-of-protection in which different trust levels are assigned to memory portions and tasks, paging which includes mapping of logical memory into physical portions or pages, allowing different tasks to have different mapping, with the pages having different trust levels, and segmentation which involves mapping logical memory into logical portions or segments, each segment having its own trust level wherein each task may reference a different set of segments. Since the sharing capabilities using traditional operating systems are extensive, so are the security features. However, the more complex the security mechanism is, the more options a malware practitioner has to bypass the security and to hack or corrupt other programs or the O/S itself, sometimes using these very features that allow sharing and communication between programs to do so.

Further, regarding malware programs, for virtually every software security mechanism, a malware practitioner has

found a way to subvert, or hack around, the security system, allowing a malware program to cause harm to other programs in the shared environment. This includes every operating system and even the Java language, which was designed to create a standard interface, or sandbox, for Internet downloadable programs or applets.

Major vulnerabilities of existing computer systems lies in the architectures of the computer system and of the operating system itself. A typical multi-tasking O/S environment includes an O/S kernel loaded in the computer random access memory (RAM) at start-up of the computer. The O/S kernel is a minimal set of instructions which loads and off-loads resources and resource vectors into RAM as called upon by individual programs executing on the computer. Sometimes, when two or more executing programs require the same resource, such as printer output, for example, the O/S kernel leaves the resource loaded in RAM until all programs have finished with that resource. Other resources, such as disk read and write, are left in RAM while the operating system is running because such resources are more often used than others. The inherent problem with existing architectures is that resources, such as RAM, or a hard disk, are shared by programs simultaneously, giving a malware program a conduit to access and corrupt other programs, or the O/S itself through the shared resource. Furthermore, as many application programs are of a general nature, many features are enabled by default or by the O/S, thus in many cases bypassing the O/S security mechanism. Such is the case when a device driver or daemon is run by the O/S in kernel mode, which enables it unrestricted access to many if not all the resources.

The most common state-of the-art solutions for preventing malware infiltration are software based, such as blockers, sweepers and firewalls, for example, and hardware based solutions such as router/firewalls. Examples of software designed to counter malware are Norton Systems Works, distributed by the Symantec Corporation, Ad-aware, distributed by the Lavasoft Corporation of Sweeden, Spy Sweeper, distributed by the Webroot Software Corporation, Spyware Guard, distributed by Javacool Software LLC, among others. Currently there are a plethora of freeware, shareware and purchased software programs designed to counter malware by a variety of means. Such anti-malware programs are limited because they can only detect known malware that has already been identified (usually after the malware has already attacked one or more computers).

Network firewalls are typically based on packet filtering, which is limited in principle, since the rules determining which packets to accept and which to reject may contain subjective decisions based on trusting known sites or known applications. However, once security is breached for any reason (for example, due to a software or hardware error, a new piece of malware unrecognized by the anti-malware program or firewall, or an intended deception), a malicious application may take over the computer or server or possibly the entire network and create unlimited damages (directly or indirectly by opening the door to additional malicious applications).

The methods in the prior art are typically comprised of embedded software countermeasures that detect and filter unwanted intrusions in real time, or scan the computer system either at the direction of a user or as a scheduled event. Two problems arise from these methods. In the first instance, a comprehensive scan, detect, and elimination of malware from desired incoming data streams could significantly slow or preclude the interactive nature of many applications such a gaming, messaging, and browsing. In the second instance, newly implemented software screens may be quickly circumvented by malware practitioners who are determined to pass their files through the screen. Newly discovered malware leads to the development of additional screens, which lead to more malware, etc., thus creating an escalating cycle of measure, countermeasure. The basic flaw is that all incoming executable data files must be resident on the computers main processor to perform their desired function. Once resident on that processor, access may be gained to non-volatile memory and other basic computer system elements. Malware exploits this key architectural flaw to infiltrate and compromise computer systems.



The majority of these applications rely upon a scanning engine which searches suspect files for the presence of predetermined malware signatures. These signatures are held in a database which must be constantly updated to reflect the most recently identified malware. Typically, users regularly download replacement databases, either over the Internet, from a received e-mail, or from a CDROM or floppy disc. Users are also expected to update their software engines every so often in order to take advantage of new virus detection techniques (e.g. which may be required when a new strain of malware is detected).

Many of the aforementioned applications are also not effective against security holes, for example, in browsers or e-mail programs, or in the operating system itself. Security holes in critical applications are discovered quite often, and just keeping up with all the patches is cumbersome. Also, without proper generic protection against, for example, Trojan horses, even VPNs (Virtual Private Networks) and other forms of data encryption, including digital signatures, are not totally safe because information can be stolen before or below the encryption layer. Even personal firewalls are typically limited, because once a program is allowed to access the Internet, there are often few limitations on what files may be accessed and transmitted back to a host.

A major problem faced by computer users connected to a network is that the network interface program (a browser, for example) is resident on the same processor as the O/S and other trusted programs, and shares space on a common memory storage medium. Even with security designed into the O/S, malware practitioners have demonstrated great skill in circumventing software security measures to create malware capable of corrupting critical files on the shared memory storage medium. When this happens, users are often faced with a lengthy process of restoring their computer systems to the correct configuration, and often important files are simply lost because no backup exists.

Therefore, what is needed in the art is a means of isolating the network interface program from the main computer system such that the network interface program does not share a common memory storage area with other trusted programs. The network interface program may be advantageously given access to a separate, protected memory area, while being unable to initiate access to the main computer's memory storage area. With the network interface program constrained in this way, malware programs are rendered unable to automatically corrupt critical system and user files located on the main memory storage area. If a malware infection occurs, a user would be able to completely clean the malware infection from the computer using a variety of methods. A user could simply delete all files contained in the protected memory area, and restore them from an image residing on the main memory area, for example.

Other discussions of malware, its effects on computer systems, techniques used by malware practitioners to install malware, and techniques for detection and removal, may be found in the published literature, and in some of the patents

and applications previously incorporated by reference. Reference to malware may be found in a technical white paper entitled "Spyware, Adware, and Peer-to-Peer Networks: The Hidden Threat to Corporate Security.", by Kevin Townsend, © Pest Patrol Inc. 2003. Pest Patrol is a Carlisle; Pa. based developer of software security tools. Another reference is a technical white paper entitled "Beyond Viruses: Why antivirus software is no longer enough." by David Stang, PhD, © Pest Patrol Inc. 2002. Yet another reference is "The Web: Threat or Menace?" from "Firewalls and Internet Security: Repelling the Wily Hacker", Second Edition, Addison-Wesley. ISBN 0-201-63466-X, Copyright 2003. The foregoing references are incorporated by reference as if reproduced herein in their entirety.

