**Case No. 2018-1049**

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

ALFONSO CIOFFI, MELANIE ROZMAN,
MEGAN ROZMAN, MORGAN ROZMAN,
*Plaintiffs-Appellees*

v.

GOOGLE LLC,
*Defendant-Appellant*

*Appeal from the United States District Court for the Eastern District of Texas,*
*Case No. 2:13-cv-00103-JRG · Honorable J. Rodney Gilstrap, Chief Judge*

# RESPONSE BRIEF OF APPELLEES

WILLIAM E. DAVIS
THE DAVIS FIRM, PC
213 North Fredonia Street, Suite 230
Longview, Texas 75601
(903) 230-9090 Telephone
bdavis@davisfirm.com

ERIC W. BENISEK
ROBERT MCARTHUR
VASQUEZ BENISEK & LINDGREN LLP
1550 Parkside Drive, Suite 150
Walnut Creek, California 94596
(925) 627-4250 Telephone
ebenisek@vbllaw.com
mcarthur@vbllaw.com

*Attorneys for Plaintiffs and Appellees,*
*Alfonso Cioffi, Melanie Rozman, Megan Rozman and Morgan Rozman*

July 15, 2022

COUNSEL PRESS · (213) 680-2300 PRINTED ON RECYCLED PAPER

## PATENT CLAIMS AT ISSUE

**RE43,500 claim 43 (dependent from claims 41 and 42):**

41. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on a portable computer and communication device capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first memory space with at least one system file and a second memory space, the portable computer and communication device including a network interface device configured to exchange data across a network of one or more computers using a wireless connection, and an intelligent cellular telephone capability with a secure web browser including a first web browser process and a second web browser process, configured to:

open the first web browser process within the common operating system, wherein the first web browser process is capable of accessing data of a website via the network and accessing data contained in the first memory space;

open the second web browser process within the common operating system on command from the first web browser process, wherein the second web browser process is capable of accessing data contained in the second memory space and is further capable of generating data;

pass data from the first web browser process to the second web browser process; and

process data from the second web browser process;

wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

42. The computer program product of claim 41 wherein the first web browser process is capable of directly exchanging data with the network interface device and with the second web browser process.

43. The computer program product of claim 42 wherein the program code stored in the non-transitory computer readable medium is further configured to download data from the network and pass the downloaded data from the first web browser process to the second web browser process.

**RE43,528 claim 5 (dependent from claim 1):**

1. A method of operating a computer system capable of exchanging data across a network of one or more computers and having at least a first and second electronic data processor capable of executing instructions using a common operating system, comprising:

executing a first web browser process, capable of accessing data of a website via the network, in a first logical process within the common operating system using the

first electronic data processor, wherein the first logical process is capable of accessing data contained in a first memory space;

executing a second web browser process in a second logical process within the common operating system using the second electronic data processor, wherein the second logical process is capable of accessing data contained in the second memory space; and

displaying data from the first logical process and the second logical process, wherein a video processor is adapted to combine data from the first and second logical processes and transmit the combined data to a display;

wherein the computer system is configured such that the second electronic data processor is operating in a protected mode and data residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

5. The method of claim 1 wherein the first and second electronic data processors are part of a multi-core electronic data processor.

**RE43,528 claim 67 (dependent from claim 64):**

64. A computer program product comprising a program code stored in a non-transitory computer readable medium operable on computer capable of executing instructions using a common operating system and having at least one electronic data processor communicatively coupled to a first and second memory space and to a network interface device configured to exchange data across a network of one or more computers and access at least one website, configured to:

store at least one system file within the first memory space;

open a first web browser process, capable of accessing data of the at least one website via the network, in a first logical process, the first logical process being configured to access data contained in the first memory space;

open a second web browser process in a second logical process, the second logical process being configured to access data contained in the second memory space; and

pass data from the first web browser process to the second web browser process, wherein the at least one system file residing on the first memory space is protected from corruption by a malware process downloaded from the network and executing as part of the second web browser process.

67. The computer program product of claim 64 wherein the first web browser process is capable of directly exchanging data with the network interface device and the second web browser process or the second web browser process is capable of directly exchanging data with the network interface device and the first web browser process.

**RE43,529 claim 49 (dependent from claim 36):**

36. A method of operating a portable computer based system employing a common operating system and configured with a first memory space and a second protected memory space and at least one electronic data processor, comprising:

storing at least one system file within the first memory space;

downloading website content potentially containing malware from a network of one or more computers using a secure web browser process, wherein the secure web browser process is configured to execute on the at least one electronic data processor, and comprises a first web browser process and at least one second protected web browser process, the first web browser process and the at least one second protected web browser process being configured to access the website content via the network of one or more computers;

executing instructions in the first web browser process, wherein the first web browser process is configured to access data contained in the first memory space and to initialize the at least one second protected web browser process;

passing data from the first web browser process to the at least one second protected web browser process;

executing instructions in the at least one second protected web browser process, wherein the at least one second protected web browser process is configured to access data contained in the second protected memory space and to execute instructions from the downloaded website content, wherein the downloaded website content is capable of accessing the second protected memory space but is denied access to the first memory space;

displaying digital content generated by the secure web browser process;

wherein the secure web browser process is configured such that the at least one system file residing on the first memory space is protected from corruption by website content potentially containing malware downloaded from the network and executing as part of the at least one second protected web browser process.

49. The method of claim 36 further comprising:

executing instructions from the first web browser process on a first core of a multi-core processor, and

executing instructions from the at least one second protected web browser process on a second core of the multi-core processor.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2018-1049

**Short Case Caption** Cioffi v. Google LLC

**Filing Party/Entity** Plaintiffs-Appellees

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/15/2022

Signature: /s/ Eric W. Benisek

Name: Eric W. Benisek

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Alfonso Cioffi | | |
| Melanie Rozman | | |
| Morgan Rozman | | |
| Megan Rozman | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Christian Hurt | Davis Firm P.C. | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

STATEMENT OF RELATED CASES ..... v

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 4

I. The Inventors ..... 4

II. The Patents-In-Suit ..... 7

III. The Asserted Claims were amended from "logical processes" to claim "web browser processes" ..... 10

IV. Appellant and the Accused Product ..... 15

V. Claim Construction ..... 16

VI. Trial ..... 16

VII. Post-Trial ..... 17

VIII. Google's *Ex-Parte* Reexamination ..... 17

SUMMARY OF ARGUMENT ..... 19

ARGUMENT ..... 23

I. Standard of Review ..... 23

II. Google failed to prove with clear and convincing evidence that the Asserted Claims violate the "original patent rule" ..... 24

A. The original '247 Patent discloses "two web browser processes" ..... 24

1. Figure 6 and its discussion in column 14 of the specification clearly and unequivocally discloses two web browser processes ..... 25

2. Google cannot limit "interactive network process" and "P1" and "P2" in Figure 6 to "online gaming" ..... 27

3. Google's attack on the District Court's fact finding and use of expert testimony is unpersuasive ..... 30

B. The original '247 Patent discloses a first web browser process passing web data to a second web browser process ....37

C. The original '247 Patent discloses a first web browser process that can initialize a second web browser process ........41

III. Claims 43 and 67 do not violate the rule against recapture ................42

A. The Inventors did not violate step three of the rule against recapture ....................................................................44

B. The District Court's findings of fact........................................44

C. The Inventors' material narrowing of claims 43 and 67 was related to the surrendered subject matter...........................46

D. Claims 43 and 67 also avoid recapture because they are directed towards "overlooked aspects"....................................49

IV. The jury properly found infringement...............................................54

A. The jury rejected Google's expert argument that shared memory was necessarily part of the first memory space..........54

B. The jury properly found Google liable for indirect infringement ........................................................................59

1. Contributory infringement requires "knowledge" of the Patents-In-Suit ....................................................59

2. Substantial evidence support's Google's liability for inducement ..............................................................62

CONCLUSION ..........................................................................................65

CERTIFICATE OF COMPLIANCE......................................................................66

CERTIFICATE OF SERVICE .........................................................................67

## TABLE OF AUTHORITIES

### CASES

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) ....................59

*Advanced Ground Info. Sys. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016) ....................23

*Advanced Video Techs. LLC v. HTC Corp.*,
No. 11 Civ. 6604 (CM), 2013 U.S. Dist. LEXIS 161753
(S.D.N.Y. Nov. 7, 2013)....................30

*All Dental Prodx, LLC v. Advantage Dental Prod., Inc.*,
309 F.3d 774 (Fed. Cir. 2002) ....................28

*Capital Sec. Sys. v. NCR Corp.*,
725 Fed. Appx. 952 (Fed. Cir. 2018) ....................23

*Cioffi v. Google, Inc.*,
632 Fed. Appx. 1013 (Fed. Cir. 2015) .......... 16, 20, 25, 29, 31, 65

*Commil USA, LLC v. Cisco Sys.*,
135 S. Ct. 1920 (2015)....................59

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ....................59

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
909 F.3d 398 (Fed. Cir. 2018) ....................64

*Forum US, Inc. v. Flow Valve, LLC*,
926 F.3d 1346 (Fed. Cir. 2019) ....................3, 20, 23, 24, 32, 33

*Fromberg, Inc. v. Thornhill*,
35 F.2d 407 (5th Cir. 1963) ....................61, 62

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)....................62

*Hall v. GE Plastic Pac. PTE Ltd.*,
327 F.3d 391 (5th Cir. 2003) ....................64

*In re GE*,
789 Fed. Appx. 857 (Fed. Cir. 2019) ....................49, 50, 53

*In re Mostafazadeh*,
643 F.3d 1353 (Fed. Cir. 2011) ....................44

*In re Youman*,
679 F.3d 1335 (Fed. Cir. 2012) ....................................................44, 53

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017) ....................................................59

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)....................................................................63

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) ....................................................44

*Pannu v. Storz Instruments*,
258 F.3d 1366 (Fed. Cir. 2001) ....................................................48, 49

*PPG Indus. v. Guardian Indus. Corp.*,
156 F.3d 1351 (Fed. Cir. 1998) ....................................................59

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) ....................................................62

*Salazar v. Procter & Gamble Co.*,
414 F.3d 1342 (Fed. Cir. 2005) ....................................................19

*U.S. Indust. Chems. v. Carbide & Carbon Chems. Corp.*,
315 U.S. 668 (1942)....................................................................1

**STATUTES**

35 U.S.C. § 251 ..........................................................................6, 19, 20

## STATEMENT OF RELATED CASES

Counsel for Appellees is not aware of any related cases that are currently pending in this Court.