## SUMMARY OF THE INVENTION

Embodiments of the present invention achieve technical advantages as a system and method for protecting a computer system from malicious software attacks via a network connection.

It is an object of the present invention to provide a computer system capable of preventing malware programs from automatically corrupting critical user and system files.

It is another object of the present invention to confine any malware infection that may occur to a separate, protected part of the computer system.

It is another object of the present invention to provide a user with an easy and comprehensive method of removing the malware infection, even if the user's anti-malware software is incapable of detecting and/or removing the malware infection.

It is another object of the present invention to provide a user with an easy and comprehensive method of restoring critical system and user files that may have been corrupted by a malware infection.

It is another object of the present invention to provide a computer system configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked.

It is another object of the present invention to provide a computer system capable of executing instructions in a first logical process, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space.

It is another object of the present invention to provide a computer system capable of executing instructions in a second logical process, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers.

It is another object of the present invention to provide a computer system capable of displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal

It is another object of the present invention to provide a computer system configured such that a malware program downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space.

It is another object of the present invention to provide a computer system configured such that corrupted data files residing on the second memory space may be restored from an image residing on the first memory space.



It is another object of the present invention to provide a computer system configured such that data files residing on the second memory space may be automatically deleted when the second logical process is terminated.

It is another object of the present invention to provide a computer system configured such that the second electronic data processor and the video processor are co-located on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.

These objects and other advantages are provided by a preferred embodiment of the present invention wherein a computer system comprising a first electronic data processor is communicatively coupled to a first memory space and to a second memory space, a second electronic data processor is communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device, a video processor is adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format, wherein the computer system is configured such that a malware program downloaded from the network and executing on the second electronic data processor is incapable of initiating access to the first memory space.

## *TERM DESCRIPTION*

*Advertisement(s)—This term is intended to broadly encompass any secondary content that is delivered or distributed to client devices in addition to the primary content, e.g., e-mail messages, which the software product instantiated by the client device is designed to receive, transmit, process, display, and/or utilize. For example, this term is intended to cover, without limitation, paid advertisements, community service messages, public service announcements, system information messages or announcements, cross-promo spots, artwork, and any other graphical, multimedia, audio, video, text, or other secondary digital content.*

*Client Device—This term is intended to broadly encompass any device that has digital data processing and output, e.g., display, capabilities, including, but not limited to, desktop computers, laptop computers, hand-held computers, notebook computers, Personal Digital Assistants (PDAs), palm-top computing devices, intelligent devices, information appliances, video game consoles, information kiosks, wired and wireless Personal Communications Systems (PCS) devices, smart phones, intelligent cellular telephones with built-in web browsers, intelligent remote controllers for cable, satellite, and/or terrestrial broadcast television, and any other device that has the requisite capabilities.*

*Information—This term is intended to broadly encompass any intelligible form of information which can be presented by a client device, i.e., an information client device, including, without limitation, text, documents, files, graphical objects, data objects, multimedia content, audio/sound files, video files, MPEG files, JPEG files, GIF files, PNG files, HTML documents, applications, formatted documents (e.g., word processor and/or spreadsheet documents or files), MP3 files, animations, photographs, and any other document, file, digital, or multimedia content that can be transmitted over a communications network such as the Internet.*

*E-Mail Messages—This term is intended to broadly encompass the e-mail message and any attachments thereto,*

*including, without limitation, text, documents, files, graphical objects, data objects, multimedia content, audio/sound files, video files, MPEG files, JPEG files, GIF files, PNG files, HTML documents, applications, formatted documents (e.g., word processor and/or spreadsheet documents or files), MP3 files, animations, photographs, and any other document, file, digital, or multimedia content that can be transmitted over a communications network such as the Internet.*

*Memory—This term is intended to broadly encompass any device capable of storing and/or incorporating computer readable code for instantiating the client device referred to immediately above. Thus, the term encompasses all types of recording medium, e.g., a CD-ROM, a disk drive (hard or soft), magnetic tape, and recording devices, e.g., memory devices including DRAM, SRAM, EEPROM, FRAM, and Flash memory. It should be noted that the term is intended to include any type of device which could be deemed persistent storage. To the extent that an Application Specific Integrated Circuit (ASIC) can be considered to incorporate instructions for instantiating a client device, an ASIC is also considered to be within the scope of the term "memory."*

*It is also know that the state of the art for advertising on personal computers (PCs) currently consists of Internet advertising that is displayed using World Wide Web (or Internet) browser software. As users browse the Internet, the various sites they visit display advertisements of a random nature or advertisements that are related to the content of the Web pages being browsed. Although this method of advertisement is growing rapidly it is not ideal in several respects. Web page based advertisements are easy to ignore. They generally occupy a small area of the computer monitor's display and are inconsistent in appearance with the material that hosts them. Internet users quickly adjust and typically ignore advertisements. To solve this problem, Web based advertisements are becoming more striking in appearance and are making use of animation. However, the advertisement's animation requires additional time when loading a Web page into a user's browser and ultimately detracts from the material that hosts the advertisement.*

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **2** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention;

FIG. **3** illustrates a preferred embodiment of an exemplary file download process according to the principles of the present invention;

FIG. **4** illustrates a preferred embodiment of an exemplary memory restoration process according to the principles of the present invention;

FIG. **5** illustrates a preferred embodiment of an exemplary automatic memory restoration and cleaning process according to the principles of the present invention;

FIG. **6** illustrates a preferred embodiment of an exemplary interactive network process flow according to the principles of the present invention;

FIG. **7** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **8** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **9** illustrates a preferred embodiment of an exemplary computer system according to the principles of the present invention;

FIG. **10** illustrates a preferred embodiment of an exemplary protected process flow according to the principles of the present invention.

## DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

The making and using of the presently preferred embodiments are discussed in detail below. It should be appreciated, however, that the present invention provides many applicable inventive concepts that can be embodied in a wide variety of specific contexts. The specific embodiments discussed are merely illustrative of specific ways to make and use the invention, and do not limit the scope of the invention.