## INTRODUCTION

Alfonso Cioffi and Allen Rozman are the Inventors[1] of U.S. Patent No. 7,484,247 ("the '247 Patent") and the three reissue Patents-In-Suit.[2] Google argues that the reissue Patents-In-Suit violate the "original patent rule" for not disclosing two "web browser processes" and asks this Court to overrule the District Court's findings, invalidate the Patents-In-Suit and vacate the jury verdict. Google is wrong for a multitude of reasons.

The '247 Patent specification *clearly* and *unequivocally* discloses the use of two "web browser processes." The original patent rule is akin to written description but has a heightened disclosure requirement for broadening reissue claims: "It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original."[3] Google admits that two "web browser processes" are disclosed within the '247 Patent specification but relies on a simplistic word-matching argument that the specification does not use the exact words "web browser process, or accessing website data" and therefore does not comply with the original patent requirement.

[1] Rozman died in 2012 passing his one-half interest in the Patents-In-Suit to his three daughters, Melanie Rozman, Morgan Rozman and Megan Rozman. Rozman's daughters together with Cioffi are the "Plaintiffs."
[2] U.S. Patent No. RE43,500 (" the '500 Patent"), U.S. Patent No. RE43,528 ("the '528 Patent") and U.S. Patent No. RE43,529 ("the '529 Patent").
[3] *U.S. Indust. Chems. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 676 (1942).

This Court has long held that for disclosure purposes, it is not necessary to describe the claimed subject matter with the exact same terms as used in the claims. What counts is that Figure 6 of the ’247 Patent specification, and its accompanying disclosure in column 14, clearly describe to one of skill two processes capable of accessing website data. That is precisely what Figure 6 discloses with its overarching “interactive network process,” and two logical processes (P1 and P2) exchanging data from the network. That is also what the District Court found sitting as fact finder for the underlying questions of fact, and relying on intrinsic and extrinsic evidence.

In an attempt to counter the clear disclosure in Figure 6, its own admissions, and the District Court’s findings, Google raises several factual and legal arguments that all fail. First, Google tries to cabin the Figure 6 “interactive network process” embodiment arguing it is limited to “online gaming” despite the specification stating “online gaming” is just ***one example*** of an “interactive network process.” Next, Google invokes a form of prosecution history estoppel to suggest the Inventors disclaimed “web browser processes” as being part of the specification’s “interactive network process” when they distinguished “online gaming” prior art during prosecution of the Patents-In-Suit. Google’s argument is factually incorrect, but even assuming it was not, it is basic that one cannot waive written description support disclosed in the *specification* through arguments made in prosecution of

the *claims*. Finally, Google contends the District Court ran afoul of *Forum*[4] for its reliance on expert testimony in its fact finding. The District Court followed *Forum* to the letter relying on expert testimony to help determine what a person of ordinary skill in the art ("POSITA") would understand specific disclosures in the '247 Patent specification actually say. Indeed, to underscore the soundness of the District Court's findings, during reexamination of the Patents-In-Suit (which confirmed three of the four asserted claims with the fourth still subject to examination), the PTO found that Figure 6 discloses web browser processes through its "interactive network process" embodiment directly contradicting Google's arguments on appeal. Google's original patent arguments are deeply flawed and come nowhere close to meeting Google's burden of proving invalidity with clear and convincing evidence.

Google's second argument on appeal is that claim 43 of the '500 Patent and claim 67 of the '528 Patent are invalid for violating the rule against recapture. Google's argument fails because it mischaracterizes the scope of the surrendered subject matter to suit its argument. In its role as fact finder, the District Court rejected Google's mischaracterization of the surrendered subject matter which collapses the rest of Google's arguments. Additionally, the District Court properly

[4] *Forum US, Inc. v. Flow Valve, LLC*, 926 F.3d 1346, 1351-52 (Fed. Cir. 2019).

found that reissue claims 43 and 67 are directed to "overlooked aspects" which is a separate and distinct basis for overruling Google's recapture argument.

Finally, as back-up, Google argues that the Plaintiffs failed to prove direct and indirect infringement with substantial evidence. Google's entire non-infringement argument hinges on a fact dispute between the experts. Google's expert was not believed and substantial evidence supported the jury's underlying finding of infringement. Similarly, as to indirect infringement, the jury was provided substantial evidence showing Google's intent to induce and Google Chrome's total lack of substantial non-infringing uses, all of which provided sufficient evidentiary basis to support the jury's verdict.

The Court should affirm the judgment in all respects.

## STATEMENT OF THE CASE

### I. The Inventors.

Electrical engineers, Alfonso Cioffi and Alan Rozman were colleagues at Bell Laboratories and General Electric. Both were experts in the field of power electronics and systems architecture. Mr. Rozman is the named inventor on over 40 patents and was a registered patent agent. Appx4117. Cioffi and Rozman were also best friends, and lived a few houses away from each other in the town of Murphy, located in the Eastern District of Texas.

In the Spring of 2004, Cioffi's son was using Internet Explorer on the family computer to play a game over the Internet when he inadvertently downloaded malware from the Internet that crashed the computer. Appx4102-4103, Appx4125, Appx4150. Cioffi was forced to wipe and reformat the family's computer much to the dismay of his spouse who lost important files. Appx4102-4103, Appx4107-4108. Immediately after this event, Cioffi walked over to Rozman's house and they began discussing the shortcomings of anti-malware products. Appx4109. What they concluded was that the focus of anti-malware products on scanning and blocking were imperfect because these types of strategies were only good at stopping known malware. Appx4109-4110. What was needed was an additional strategy, a computer space in hardware or software (i.e., a "logical process" or "processor") where suspected malware could be directed to execute and reveal itself, but not gain access to other parts of the computer system or program. Appx4110-4113.

The Inventors divided the physical work of drafting their patent application with Cioffi drafting the specification and Rozman drafting the claims and prosecuting the application. Appx4117-4118. On August 7, 2004, the Inventors filed their patent application entitled "System and Method for Protecting a Computer System From Malicious Software." Appx10001. On January 27, 2009,

their patent application matured into U.S. Patent No. 7,484,247 (the "'247 Patent"). Appx89.

Within days of their patent issuing, a broker reached out to the Inventors and eventually made an unsolicited offer on behalf of Intellectual Ventures to purchase the patent for $100,000. Appx4127-4131. The Inventors turned down the offer, but the encounter spurred them over the next several months to research the marketplace and discover that many well-known technology companies were likely using their ideas. Appx4131-4133, Appx4136-4138.

Rather than sell the '247 Patent, the Inventors decided to pursue the reissue process (with the help of counsel this time) to claim additional embodiments they had missed in their original prosecution, including embodiments covering use of their invention on cellphones and with web browsers. Appx4146-4147, Appx4149-4151. Notwithstanding Google's insinuations to the contrary, the Inventors' decision to pursue reissue predated any knowledge of Google's Chrome browser and how it operated. Appx4131, Appx4136-4138, Appx4188-4189.[5] Approximately thirteen months after issuance of the '247 Patent, the Inventors timely surrendered the '247 Patent pursuant to 35 U.S.C. § 251, and pursued six separate reissue applications.

---

[5] The Inventors decided to pursue reissue in August 2009 but did not learn how Chrome operated in until October 2009.

Upon the successful prosecution of the reissue patents, the Inventors began pursuing efforts to raise venture capital to launch their prospective business. Appx4153-4154. Tragically, however, in 2012 Rozman died in a traffic accident. Appx4092, Appx4153-4154. Without his best friend and colleague of over 20 years, Cioffi abandoned their plans to form a business and pursued enforcement of the patents instead. *Id*.

## II. The Patents-In-Suit.

The Patents-In-Suit teach unique software architectures with various hardware configurations to protect computers from malware downloaded from the Internet. In 2004, the state of the art focused on scanning for malware and preventing malware from ever gaining access to the user's computer. Appx104 (col. 6:10-31). This was the type of malware prevention software used by Mr. Cioffi when malware downloaded from Internet Explorer crashed his family's home computer. Appx4102-4103, Appx4125, Appx4150. In contrast to scanning and prevention, the Inventors' idea was to assume malware would eventually gain access to the computer. Appx4110-4113. To limit its destructive effect, suspected malware should be directed to its own logical process where it can safely execute without harming the rest of the computer. Appx155 (col. 8:23-39). Figure 1 of the '528 patent (below) illustrates an embodiment where two processes are separated on to separate processors (or processing cores). Appx141. In particular, Figure 1

shows a first process executed within first processor 120, a second process executed within the second processor 140 that has access to its own expendable second memory space 130, and untrusted content downloaded from the Internet is executed in the second process running in 140 where it is unable to damage important files stored in the first memory space 110.




Fig. 1

Appx141 (Fig. 1).

In another embodiment, Figure 9 of the ’528 Patent shows two logical processes are separated logically on a single processor but achieve the same benefits:




Fig. 9

Appx150. The description of Figure 9 is in column 16 of the ’528 Patent specification, and teaches that the second logical process executing the malware downloaded from the Internet is prevented from writing to certain memory spaces or initiating access to other logical processes:

> Referring again to FIG. 9, ***the functions carried out by processors 920 and 940*** may comprise separate, ***secure logical processes*** executing on the same physical processor. For example, a first logical process may comprise executing instructions necessary to carry out the functions of an operating system, or the first logical process may comprise executing instructions necessary to carry out the functions of a first computer program, including but not limited to a word processor. ***A second logical process may comprise executing instructions necessary to carry out the functions of a web browser program***, or may comprise executing instructions necessary to carry out the functions of an instant messenger program, for example.

Appx159 (col. 16:10-22).

In column 16, the Inventors referred back to "computer system 100" introduced in Figure 1 and made clear that all the disclosed embodiments referring to "processor" P1 and "processor" P2 can be interchanged with a first and second "logical process" (instead of processor) to implement their same inventive concept:

> A computer system 100 constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M1 110 or another logical process performing the functions of P1 120.

Appx159 (col. 16:22-33).

## III. The Asserted Claims were amended from "logical processes" to claim "web browser processes."

The Inventors originally claimed in the '247 Patent an isolated first logical process and un-isolated second logical process, and added a second electronic data processor during prosecution to distinguish over U.S. Patent No. 6,192,477 ("Corthell"). Appx10146, Appx10153-10156. The purpose of the second electronic data processor was to provide further physical isolation between the first logical process and the network. Appx10153-10156. In contrast, during prosecution for the Patents-In-Suit, the Inventors amended the original claim terms "first logical

process" and "second logical process" to "first web browser process" and "second web browser process," respectively. Appx10626, Appx10629, Appx10631-10632, Appx11140, Appx11142-11143, Appx11143-11145, Appx11146-11147, Appx11148-11149, Appx11151-11152, Appx11154-11155, Appx11534-11535, Appx11537-11538, Appx11541-11542.