A computer system, constructed in accordance with a preferred embodiment of the present invention, is illustrated in FIG. **1**. Computer system **100** may represent, for example, a personal computer (PC) system, a server, a portable computer, such as a notebook computer, or any data processing system, a personal digital assistant (PDA), a communication device such as a cell phone, or device that is capable of being connected to a network of one or more computers. System **100** comprises a first processor **120** (P**1**) communicatively coupled to a first memory and data storage area **110** (M**1**). P**1** **100** may comprise, for example, a microprocessor, such as a Pentium® 4 processor, manufactured by the Intel Corporation, or a Power PC® processor, manufactured by the IBM Corporation. Other electronic data processors manufactured by other companies, including but not limited to electronic data processors realized in Application Specific Integrated Circuits (ASICs) or in Field Programmable Gate Arrays (FPGAs), are within the spirit and scope of the present invention.

The first memory and data storage area **110** may comprise both volatile and nonvolatile memory devices, such as DRAMs and hard drives, respectively. Any memory structure and/or device capable of being communicatively coupled to P**1** may be advantageously used in the present invention. M**1** may be used to store, for example, critical operating system files, user data and applications, interim results of calculations, etc. The many uses of computer memory are well understood by those skilled in the art, and will not be discussed further here. One may refer to several of the aforementioned patents and applications incorporated by reference, in addition to other references, for a discussion of existing computer architectures and uses of computer memory. Also part of system **100** is user interface **150**, which may comprise, for example, a keyboard, mouse or other pointing device, microphone, pen pad, etc. Any device or method capable of inputting commands and/or data from a user **160** to computer system **100** may be used to advantage. A video processor **170** is used to format information for display and transmit the display information to a video display device **180**, which is viewed by user **160**. Video processor **170** typically includes an associated video memory area, which may be dedicated to the video processor, or shared with other resources. It is understood in the art that the video processor **170** may be part of processor P**1** **120**, in that it may be integrated onto the microprocessor chip. Video processor **170** may also comprise a processor IC located on a video graphics card, which is communicatively coupled to a computer motherboard. Additionally, video processor **170** may

comprise circuitry located on the computer motherboard. Further still, functions of video processor **170** may be split between the processor, motherboard, or separate video graphics card.

It is often desirable to connect computer system **100** to a network of one or more computer devices **195**, such as the Internet, a LAN, WAN, VPN, etc. This connection may be accomplished via network interface device **190**, which may comprise, for example, a telephone modem, a cable modem, a DSL line, a router, gateway, hub, etc. Any device capable of interfacing with the network **195** may be used, via a wired connection, a wireless connection, or an optical connection, for example. Network interface device **190** may connect to network **195** through one or more additional network interface devices (not shown). For example, network interface device **190** may comprise a gateway or router, connected to a cable modem, with the cable modem connected to network **195**. Of course, other configurations are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, network **195** is isolated from the first processor **120** and memory **110** by a second processor **140** (P**2**). Second processor **140** may comprise any electronic data processor, such as the devices previously described as applicable to first processor **120**. Communicatively coupled to P**2 140** is second memory and data storage area **130** (M**2**), which may comprise any memory device or devices, such as the devices previously described as applicable to first memory **110**.

The architecture of computer system **100** is designed to be capable of protecting memory **110** from malware initiated intrusions, and preventing malware from initiating unwanted processes on first processor **120**. This is accomplished by using second processor **140** to isolate **110** and **120** from network **195**. In a preferred embodiment, P**2 140** is communicatively coupled to memory storage area M**2 130**, and may be configured such that P**2 140** is incapable of initiating access to memory storage area M**1 110**. For example, P**2 140** may be capable of accessing memory storage area M**1 110** with the strict permission of user **160**, either through a real time interaction or via stored configuration or commands. Such a configuration may be desirable in a multi-core or multi processor system, where user **160** may wish to use P**2 140** in either a protected mode or an unprotected mode, depending on the application. However, user **160** is capable of denying P**2 140** the capability of initiating access to memory storage area M**1 110** without the user's permission. P**1 120** is communicatively coupled to both memory areas M**1 110** and M**2 130**, thereby enabling P**1 120** to access data downloaded from the network **195**. In the presently described embodiment, any malware that has intruded the **130-140** system is thus confined to the **130-140** system, and may be configured to be incapable of automatically corrupting data contained on M**1 110**, or of automatically initiating an unwanted process on P**1 120**.

This and other features of the present teachings may be illustrated with reference to the example process flow **200** of FIG. **2**. Computer user **160** wishes to connect to network **195** via for example, a browser program such as Internet Explorer or Netscape Navigator. Of course, other methods of connecting to network **195** may be used. User **160** inputs commands to open a protected process (e.g. a browser program in this example) at step **210**. At step **220**, 1st processor **120** instructs 2nd processor **140** to initiate the protected process and open one or more process windows. Second processor **140**, in conjunction with memory **130**, then interacts with the network **195** via network interface device **190**, receiving and transmitting the data necessary to execute the desired protected process, such as browsing the internet or communication via e-mail. Second processor **140** and memory **130** act as a separate computer system, interacting with network **195** while isolating network **195** from the first processor **120** and memory **110**. Memory **130** may store critical application and system files required by second processor **140** to execute the desired tasks. Memory **130** also stores data necessary to carry out the desired protected process. In the example of FIG. **2**, first processor **120** receives user interface data from user **160**, and passes user interface data to second processor **140** when the protected process window is selected or active, illustrated at step **230**. User interface data, such as keystrokes for example, may be advantageously encrypted by P**1 120** before passing the data to P**2 140**, with network interface device **190** possibly decrypting the data prior to transmitting the data to network **195**. Encrypting, for example keystroke data, may disrupt the efforts of spyware programs designed to store user keystrokes for later transmission to a host computer. Second processor **140** generates video data for the protected process window(s) and passes the video data to video processor **170**, for eventual display on video display **180**, shown at step **240**. Video processor **170** then interleaves the video data from all processes being executed by first processor **120** and second processor **140**, at step **250**. While there are many applicable methods for displaying video data from multiple sources, one such method was described in U.S. Pat. No. 5,751,979, entitled "Video hardware for protected, multiprocessing systems", previously incorporated by reference.



In accordance with a preferred embodiment of the present invention, if any malware is downloaded from network **195**, it is stored in memory **130**, and/or run as a process on second processor **140**. In the configuration of computer system **100**, any downloaded malware is rendered incapable of self initiating access to memory **110** or first processor **120**, because second processor **140** is rendered incapable of initiating access to **110** and **120** without a direct or stored command from user **160**. Any malware infection is thus confined. If a malware attack corrupts files and/or disrupts the operation of the **130-140** system, the user may easily shut down the corrupted process and restore the corrupted files from a protected image stored on memory **110**, for example.