In the reissue applications for the Patents-In-Suit, the Inventors originally claimed first and second "browser processes" and by doing so, the Inventors claimed an un-isolated first process which was the key distinction over the original '247 Patent claims that claimed an isolated first process. Appx10717, Appx10719, Appx10721, Appx10724, Appx10727. The examiner rejected the claims over U.S. Patent Publication No. 2002/0002673 ("Narin") as anticipated and obvious because Narin disclosed two browser processes executing on a single processor. Appx10954-10972. The Inventors attempted to distinguish Narin by arguing that Narin's first browser process was isolated while theirs was not—meaning Narin's "first browser process" could not access website data. Appx11034-11039.

The examiner acknowledged the Inventors' argument that their "first browser process is a web process," but noted the *claims* did not specify the "claimed browsers are actually web browsers." Appx11078-11079. In response to the examiner's remarks, the Inventors amended the term "browser process" to "web browser process" and specified that the "first browser process" is "capable of

accessing data of a website via the network." Appx11140, Appx11142, Appx11144, Appx11146, Appx11149, Appx11151, Appx11155. By doing so, the Inventors made clear that their first web browser process was un-isolated because it could access website data. As a result, the reissue claims were allowed. Appx11194.

Notably the examiner never raised any objection under written description or original patent with respect to the Inventors claiming two web browser processes. This is because the Inventors' first and second web browser process embodiment was clearly disclosed in Figure 6 of the original '247 Patent specification. Figure 6 shown below introduces the Inventors' "Interactive Network Process" embodiment:




Fig. 6

Appx97.

The ’247 Patent specification identified “gaming, messaging and browsing” as examples of interactive applications or interactive network processes that are the subject matter of the invention. Appx104 (col. 6:14-18). Figure 6 illustrates “a preferred embodiment of an exemplary interactive network process flow according to the principles of the present invention.” Appx106 (col. 9:3-6). The detailed

description of Figure 6 makes clear that this particular embodiment discloses a first process (P1) that can be isolated, or un-isolated:

> In accordance with a preferred embodiment of the present invention, an exemplary process flow 600, illustrated in FIG. 6, allows an interactive network process, such as online gaming, to be carried out on computer system 100. A user initiates an interactive network process via 2nd processor P2 140 (step 610). ***P2 140 receives interactive network process status data from network connection (step 620).*** P2 140 informs 1st processor P1 120 that interactive network process status data is available (step 630). ***P1 120 retrieves interactive network process status data from P2 140 and uses the status data to update the interactive network process and update video display (step 640). P1 120 then passes the updated interactive network process status data to P2 140 (step 650).*** P2 140 then sends the updated interactive network process status data to the network via network connection 195 (step 660).

Appx108 (col. 14:28-42).

As clearly disclosed above, "interactive network process status data" is passed from P2 to P1 demonstrating in this embodiment that P1 is un-isolated from the network because it has access to network status data.[6] However, later in the same column, the Inventors teach that this embodiment may be modified to make P1 "isolated" and therefore more secure:

> Additionally, computer system 100 could be configured such that system 130-140 is powerful enough to process the interactive network process ***without exchanging information with the 110-120 system***. ***Such a configuration may be more secure, as a conduit between the 110-120 system and the 130-140 system may not be necessarily***

[6] The '247 Patent specification defines "network" (item 105) as including "the Internet, a LAN, WAN, VPN, etc." Appx106 (col. 10:14-16).

> ***opened***. The 130-140 system may contain all the necessary files to facilitate the interactive network process.

Appx108 (col. 14:55-62).

The Inventors teach that the Figure 6 "interactive network process" embodiment may use an un-isolated P1 to exchange network data (which is what the Inventors claimed in the Patents-In-Suit), but as noted immediately above, the "interactive network process" embodiment can be made even more secure by isolating P1 from the network (the subject matter of the '247 Patent and other reissue patents not at issue in this case).[7]

## IV. Appellant and the Accused Product.

Google launched the Chrome browser in the fall of 2008. Appx4518-4519. Google's Chrome browser is separated into multiple processes including a "browser kernel" and one or more "rendering engines." Appx4249, Appx4259-4261. Chrome's "rendering engines" are the processes designated for handling the execution of potentially malicious code. Appx4259-4261. Chrome's multi-process security architecture was the basis for the Inventors asserting infringement against Google's browser.

[7] In its Opening Brief, Google makes that statement that "using two web browser processes rather than one was antithetical to the originally claimed invention, which sought to isolate the first processor from outside networks." OB at 3. This is flat wrong. The foregoing section of the specification plainly discloses the use of an isolated, and un-isolated, first process.

## V. Claim Construction.

On August 28, 2014, the District Court issued its claim construction order. The order construed the term "web browser process" to mean a "process that can access data on websites" that must have "direct" access capability not requiring use of another web browser process. Appx2519-2520. On December 9, 2014, Plaintiffs appealed and this Court reversed, finding that a web browser process was not limited to "direct access capability" but could also access website data indirectly through another web browser process. *Cioffi v. Google, Inc.*, 632 Fed. Appx. 1013, 1021-22, 1023-24 (Fed. Cir. 2015). The Court's claim construction ruling is extremely relevant for considering Google's original patent arguments because the term "web browser process" is defined as a process capable of accessing website data either directly or indirectly. The '247 Patent specification does not use the precise words first and second "web browser processes," but it clearly discloses two processes capable of accessing website data either directly or indirectly—meaning it discloses two web browser processes without using the exact words in the specification.

## VI. Trial.

On February 6, 2017, the District Court commenced a one-week jury trial. Plaintiffs sought approximately $26 million in royalties. Appx4506. Plaintiffs' damages expert explained on cross-examination that his damages opinions, and

thus the verdict, are independently supported by each of the Patents-In-Suit. Appx4425. Google asserted a host of defenses and claimed damages were less than $1 million in royalties. Appx5266-5267. On February 10, 2017, the jury found infringement of all the asserted claims and awarded Plaintiffs twenty million dollars in royalties. Appx3921.

## VII. Post-Trial.

On April 7, 2017, Google moved for judgment as a matter of law ("JMOL") and for a new trial. Appx5291, Appx5343. On March 29, 2018, the District Court vacated the final judgment in view of Google's argument that Google's section 251 defenses (recapture and original patent) should be decided by the District Court, and not the jury. Appx5631. On April 30, 2018 the parties filed their competing proposed findings of fact and conclusions of law. Appx5669, Appx5741.

## VIII. Google's *Ex-Parte* Reexamination.

In June 2017, four months after the verdict, Google filed three separate requests for *ex-parte* reexamination targeting the Patents-In-Suit. The PTO has confirmed three of the claims while the fourth remains in examination. Appx11851, Appx5868, Appx6163.

Plaintiffs notified the District Court of the reexamination results because the PTO's examiner's analysis of the reissue patents' specification was informative with respect to Google's original patent argument pending before the District

Court. In particular, in analyzing the common specification for claim construction purposes, the PTO examiner independently recognized Figure 6 as disclosing a web browser process with a first and second logical process:

> In the embodiment of FIG. 6, "P1" and "P2" are the first and second processors 120 and 140, not first and second web browser processes. Id. at column 14, line 31-36. Still, with reference to the embodiment of FIG. 9, the specification discloses that "the functions carried out by P2 140 . . may comprise a secure logical process" and discloses "another logical process performing the functions of P1 120." Id. at column 16, lines 39-43. ***Thus, in light of the embodiment of FIG. 9, the first and second processors in the process flow 600 of FIG 6 could represent first and second "logical processes." If the process flow 600 were implemented in software, then the process flow 600 could represent software for an "interactive network process" that includes first and second "logical processes." And if the "the interactive network process" were a "web browser process," then the process flow 600 could represent software for a notional "web browser process" that includes first and second "logical processes."***

Appx6167, Appx6240. The PTO's findings are consistent with the District Court's finding that a POSITA would recognize Figure 6 and column 14 as clearly disclosing an interactive network process that could be a web browser with its own first and second web browser processes. The PTO's interpretation directly contradicts Google's arguments on appeal that P1 and P2 of Figure 6 are limited to *physical processors* and cannot be interpreted as software processes. The PTO later reiterated this position in front of the PTAB stating:

> "The examiner found that FIG. 6 of the '247 patent, which illustrates 'an **exemplary process** flow 600' between first and second processors 120 ("Pl") and 140 ("P2") that allows an interactive network process, such as online gaming, to be carried out on computer system 100,'

> ***when interpreted in light of FIG. 9, for which the specification discloses 'the functions carried out by P2 140 ... may comprise a secure logical process' and discloses 'another logical process performing the functions of Pl 120,' could represent software for an 'interactive network process' comprising first and second logical processes***."

Appx6167 (n.2), Appx6249.

As discussed below, while the District Court did not rely on the PTO examiner's consistent findings with respect to Figure 6, this Court has recognized that an examiner's findings can be informative as to what a POSITA would understand interpreting disclosures in the specification.[8]

## SUMMARY OF ARGUMENT

**Original Patent**. The asserted claims of the Patents-In-Suit all satisfy the original patent requirement under 35 U.S.C. § 251. Google's main argument is that the '247 Patent specification does not disclose the use of two "web browser processes." This argument fails. The intrinsic and extrinsic record shows that the original '247 Patent specifications discloses the use of two "web browser processes" in its Figure 6 "interactive network process" embodiment. Relying on both the intrinsic record, and the expert testimony from the parties, the District Court properly found that a POSITA would view the Figure 6 embodiment as

[8] *See, e.g., Salazar v. Procter & Gamble Co*., 414 F.3d 1342, 1347, 2005 (Fed. Cir. 2005)(stating "[s]tatements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed.").

disclosing two processes "capable of accessing website data"—the Court's precise definition of a "web browser process." *Cioffi*, 632 Fed. Appx. at 1021-22, 1023-24. Google's disclaimer argument and argument that the District Court should not have relied on expert testimony is incorrect under the law. The District Court closely followed this Court's direction in *Forum* by relying on expert testimony to help determine what the express disclosures in the '247 Patent specification actually says, not to find the disclosures in the first instance. *Forum*, 926 F.3d at 1351-52. There was no clear error by the District Court in finding the Figure 6 "interactive network process" embodiment discloses the use of two web browser processes, just as the examiner found in the Reexaminations.