In accordance with a preferred embodiment of the present invention, the operating system controlling the **110-120** system may be different from an operating system controlling the protected **130-140** system. Conversely, a common operating system may control both the **110-120** system and the protected **130-140** system.

A user **160** may find it desirable to transfer files from the protected **130-140** system to the **110-120** system. User **160** may find it necessary, for example, to transfer an attachment from an e-mail message stored on memory **130** to the **110-120** system for further processing, modification, etc. In this case, the computer system **100** may go through a process whereby a file or other data is transferred from the **130-140** system to the **110-120** system, exemplified by the process **300** illustrated in FIG. **3**.

In accordance with a preferred embodiment of the present invention, at step **310**, user **160** selects one or more data files to download from network **195**. The desired data is downloaded to the **130-140** system at step **320**. The user **160** then directs computer system **100** to move the desired file(s) from the **130-140** system to the **110-120** system at step **330**. P**1 120** may then perform a malware scan on the desired files, either in real time as the data is being transferred, or while the data still resides in M**2 130** (step **340**). Alternatively, P**2 140** may perform the malware scan. At step **350**, processor P**2 140** (or P**1 120**) determines if malware has been detected in the

desired file(s), and thus P**1** **120** makes a decision. If no malware is detected, the file(s) are moved or copied onto M**2** **110** at step **360**. If malware is detected, the data file(s) are quarantined on M**2** **130**, and the data file(s), if transferred to M**1** **100**, are erased or quarantined. Once malware is detected, the user **160** may be alerted of the detection (step **370**). Either as a result of user input or stored configuration commands, the infected file(s) are deleted, cleaned, or quarantined on M**2** **130**, at step **380**.

The user **160** would of course understand the dangers inherent in transferring downloaded files from the **130-140** system to the **110-120** system. For example, the user's anti-malware software may not be up to date, or may simply be unable to detect certain types of malware. Also, the malware itself may be so new that the user's anti-malware definitions have not been updated as yet. Therefore the user may wish to keep the files on the **130-140** system for some period of time. Consequently, it may be desirable to have resident on the **130-140** system a variety of application software such as readers, thereby allowing the user to examine the files without risking transferring the files to the **110-120** system. These reader programs, such as Adobe Acrobat Reader, by the Adobe Systems Corporation, or Visio reader, by the Microsoft Corporation, are typically subset application programs of the full featured application programs, and may thus require far less memory space than the full application. Additionally, software companies often distribute the reader programs for free (or a nominal fee), thereby providing advertising for the full featured application in the hopes that it will be eventually purchased by the user. This reader application may be opened and executed on the **130-140** system in a manner similar to the process described in FIG. **2**. Of course, a user **160** may also load a full application into the **130-140** system, enabling processing and modification of a downloaded file fully in the protected space, without risking a transfer of the file to the **110-120** system.

In the event the **130-140** system becomes infected with malware, the user **160** may wish to clean the **130-140** system. This cleaning may be accomplished by running an anti-malware application on the **130-140** system. However, if the infection is too severe for the anti-malware software to clean, or if the malware is undetectable by the user's anti-malware software, the user may wish to restore critical system files (or other user data files) for the **130-140** system from a protected image stored on M**1** **100**, for example. It is of course understood that the critical system file image may be restored from another device, such as a removable drive or a CD, for example. The user may however consider it more convenient to restore the critical system files from an image on M**1** **100**.

In accordance with a preferred embodiment of the present invention, an exemplary process for restoring M**2** **130** from M**1** **110** is illustrated by process **400** in FIG. **4**. At step **410**, malware is detected or suspected to be infecting the **130-140** system. The user instructs P**1** **120** to reload critical system files onto M**2** **130** from a protected image on M**1** **110**, at step **420**. Depending on the severity of the infection, P**1** **120** may scan all or part of the data contained on M**2** **130** for malware, and may scan all processes currently running on P**2** **140**. The scan may be initiated by direct instructions from the user, or by stored configuration commands, for example (step **430**). P**1** **120** may delete all or part of the data contained on M**2**. P**1** **120** may also reset P**2** **140** and/or delete the contents of any RAM communicatively coupled to P**2** **140** (step **440**). Once the **130-140** system has been adequately cleaned, clean critical system files are loaded onto M**2** **130** from any of the sources previously mentioned, preferably an image stored on M**1** **110** (step **450**). The **130-140** may now be rebooted and/or



reinitialized from the clean critical system files. In an extreme case where the malware resists deletion by the operating system, the user may elect to do a low level format on the M**1** **110** memory in order to ensure that the malware infection has been cleaned.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically reinitialized from clean critical system files when a protected process window is opened. In this way, the new protected process is much less likely to be affected by an infection from a previous protected process session. Of course, a user may have a plurality of protected processes open and running during a protected process session. It may only be necessary to automatically reinitialize from clean critical system files when the first protected process is opened during a session. Subsequent protected processes may not require automatic re-initialization from clean critical system files. An exemplary automatic re-initialization from clean critical system files is illustrated by steps **510**, **520** and **530** in FIG. **5**a. Additionally, processes running on P**2** **140** may be automatically scanned and compared with an allowed process list, particularly as a protected process is started up. If any process is detected which is not on the allowed list, the user may be alerted that a possible malware infection has occurred. A user may then choose to scan or clean the system, or inspect the unknown process to determine if the process will be allowed to continue to execute. A user may also update the list of allowed processes from time to time as new, legitimate processes are added, for example, by a browser software update.

In accordance with a preferred embodiment of the present invention, a user **160** may consider it advantageous for the **130-140** system to be automatically cleaned when a protected process window is closed. In this way, any detected or undetected malware infections are much less likely to affect a future protected process session. It may only be necessary to automatically clean the **130-140** system when the last protected process is closed during a session. An exemplary automatic cleaning process is illustrated by steps **540**, **550**, **560**, **570** and **580** in FIG. **5**b. The memory M**2** **130** and processor P**2** **140** may be automatically scanned for malware infections as the protected process session closes. Infected files may be deleted or quarantined automatically. Additionally, there may be a variety of files that a user may wish to have automatically cleaned or deleted upon closing a protected process session. For example, temporary internet files, cookies, browser plugins, etc., may be deleted or scanned for malware automatically. A user may also wish to have websites that contributed to a malware infection noted, and may wish to place the offending websites in a block list, such that the offending websites cannot be accessed in the future without the user specifically authorizing access. As part of the malware scan, the malware scanner may automatically log the offending website(s), and block future access. Also, the P**2** **140** processor and any associated non-volatile memory may be reset and/or erased as the protected process session is closed. The exemplary automatic cleaning process illustrated in FIG. **5**b may therefore reduce the risk of a malware infection being carried over to a future protected process session.