**Recapture**. Asserted claims 43 and 67 of the Patents-In-Suit do not violate the rule against recapture under 35 U.S.C. § 251. Claims 43 and 67 were narrowed in scope relative to the original claims of the '247 Patent in a way directly related to the surrendered subject matter (step three of the recapture test). Google's recapture argument fails because it mischaracterizes the surrendered subject matter to suit its argument. The District Court, acting as fact finder and relying on the intrinsic and extrinsic record, properly found that "***the surrendered subject matter was not merely a single-processor embodiment, but also the first process being isolated from the network and the second process not being isolated***." Appx43 (FF112) (emphasis added)). This finding is fatal to Google's argument. The '247

Patent claims were directed to isolation of a first logical process where the reissue claims are directed toward a first logical process without isolation (i.e., a first "web browser process"). The result is that claims 43 and 67 were materially narrowed with respect to the surrendered subject matter (i.e., a single processor executing a first, isolated logical process and a second, un-isolated logical process), and therefore do not violate the rule against recapture.

Asserted claims 43 and 67 also do not violate the rule against recapture for a separate, independent reason: they are directed to "overlooked aspects" of the original '247 Patent claims. Because claims 43 and 67 claim disclosed embodiments not covered by the original '247 Patent claims, they are considered "overlooked" and therefore not subject to the rule against recapture. Google argues the District Court erred in finding claims 43 and 67 were not covered by the original '247 Patent claims, but Google's argument is undone by the District Court's fact findings which are largely based on the testimony of Google's experts.

**Direct Infringement**. The jury's verdict of direct infringement is supported by substantial evidence. The dispute here was squarely between the experts who disagreed which memory areas of the computer system represented Chrome's first memory space. To put a finer point on it, the experts disagreed on whether a tiny piece of shared memory between the first and second web browser processes was located in Chrome's first memory space or second memory space. The jury, as fact

finder, rejected Google's argument that the shared memory was necessarily part of the first memory space. On direct and re-direct, Dr. Rubin identified Chrome's two browser processes and their distinct memory spaces using Google's own documents. Google's expert disagreed, but the jury found his testimony unpersuasive. There is no argument the District Court's claim construction was incorrect, or that Dr. Rubin strayed from the Court's construction.

**Indirect Infringement**. The jury's verdict of indirect infringement for claims 5 of the '528 Patent and 49 of the '529 Patent is supported by substantial evidence. The jury found that Google indirectly infringed claims 5 and 49 under theories of contributory infringement and induced infringement, and as a result, the Court need not reach the question of induced infringement if it affirms contributory infringement. Both theories where supported with substantial, unrebutted evidence that Google had knowledge of the Patents-In-Suit, architected Chrome to infringe upon opening, marketed the infringing feature of Chrome and discouraged users from ever using Chrome's sole non-infringing mode. Moreover, Plaintiffs came forward with overwhelming evidence that Chrome lacked any substantial non-infringing use. Google's last-ditch argument is to point to the District Court's early claim construction (eventually reversed by this Court) and argue that for the period of time the District Court's claim construction order was in effect, Google had no

intent to induce infringement as a matter of law. Google, however, intentionally excluded this evidence from the trial record and now cannot exploit it on appeal.

## ARGUMENT

### I. Standard of Review.

Plaintiffs agree that this Court's consideration of Google's section 251 defenses (original patent and recapture) is a question of law reviewed *de novo*. "The legal conclusion regarding § 251 compliance, however, can involve underlying questions of fact." *Forum*, 926 F.3d at 1351-52. This Court reviews underlying findings of fact for "clear error." *See Advanced Ground Info. Sys. v. Life360, Inc*., 830 F.3d 1341, 1346-1347 (Fed. Cir. 2016) (stating "if the district court makes underlying findings of fact based on extrinsic evidence, such findings are reviewed for clear error. 'Clear error only exists if we are left with a definite and firm conviction that a mistake has been committed.'") (internal citations omitted) (claim construction); *see also Capital Sec. Sys. v. NCR Corp*., 725 Fed. Appx. 952, 956 (Fed. Cir. 2018).

Plaintiffs agree that questions of infringement are reviewed under the substantial evidence standard.

## II. Google failed to prove with clear and convincing evidence that the Asserted Claims violate the "original patent rule."

### A. The original '247 Patent discloses "two web browser processes."

The specification discusses the use of web browsers in various embodiments of the invention but does not use the specific claim term "web browser process." Instead, the broader term "interactive network process" which on its face plainly encompasses a "web browser process" is disclosed. Applying this Court's precedent in *Forum*, the District Court found that a POSITA would view Figure 6 and its disclosure of "interactive network process" with P1 and P2 exchanging network status data clearly and unequivocally discloses the use of two web browser processes. The District Court followed this Court's direction under *Forum* where the experts for both parties testified as to a POSITA's understanding of the Figure 6 disclosure, and the terms "interactive network process" and "logical process." Acting as fact finder for purposes of determining what the '247 Patent's specification actually says, the District Court relied in part on the testimony of the parties' experts to find that the specification clearly and unequivocally discloses use of two "web browser processes." In particular, the District Court credited the testimony of Professor Dunsmore who explained that P1 and P2 of Figure 6 disclose the use of two processes both capable of accessing website data, which by this Court's definition discloses two web browser processes.

1. Figure 6 and its discussion in column 14 of the specification clearly and unequivocally discloses two web browser processes.

The term "web browser process" was defined by this Court to mean a "process that can access data on websites" either directly or indirectly. *Cioffi*, 632 Fed. Appx. at 1021-22. Google complains that the specification does not disclose the specific term "web browser process" or the use of "two web browser processes" together. Opening Brief ("OB") at 31-34. In particular, Google argues that the specification only discloses the use of two processes, where only one has access to website data. OB at 32. This is incorrect. As the District Court found, the use of two web browser processes, that is, the use of two processes that can access data on websites either directly or indirectly, is clearly and unequivocally disclosed in Figure 6 and its accompanying description in column 14 of the '247 Patent. Appx15-23, Appx47-54.

Figure 6, shown below, discloses an "interactive network process" with use of P1 and P2 where "interactive network process status data" is obtained from the "network" and passed back and forth between P1 and P2.




Appx97.

As described in the specification, P1 and P2 refer to physical processors but also "logical processes" which can be substituted for physical processors. Column 16 of the specification explains that the functions carried out by processors P1 and P2 introduced in Figure 1 of the specification can also be carried out by "logical processes." Appx109 (col. 16:39-43) ("For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M1 110 or another logical process performing the functions of P1 120."). Accordingly, when interpreting the

disclosure of P1 and P2 throughout the specification, it is proper to view P1 and P2 as "logical processes" capable of carrying out the same functions of physical processors.[9]

Once P1 and P2 of Figure 6 are understood to encompass logical processes or physical processors, it is clear and unequivocal that Figure 6 discloses the use of two web browser processes. This is because P1 and P2 are each processes that can access data on websites, which is the definition of a web browser process. P2 receives "interactive network process status data" from the network and passes the data to P1. Appx108 (col. 14:33-39). P1 updates the network data and passes it back. Appx108 (col. 14:39-40). Professor Dunsmore explained that a POSITA interpreting Figure 6 would understand that it discloses use of two web browser processes. Appx5045.

2. Google cannot limit "interactive network process" and "P1" and "P2" in Figure 6 to "online gaming."

Google argues unpersuasively that Figure 6 fails to adequately disclose the use of two web browser processes. OB at 31-34. Google's first argument is that Figure 6 does not mention "web browsing, a web browser process, or accessing

---

[9] Indeed, the "Summary of Invention" refers almost exclusively to use of a first and second "logical process" (instead of first and second physical processors) with access to first and second memory spaces. Appx105 (col. 7:65-8:26). This is also exactly how the PTO interpreted the specification in reexamination. Appx6167-6168.

website data" and should be limited to "online gaming" and "game status data." Google's second argument is that the District Court improperly relied on expert testimony to find that Figure 6 and its accompanying disclosure clearly disclosed two web browser processes. Both arguments fail.

Google first argues simplistically that Figure 6 and its accompanying disclosure in column 14 never mentions "a web browser process, or accessing website data." OB at 32. This Court has long held that for disclosure purposes, it is not necessary to describe the claimed subject matter with the exact same terms as used in the claims. *See All Dental Prodx, LLC v. Advantage Dental Prod., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002) ("In order to comply with the written description requirement, the specification 'need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to a POSITA that as of the [filing] date the applicant had invented what is now claimed.'"). What is important is that Figure 6 and its accompanying disclosure clearly describe two processes capable of accessing website data. That is precisely what Figure 6 discloses with its overarching "interactive network process," and two logical processes (P1 and P2) exchanging data from the network.

Google tries to limit the terms (1) "interactive network process" to "online gaming" and (2) "interactive network status data" to "game status data." OB at 32. Figure 6 is not so limited. Figure 6 discloses the broader term "interactive network

process" which on its face encompasses a web browser process and other known types of programs in 2004 that interacted with the Internet. Column 14 describes the "interactive network process" flow of Figure 6 and notes that "interactive" or "online" "gaming" is ***one example*** of an "interactive network process." Appx108 (col. 14:3, 14:28-31). The specification explicitly does not limit "interactive network processes" to online gaming. Moreover, as noted above, P1 and P2 in Figure 6 and its accompanying description, disclose two processes both with access to website data—i.e., web browser processes.

Google next confuses things by erroneously suggesting the District Court cannot rely on Figure 6 disclosing two web browser processes because of alleged disclaimer arguments made by the Inventors in prosecution of the Patents-In-Suit. OB at 32-33. Google's confusing argument is that the Inventors' distinguished Narin as an online game compared to their two web browser processes therefore the Inventors cannot rely on that portion of the specification that discloses online games as also disclosing two web browser processes. *Id*. This disclaimer argument is flawed on many levels.

First, as this Court already found, the applicants distinguished Narin because Narin's secure process could not access website data "**at all**." *See Cioffi*, 632 Fed. Appx. at 1020. The Inventors' distinguishing argument had nothing to do with online gaming. Second, even if this were the case, distinguishing the claimed "web

browser process" from online gaming does not somehow mean P1 and P2 of Figure 6 and column 14 fail to disclose two web browser processes. Finally, as a basic legal principal, one cannot waive support of written description based on arguments made in prosecution. *Advanced Video Techs. LLC v. HTC Corp*., No. 11 Civ. 6604 (CM), 2013 U.S. Dist. LEXIS 161753, *14 (S.D.N.Y. Nov. 7, 2013) (stating "[w]hat a particular claim term means and whether it has written description support are two separate inquiries.").