Interactive network processes such as interactive gaming have become very popular in recent years. In current interactive gaming processes, a user may log onto a game host located on network **195**, or connect to other computers whose users wish to participate in the game. Computer games, such as Quake 3. Arena, by Id Software Incorporated, or Call of Duty, by Activision Incorporated, are just two examples of the plethora of games available that may be played interactively

over a network. The user's computer system typically provides the bulk of the processing power and video graphics generation required to display the often fast moving and richly detailed three dimensional game environments. Information about the current and new state of the game is exchanged between various users' computer systems, often in real time. With this type of process, a relatively modest amount of data is required to be exchanged between users, or a user and the host, with the bulk of the processing, data manipulation, and graphics generation being handled by the user's local machine. However, this open network connection may become a conduit for malware practitioners to exploit, allowing malware to be downloaded onto a user's computer during a gaming session, often without the user being aware of the malware transfer. It would be advantageous, therefore, for a computer system to be much less susceptible to malware attacks during gaming sessions.

In accordance with a preferred embodiment of the present invention, an exemplary process flow **600**, illustrated in FIG. **6**, allows an interactive network process, such as online gaming, to be carried out on computer system **100**. A user initiates an interactive network process via 2nd processor P**2 140** (step **610**). P**2 140** receives interactive network process status data from network connection (step **620**). P**2 140** informs 1st processor P**1 120** that interactive network process status data is available (step **630**). P**1 120** retrieves interactive network process status data from P**2 140** and uses the status data to update the interactive network process and update video display (step **640**). P**1 120** then passes the updated interactive network process status data to P**2 140** (step **650**). P**2 140** then sends the updated interactive network process status data to the network via network connection **195** (step **660**). The exemplary process **600**, or a process functionally equivalent, is carried out continuously as long as the interactive process is running.

By using exemplary process **600** (or an equivalent), computer system **100** is capable of actively deciding what data to download and use, and what data to discard or scan for malware. The game status data is buffered prior to loading it onto the **110-120** system. The **110-120** system may be advantageously configured to only accept game status information in the proper format, thereby minimizing the chance that a malware practitioner could deceptively load malware onto the **110-120** system.

Additionally, computer system **100** could be configured such that system **130-140** is powerful enough to process the interactive network process without exchanging information with the **110-120** system. Such a configuration may be more secure, as a conduit between the **110-120** system and the **130-140** system may not be necessarily opened. The **130-140** system may contain all the necessary files to facilitate the interactive network process. Higher end computers, workstations, and servers often contain dual (or more) processors, such as the Mac G5, manufactured by the Apple Computer Corporation, or a single physical processor with a multiple processor core. Often, the processors in these multi-processor machines are of equal or comparable processing power. In such a configuration, one processor may be dedicated to performing functions equivalent to those described for P**1 120**, with a second processor performing the functions equivalent to those described for P**2 140**. A computer system **100** employing multiple processors may be advantageously configured such that one of the processors is dedicated to protected processes only when a network process is active. When a user is not accessing a network, the multiple processors in a computer system may be dedicated to other processes, such as performing complex calculations or simulations, or running complex non-network interactive gaming processes, for example. Alternatively, the computer system **100** may be configured such that the **110-120** system simply transfers required files to the video processor **170** or the **130-140** system at the appropriate time to facilitate the interactive network process. The **110-120** system could be commanded to retrieve and transfer the files at the command of the video processor, or at the command of the **130-140** system, or a combination of both.

In accordance with embodiments of the present invention, computer system **100** may be configured in a variety of ways, while still remaining within the spirit and scope of the present teachings. One such exemplary embodiment is illustrated in FIG. **7**. Subsystem **700** of computer system **100** comprises a video processor **770**, a second processor **740**, and a second memory data storage area **730**. The demarcation line illustrated by subsystem **700** may be either physical or logical. For example, subsystem **700** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of the teachings of the present invention. Subsystem **700** may be plugged into the main motherboard of an existing computer, for example. The motherboard connector may be already communicatively coupled to the **110-120** system, thereby facilitating the system upgrade. The network interface device **190** may be connected directly to subsystem **700**, or network interface device **190** could be integrated as part of subsystem **700**. Memory data storage area **730** may comprise any of the volatile and/or non-volatile memory types previously described, or any combination thereof, or any suitable memory storage medium, for example. Alternatively, subsystem **700** may be located on the motherboard, as opposed to an add-on card. Further still, portions of subsystem **700**, such as video processor **770**, and/or second processor **740**, for example, may be integrated together with P**1 120**. It is understood that functions described herein may be configured in a wide variety of ways, without departing from the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **8**. Subsystem **800** of computer system **100** comprises a video processor **870**, a second processor **840**, and a second memory data storage area **830**. The demarcation line illustrated by subsystem **800** may be either physical or logical. For example, subsystem **800** may comprise an add-on card, such as a high end video card, or a video/network card. If configured in this exemplary manner, a user could upgrade an existing computer system to take advantage of features of the present invention. In the exemplary embodiment of FIG. **8**, second processor **840** and video processor **870** are integrated together, perhaps on a common integrated circuit. Such a configuration may help to reduce the cost of subsystem **800**, and/or improve the performance. Additionally, a circuit designer may find it advantageous to integrate **840** and **870** together to facilitate communication between the functions. It is understood that such an integration of functions may create a device in which an external user may find it difficult to distinguish where the function of **870** ends and the function of **840** begins, and vice versa. Such a device, however, would remain within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, an alternate configuration for computer system **100** is illustrated in FIG. **9**. Computer system **100** comprises a video processor **970**, processor **960**, and a memory data storage area **950**. Processor **960** may further comprise multiple processor cores, illustrated by 1st processor **920** and 2nd processor **940**. It is understood that processor **960** may contain

more than 2 processor cores. Microprocessors manufactured with multiple processor cores are becoming common in the industry, and such multi-core processors may be particularly advantageous when used in accordance with the present teachings. Memory data storage area **950** may further comprise 1st memory data storage area **910** and 2nd memory data storage area **930**. Memory areas **910** and **930** may comprise, for example, different partitions on a single hard drive, and/or different address ranges in a RAM bank.