3. Google's attack on the District Court's fact finding and use of expert testimony is unpersuasive.

Google first criticizes the District Court for recognizing that the '247 Patent specification "explains that prior art solutions 'could significantly slow or preclude the ***interactive nature of many applications such as*** gaming, messaging, and ***browsing.***'" Appx22 (FF46). The statement shows that the invention seeks to improve upon the prior art security solutions by not slowing down or precluding the interactive nature of many applications such as browsing. The disclosure shows that web browsing is clearly within the scope and definition of "interactive applications" and thus the "interactive network process" disclosed in Figure 6. Google argues the statement distinguishes gaming from browsing and messaging, which is true, but that argument misses the point. OB at 35-36. All three applications may be different, but they are all "interactive applications" within the definition of the "interactive network process" disclosed in Figure 6.

Google next criticizes the District Court for recognizing that the ’247 Patent specification “interactive network process” embodiment describes P1 120 connecting to the “network” which is defined as the “Internet, a LAN, WAN, VPN, etc.” OB at 36. Google argues that Figure 6 and column 14 only describe P2 connecting to the network, and only exchanging with P2. This argument ignores the Court’s prior claim construction decision which expressly found that access to website data can be direct or indirect. *See Cioffi*, 632 Fed. Appx. at 1021-22, 1023. Accordingly, P1 being passed “interactive network status data” from P2 **is** connecting to the network indirectly through P2. Moreover, P1 and P2, which are introduced initially with Figure 1, clearly show in Figure 1 that P1 can connect to the network either directly via communication link 191, or indirectly through P2:




Fig. 1

Appx91. Whether P1 120 connects directly to the network via communication link 191 or indirectly through P2 140, both are ways for P1 to connect with the

network. Accordingly, Google's assertion that P1 is not connected to the "network" is without merit.

Google's third complaint is the District Court improperly relied on expert testimony to find that a POSITA would recognize that two web browser processes are disclosed in Figure 6 and column 14. As instructed in *Forum*, this is precisely the type of situation where the District Court can consider expert testimony for purposes of understanding terms of art in the specification and whether they disclosed two web browser processes. In *Forum*, the only disclosure in the specification supporting the expert's opinion was the general statement that "it will be understood that numerous changes may be made which will readily suggest themselves to those skilled in the art which are encompassed within the spirit of the invention disclosed." *Forum*, 926 F.3d at 1352. (internal quotations omitted). This Court found the expert declaration unhelpful because it did not aid the Court in understanding what the specification actually says, but rather explains what a POSITA would understand in the absence of an "arbor-less" disclosure. *See id*.

Unlike *Forum*, here the District Court analyzed clear and specific disclosures in the specifications:

> Instead of relying on a POSITA's understanding that "modifications to the invention are possible," Plaintiffs identify specific portions of the '247 Patent specification corresponding to each challenged limitation and provide expert testimony explaining what such disclosures convey to a person of ordinary skill in the art. Simply put, the parties' disputes here focus on whether such as skilled person

> would understand such portions of the ’247 Patent specification as clearly and unequivocally disclosing the asserted claims.

Appx52 (CL24). Specifically, as set forth above, Figure 6 and column 14 disclose two “web browser processes” through disclosure of the “interactive network process” embodiment and the exchanging of “interactive network process status data” between P1 and P2, and the network. Professor Dunsmore testified that a POSITA would understand the Figure 6 “interactive network process” embodiment as disclosing two processes that can access website data, and therefore unequivocally discloses two “web browser processes” as defined by this Court. Appx5044-5045, Appx52 (CL25). The District Court properly followed *Forum* by relying on expert testimony in its fact finding effort to determine what the disclosures in the ’247 Patent specification actually say.

Google’s fourth critique is similar to the above complaint that the District Court improperly relied on expert testimony to interpret the term “logical processes.” This time, however, Google tries to undo the admissions of its two invalidity experts at trial. In addition to the “interactive network process” embodiment disclosed in Figure 6, the specification discloses the broader term “logical process” throughout. For example, the summary of the invention states:

> It is another object of the present invention to provide a computer system capable of executing instructions in a ***first logical process***, wherein the ***first logical process*** is capable of accessing data contained in a first memory space and a second memory space.

> * * * * *
>
> It is another object of the present invention to provide a computer system configured such that a malware program downloaded from the network and executing as part of the ***second logical process*** is incapable of initiating access to the first memory space.

Appx105 (col. 7:63-67, 8:14-18) (emphasis added). Similarly, Column 16 of the specification discloses:

> A computer system 100 constructed in accordance with the principles of the present invention would be capable of disallowing a ***secure logical process***, such as the ***second logical process*** described above, access to certain memory spaces, and/or disallowing a ***secure logical process*** from initiating access to another ***logical process***.

Appx109 (col. 16:34-40) (emphasis added).

In advancing various invalidity arguments, Google's trial counsel and experts conceded that the term "web browser process" is a sub-species of "logical processes" disclosed throughout the specification. Appx5305 (arguing "by broadly reciting 'logical processes,' the originally filed '247 Patent claims indisputably encompassed web browser processes, including a first web browser process") and Appx5305 (arguing that "[c]hanging the originally filed claims of the '247 Patent to recite a 'first web browser process' requires revising only one term, 'first logical process,' to a 'first web browser process.' This change is minor given that a 'web browser process' is a type of 'logical process.'"). Google's invalidity expert, Dr. Arbaugh, called "logical processes" and "web browser processes" the same thing. Appx4780-4781.

Professor Dunsmore for the Plaintiffs similarly agreed that a “web browser process” is an obvious sub-species of a “logical process.” Appx5047. Professor Dunsmore went further, however, and explained that P1 and P2 of Figure 6 disclose two processes both capable of accessing website data which clearly and unequivocally disclosed two “web browser processes.” Appx5044-5045.

The District Court presented with this record noted that Google and its experts were advancing contradictory positions. For purposes of the original patent, Google argued the specification’s disclosure of a first “logical process” was not specific enough and that “logical processes” could refer to a number of different software processes besides “web browser processes” Appx53 (CL27). However, for purposes of invalidity under sections 102, 103 and 251 for improper recapture, Google argued that the patents’ “first logical process” includes a process that “could ‘access website data,’” which is the precise definition of a “web browser process.” Appx53 (CL27). The District Court reached the reasonable conclusion that “[i]f a person of ordinary skill would recognize that the ’247 Patent specification’s disclosure of a ‘first logical process’ encompasses a ‘web browser process,’ then narrowing the disclosed ‘logical process’ to directly claim a known subspecies (i.e., the ‘web browser process’ of the asserted claims) is clearly and unequivocally within the scope of the original invention disclosed in the ’247 Patent specification.” Appx53 (CL27).

Google tries to unwind its experts' admissions by arguing their statements are not actually contradictory. OB at 37-39. Google reasons that because original patent and "overlooked aspects" are different inquires, its experts' statements that "logical processes" and "web browser processes" are the same thing should not be given weight. OB at 38-39. This reasoning is flawed for several reasons.

First, the term "logical process" appears throughout the '247 Patent *specification*, in the *original claims* of the'247 Patent *application*, and in the claims of the '247 Patent *as issued*. Google argues the'247 Patent specification fails to disclose two web browser processes, but at the same time argues two web browser processes were claimed within the scope of the original '247 Patent application because that application's claims disclosed use of a first and second logical process. Those are the same two logical processes that appear throughout the specification and in the issued claims for the '247 Patent. It stretches credibility to suggest expert opinions as to the scope and meaning of the term "logical process" for improper recapture can be divorced from consideration of the scope and meaning of ***the exact same term*** for original patent. Second, Google is wrong in suggesting its experts' contradictory opinions were only given for improper recapture. Google's invalidity expert, Dr. Arbaugh, testified that "logical processes" are the same thing as "web browser processes" as part of his section 102 and 103 invalidity opinion.

In summary, the District Court's findings of fact were not clearly erroneous. Based on these findings, the District Court reached the proper conclusion that Google failed to prove by clear and convincing evidence that the '247 Patent specification failed to clearly and unequivocally disclose two web browser processes.

### B. The original '247 Patent discloses a first web browser process passing web data to a second web browser process

Once the Court finds Figure 6 and column 14 disclose two web browser processes, the rest of Google's original patent arguments are easily rejected. Google's second original patent argument is that even assuming the '247 Patent specification discloses two web browser processes, it fails to disclose the two web browser processes ***passing website data***. This argument hinges on two sub-arguments: First, Google argues that "interactive network process status data" disclosed in Figure 6 and column 14 does not clearly and unequivocally describe "website data." Second, Google argues that P1 and P2 described in Figure 6 and column 14 refers to physical processors only, and not "processes." OB at 40. Both arguments are wrong.

Figure 6 and column 14 disclose the passing of "interactive network status data" which on its face encompasses website data. As the specification notes (and the District Court recognized), "interactive" "applications" include "gaming, messaging, and ***browsing.***'" Appx22 (FF46). Both P1 and P2 are connected to the

"network" (item 195) which the specification discloses as including the "Internet, a LAN, WAN, VPN, etc." Appx106 (col. 10:14-16). The specification further notes that a "network interface program" is "a browser, for example." Appx104 (col. 6:56-58). Google argues that the Figure 6 "interactive network process" embodiment is limited to "interactive gaming" and "game status data," and therefore fails to disclose the passing of ***website data***. OB at 40. As discussed above, the applicants made clear that online gaming was ***one example*** of an "interactive network process." Column 14 refers specifically to passing "interactive network process status data" between P1 and P2, which is broader than "game status data," and obtained from the "network," which expressly includes the "Internet." It should be no surprise that a POSITA would recognize Figure 6 and column 14 as clearly disclosing two "web browser processes" passing website data. Appx5044-5045.