Referring again to FIG. **9**, the functions carried out by processors **920** and **940** may comprise separate, secure logical processes executing on the same physical processor. For example, a first logical process may comprise executing instructions necessary to carry out the functions of an operating system, or the first logical process may comprise executing instructions necessary to carry out the functions of a first computer program, including but not limited to a word processor. A second logical process may comprise executing instructions necessary to carry out the functions of a web browser program, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example. A computer system **100** constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P**2 140** (FIG. **1**) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M**1 110** or another logical process performing the functions of P**1 120**. Additionally, memory areas **910** and **930** may comprise separate, isolated memory zones within a common physical memory space, such as separate partitions within the same hard drive, for example.

Some malware programs are designed to secretly record user input commands (such as keystrokes, for example), then send the information back to a host computer. This type of malware is capable of stealing important user information, such as passwords, bank account numbers, social security numbers, driver's license numbers, credit account numbers, etc. Theft of such personal information could result in the theft of actual assets (money or securities, etc.) or perhaps used for identity theft, among other malicious intents. Clearly, a computer system capable of ensuring the protection of such sensitive information would be desirable.

In accordance with an embodiment of the present invention, a computer system is configured such that attempts by malware to record and report data entry by the computer user via input devices such as keyboards, mouse clicks, microphones, or any other data input devices are effectively blocked. Encryption of user input data, such as keystrokes, is an effective means of protecting such data from theft by malware. Specific techniques used for data encryption and decryption are well known in the art, and need not be discussed further here. There are many examples in the art that may be examined to better understand various encryption/decryption techniques and the use of encryption/decryption in computer systems. Among these are U.S. Pat. No. 6,581,162 entitled "Method for securely creating, storing and using encryption keys in a computer system." issued to Angelo, et al., and U.S. Pat. No. 6,134,661 entitled "Computer network security device and method." Issued to Topp. The aforementioned patents have been previously incorporated by reference.

In accordance with the present teachings, a method of operating a computer system involving data encryption is



described. In step **1010**, a user opens a protected process where some level of data encryption is desired, for example, the encryption of sensitive user interface data or user files. Other data may be encrypted as desired. At step **1020**, processor P**1 120** instructs processor P**2 140** to initiate a protected process and open a process window. P**1 120** encrypts the sensitive data and passes the user interface data to P**2 140** when a P**2 140** window is selected or active (step **1030**). P**2 140** generates video data for the P**2 140** process window(s) and passes the video data to video processor **170** (step **1040**). Video processor **170** decrypts the sensitive data and interleaves the video data from all P**1** and P**2** processes (step **1050**). P**2 140** passes the encrypted sensitive data to network interface device **190** (step **1060**). Network interface device **190** decrypts the sensitive data and passes the decrypted sensitive data to network **195**. Of course, other methods of operating a computer system in which data is encrypted prior to being passed to P**2 140**, and decrypted after leaving the control of P**2 140**, are within the spirit and scope of the present teachings.

In accordance with a preferred embodiment of the present invention, data desired to be protected is encrypted prior to sending the data to processor P**2 140**, which may be running one or more malware processes. Processor P**2 140** does not have visibility to the decryption keys, and is therefore unable to decrypt the data. Data may be decrypted by network interface device **190** prior to forwarding the data on to network **195**. Conversely, encrypted data may be sent directly over the network for decryption by another computer system, including, for example, an interne banking host computer. Decryption keys may be passed between P**1 120** and network interface device **190** via a communication link **191**. Video processor **170** may decrypt the data prior to displaying the data on video display **180**, with decryption keys possibly passed between P**1 120** and video processor **170** via a communication link **171**. Conversely, data may be passed directly to video processor **170** via a communication link **151**.

A user **160** may wish to encrypt just a portion of the data destined for the network, such as passwords, credit card numbers, etc. Conversely, a user may wish to encrypt large blocks of data, such as e-mails or large application files containing sensitive text and/or graphics. Instructions may be passed to network interface device **190** directing **190** to decrypt one or more specific data blocks prior to sending the data blocks to network **195**. Conversely, instructions may be passed to network interface device **190** directing **190** to pass one or more specific data blocks to network **195** without decryption.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is therefore intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**[**1. A method of operating a computer system having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising the steps of:

executing instructions in a first logical process within the common operating system using the first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space and a second memory space;

executing instructions in a second logical process within the common operating system using the second elec-

tronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.**]**

**[2**. The method of claim **1** wherein the first memory space and the second memory space comprise separate regions of a common memory space.**]**

**[3**. The method of claim **1** wherein the second logical process is selected from the group consisting of; an electronic mail process, an instant messaging process, an internet browser process, an interactive gaming process, a virtual private network (VPN) process, and a reader application process.**]**

**[4**. The method of claim **1** wherein the first logical process receives user interface data, and passes the user interface data to the second logical process.**]**

**[5**. The method of claim **1** wherein the first and second electronic data processors are part of a multi-core electronic data processor.**]**

**[6**. The method of claim **1** and further comprising the step of restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.**]**

**[7**. The method of claim **1** and further comprising the step of automatically deleting at least one data file residing on the second memory space when the second logical process is terminated.**]**

**[8**. The method of claim **1** and further comprising the steps of:

encrypting data with the first logical process;

transferring the encrypted data from the first logical process to the second logical process;

transferring the encrypted data from the second logical process to the network interface device.**]**

**[9**. The method of claim **8** and further comprising the steps of:

decrypting the data with the network interface device;

transferring the decrypted data from the network interface device to the network.**]**

**[10**. A multi-processor computer system using a common operating system, comprising:

a first electronic data processor capable of executing instructions using the common operating system and communicatively coupled to a first memory space and a second memory space;

a second electronic data processor capable of executing instructions using the common operating system and communicatively coupled to the second memory space and to a network interface device, wherein the second electronic data processor is capable of exchanging data across a network of one or more computers via the network interface device;

a video processor adapted to combine video data from the first and second electronic data processors and transmit the combined video data to a display terminal for displaying the combined video data in a windowed format;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing on the second electronic data processor.**]**

**[11**. The computer system of claim **10** wherein the first memory space and the second memory space comprise separate regions of a common memory space.**]**