Google's second sub-argument attempts to limit the P1 and P2 disclosures in Figure 6 to *physical processors*. Essentially, Google contends that the '247 Patent is only a hardware invention. *See*, *e.g*., OB at 6 (arguing the "'247 patent accordingly disclosed a hardware-based security architecture"). Cioffi explained that all the figures in the '247 Patent specification specifically refer to P1and P2 as physical processors, but they also by definition refer to the first logical process, P1, and the second logical process, P2. Appx4161-4162. The '247 Patent specification

confirms this by teaching that the invention covers execution of the Inventors' security solution through hardware and software. For example, the '247 Patent specification in the Summary of Invention discloses implementing the Inventors' security solution using a first and second "logical process" where "a malware program downloaded from the network and ***executing as part of the second logical process*** is incapable of initiating access to the first memory space." Appx105 (col. 8:14-18). Below this disclosure and still in the Summary of Invention is the identical disclosure but this time referring to physical processors instead of logical processes:

> wherein the computer system is configured such that a malware program downloaded from the network and ***executing on the second electronic data processor*** is incapable of initiating access to the first memory space.

Appx105 (col. 8:44-48). Accordingly, the '247 Patent specification clearly discloses implementation of the security architecture using both physical processors and logical processes. After this clear disclosure, the description of the "illustrated embodiments" introduces the item 120 in Figure 1 as "first processor 120 (**P1**)" and item 140 as "second processor 140 (**P2**)." Appx106 (col.9:38, 10:31). After this initial first disclosure, item 120 and 140 are then described in each of the subsequent embodiments, including Figure 6, as first and second physical processors. However, in column 16, the '247 Patent specification discloses that the functions of the *two processors* may be carried out by "separate,

secure *logical processes* executing on the same physical processor." Appx109 (col. 16:22-24). The disclosure continues:

> A computer system 100 constructed in accordance with the principles of the present invention would be capable of disallowing a secure logical process, such as the second logical process described above, access to certain memory spaces, and/or disallowing a secure logical process from initiating access to another logical process. For example, the functions carried out by P2 140 (FIG. 1) may comprise a secure logical process, which may be configured to be unable to automatically initiate access to either M1 110 or another logical process performing the functions of P1 120.

Appx109 (col. 16:34-43). The above disclosure makes clear that P1 120 and P2 140 that were previously described in the '247 Patent specification as first and second ***processors*** may be substituted for first and second logical ***processes*** which is exactly what is disclosed in the Summary of the Invention.[10] This interpretation was corroborated by Professor Dunsmore at trial (Appx5044-5045), and the PTO examiner during Google's failed reexamination attempt (Appx6167-6168).

In summary, both of Google's sub-arguments fail. As correctly decided by the District Court, the '247 Patent specification clearly and unequivocally discloses two web browser processes passing website data and Google has failed to meet its burden of clear and convincing evidence to show otherwise.

---

[10] Notably at trial Google's experts argued that P1 and P2 described in column 14 refer back to elements 120 and 140 of Figure 1. *See, e.g.*, Appx5309, Appx4858.

### C. The original ’247 Patent discloses a first web browser process that can initialize a second web browser process.

Once the Court finds Figure 6 and column 14 disclose two web browser processes, Google’s third original patent argument can be easily rejected.

Google argues the District Court improperly relied on the numerous disclosures of P1 opening or initiating P2 because P1 and P2 referred to “*processors*,” and not “*processes*.” OB at 40. As the District Court observed, the ’247 Patent specification describes in several instances P1 opening or initiating P2. Appx33-34 (FF81-83). For example, Figure 2 of the ’247 Patent describes “(P1)” instructing “(P2)” to initiate a “protected process” and open one (1) or more process windows (step 220). Appx92. The discussion of Figure 2 discloses the user launching of a “protected process” such as Internet Explorer or Netscape Navigator. The user inputs commands to launch the overall program. Appx107 (col. 11:2-4). The ’247 Patent specification goes on to describe the “1st processor 120” (P1) instructing the “2nd processor 140” (P2) to initiate the protected process and open one or more process windows and that the protected process may be “browsing the internet.” Appx107 (col. 11:4-11).

Similarly, Figure 10 discloses “(P1) instruct[ing] 2nd processor (P2) to initiate protected process and open process window.” Appx101. The ’247 Patent specification then describes Figure 10 as disclosing “P1 120 instruct[ing] processor P2 140 to initiate a protected process and open a process window.” Appx110 (col.

17:16-18). When it is understood that P1 and P2 also refer to "logical processes" and not just processors (as established above), it is plain that the specification discloses in multiple places a first web browser process (P1) capable of initializing a second web browser process (P2). Moreover, the experts for the parties agreed that the disclosed logical processes in the '247 Patent specification included "web browser processes." Appx4780-4781, Appx5047, Appx18 (FF37). Google fails to meet its burden of clear and convincing evidence that the '247 Patent specification does not clearly and unequivocally disclose a "first web browser process initializing a second web browser process."

In sum, Google fails to prove with clear and convincing evidence that any of the challenged limitations of the Patents-In-Suit violate the original patent requirement of section 251.

## III. Claims 43 and 67 do not violate the rule against recapture.

Claims 43 of the '500 Patent and 67 of the '528 Patent do not violate the rule against recapture because they were materially narrowed in a way directly related to previously surrendered subject matter. Google's improper recapture argument fails because it is based entirely on the mischaracterization of the original surrendered subject matter. The District Court made the factual finding based on extrinsic evidence that the surrendered subject matter during the original prosecution of the '247 Patent was not simply a single processor embodiment. The

District Court found that "***the surrendered subject matter was not merely a single-processor embodiment, but also the first process being isolated from the network and the second process not being isolated***." Appx43 (FF112) (emphasis added)). Once properly framed, it is clear that the Inventors did not violate the rule against recapture because claims 43 and 67 were materially narrowed during reissue in a way directly related to the originally surrendered subject matter.

As background, there have been six reissue prosecutions off of the original '247 Patent, leading to five reissued patents and another pending patent before the PTO. In those prosecutions, the PTO challenged the reissue claims for improper recapture on two occasions. Appx10824-10826, Appx11361-11362. In both instances, the PTO withdrew the recapture rejections in response to the Inventors' explanatory remarks. Appx10914-10915.

Following withdrawal of its recapture rejection, the PTO issued new rejections of all of the asserted claims in light of Narin for disclosing two "browser processes." Appx10462-10474, Appx1787-1805, Appx11366-11367, Appx11374-11375. The Inventors traversed Narin by amended the term "browser process" to "web browser process" and specified that the "first browser process" is "capable of accessing data of a website via the network." Appx11140, Appx11146, Appx11157-11158, Appx11192.

### A. The Inventors did not violate step three of the rule against recapture.

The parties disagree whether claims 43 and 67 violate step three of the recapture test. Step three considers "whether the reissue claims were materially narrowed in other respects, so that the claims may not have been enlarged, and hence avoid the recapture rule." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1349 (Fed. Cir. 2005). The rule against recapture is not violated where "the reissue claims 'materially narrow' the claims relative to the original claims such that full or substantial recapture of the subject matter surrendered during prosecution is avoided." *In re Mostafazadeh*, 643 F.3d 1353, 1361 (Fed. Cir. 2011); *see also In re Youman*, 679 F.3d 1335, 1347 (Fed. Cir. 2012).

### B. The District Court's findings of fact.

The District Court rejected Google's argument that the surrendered subject matter in its totality was the "single-processor embodiment" and instead found "the surrendered subject matter was not merely a single-processor embodiment, ***but also the first process being isolated from the network and the second process not being isolated***." Appx43 (FF112). This was based in part on the testimony of Professor Dunsmore and co-inventor, Alfonso Cioffi, who both explained that the second physical processor was added during the prosecution of the '247 Patent to distinguish Corthell by providing physical isolation of the first logical process from

exposure to the network (*i.e.*, the second logical process was moved to its own physical processor with access to the network). Appx40-43. Professor Dunsmore further explained that what the Inventors were surrendering was a single processor embodiment where the first logical process was isolated from the network, but the second logical process was not. Appx5048, Appx5049-5050. The District Court's finding of fact was also based on its own review of the prosecution history which showed "in order for the '247 Patent to issue, the Inventors added the second processor limitation—which added physical isolation of the first logical process—to distinguish the isolated and non-isolated processes of Corthell . . . ." Appx40 (FF101); *see also* Appx39 (FF99) ("To distinguish Corthell, the Inventors argued that adding a "second electronic data processor" provides "physical isolation" between the first and second logical processes"). The above record shows the District Court was well supported in finding that the surrendered subject matter was more than just a single processor embodiment, but actually included single processor embodiment where the first process is physically isolated from the network and the second process is not isolated.

The District Court further found that the Inventors' narrowing of the reissue claims from two "logical processes" in the original '247 Patent claims to two "web browser processes" in the reissue claims was a "material narrowing" of the reissue claim relative to the original claims. Appx42-43. By narrowing the reissue claims

from “logical processes” to “web browser processes” the Inventors excluded all other types of processes. Appx42-43.

Finally, the District Court found that material narrowing of the reissue claims to “web browser processes” related to the surrendered subject matter of a single-processor embodiment where the first process is isolated from the network and the second process is not. Appx40-41, Appx42-43. Although the reissue claims were “recapturing” use of the single processor embodiment, they were not recapturing a single-processor embodiment where the first process is isolated from the network and the second process is not isolated. Instead, the reissue claims only cover a single-processor embodiment where both processes were un-isolated from the network because both “logical processes” are now “web browser processes.” Appx40-41 (“Since the first logical process in the reissued Asserted patents was now a “browser process” with access to the network (i.e., non-isolated), there was no longer a need for the physical isolation from the network afforded by the previously claimed the second electronic data processor.”)).

### C. The Inventors’ material narrowing of claims 43 and 67 was related to the surrendered subject matter.

The District Court properly found Google failed to prove by clear and convincing evidence that claims 43 and 67 violated the rule against recapture. It was undisputed that claims 43 and 67 were narrowed in scope to a first and second “web browser process.” Appx68 (CL77). Moreover, the District Court had already

found that the surrendered subject matter was a single processor embodiment executing a first, isolated logical process and a second, un-isolated logical process. As the District Court observed, independent claim 1 of the original ’247 Patent claims was directed to an isolated first logical process and un-isolated second logical process executing on a single processor. When the Inventors added the second processor to physically isolate the first processor and traverse Corthell, they gave up the single-processor embodiment with an isolated first logical process and un-isolated second logical process (i.e., the surrendered subject matter). In the reissues, the Inventors’ claimed a single processor embodiment again, but this time both processes were amended to “web browser processes” which meant removal of isolation from the first process. With the original second electronic data processor added to provide physical isolation between the first logical process and the network to traverse Corthell, it made sense that the second electronic data processor was no longer needed for isolation with the reissue claims because the first logical process was now a “web browser process” and no longer isolated. On this record, the District Court properly concluded that “Claim 43 of the ’500 Patent and Claim 67 of the ’528 Patent are materially narrowed with respect to the surrendered subject matter (i.e., a single processor executing a first, isolated logical process and a second, unisolated logical process).” Appx70 (CL84).