**[12**. The computer system of claim **10** wherein the first and second electronic data processors are part of a dual processor computer system.**]**

**[13**. The computer system of claim **10** wherein the second electronic data processor and the video processor are colocated on a circuit card, the circuit card being communicatively coupled to the first electronic data processor.**]**

**[14**. The computer system of claim **10** wherein the computer system is configured such that the first electronic data processor is protected from executing instructions initiated by a malware process downloaded from the network and executing on the second electronic data processor.**]**

**[15**. A multi-processor computer system using a common operating system, comprising:

at least a first and second electronic data processor capable of executing instructions using the common operating system;

at least a first and second memory space;

a video processor;

wherein the first and second electronic data processors, first and second memory space, and video processor are configured for performing the steps of:

executing instructions in a first logical process with the first electronic data processor, wherein the first logical process is executing within the common operating system and is capable of accessing data contained in the first memory space and the second memory space;

executing instructions in a second logical process with the second electronic data processor, wherein the second logical process is executing within the common operating system and is capable of accessing data contained in the second memory space, the second logical process being further capable of exchanging data across a network of one or more computers;

displaying, in a windowed format on a display terminal, data from the first logical process and the second logical process, wherein the video processor is adapted to combine data from the first and second logical processes and transmit the combined data to the display terminal;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second logical process.**]**

**[16**. The computer system of claim **15** wherein the computer system is further configured such that the first logical process is protected from executing instructions initiated by a malware process downloaded from the network and executing as part of the second logical process.**]**

**[17**. The computer system of claim **15** and further comprising: at least one network interface device capable of exchanging data with both the second logical process and with the network.**]**

**[18**. The computer system of claim **17** wherein the network interface device is capable of decrypting data received from

the second logical process and transmitting the decrypted data to the network while preventing the second logical process from accessing the decrypted data.]

[**19**. The computer system of claim **15** wherein the at least one electronic data processor is selected from the group consisting of: a multi-core electronic data processor; dual electronic data processors; and multiple electronic data processors.]

[**20**. The computer system of claim **15** and further configured for performing the step of: restoring at least one corrupted data file residing on the second memory space from an image residing on the first memory space.]

*21. A method of generating data for display of website content on a portable computer employing a common operating system in a secure manner, comprising:*

*distributing website content, via a network of one or more computers, to the portable computer capable of executing a secure web browser process, wherein the website content potentially contains malware;*

*wherein the secure web browser process is capable of executing on at least one electronic data processor and comprises a first web browser process and at least one second protected web browser process, the first web browser process and the at least one second protected web browser process being configured to access the website content via the network of one or more computers, the at least one electronic data processor capable of being communicatively coupled to a first memory space and to a second protected memory space, the first memory space having at least one system file, the secure web browser process configured for:*

*executing instructions in the first web browser process, wherein the first web browser process is configured to access data contained in the first memory space and to initialize the at least one second protected web browser process;*

*passing data from the first web browser process to the at least one second protected web browser process;*

*executing instructions in the at least one second protected web browser process, wherein the at least one second protected web browser process is configured to access data contained in the second protected memory space but is denied access to the first memory space;*

*generating data for display of the distributed website content potentially containing malware;*

*wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by the website content potentially containing malware executing in the at least one second protected web browser process.*

*22. The method of claim 21 wherein the first web browser process is configured to directly exchange data with a network interface device and with the at least one second protected web browser process.*

*23. The method of claim 22 wherein the first web browser process is configured to pass website content downloaded from the network to the at least one second protected web browser process.*

*24. The method of claim 21 wherein the at least one second protected web browser process is configured to directly exchange data with a network interface device and with the first web browser process.*

*25. The method of claim 21 wherein the website content potentially containing malware comprises internet advertising.*



*26. The method of claim 25 wherein the internet advertising contains digital content selected from the group consisting of:*

*graphical content;*

*multimedia content; and*

*video content.*

*27. The method of claim 21 further comprising:*

*closing the at least one second protected web browser process; and*

*upon closing the at least one second protected web browser process, automatically deleting at least one file selected from the group consisting of:*

*a temporary internet file;*

*a cookie; and*

*a file corrupted by malware.*

*28. The method of claim 21 further comprising the first web browser process initializing a plurality of second protected web browser processes, wherein each of the plurality of second protected web browser processes comprises a separate second protected memory space, and each of the plurality of second protected web browser processes are disallowed from initiating access to another one of the plurality of second protected web browser processes.*

*29. The method of claim 21 wherein the at least one second protected web browser process is initialized from clean system files.*

*30. The method of claim 21 further comprising:*

*executing instructions from the first web browser process on a first core of a multi-core processor; and*

*executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.*

*31. The method of claim 21 wherein the data for display of the distributed website content potentially containing malware is rendered using a video processor.*

*32. The method of claim 21 wherein at least one file corrupted by a malware process is capable of being restored from a protected image.*

*33. The method of claim 32 wherein the protected image is stored at a location selected from the group consisting of:*

*a removable drive;*

*the first memory space; and*

*a partition on a memory device.*

*34. The method of claim 21 wherein the at least one second protected web browser process is capable of running a process selected from the group consisting of:*

*an electronic mail process;*

*an instant messaging process;*

*a gaming process; and*

*a reader application process.*

*35. The method of claim 21 wherein the portable computer comprises an intelligent cellular telephone with a built-in secure web browser.*

*36. A method of operating a portable computer based system employing a common operating system and configured with a first memory space and a second protected memory space and at least one electronic data processor, comprising:*

*storing at least one system file within the first memory space;*

*downloading website content potentially containing malware from a network of one or more computers using a secure web browser process, wherein the secure web browser process is configured to execute on the at least one electronic data processor, and comprises a first web browser process and at least one second protected web browser process, the first web browser process and the at*

*least one second protected web browser process being configured to access the website content via the network of one or more computers;*

*executing instructions in the first web browser process, wherein the first web browser process is configured to access data contained in the first memory space and to initialize the at least one second protected web browser process;*

*passing data from the first web browser process to the at least one second protected web browser process;*

*executing instructions in the at least one second protected web browser process, wherein the at least one second protected web browser process is configured to access data contained in the second protected memory space and to execute instructions from the downloaded website content, wherein the downloaded website content is capable of accessing the second protected memory space but is denied access to the first memory space;*

*displaying digital content generated by the secure web browser process;*

*wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by website content potentially containing malware downloaded from the network and executing as part of the at least one second protected web browser process.*