Google's main argument regarding step three of the recapture test is based on the position that the surrendered subject matter was "all single processor embodiments of the original claims." As noted above, the District Court's findings of fact rejected this notion by specifically finding that the surrendered subject matter was a single processor embodiment with an isolated first logical process and un-isolated second logical process. As an alternative, Google tries to argue that even if the Inventors' narrowing had "some" relation to the surrendered subject matter, it was not sufficient under this Court's precedent to avoid recapture. The cases cited by Google are inapposite, especially considering Google's argument refuses to apply the surrendered subject matter as found by the District Court.

For example, Google cites *Pannu v. Storz Instruments*, 258 F.3d 1366 (Fed. Cir. 2001) as foreclosing narrowing amendments that are insufficiently related to the original surrendered subject matter. *Pannu* is not helpful because the narrowing amendments in *Pannu* did not relate at all to the surrendered subject matter. In *Pannu*, the surrendered subject matter was the "shape of the haptics" but the narrowing amendments in reissue had nothing to do with shape of the haptics. As the Court properly held, "the issued claims were not narrowed in any material respect compared with their broadening." *Pannu*, 258 F.3d at 1372. Unlike *Pannu*, the reissue claims were narrowed in a material respect compared to their broadening because they claim a single processor embodiment with two un-

isolated processes compared to the original surrendered subject matter of a single processor embodiment with an isolated first logical process and un-isolated second logical process.

Similarly, Google cites *In re GE*, 789 Fed. Appx. 857 (Fed. Cir. 2019), in support of its position that the Inventors' material narrowing is not sufficiently related to overcome recapture. Like *Pannu*, the narrowing amendment by GE did not relate at all to the surrendered subject matter. GE argued that step three of the recapture test was not met because the "surrendered subject matter related generally to the positioning of the synthetic jet assembly rather that specifically to attachment" but this Court disagreed. This Court found that "the Board correctly determined that the surrendered subject matter was an unattached jet assembly" and therefore the narrowing amendments as to positioning of the jet assembly were not related to the surrendered subject matter ***at all***.

In summary, the District Court properly found that Google failed to prove by clear and convincing evidence that asserted claims 43 and 67 violated step three of the rule against recapture.

### D. Claims 43 and 67 also avoid recapture because they are directed towards "overlooked aspects."

The District Court also properly found that claims 43 and 67 did not violate the rule against recapture, for the separate and independent reason that the claims were directed to "overlooked aspects" of the original '247 Patent.

As the Court most recently stated in *In re GE*:

> The recapture rule does not apply to reissue claims directed to 'overlooked aspects' such as 'additional *inventions/embodiments/species* not originally claimed.' Overlooked aspects, however, are not merely incidental features of the originally claimed invention. Rather, they are distinct elements which 'were never claimed and thus never surrendered.'

789 Fed. Appx. at 860 (internal quotation omitted).

The District Court made several key findings of fact that form the basis of its conclusion that Google failed to meet its burden of clear and convincing evidence that claims 43 and 67 were not directed to "overlooked aspects" of the '247 Patent. In particular, the District Court found that reissue claims 43 and 67 were directed towards a different invention than the original claims of the '247 Patent. Appx36-37 (FF92). The District Court made this finding based in part because: (1) the originally filed claims of the '247 Patent claimed a "first and second logical process where only the second logical process had access to the network" where reissue claims 43 and 67 claim two "web browser processes" which "by definition [means] ***both*** processes require access to the network." Appx35 (FF86, FF87); (2) Google's experts made admissions at trial that the original '247 Patent claims required a second processor to isolate the system, and that the reissue claims disclose a different invention than what was claimed in the original '247 Patent. *Id*. (FF88); and (3) the District Court found various arguments made by Google related to its "original patent" defense were concessions that the reissue claims are

directed towards a different invention than the original ’247 Patent. Appx36-37 (FF92).

Based on the District Court’s finding that claims 43 and 67 were directed towards a different invention than the claims of the ’247 Patent, and the fact that Google failed to proffer any evidence that claims 43 and 67 were not patently distinct over the ’247 Patent claims, the District Court properly found that Google failed to prove by clear and convincing evidence that claims 43 and 67 were not directed to overlooked aspects.

On appeal, Google raises four arguments why the District Court’s decision on overlooked aspects should be overturned. None have merit. First, Google rehashes its “original patent” argument that the ’247 Patent specification fails to disclose the “two web browser process” claim limitation and therefore cannot be considered “overlooked.” As found by the District Court, and discussed herein, the ’247 Patent specification properly discloses two web browser processes.

Second, Google flip-flops and now argues claims 43 and 67 are actually disclosed within the original ’247 Patent claims and therefore cannot be considered “overlooked.” Notwithstanding Google’s inconsistent position, the question is straight forward: do the original claims of the’247 Patent application disclose the limitations of reissue claims 43 and 67. If they do not, then the Inventors

"overlooked" claims 43 and 67 as they were outside the scope of the very first proposed claims.

As the District Court found, the original claims of the '247 Patent application did not disclose an un-isolated first process that is found in claims 43 and 67. Analyzing the intrinsic and extrinsic record, the District Court found that a "first and second 'web browser process,' though disclosed in the '247 Patent specification, [was] not originally claimed by the '247 Patent." Appx62 (CL59). In reaching this finding, the District Court relied in large part on Google's own admissions. For example, Google argued at trial that "the invention disclosed in the reissue patents is entirely different from the one disclosed in the original '247 Patent . . . . [The] first logical process ran on the first processor and a second logical process ran on the second processor, and only the second process . . . was a network-interface program or browser." Appx62 (CL58), Appx3913-3914. Moreover, Google's expert's argued (a) that the '247 Patent required a second processor to isolate the computer system from the network and (b) that the reissue claims disclosed a different invention from the original '247 Patent. Appx61-62 (CL56), Appx4825-4826, Appx4927. Finally, in the District Court's own assessment of the '247 Patent, the court found that "the essence of the invention claimed in the '247 Patent was isolation—only the second logical process could access the network; the rest of the system could not." In sum, the District Court's

finding was well supported that "first and second 'web browser process,' though disclosed in the '247 Patent specification, were not originally claimed by the '247 Patent."

Google's third argument is a misguided attempt to create a new rule with respect to considering simultaneously step three of the rule against recapture along with overlooked aspects. According to Google, a materially narrowing amendment that relates to the surrendered subject matter (a situation that would avoid improper recapture under step three) can never be an overlooked aspect of the original patent claims because the new claims must be "wholly unrelated" to and "patently distinct" from what was claimed previously. OB at 52. The two tests are not so linked. All that is required is that the reissue claims are directed to "distinct elements which 'were never claimed and thus never surrendered.'" *In re GE*, 789 Fed. Appx. at 860 (quoting *In re Youman*, 679 F.3d at 1347). Here, the assessment is straight forward: Claims 43 and 67 claim two web browser processes—i.e., two un-isolated processes—in a single processor embodiment. As found by the District Court, the original patent claims of the '247 Patent claimed two logical processes—the first <u>isolated</u> and the second un-isolated—in a single processor embodiment. Claims 43 and 67 are directed to "distinct elements" (an un-isolated first process in single processor embodiment) that were never claimed and therefore never surrendered. Accordingly, claims 43 and 67 are properly construed

as being directed at "overlooked aspects" of the original '247 Patent and therefore do not trigger the rule against recapture in the first place.

Google has failed to prove with clear and convincing evidence that claims 43 and 67 violate the rule against recapture.

## IV. The jury properly found infringement.

### A. The jury rejected Google's expert argument that shared memory was necessarily part of the first memory space.

At trial, the parties agreed on the District Court's definition of first memory space and second memory space, but disagreed whether the Chrome Browser disclosed a claimed first memory space and second memory space. The jury believed Plaintiffs' expert, Dr. Rubin, who is a professor at the Johns Hopkins University Whiting School of Engineering and Technical Director of the JHU Information Security Institute. Dr. Rubin explained to the jury how Chrome satisfies the asserted claims, using Google's marketing materials and engineering articles to identify where the "first memory space" and the "second protected memory space" are found in Chrome. Appx4253-4255; Appx11855, Appx11856-11860, Appx11880-11883; Appx11900-11901, Appx11902-11905; Appx11911-11912. Dr. Rubin then showed the "first memory space" was accessible by only Chrome's browser process (the first web browser process) and further showed Chrome's renderer process (the second web browser process) "has its own [second] protected memory space that's distinct." Appx4253, Appx11880-11882.

Dr. Rubin showed the jury with Google's documents that "the first memory space in Chrome is that part of the file system and that part of the memory of the browser process that's not accessible to the renderer processes." Appx4254-4255, Appx11900-11901, Appx11902-11905; Appx11911-11912.

Google's non-infringement defense theory at trial, and repeated here on appeal, was that following start-up, Chrome allowed its browser process and renderer process (the claimed first and second web browser processes respectively) to ***share*** a portion of memory to communicate and therefore could not infringe because the asserted claims required "distinct" memory spaces. Dr. Kogan, Google's paid consultant and serial defense expert for Google (Appx4914-4917), pointed to memory shared by Chrome's first and second web browser processes and declared Chrome cannot infringe because in his view this shared memory meant Chrome's first and second memory spaces must be overlapping. Appx4866, Appx4867-4879.

The problem with Google's argument is that the Patents-In-Suit specifically contemplated the first web browser process sharing memory with the second web browser process. In particular, '247 Patent specification teaches the first web browser process is capable of accessing data contained in *a first memory space* **and** *second memory space*, but the second web browser process is only capable of accessing data contained in the second memory space. *See, e.g.*, Appx105 (col.

7:63-67) ("It is another object of the present invention . . . where in the first logical process is capable of accessing data contained in the first memory space and a second memory space."), and (col. 8:15-18) ("It is another object of the present invention . . . [that a] malware program downloaded from the network and executing as part of the second logical process is incapable of initiating access to the first memory space."). Accordingly, the first and second web browser processes of the Patents-In-Suit can share memory ***in the second memory space*** where both web browser processes have access.