*37. The method of claim 36 wherein the first web browser process is configured to directly exchange data with a network interface device and with the at least one second protected web browser process.*

*38. The method of claim 37 wherein the first web browser process is configured to pass website content downloaded from the network to the at least one second protected web browser process.*

*39. The method of claim 36 wherein the at least one second protected web browser process is configured to directly exchange data with a network interface device and with the first web browser process.*

*40. The method of claim 36 wherein the website content potentially containing malware comprises internet advertising.*

*41. The method of claim 40 wherein the internet advertising contains digital content selected from the group consisting of:*

*graphical content;*

*multimedia content; and*

*video content.*

*42. The method of claim 40 wherein the internet advertising is downloaded from a search engine website.*

*43. The method of claim 36 further comprising:*

*closing the at least one second protected web browser process;*

*upon closing the at least one second protected web browser process, automatically deleting at least one file selected from the group consisting of:*

*a temporary internet file;*

*a cookie; and*

*a file corrupted by malware.*

*44. The method of claim 36 further comprising blocking attempts by malware to record data entry by a computer user.*

*45. The method of claim 36 further comprising the first web browser process opening a plurality of second protected web browser processes, wherein each of the plurality of second protected web browser processes comprises a separate second protected memory space, and each of the plurality of second protected web browser processes are disallowed from initiating access to another one of the plurality of second protected web browser processes.*



*46. The method of claim 36 wherein the at least one second protected web browser process is initialized from clean system files.*

*47. The method of claim 36 wherein the at least one second protected web browser process is capable of accessing the first memory space only with the permission of a computer user.*

*48. The method of claim 36 wherein at least one user file residing on the first memory space is protected from being read by a malware process downloaded from the network and executing as part of the at least one second protected web browser process.*

*49. The method of claim 36 further comprising:*

*executing instructions from the first web browser process on a first core of a multi-core processor; and*

*executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.*

*50. The method of claim 36 wherein the digital content is rendered using a video processor.*

*51. The method of claim 36 wherein the at least one second protected web browser process is capable of running a process selected from the group consisting of:*

*an electronic mail process;*

*an instant messaging process;*

*a gaming process; and*

*a reader application process.*

*52. The method of claim 36 wherein the portable computer based system comprises an intelligent cellular telephone with a built-in secure web browser.*

*53. A portable computer based system employing a common operating system for protecting critical files from malicious software attacks via a network of one or more computers, comprising:*

*a first web browser process capable of executing instructions using at least one electronic data processor and further capable of accessing a first memory space, wherein the first memory space contains at least one critical file; and*

*at least one second protected web browser process capable of executing instructions using the at least one electronic data processor and further capable of accessing a second protected memory space;*

*the first web browser process configured to:*

*accept data entry from a computer user;*

*execute instructions to access website content from the network of one or more computers;*

*initialize the at least one second protected web browser process; and*

*pass data to the at least one second protected web browser process;*

*the at least one second protected web browser process configured to:*

*execute instructions for the display of the website content downloaded from the network of one or more computers, wherein the instructions for the display of the website content potentially contain malware;*

*access data contained in the second protected memory space, wherein the instructions potentially containing malware are capable of accessing the second protected memory space but are denied access to the first memory space; and*

*generate data for display of website content downloaded from the network of one or more computers;*

*wherein the portable computer based system is configured such that the at least one critical file residing on the first memory space is protected from corruption by the instructions for the display of website content potentially containing malware downloaded from the network and executing as part of the at least one second protected web browser process;*

*wherein the portable computer based system is configured such that the at least one second protected web browser process is initialized from clean system files.*

*54. The portable computer based system of claim 53 wherein the first web browser process is configured to directly exchange data with a network interface device and with the at least one second protected web browser process.*

*55. The portable computer based system of claim 54 wherein the first web browser process is configured to pass website content downloaded from the network to the at least one second protected web browser process.*

*56. The portable computer based system of claim 53 wherein the at least one second protected web browser process is configured to directly exchange data with a network interface device and with the first web browser process.*

*57. The portable computer based system of claim 53 wherein the instructions for the display of website content potentially containing malware comprise internet advertising.*

*58. The portable computer based system of claim 57 wherein the internet advertising contains digital content selected from the group consisting of:*

*graphical content;*

*multimedia content; and*

*video content.*

*59. The portable computer of claim 57 wherein the internet advertising is downloaded from a search engine website.*



*60. The portable computer based system of claim 53 wherein the data for display of website content is rendered using a video processor.*

*61. The portable computer based system of claim 53 further comprising:*

*closing the at least one second protected web browser process;*

*upon closing the at least one second protected web browser process, automatically deleting at least one file selected from the group consisting of:*

*a temporary internet file;*

*a cookie; and*

*a file corrupted by malware.*

*62. The portable computer based system of claim 53 further comprising the first web browser process opening a plurality of second protected web browser processes, wherein each of the plurality of second protected web browser processes comprises a separate protected memory space, and each of the plurality of second protected web browser processes are disallowed from initiating access to another one of the plurality of second protected web browser processes.*

*63. The portable computer based system of claim 53 further comprising:*

*executing instructions from the first web browser process on a first core of a multi-core processor; and*

*executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.*

*64. The portable computer based system of claim 53 wherein the at least one second protected web browser process is automatically reinitialized from clean system files following a malware infection.*

*65. The portable computer based system of claim 53 further comprising an intelligent cellular telephone with a built-in secure web browser.*

* * * * *

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type–volume limitation of Federal Circuit Rule 32(b). The brief contains 13,591 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

Dated: May 16, 2022. /s/Dan L. Bagatell

Dan L. Bagatell

## CERTIFICATE OF COMPLIANCE REGARDING CONFIDENTIAL MATERIAL

The body of this brief contains no confidential information. (The confidential information appears only in the addendum.) The brief thus complies with Fed. Cir. R. 25.1(d)(1).

Dated: May 16, 2022. /s/Dan L. Bagatell

Dan L. Bagatell

## Certificate of Authority

I certify that I have the authorization of my co-counsel Darin W. Snyder to file this brief with his electronic signature.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: May 16, 2022.

/s/Dan L. Bagatell
Dan L. Bagatell

## Certificate of Service

I certify that on this date I caused a copy of the confidential version of this brief to be sent by electronic means to Eric Benisek, counsel for appellees.

Dated: May 16, 2022.

/s/Dan L. Bagatell
Dan L. Bagatell