Google's expert, Dr. Kogan, argued to the jury that the shared memory between Chrome's render process and browser process was part of Chrome's first memory space. However, Dr. Rubin explained to the jury that Dr. Kogan was simply line-drawing by trying to place Chrome's shared memory within the first memory space. Dr. Rubin identified the "first memory space as being the hard disk and that portion of the browser process memory that cannot be accessed by the rendering process." Appx5134-5136. To make the experts' conflicting understanding of Chrome's first and second memory spaces clearer for the jury, Dr. Rubin edited Dr. Kogan's demonstratives directly comparing how each expert identified Chrome's first and second memory spaces. Appx5136-5140, Appx5144-

5145, Appx5148-5149, Appx5153-5154.

| Kogan Direct - Slide 17 (Demonstrative illustrating Chrome) | Rubin Rebuttal Video At 0:07 (Demonstrative illustrating Rubin's theory) |
|---|---|
|  |  |





Appx5363, Appx5402-5403.

The experts agreed on the meaning of the claim terms first and second memory space as construed by the District Court, ***but disagreed on which memory areas of the computer system comprised Chrome's first and second memory spaces***. Dr. Rubin's infringement analysis focused on whether a particular memory area was accessible by both web browser processes during the entire operation of Chrome, and if the memory area was accessible by both browser processes, then such memory area was part of the second memory space. This was precisely the issue the jury resolved when it credited Dr. Rubin's testimony over Dr. Kogan's testimony, and rejected Google's argument that the shared memory was necessarily part of the first memory space.

The District Court found this to be "a classic battle of the experts, and the jury, not the Court, is the appropriate body to make the credibility determinations necessary to resolve conflicting testimony." Appx78-79. The District Court properly recognized that Plaintiffs proved infringement with substantial evidence, noting Dr. Rubin, using Google's own documents, identified Chrome's two web browser processes each having their own distinct memory spaces (as required by the Court's claim construction). Appx79-80.

In its opening brief, Google tries to reframe the question of infringement as one of claim construction: "Simply put, the claimed invention requires that once memory is allocated to the 'first memory space' (i.e., is accessible only to the 'first web browser process'), that memory must remain off-limits to the 'second web browser process.'" OB at 59. This argument relies on a major false assumption; it assumes that the claims require memory allocated to the first browser process (at any time) to be automatically part of the first memory space. The claims and the specification contain no such limitation and/or requirement. Indeed, as discussed above, the specification clearly teaches that memory allocated to the first web browser process can be part of the *first or second* memory space. This Court has long held that once the trial court "has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim

reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus. Corp*., 156 F.3d 1351, 1355 (Fed. Cir. 1998); *see also Acumed LLC v. Stryker Corp*., 483 F.3d 800, 806 (Fed. Cir. 2007) ("The resolution of some line-drawing problems—especially easy ones like this one—is properly left to the trier of fact."). Google's attempt at further claim construction should be rejected, and was waived in any event for failure to raise it at the District Court. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006). The jury's verdict is easily supported by substantial evidence.

### B. The jury properly found Google liable for indirect infringement.

The jury found Google liable for indirect infringement of claim 5 of the '528 Patent and claim 49 of the '529 Patent under theories of induced infringement and contributory infringement. Substantial evidence supports the jury's verdict under both theories.

#### 1. Contributory infringement requires "knowledge" of the Patents-In-Suit.

Under Federal Circuit law, contributory infringement requires "only proof of a defendant's knowledge, ***not intent***, that his activity cause infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1381, 2017 (Fed. Cir. 2017) (emphasis added); *see also Commil USA, LLC v. Cisco Sys.*, 135 S. Ct. 1920, 1927 (2015) ("[C]ontributory infringement requires knowledge of the patent in suit and

knowledge of patent infringement.”). Plaintiffs easily met their burden of substantial evidence.

It was undisputed that Google knew of the Patents-in-Suit at least as of December 11, 2012, prior to filing of the lawsuit. Appx5225. Plaintiffs’ expert, Dr. Rubin, testified uncontradicted that the Chrome browser has no substantial non-infringing uses, and that Google discouraged users from running Chrome in a non-infringing manner (*e.g.*, in single-process mode). Appx4290. For example, Dr Rubin explained that once Chrome is fully opened and displays its first page all the elements of the asserted claims are met. Appx4290. While Chrome maintains a non-infringing single process mode, only computer experts with knowledge of how to do a “command line switch” can access this non-infringing mode. Moreover, Google specifically ***discouraged*** users to make use of this non-infringing testing mode because Google believed it was not a safe or robust architecture. Appx4290. On appeal, Google complains that Dr. Rubin did not identify the document that “discouraged” end-users from using Chrome in a non-infringing manner, but the document was shown the jury during his direct exam and admitted into evidence.




Appx11897 (Google's Chrome web blog for developers), Appx4570 (listing PTX105 as admitted). As the Court can see, Google's claimed "substantial non-infringing use" was for "testing and development purposes" only.

Finally, Dr. Rubin pointed out that Google touted the infringing security feature of Chrome as a primary basis for end-users to use Chrome in the first place. Appx4290-4291. On cross-exam Dr. Rubin agreed that Chrome could be used "off-line" to access locally stored files (Appx5149-5150) but not surprisingly Google did not follow-up this line of questioning with evidence *that even a single user* uses the Chrome ***web browser*** in such a non-infringing manner.

In sum, Google designed Chrome to infringe at first use and actually discouraged use of the web browser's non-infringing mode. "The presence or absence of the element of substantial non-infringing use is significant principally in determining whether there is an intention to infringe" and here the unrebutted evidence was there were no substantial non-infringing uses of Chrome. *Fromberg,*

*Inc. v. Thornhill*, 35 F.2d 407, 414 (5th Cir. 1963); *see also Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1343 (Fed. Cir. 2008) (stating "*Grokster* recognized that providing instruction on how to engage in an infringing use 'show[s] an affirmative intent that the product be used to infringe.'"). The District Court properly found that Plaintiffs presented substantial evidence that Google is liable for contributory infringement.

2. Substantial evidence support's Google's liability for inducement.

Plaintiffs satisfied this "specific intent" requirement for inducement by showing that Google took "affirmative steps to bring about the desired result" through it advertisements and instructions to users to operate Chrome in an infringing manner. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011). Dr. Rubin identified three ways in which Google encouraged its end users to infringe the asserted claims: "Chrome is configured to infringe on opening. Google discourages non-infringing single process mode, and … Google markets the infringing feature." Appx4290. Dr. Rubin explained to the jury that by default, Chrome operates in an infringing manner, and that Google's own documents discourage operating Chrome in a non-infringing, single-process configuration, because it is neither safe nor robust. Appx4290-4291. Dr. Rubin also pointed to Google's video and blog as evidence that Google markets Chrome's multi-process

sandbox configuration—the invention feature claimed in the Patents-In-Suit. Appx4290-4291 (identifying PTX-91 and PTX-135).

Dr. Rubin's testimony and evidence allowed the jury to construct the required intentionality out of evidence that Google deliberately exploits the potential for Chrome to be used in infringement. *MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 931-37 (2005) (noting a party may be held liable for induced infringement on the basis of evidence that the defendant advertised the infringing feature of the product or tied its revenue to infringing uses). Accordingly, substantial evidence supports the jury's finding of Google's "specific intent" to induce infringement by its customers.

Google tries to argue that as a matter of law it could not have been liable for induced infringement before November 17, 2015 because that is when this Court reversed the District Court's initial claim construction. Assuming for the sake of argument that this evidence could have been relevant to Google's defense against inducement, it was Google's strategic decision to **not** introduce this evidence into the trial record.[11] Presumably Google wanted to avoid being seen by the fact-finder

[11] Appx11829-11830, § IV.C.2 ("Agreed MILs Proposed By Defendant) at ¶ 51 (Filed Under Seal). As shown in the "Proposed Joint Pretrial Order" Google sought to *in limine* from the trial proceeding "evidence, testimony, argument, or reference relating to any decisions on claim construction, including the Court's August 28, 2014 Claim Construction Order or the Federal Circuit's November 17, 2015 opinion, or the parties' claim construction positions."

as taking a losing claim construction position on appeal which would have made its continued infringement through trial look even more deliberate. But now Google cannot have it both ways – on the one hand excluding evidence that its primary claim construction position was erroneous, and thus avoid any negative inference by the jury, but now on the other hand seeking to use the evidence as dispositive of its "intent" prior to November 17, 2015. Google's mental state is a quintessential question of fact that was weighted by the jury (*Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018)) and Google could have introduced this evidence at trial explaining its good faith belief that it was not knowingly encouraging infringement. By waiting until after the jury verdict, Google has waived it opportunity to rely on such evidence and should also be barred by judicial estoppel.[12]

At a minimum, Plaintiffs are prejudiced by losing the opportunity to cross examine Google's corporate representative as to the company's "reasonable belief" of noninfringement given this Court's reversal of the underlying claim construction

---

[12] "Judicial estoppel 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.'" *Hall v. GE Plastic Pac. PTE Ltd*., 327 F.3d 391, 396 (5th Cir. 2003). Google took the position pretrial that this Court's opinion reversing the District Court's claim construction should be excluded as evidence of its mental state at trial. Appx11829-11830, § IV.C.2 ("Agreed MILs Proposed By Defendant) at ¶ 5 (Filed Under Seal). This was not inadvertent, but a strategic decision made by Google at the time which it now seeks to undo.

finding was a not a close call. *Cioffi v. Google, Inc.*, 632 Fed. Appx. 1013, 1014 (Fed. Cir. 2017) (unanimous reversal). It would be highly prejudicial to Plaintiffs at this stage of the proceeding to suddenly give weight to this evidence Google specifically chose to exclude at trial. Accordingly, the Court should reject Google's belated, and waived, attempt to rely on the District Court's temporarily erroneous claim construction order as evidence supporting its defense to active inducement. As set forth above, substantial evidence supports the jury's finding of Google's "specific intent" to induce infringement by its customers.

## CONCLUSION

In summary, Plaintiffs respectfully request the Court overrule all of Google's arguments and affirm the judgment in full.

Dated: July 15, 2022

Respectfully submitted,

VASQUEZ BENISEK & LINDGREN LLP

/s/ Eric W. Benisek

Eric W. Benisek
Robert McArthur

— and —

THE DAVIS FIRM, PC

William E. Davis

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2018-1049

**Short Case Caption:** Cioffi v. Google LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,997 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 07/15/2022

Signature: /s/ Eric W. Benisek

Name: Eric W. Benisek

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Eric W. Benisek
Eric W. Benisek